C.D. Michel-SBN 144258
Anna M. Barvir-SBN 268728
Tiffany D. Cheuvront-SBN 317144
MICHEL & ASSOCIATES, P.C.
180 East Ocean Blvd., Suite 200
Long Beach, CA 90802
Telephone: (562) 216-4444
Fax: (562) 216-4445
Email: cmichel@michellawyers.com

Attorneys for Plaintiffs B&L Productions, Inc., Barry Bardack, Ronald J. Diaz, Sr.,
John Dupree, Christopher Irick, Robert Solis, Lawrence Michael Walsh, Captain
Jon's Lockers, LLC, L.A.X. Firing Range, Inc., California Rifle & Pistol
Association, Incorporated, and South Bay Rod and Gun Club, Inc.

Donald Kilmer-SBN 179986
Law Offices of Donald Kilmer, APC
14085 Silver Ridge Road
Caldwell, Idaho 83607
Telephone: (408) 264-8489
Email: Don@DKLawOffice.com

Attorney for Plaintiff Second Amendment Foundation

# IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| B&L PRODUCTIONS, INC., d/b/a CROSSROADS OF THE WEST; BARRY BARDACK; RONALD J. DIAZ, SR.; JOHN DUPREE; CHRISTOPHER IRICK; ROBERT SOLIS; LAWRENCE MICHAEL WALSH; CAPTAIN JON'S LOCKERS, LLC; L.A.X. FIRING RANGE, INC., d/b/a LAX AMMO; CALIFORNIA RIFLE & PISTOL ASSOCIATION, INCORPORATED; SOUTH BAY ROD AND GUN CLUB, INC.; and SECOND AMENDMENT FOUNDATION, <br><br> Plaintiffs, <br><br> v. <br><br> GAVIN NEWSOM, in his official capacity as Governor of the State of California and in his personal capacity; ROBERT BONTA, in his official capacity as Attorney General of the State of California and in his personal capacity; KAREN ROSS, in her | CASE NO:  '21CV1718 AJB KSC <br><br> **COMPLAINT FOR MONETARY, DECLARATORY & INJUNCTIVE RELIEF; DEMAND FOR JURY TRIAL** <br><br> **(1) VIOLATION OF 42 U.S.C. § 1983 [FREE SPEECH - POLITICAL];** <br><br> **(2) VIOLATION OF 42 U.S.C. § 1983 [FREE SPEECH-MIXED POLITICAL/ COMMERCIAL];** <br><br> **(3) VIOLATION OF 42 U.S.C. § 1983 [FREE SPEECH-COMMERCIAL];** <br><br> **(4) VIOLATION OF 42 U.S.C. § 1983 [PRIOR RESTRAINT ON SPEECH];** <br><br> **(5) VIOLATION OF 42 U.S.C. § 1983 [RIGHT TO ASSEMBLY];** <br><br> **(6)  VIOLATION OF 42 U.S.C. § 1983 [EQUAL PROTECTION];** |

1

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

| | |
|---|---|
| 1 | official capacity as Secretary of California Department of Food & Agriculture and in his personal capacity; STEPHAN SUMMER, in his official capacity as District Attorney of San Diego County; THOMAS MONTGOMERY, in his official capacity as County Counsel of San Diego County; 22nd DISTRICT AGRICULTURAL ASSOCIATION; DOES 1-50; | **(7) INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE;** |
| 2 | | |
| 3 | | **(8) NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE;** |
| 4 | | |
| 5 | | **(9) INTENTIONAL INTERFERENCE WITH CONTRACT.** |
| 6 | | |
| 7 | Defendants. | **DEMAND FOR JURY TRIAL** |
| 8 | | **NOTICE OF UNCONSTITUTIONALITY OF STATE STATUTE** |
| 9 | | |
| 10 | | **NOTICE OF RELATED CASE** |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

2

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

# INTRODUCTION

1.      Plaintiff B & L PRODUCTIONS, INC., d/b/a CROSSROADS OF THE WEST has operated popular, safe, heavily regulated, legal and family-friendly gun shows as a business in California for over 30 years, including at the Del Mar Fairgrounds.

2.      Crossroads produces gun shows at the Fairgrounds where like-minded individuals gather to engage in commerce related to, and necessary for, the lawful and regulated exercise of Second Amendment rights for themselves, their exhibitors, their patrons, their customers, and the general public. This safe and regulated marketplace promotes public safety, even for people who do not attend gun shows because it will tend to reduce the unregulated transfer of firearms within San Diego County. Furthermore, by providing a convenient forum for Californians to exercise their right to acquire firearms locally, gun shows at the Fairgrounds will have the tendency to discourage the sale and importation of firearms from other states with less strict gun laws than California.

3.      Plaintiffs Barry Bardack, Ronald J. Diaz, Sr., John Dupree, Christopher Irick, Robert Solis, Lawrence Michael Walsh, Captain Jon's Lockers, LLC, L.A.X Firing Range, d/b/a LAX Ammo, California Rifle & Pistol Association, Incorporated, South Bay Rod and Gun Club, Inc., and Second Amendment Foundation, Inc., attend and participate in the Crossroads gun show to engage in First Amendment activities that are both necessary and essential to the open, robust, and lawful exercise of their Second Amendment rights.

4.      At the gun show, Plaintiffs associate with like-minded people, participate in public discussions, attend informational forums, distribute and collect information, make offers for sale, make offers to buy, and engage in legal and political discussions related to the Second Amendment, which are all forms of speech protected by the First Amendment. Discussions include, but are not limited to, firearms and ammunition, firearm technology, firearm safety, and firearm law

3

1  and politics. Participants also exchange information about where to hunt and where

2  to practice shooting, where and from whom to receive training, gunsmithing, gun

3  repair, gun art, and many other topics that arise from the right to acquire, own,

4  possess, enjoy, and celebrate arms as a quintessentially American artifact with

5  constitutional significance.

6      5.      Defendants are government actors who, through the adoption and

7  enforcement of Assembly Bill 893, codified at California Food & Agricultural Code

8  section 4158,[1] which prohibits the sale of firearms and ammunition at the

9  Fairgrounds with the intention and effect of shuttering gun show events altogether,

10  have engaged in and will continue to engage in action that violates Plaintiffs'

11  constitutional rights to free speech, assembly, and equal protection. Their actions

12  also constitute prior restraint.

13      6.      What's more, the conduct of Defendants Newsom, Bonta, Ross, and the

14  22nd District Agricultural Association also constitutes intentional and/or negligent

15  interference with the prospective economic advantage of Plaintiffs Crossroads,

16  Walsh, LAX Ammo, CRPA, and SAF, as well as intentional interference with

17  Plaintiff Crossroads' contracts.

18      7.      This action seeks declaratory and injunctive relief against Defendants

19  for violating the United States Constitution. It also seeks damages for lost profits,

20  lost opportunities, and diminished marketing value, and reimbursement for

21  reasonable attorney's fees, costs, and other expenses in bringing this action.

22                          **JURISDICTION AND VENUE**

23      8.      The Court has original jurisdiction of this civil action under 28 U.S.C. §

24  1331 because the action arises under the Constitution and laws of the United States,

25  thus raising federal questions. The Court also has jurisdiction under 28 U.S.C. §

26  1343(a)(3) and 42 U.S.C. § 1983 since this action seeks to redress the deprivation,

---

27  28  [1] Plaintiffs refer to the challenged law, California Food & Agricultural Code
section 4158, as AB 893 throughout this complaint.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1  under color of the laws, statutes, ordinances, regulations, customs and usages of the

2  State of California and political subdivisions thereof, of rights, privileges or

3  immunities secured by the United States Constitution and by Acts of Congress

4     9.     Plaintiffs' claims for declaratory and injunctive relief are authorized by

5  28 U.S.C. §§ 2201 and 2202, respectively, and their claim for attorneys' fees is

6  authorized by 42 U.S.C. § 1988.

7     10.    Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because the

8  22nd District Agricultural Association is located in San Diego County and a

9  substantial part of the events or omissions giving rise to Plaintiffs' claims occurred

10  in this district. Further, the state of California maintains an office for service of

11  process in San Diego County at 600 West Broadway, Suite 1800, San Diego,

12  California 92101.

13                          **PARTIES**

14                        **[Plaintiffs]**

15     11.    Plaintiff B & L PRODUCTIONS, INC., d/b/a CROSSROADS OF THE

16  WEST, is a for-profit event promoter operating in several western states. Crossroads

17  is in the business of promoting and organizing trade shows throughout the state of

18  California and other western states, including their long-running gun show events

19  held at the Del Mar Fairgrounds ("the Fairgrounds") operated under the d/b/a

20  Crossroads of the West ("Crossroads"). Crossroads currently is the largest vendor of

21  gun show events in California and at the Del Mar Fairgrounds. The gun shows

22  occupy thousands of square feet of the Fairgrounds. Typically, thousands of people

23  attend the gun show on each of the weekends they are held. They have successfully

24  produced and operated multiple safe, legal, and family-friendly gun show events in

25  California and at the Fairgrounds every year for over 30 years.

26     12.    Plaintiff BARRY BARDACK is a resident of El Cajon, California, and

27  he is a part-time flight instructor. He regularly attends the gun shows at the

28  Fairgrounds where he purchases ammunition for his target shooting hobby and

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

volunteers at the CRPA booth to talk to others about their rights, the importance of membership in the CRPA, and the Second Amendment.  The ban on sales of firearms and ammunition at the Fairgrounds burdens his right to engage in otherwise lawful commercial speech in a public forum and restricts his ability to purchase ammunition for lawful purposes—this is especially true for Plaintiff Bardack because the nearest vendor that could serve his particular ammunition needs is some two hours from his home. And because the ban is intended to make gun shows less profitable and effectively shutter them, it also restricts his right to engage in the unique types of political, educational, and commercial speech that takes place at the gun show.

13.     Plaintiff RONALD J. DIAZ, SR., is a resident of Alpine, California, and he is a retired federal contractor. He regularly attends gun shows at the Fairgrounds to purchase ammunition reloading supplies. Plaintiff Diaz also attends the Crossroads gun show events at the Del Mar Fairgrounds to engage in expressive activities with like-minded people, including discussions related to firearms, ammunition, and firearm accessories, the shooting sports, politics, and the Second Amendment. The ban on sales of firearms and ammunition at the Fairgrounds, which is intended to make gun shows less profitable and effectively shutter them, burdens his right to engage in otherwise lawful commercial and educational speech in a public forum with vendors that offer him the expertise and variety of reloading supplies available at Crossroads gun shows. It also restricts his right to engage in the unique types of political, educational, and commercial speech that takes place at the gun show.

14.     Plaintiff JOHN DUPREE is a resident of Alpine, California, and he works for the federal government. He regularly attends the Crossroads gun shows at the Fairgrounds. He is a competitive shooter and has the need to purchase bulk ammunition in order to compete. Plaintiff Dupree also attends the Crossroads gun show events at the Del Mar Fairgrounds to engage in expressive activities with like-

1   minded people, including discussions related to firearms, ammunition, and firearm

2   accessories, the shooting sports, politics, and the Second Amendment. The ban on

3   sales of firearms and ammunition at the Fairgrounds burdens his right to engage in

4   otherwise lawful commercial speech in a public forum and restricts his ability to

5   purchase ammunition for lawful purposes—this is especially true for Plaintiff

6   Dupree because the nearest vendor that could serve his particular ammunition needs

7   is several hours from his home. And because the ban is intended to make gun shows

8   less profitable and effectively shutter them, it also restricts his right to engage in the

9   unique types of political, educational, and commercial speech that takes place at the

10   gun show.

11      15.   Plaintiff CHRISTOPHER PAUL IRICK is a resident of Carlsbad,

12   California, and he regularly attends the Crossroads guns shows at the Fairgrounds.

13   He is self-employed and enjoys going to the shows for good prices on firearms and

14   accessories, as well as the variety of merchandise available at the events. Plaintiff

15   Irick also attends the Crossroads gun show events at the Fairgrounds to engage in

16   expressive activities with like-minded people who hunt and support the Second

17   Amendment, while learning about new and innovative products available to firearms

18   owners and sportsmen. The ban on sales of firearms and ammunition at the

19   Fairgrounds burdens his right to engage in otherwise lawful commercial speech in a

20   public forum and restricts his ability to purchase firearms and ammunition for lawful

21   purposes. And because the ban is intended to make gun shows less profitable and

22   effectively shutter them, it also restricts his right to engage in the unique types of

23   political, educational, and commercial speech that takes place at the gun show.

24      16.   Plaintiff ROBERT SOLIS is a resident of Oxnard, California, and he is

25   a regular vendor at the Crossroads gun shows at the Fairgrounds. At the Crossroads

26   gun show, he sells firearms-related accessories and, though not in the business of

27   selling firearms, he occasionally engages in the lawful private sale of firearms and

28   ammunition at the show. Plaintiff Solis also attends gun show events at the Del Mar

7

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Fairgrounds to engage in expressive activities with like-minded people, including discussions related to firearms, ammunition, and firearm accessories, the shooting sports, politics, and the Second Amendment. The ban on sales of firearms and ammunition at the Fairgrounds directly burdens Plaintiff Solis' right to engage in otherwise lawful commercial speech in a public forum and to access firearms and ammunition for lawful purposes. And because the ban on sales of firearms and ammunition at the Fairgrounds is intended to make gun shows less profitable and effectively shutter them, it restricts his right to engage in otherwise lawful commercial speech related to the sales of firearms accessories and his ability to engage in the unique types of political, educational, and commercial speech that takes place at the gun show.

17. Plaintiff LAWRENCE MICHAEL WALSH is a resident of Grass Valley, California, and is the owner of Miwall Corporation, d/b/a Wholesale Ammunition. Miwall is one of the major gun ammunition distributors on the west coast and has been in business for decades. He is a regular vendor at the Crossroads gun shows at the Fairgrounds. Plaintiff Walsh's business currently does not have a physical store, and it only sells its product at gun shows across the state and online. Wholesale Ammunition also supplies ammunition to many of the law enforcement agencies and officers in the state, some of which purchase their ammunition from him at the gun shows because of the amount available, the cost, and the variety they can find. Plaintiff Walsh enjoys being able to talk with other Second Amendment supporters with like interests and views. If the gun shows at the Fairgrounds, or any of the other state venues, were to be shut down, it would be devastating to Plaintiff Walsh's business. The ban on sales of firearms and ammunition at the Fairgrounds directly burdens Plaintiff Walsh's right to engage in otherwise lawful commercial speech in a public forum and to access firearms and ammunition for lawful purposes. And because the ban on sales of firearms and ammunition at the Fairgrounds is intended to make gun shows less profitable and effectively shutter

them, it restricts his right to engage in the unique types of political, educational, and commercial speech that takes place at the gun show.

18.     Plaintiff CAPTAIN JON'S GREEN CAN LOCKERS, LLC, is a limited liability corporation incorporated under the laws of California, with headquarters in Alpine, California. It is wholly owned and operated by Jon J. Winslow, a Retired Fire Captain, who invented and, through the Captain Jon's business, sells a device that safely and effectively locks the widely popular green metal surplus ammunition cans to prevent unauthorized access to their contents. Captain Jon's has no physical store but has been a regular vendor at the Crossroads gun shows at the Fairgrounds since 2015. The Fairgrounds is only 45 minutes from Captain Jon's headquarters, and the next nearest gun show event is at least two hours away. Captain Jon's thus depends on the Del Mar gun show for a significant portion of its annual revenues. Indeed, Captain Jon's has built a loyal following of repeat buyers at the Del Mar show, which make up approximately 50% of the business' sales at the gun show. What's more, Mr. Winslow, Captain Jon's only employee, also attends gun show events at the Fairgrounds to engage in expressive activities with like-minded people, including discussions related to firearms, ammunition, and firearm accessories, the shooting sports, politics, and the Second Amendment. Because the ban on sales of firearms and ammunition at the Fairgrounds is intended to make gun shows less profitable and effectively shutter them, it restricts the lawful commercial speech that Captain Jon's and its sole owner, operator, and employee, Mr. Winslow, engage in at the gun show. It also restricts Mr. Winslow's ability to engage in the unique types of political, educational, and commercial speech that takes place at the gun show.

19.     Plaintiff L.A.X. FIRING RANGE, INC., d/b/a LAX AMMO LLC, is a limited liability corporation incorporated under the laws of California, with headquarters in Inglewood, California. LAX Ammo is a regular vendor at the Crossroads gun shows at the Fairgrounds. At the Crossroads gun show, LAX Ammo

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

sells "high quality reloads and factory new ammunition in various calibers for rifles, handguns, and shotguns at affordable prices." The ban on sales of firearms and ammunition at the Fairgrounds directly burdens the right of LAX Ammo, its owners, and employees, to engage in otherwise lawful commercial speech in a public forum and to access firearms and ammunition for lawful purposes. And because the ban on sales of firearms and ammunition at the Fairgrounds is intended to make gun shows less profitable and effectively shutter them, it restricts the right of LAX Ammo, its owners, and employees, to engage in the unique types of political, educational, and commercial speech that takes place at the gun show.

20.    Plaintiff CALIFORNIA RIFLE & PISTOL ASSOCIATION, INCORPORATED ("CRPA") is a nonprofit membership organization incorporated under the laws of California, with headquarters in Fullerton, California. Among its other activities, CRPA works to preserve and expand constitutional and statutory rights of gun ownership, including the right to self-defense and the right to keep and bear arms. CRPA accomplishes this through its educational offerings, publications, member engagement events, and legislative advocacy and initiatives. CRPA is also a regular vendor at the Crossroads gun shows at the Fairgrounds, where it engages the public in discussions about the organization and its purposes, the shooting sports, firearms and firearm safety, and the Second Amendment and other political issues. It also attends gun shows at the Fairgrounds to sell organization memberships, advertise its events, distribute its publications, and sell its merchandise, some of which includes expressly pro-gun messaging. CRPA has also hosted political rallies, educational seminars, and range safety officer training at gun shows throughout the state, including those at the Fairgrounds. What's more, CRPA has tens of thousands of members and supporters, many of whom (including Plaintiffs Bardack, Diaz, Dupree, Irick, Solis, and Winslow) attend the Crossroads gun shows at the Fairgrounds to engage in expressive activities with like-minded people, including discussions related to firearms, ammunition, and firearm accessories, the shooting

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1   sports, politics, and the Second Amendment. Because the ban on sales of firearms

2   and ammunition at the Fairgrounds is intended to make gun shows less profitable

3   and effectively shutter them, it restricts the rights of CRPA, its employees,

4   volunteers, members, and supporters, to engage in the unique types of political,

5   educational, and commercial speech that takes place at the gun show. Through this

6   lawsuit, CRPA represents not only its own interests as a gun show vendor, but also

7   the interests of its members as gun show attendees and supporters of the right to

8   keep and bear arms for lawful purposes.

9         21.   Plaintiff SOUTH BAY ROD AND GUN CLUB, INC. ("South Bay") is

10   a private nonprofit corporation incorporated under the laws of California, with

11   headquarters in San Diego County, California. It was formed in 1955 with a mission

12   to operate a properly managed nonprofit shooting club that is efficiently designed,

13   contracted, and safely operated with diligently maintained shooting ranges, support

14   structures, and facilities so that all authorized members and guests may use the

15   facility with pride, confidence, and satisfaction. South Bay endeavors to promote

16   and encourage the safe handling and use of firearms. South Bay is a regular vendor

17   at the Crossroads gun shows at the Fairgrounds, where it engages the public in

18   discussions about the organization and its purposes, the shooting sports, and

19   firearms and firearm safety. What's more, South Bay has some 4,000 members,

20   many of whom reside in San Diego County and attend the Crossroads gun shows at

21   the Fairgrounds to engage in expressive activities with like-minded people,

22   including discussions related to firearms, ammunition, and firearm accessories, the

23   shooting sports, politics, and the Second Amendment. Because the ban on sales of

24   firearms and ammunition at the Fairgrounds is intended to make gun shows less

25   profitable and effectively shutter them, it restricts the rights of South Bay, its

26   employees, volunteers, and members, to engage in the unique types of political,

27   educational, and commercial speech that takes place at the gun show. Through this

28   lawsuit, South Bay represents not only its own interests as a gun show vendor, but

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1 | also the interests of its members as gun show attendees and supporters of the right to

2 | keep and bear arms for lawful purposes.

3 |      22.    Plaintiff SECOND AMENDMENT FOUNDATION, INC. ("SAF") is a

4 | non-profit membership organization. It is incorporated under the laws of the state of

5 | Washington and was founded in 1974. SAF has over 650,000 members and

6 | supporters nationwide, include thousands of members in California.  The purposes

7 | of SAF include education, research, publishing, and litigation. It is critical to the

8 | success of SAF that its promotional material, publications, and messages about the

9 | "right to keep and bear arms" reach demographic groups that are saturated with gun

10 | owners, gun buyers, and people of the "gun culture."  Gun Shows like the one

11 | threatened by the Defendants' actions interfere with this effort. SAF is dedicated to

12 | promoting a better understanding about our constitutional heritage to privately own

13 | and possess firearms through educational and legal action programs designed to

14 | better inform the public about gun control issues. SAF has been a pioneer in

15 | innovative defense of the right to keep and bear arms, through its publications and

16 | public education programs like the Gun Rights Policy Conference. Those

17 | publications and other SAF materials and information are offered at gun show

18 | events. Second Amendment Foundation also expends significant sums of money

19 | sponsoring public interest litigation to defend its own interests to disseminate

20 | information to like-minded individuals, in and individualized setting, but SAF also

21 | seeks to defend the interests of its member in lawsuits like this present effort.

**[Defendants]**

23 |      23.    Defendant GAVIN NEWSOM is the Governor of the State of

24 | California. As Governor, he is vested with "the supreme executive power" of the

25 | state and "shall see that the law is faithfully executed." Cal. Const. art. 5, §1. The

26 | injunctive and declaratory relief portions of this suit are brought against Defendant

27 | Newsom in his official capacity. Claims for damages are brought against Defendant

28 | Newsom in his personal capacity.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

24.   Defendant ROBERT BONTA is the Attorney General of the State of California. He is the "chief law officer" of the state and has the duty to 'see that the laws of the State are uniformly and adequately enforced." Cal. Const. art. 5, § 1. Additionally, Defendant Bonta has "direct supervision over every district attorney" within the State. *Id.* If, at any point a district attorney of the State fails to enforce adequately "any law of the State," Defendant Bonta must "prosecute any violations of the law." *Id.* Finally, Defendant Bonta, as Attorney General of the State of California, "shall assist any district attorney in the discharge" of duties when "required by the public interest or directed by the Governor. . . ." *Id.* The injunctive and declaratory relief portions of this suit are brought against Defendant Bonta in his official capacity. Claims for damages are brought against Defendant Bonta in his personal capacity.

25.   Defendant STEPHAN SUMMER is the District Attorney responsible for enforcing the law within the county of San Diego. Under the California Government Code, the district attorney must prosecute "all actions for the recovery" of fines and penalties. Cal. Gov't Code § 26521. The injunctive and declaratory relief portions of this suit are brought against District Attorney Summer in his official capacity.

26.   Defendant THOMAS MONTGOMERY is the County Counsel responsible for enforcing the law within the County of San Diego. In that capacity, he must "discharge all the duties vested in the district attorney." Cal. Gov't Code § 26529. The injunctive and declaratory relief portions of this suit are brought against County Counsel Montgomery in his official capacity.

27.   Defendant 22nd DISTRICT AGRICULTURAL ASSOCIATION ("District") is a Governor-appointed Board of Directors that manages the state-owned Del Mar Fairgrounds public venue. The District is governed by a nine-member board, each member serving a four-year term. The District Board of Directors appoints a CEO charged with the daily operations of the facilities but

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1   maintains control over activities not delegated to the CEO, including contracting

2   with those seeking to host events, including gun shows, at the Fairgrounds. It is

3   responsible for ensuring that all state laws governing gun shows at the Fairgrounds,

4   including AB 893, are faithfully enforced. In 2018, Defendant District adopted a

5   moratorium on contracting with third parties to host gun show events at the

6   Fairgrounds. That moratorium was enjoined by order of the court and later

7   permanently repealed through settlement of a related lawsuit, *B&L Productions,*

8   *Inc., et al. v. 22nd District Agricultural Association*, Case No. 3:19-cv-134-CAB.

9         28.   Defendant KAREN ROSS is the Secretary of the California Department

10   of Food & Agriculture—the entity responsible for the policy oversight of the

11   network of California fair venues, which includes the Del Mar Fairgrounds. Through

12   the Department, Defendant Ross issues guidance for governance and contracting to

13   all agricultural districts throughout California (including Defendant District) and

14   requires reporting from the districts on operational issues. The Department

15   maintains an office of legal counsel for any actions brought against Agricultural

16   Association Districts in the state. The injunctive and declaratory relief portions of

17   this suit are brought against Defendant Ross in her official capacity. Claims for

18   damages are brought against Defendant Ross in her personal capacity.

19         29.   The true names and capacities of Defendants named as DOES 1

20   through 50, inclusive, are individual, corporate, associate or otherwise, and are

21   unknown to Plaintiffs. They are, however, believed to be responsible in some way

22   for Plaintiffs' loss and damages. Each Doe Defendant is, and at all times mentioned

23   here was, a partner, agent, principal, co-conspirator, or are otherwise vicariously or

24   directly responsible for the acts or omissions of the other defendants or themselves.

25   They are each sued individually and are joined as party defendants. Plaintiffs thus

26   sue each Doe Defendant under rules 15 and 21 of the Federal Rules of Civil

27   Procedure. Plaintiffs are informed and believed that the Doe Defendants are all

28   California residents. Plaintiffs will amend this complaint to show such true names

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

and capacities of Doe Defendants when they have been ascertained.

## FACTUAL ALLEGATIONS

### [Regulation of Gun Show Events in California]

30.     The state of California has the most rigorous regulatory regime for commerce in firearms and ammunition in the United States. That regulatory regime applies to the operation of gun show events throughout California. The laws related to the acquisition and sale of firearms is arguably stricter at a gun show, than at brick-and-mortar stores or internet sales.

31.     Only state approved, licensed gun show "producers" may operate gun shows in California. All gun show producers, including Plaintiff Crossroads, must have an individual (the "promoter") who holds a valid "Certificate of Eligibility" issued by the California Department of Justice.

32.     Gun show producers must also, among other things:

      a.     Certify that they are familiar with all California laws regarding gun shows, Cal. Penal Code § 27200;

      b.     Possess a minimum of $1,000,000 liability insurance, *id.*;

      c.     Provide an annual list of shows or events to be held to the California Department of Justice, *id.*; and

      d.     Notify the California Department of Justice no later than 30 days prior to the gun show or event of any changes to the above, *id.*

      e.     Make available to law enforcement a complete and accurate list of all vendors that will participate in the show to sell, lease, or transfer firearms. Cal. Penal Code § 27205.

33.     Gun show promoters must submit an annual event and security plan and schedule to the California Department of Justice and any local law enforcement agency. The plan must include:

      a.     Type of show or event;

      b.     Estimated number of vendors offering for sale or display

15

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

firearms;

    c.    Estimated number of attendees;

    d.    Number of entrances and exits at the event;

    e.    Location, dates, and times of the event;

    f.    Contact person and telephone number for both promoter and facility;

    g.    Number of sworn peace officers employed by the producer or facility who will be present at the event;

    h.    Number of non-sworn security personnel employed by the producer or the facility who will be present at the event; and

    i.    Promoters must inform all prospective vendors of all California laws regarding gun shows.

Cal. Penal Code §§ 27210, 27215.

34.    Promoters must also provide a list of all prospective vendors and designated firearm transfer agents who are licensed firearm dealers to the California Department of Justice no later than seven days prior to the event for the purpose of determining whether the vendor possess a valid license and are thus eligible to participate in the event. Cal. Penal Code § 27220.

35.    If a vendor is not approved by the California Department of Justice or fails to comply with all applicable California laws, they cannot participate. Cal. Penal Code § 27220.

36.    If a promoter fails to inform all prospective vendors of California's state laws or fails to submit a list of all prospective vendors to the California Department of Justice, the event cannot commence. Cal. Penal Code § 27230.

37.    A promoter must have written contracts with each vendor selling firearms at the event. Cal. Penal Code § 27235.

38.    Promoters must post signs in a readily visible location at each public entrance to the event that includes all of the following notices:

- **"This gun show follows all federal, state, and local firearms and weapons laws, without exception."**
- **"Any firearm carried onto the premises by any member of the public will be checked, cleared of any ammunition, and secured in a manner that prevents it from being operated, and an identification tag or sticker will be attached to the firearm before the person is allowed admittance to the show."**
- **"No member of the public under the age of 18 years shall be admitted to the show unless accompanied by a parent, grandparent, or legal guardian."**
- **"All firearm transfers between private parties at the show shall be conducted through a licensed dealer in accordance with applicable state and federal laws."**
- **"Persons possessing firearms in this facility must have in their immediate possession government-issued photo identification and display it upon the request to any security officer or any peace officer, as defined in Section 830."**

Cal. Penal Code § 27240(a).

39.    Producers must also post signs in a readily visible location at each entrance to the parking lot stating: "The transfer of firearms on the parking lot of this facility is a crime." Cal. Penal Code § 27240(b).

40.    A willful failure of a producer to comply with any of California's applicable laws is a misdemeanor punishable with a fine of up to $2,000 dollars and would render the producer ineligible for a gun show producer license for up to one year, which could cost a producer hundreds of thousands of dollars in lost revenue for a willful infraction. Cal. Penal Code § 272459(c).

41.    Except in very limited exceptions applicable only to law enforcement, actual firearm transfers are already prohibited from taking place at any gun show in

17

California.[2] The firearm sale can be started through an on-site licensed "transfer dealer," but it cannot be completed on site. Instead, purchasers must pick up their purchase at a licensed firearm retailer at a different licensed location--but only after a 10-day waiting period and background check. There is no "Gun Show Loophole" at gun shows operated in accordance with California Law.

42.     The Gun Show Act of 2000, California Penal Code sections 27200-27245, places even more restrictions on the operation of a gun show in California by requiring that:

a.     Vendors not display, possess, or offer for sale any firearms, knives, or weapons for which possession or sale is prohibited;

b.     Vendors acknowledge that they are responsible for knowing and complying with all applicable federal, state, and local laws dealing with the possession and transfer of firearms;

c.     Vendors will not engage in activities that incite or encourage hate crimes;

d.     Vendors will process all transfers of firearms through licensed firearms dealers as required by state law;

e.     Vendors will verify that all firearms in their possession will be unloaded and that the firearms will be secured in a manner that prevents them from being operated except for brief periods, when the mechanical condition of the firearm is being demonstrated to prospective buyer;

---

[2] Cal. Penal Code § 27310 (requiring all firearm transfers at gun shows to comply with state and federal law); *id.* § 26805 (prohibiting the sale and transfer of a firearm by a licensed dealer at any location other than the dealer's premises as listed on their license but allowing dealer to prepare documents at a gun show in preparation for completion of the sale at the dealer's premises); *id.* § 27545 (requiring all firearm transactions to be processed through a licensed dealer when neither party is a licensed dealer).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

f.     Vendors provide all required information under Penal Code § 27320;

g.     Vendors will not display or possess black powder or offer it for sale;

h.     Ammunition only be displayed in closed original factory boxes or other closed containers, with the only exception for showing the ammunition to a prospective buyer. On July 1, 2019, additional state-law restrictions on the sale of ammunition will become effective and gun shows must comply;

i.     No member of the public under 18 years old may enter a gun show unless accompanied by a parent or legal guardian;

j.     No person other than security personnel or law enforcement possess both a firearm and ammunition for that firearm at the same time, with the exception of vendors who are selling both.

43.    Plaintiff Crossroads diligently operates all of its gun shows in accordance with state law, and it takes immediate remedial measures if irregularities are discovered.

44.    Vendors at Crossroads gun shows, like Plaintiffs Walsh and LAX Ammo, are some of the same licensed vendors that have brick and mortar stores in the community or operate legally over the internet and are registered with the state as lawful businesses.

45.    Vendors at Crossroads gun shows sell legal products and enjoy being able to attend gun shows so they can better interact with customers in a more meaningful and intimate way.

46.    Even with all of the state and federal regulations that promoters and vendors must abide, through the adoption and enforcement of AB 893, Defendants now seek to wholly prohibit constitutionally protected, highly regulated, and otherwise perfectly legal activity.

19

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**[The Gun Show Cultural Experience]**

47.    Gun shows are a modern bazaar—a convention of like-minded individuals who meet in this unique public forum that has been set aside by state and local governments for all manner of commerce. This convention-like setting is of incalculable benefit to the gun-buying consumer and promotes public safety.

48.    Gun shows, in general, and the Del Mar show, in particular, are a celebration of America's "gun culture" that is a natural and essential outgrowth of the constitutional rights that flow from the Second Amendment to the United States Constitution.

49.    Gun shows, in general, and the Del Mar show, in particular, are a First Amendment forum where literature and information are shared, speakers provide valuable lectures, classes are conducted, political forums are held where gun rights discussions take place, and candidates for political office can meet to discuss political issues, the government, and the constitution with constituents who are part of the California gun culture.

50.    Gun shows just happen to include the exchange of products and ideas, knowledge, services, education, entertainment, and recreation related to the lawful uses of firearms. Those lawful uses include (but are not limited to):

       a.    Firearm safety training

       b.    Self-defense

       c.    Defense of others

       d.    Defense of community

       e.    Defense of state

       f.    Defense of nation

       g.    Hunting

       h.    Target shooting

       i.    Gunsmithing

       j.    Admiration of guns as art

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

k.    Appreciation of guns as technological artifacts

l.    Study of guns as historical objects.

51.    Gun shows, in general, and the Del Mar show, in particular, are cultural marketplaces for those members of the "gun culture" who attend to celebrate their constitutional rights and to pass their beliefs in patriotism and the rights of the individual on to the next generation. It is a place where parents take their children and grandparents take their grandchildren to share with them, among other things, a love of historic firearms, stories of American war heroes, and their love of hunting.

52.    Gun shows, in general, and the Del Mar show, in particular, are places where parents can learn to protect their families and their homes, and how to stay in compliance with California's ever-changing gun laws.

53.    Gun shows, in general, and the Del Mar show, in particular, are places where people can discuss the positions of political candidates and whether those values line up with their own beliefs in protecting the Second Amendment.

54.    Gun shows, in general, and the Del Mar show, in particular, are held and promoted, and considerable investment is made, precisely to promote and "normalize" the "gun culture" and the constitutional principles that gun show participants hold dear.

55.    This forum is vitally important especially in California where government actors at all levels of government (federal, state, and local) are openly hostile to the cultural values of the Second Amendment and where supporters of those cultural values are not considered "mainstream."

56.    Participating in "gun culture" is an important reason people attend Crossroads gun shows as vendors, exhibitors, customers, and guests (even if particular vendors or attendees are not in the firearm business or in the market to buy a gun at a particular event).

57.    While less than 40% of vendors at Crossroads' events offer firearms or ammunition for sale (the remaining vendors offer accessories, collectibles, home

21

goods, lifestyle products, food, and other refreshments), the principle draw of gun shows is the availability of firearms and ammunition for sale.

58.    Indeed, many people attend gun shows to learn about the technology and use of various firearms and ammunition when they are considering whether to buy or sell a firearm (or ammunition) and to exchange knowledge with experienced dealers and firearm enthusiasts that they cannot get anywhere else. *Teixeira v. County of Alameda*, No. 13-17132 (9th Cir. 2017).[3]

59.    Without the ability to buy and sell firearms and ammunition at gun shows at the Fairgrounds, the events will no longer be able to draw many of its vendors and attendees, making the events unprofitable and economically infeasible.

60.    Defendants wish to end this celebration of "gun culture" and Second Amendment rights because they do not understand the culture or the people. To that end, Defendants have attempted, first through an unconstitutional moratorium on gun show events, *see B&L Prods. v. 22nd Dist. Agric. Ass'n*, 394 F. Supp. 3d 1226 (S.D. Cal. 2019), and then through AB 893's ban on sales of firearms and ammunition at the Fairgrounds, to permanently deprive Plaintiffs of their right to engage in constitutionally protected conduct at the Fairgrounds.

**[The Del Mar Fairgrounds Venue]**

61.    The Fairgrounds is owned by the state of California and managed by the Board of Directors of Defendant District, which must regularly report its activities to the California Department of Food & Agriculture. *See* Table of Fairground Information (Dec. 31. 2010) attached as Exhibit 1.

62.    Among other things, Defendant District is charged with maintaining the Fairgrounds and ensuring that is used for public purposes.

---

[3] The *Teixeira* court did not answer whether the Second Amendment includes a right to purchase a firearm. Plaintiffs allege, in good faith, that the right to keep and bear arms *necessarily* includes the rights to purchase and sell them. Indeed, those rights are paramount to the exercise of the Second Amendment.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

63.     Defendant Ross, as the Secretary of the California Department of Food & Agriculture, oversees the operation of the various agricultural districts in the state, including Defendant District.

64.     The California Department of Food & Agriculture, under Secretary Ross, provides policies and guidance for the operation of all agricultural districts in the state, including the use of facilities as directed by Department policy.

65.     The California Department of Food & Agriculture maintains a *CDFA Contracts Manual for Agricultural Districts* ("Manual"). Section 6.25 of the Manual states that "[w]hether or not a fair rents out their facilities for gun shows is a policy decision to be made by the fair board and their community."

66.     Due to its large size and unique urban location, the Fairgrounds is a unique, publicly owned venue. There is no other public or private venue of similar size in the area. Effectively, the government has a monopoly on venues of this size and type in the area.

67.     The Fairgrounds is a state-owned property maintained and opened for use by the public. By virtue of being opened by the state for use by the public, it is a "public forum," from which the government may not generally exclude expressive activity. *Cinevision Corp. v. City of Burbank*, 745 F.2d 560, 569 (9th Cir. 1984) (*quoting Perry Educ. Ass'n v. Perry Local Educators' Assn*, 460 U.S. 37, 45-46 (1983)).

68.     The Fairgrounds is used by many different public groups and is a major event venue for large gatherings of people to engage in expressive activities, including concerts, festivals, and industry shows.

69.     The Fairgrounds actively promotes the use of the property by the public through contracting for available space at the Fairgrounds.

70.     Indeed, the Fairgrounds plays host not only to events, like the San Diego County Fair, produced by Defendant District, but to "events and activities produced by third-party promoters, which range from concerts and festivals, trade

shows and consumer expos, equestrian competitions and animal shows, sporting events, fundraisers and personal celebrations." Del Mar Fairgrounds, About Us, https://delmarfairgrounds.com/about-us/ (last visited Sept. 29, 2021).

71.    The Fairgrounds' 2008 Master Plan, which is still in use, states that Defendant District's mission is "[t]o manage and promote a world-class, multi-use, public assembly facility with an emphasis on agriculture, education, entertainment, and recreation in a fiscally sound and environmentally conscientious manner *for the benefit of all*." 22nd District Agricultural District, *2008 Master Plan: Del Mar Fairgrounds and Horsepark* 13 (April 2011), *available at* https://delmarfairgrounds.com/pdf/11EIR_000_2008_master_plan.pdf (last visited Sept. 29, 2021) (emphasis added).

72.    The Fairgrounds has held non-gun-show events in which criminal activity has taken place—including theft and a shooting. These criminal incidents are no more likely to happen at a gun show than at other types of events, but the Defendants have not banned these promoters or their events.

**[Contracting for Use of the Fairgrounds]**

73.    Defendant District has a process for securing returning contractors who would like to secure specific dates into future years before the contracts can be drafted and executed.

74.    Each year, returning and regular contractors, including Plaintiff Crossroads, submit preferred dates for the next calendar year, so Defendant District can confirm availability and so that Plaintiff Crossroads can begin to reserve vendors and materials for the show weekends.

75.    Due to the size and extensive planning that goes into producing gun show events, Defendant District has—for decades—provided and held preferred dates for Plaintiff Crossroads, a long-time contractor, until the contracts can fully be executed.

76.    Defendant District's "hold" system essentially operates as a right of

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

first refusal to the benefit of returning contractors. For example, if another contractor wanted the same preferred dates as Plaintiff Crossroads, Defendant District would not allow another vendor to come in and take those dates from Plaintiff Crossroads even though there is no official contract in place yet.

77.    The "hold" system also provides Defendant District with the security of knowing its venue is booked with experienced and knowledgeable repeat contractors that have a demonstrated record of running safe and profitable events at the Fairgrounds.

78.    The "hold" system also permits the promoter to spend advertising dollars to promote its events, but when governments announce plans to ban gun shows at particular venues, vendors and patrons rationally make plans to attend gun show events at other venues or seek other states to conduct their commerce.

79.    Defendant District also considers the "hold" dates and shows during budget discussions which are typically held in the year before the contracts are commenced.

80.    Upon information and belief, Plaintiffs allege that the "hold" system is widely used by similar state fair board venues and is standard industry practice.

81.    Plaintiff Crossroads, after doing business in this customary manner for more than 30 years, had no reason to doubt that Defendant District would continue to honor such relationship with Plaintiff Crossroads.

**[Previous Ban on Gun Shows at the Fairgrounds & Resulting Litigation]**

82.    Despite the long history that Plaintiff Crossroads has had with the Fairgrounds in operating safe and legal events, the political environment has become hostile toward gun show events and (more generally) toward the "gun culture" in recent years.

83.    Indeed, gun-show-banning activists are at work throughout the state and the country to ban *all* gun shows *everywhere*, not because they are "dangerous for the community," but because they do not subscribe to the same values as gun

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

show promoters, vendors, and participants.

84.     These activists rely on unfounded fears about the security of gun show events, false claims that gun shows are inherently dangerous because they normalize the "gun culture," and stereotypes about the people that attend gun shows. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985) (striking an ordinance requiring a special permit for a group home for the intellectually disabled and citing direct evidence of negative attitudes toward persons with disabilities expressed by community members and recorded in the legislative history).

85.     In 2017, gun-show-banning activists using the same tactics described above began pressuring Defendant District to prohibit gun show events at the Fairgrounds.

86.     In response, Defendant District began a series of meetings and public comment periods to determine whether it would continue to contract with Plaintiff Crossroads or other promoters for the use of the Fairgrounds for gun show events.

87.     Defendant District also engaged in communications with other government agencies and with Crossroads to determine whether gun shows at the Fairgrounds were operated in full compliance with state and federal law, and if the events pose any real danger to the community.

88.     Defendant District also appointed a non-public, ad hoc committee of two members of the District to investigate the gun show operation at the Fairgrounds and report back to the District with recommendations for the continued use of the Fairgrounds for gun show events.

89.     On April 23, 2018, Defendant Newsom sent a letter to the District urging the District to ban gun shows at the Fairgrounds, citing his concerns that "[p]ermitting the sale of firearms and ammunition on state-owned property only perpetuates America's gun culture." Letter from Governor Gavin Newsom to Board Members of 22nd District Agricultural Association (April 23, 2018) attached as Exhibit 2.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

90.    On September 10, 2018, Assembly member Todd Gloria (D) sent a letter to the District, stating his "firm belief that the State of California should in no way help to facilitate the sale of firearms." He also expressed his support for the District's "willingness to consider options for limiting or eliminating these gun shows" and vowed to "act by way of legislation should the 22nd DAA Board be unable to take meaningful action." Letter from Assembly Member Todd Gloria to Board Members of 22nd District Agricultural Association (Sept. 10, 2018) attached as Exhibit 3.

91.    At a public hearing on September 11, 2018, the ad hoc "Contracts Committee" recommended that the District "not consider any contracts with the producers of gun shows beyond December 31st 2018 until such time as the District has put into place a more thorough policy regarding the conduct of gun shows that:

   a.    Considers the feasibility of conducting gun shows for only educational and safety training purposes and bans the possession of guns and ammunition on state property

   b.    Aligns gun show contract language with recent changes to state and federal law

   c.    Details an enhanced security plan for the conduct of future shows

   d.    Proposes a safety plan

   e.    Considers the age appropriateness of the event

   f.    Grants rights for the DAA to perform an audit to ensure full compliance with California Penal Code Sections 171b and 12071.1 and 1207.4."

92.    In testimony before the District at the September 11, 2018 hearing, Patrick Kerins, who was then the Public Safety Director for the District, reported on the laws that apply to gun shows in California, as well as Plaintiff Crossroads history of events at the Fairgrounds.

93.    During his comments at the September 11, 2018 hearing, Mr. Kerins

27

referenced a memorandum that he prepared for the District's Board of Directors in.

In that memorandum, he reported that:

> As Chief of Security for the 22nd DAA, I routinely inspect the gun show and on a regular basis communicate with the San Diego Sheriff's Department re: compliance with all the applicable laws and regulations and the Security Plan required by the California Department of Justice Firearms Division. I recently spoke to Detective Jaime Rodriguez of the Sheriff's North Coastal Station who supervises the four Deputies assigned to the gun show security detail and Detective Stacey Smith who is assigned to the Sheriff's Licensing Division. Both Detectives said the Crossroads of the West Gun Show is in complete compliance with all the local, State and Federal laws that govern gun shows and that there have not been any violations of law. Both Detectives had high praise for the show promoters and the 22 DAA staff.

Memorandum of Patrick Kerins, Public Safety Director, 22nd District Agricultural Association, to Board of Directors, 22nd District Agricultural Association, at 17 (2016), attached as Exhibit 14.

94.     Mr. Kerins' 2016 memorandum continued:

> In my considered opinion, as Chief of Security for the 22 DAA for the last 17 years, the CROSSROADS OF THE WEST GUN SHOWS (5 per year) are m compliance with all the local, state and federal regulatory statutes and have operated without any violations of those laws Under the laws of the State of California you must comply with all the laws of purchasing, selling and/or transferring of firearms at a gun show as you would at licensed gun dealer's store Due to the strict California gun show regulations there are no so called loop holes that you so often hear about in the media.

Ex. 14 at 17.

95.     Ultimately, the lengthy process of meetings, public comment, and communications with stakeholders resulted in no finding that allowing the (already heavily regulated) gun show events to continue at the Fairgrounds posed a definite or unique risk to public safety.

96.     Indeed, Defendant District presented *no* evidence of any safety concerns within the community that could be linked to the over-30-year-old gun show at the Fairgrounds.

97.     To the contrary, banning highly regulated gun shows in California communities, like Del Mar, serves to distort the gun market, potentially pushing

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

California gun buyers into less restrictive gun-buying environments.[4]

98.    Nonetheless, relying on contrived possibilities of unknown dangers and unfounded claims that prohibiting gun shows might prevent suicide and violent crime because the "gun culture" would be censored,[5] Defendant District voted to impose a one-year moratorium (for the year 2019) on gun show events at the Fairgrounds while they study potential safety concerns.

99.    Plaintiffs Crossroads, Bardack, Diaz, Dupree, Irick, Walsh, CRPA, South Bay, SAF, and others sued Defendants District, Ross, and others in federal court under to prevent enforcement of the moratorium, alleging violations of various constitutional rights, including the rights to free speech, assembly, and equal protection. *See B&L Prods. v. 22nd Dist. Agric. Ass'n*, 394 F. Supp. 3d 1226 (S.D. Cal. 2019) ("*B&L I*") attached as Exhibit 4.

100.    Denying Defendant District's motion to dismiss and granting plaintiffs a preliminary injunction—*sua sponte*—on the ground that plaintiffs were exceedingly likely to succeed on the merits of their constitutional claims, the court

---

[4] Joyce Lupiani, *Nevada Gun Shows Tied to California Gun Violence*, KTNV (2017), https://www.ktnv.com/news/crime/study-nevada-gun-shows-tied-to-california-gun-violence (last visited Jan. 21, 2019); Brett Israel, *Study: Gun Deaths, Injuries in California Spike Following Nevada Gun Shows*, Berkeley News (2017), https://news.berkeley.edu/2017/10/23/embargoed-until-1023-2pm-pdt-study-gun-deaths-injuries-in-california-spike-following-nevada-gun-shows/ (last visited Jan. 21, 2019). *But see* Mariel Alper, Ph.D., & Lauren Glaze, Bureau of Justice Statistics, *Source and Use of Firearms Involved in Crimes: Survey of Prison Inmates, 2016* (2019), *available at* https://www.bjs.gov/content/pub/pdf/suficspi16.pdf (last visited Jan. 21, 2019); Garen J. Wintemute, et al., *Gun Shows and Gun Violence: Fatally Flawed Study Yields Misleading Results*, 100 Am. J. Pub. Health 1856-60 (2010), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2936974/ (last visited Jan. 21, 2019).

[5] *But see* Alvaro Castillo-Caniglia, Ph.D., et al., *California's Comprehensive Background Check and Misdemeanor Violence Prohibition Policies and Firearm Mortality*, Annals of Epidemiology (Oct. 11, 2018) (noting that, in California communities with the most stringent gun restrictions, there has been a marked increase in both property and violent crime).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

in *B&L I* temporarily enjoined the enforcement of the District's gun show moratorium and ordered the District to contract with Crossroads as it would any other similar event promoter at the Fairgrounds. Ex. 4.

101.   Shortly thereafter, the *B&L I* plaintiffs negotiated a settlement with the District, represented by attorneys for the California Department of Justice, permanently terminating the 2019 gun show moratorium, reinstating Crossroads' right to promote gun show events at the Fairgrounds, and permanently barring the District from unilaterally halting B&L's gun show events at the Fairgrounds. *See* Parties' Joint Notice of Settlement and Motion for Dismissal, *B&L Prods. v. 22nd Dist. Agric. Ass'n*, 394 F. Supp. 3d 1226 (S.D. Cal. 2020) attached as Exhibit 5.

**[California's Assembly Bill 893 (Gloria)]**

102.   Making good on his threat, and fully aware of the court's decision in *B&L I*, Assembly member Gloria introduced Assembly Bill 893 ("AB 893") on or about February 20, 2019. Assem. Bill 893, 2019-2020 Reg. Sess. (Cal. 2019) attached as Exhibit 6.

103.   AB 893, which added Section 4158 to the California Food & Agricultural Code, bars any "officer, employee, operator, lessee, or licensee of the [District]" from "contract[ing] for, authoriz[ing], or allow[ing] the sale of any firearm or ammunition on the property or in the buildings that comprise the Del Mar Fairgrounds...." Violation of the law is a misdemeanor. Ex. 6.

104.   AB 893 does not bar the possession of firearms or ammunition on the property or in the buildings that comprise the Del Mar Fairgrounds. Ex. 6.

105.   The text of AB 893 expressly identifies the ongoing presence at the Fairgrounds of "marketplaces popularly known as 'gun shows,' at which firearms and ammunition and other items are sold to the public approximately five times a year." Ex. 6.

106.   AB 893 also clearly recognizes that "[p]romoters maintain relationships with a core group of vendors, some selling guns and some selling other

30

merchandise, who travel as the schedule dictates from city to city and state to state and in the West, for example, many of the same vendors can be seen at Crossroads of the West Gun Shows from San Francisco, California, to Tucson, Arizona." Ex. 6.

107.   AB 893 failed to identify, however, any real public safety or security concern specifically related to the existence of gun show events at the Fairgrounds.

108.   To be sure, AB 893 claims, without support, that "[g]un shows bring grave danger to a community" and that "dangerous incidents" have taken place at guns shows at the Fairgrounds, including "an official vendor accused of trafficking illegal firearms, sales of firearms to individuals registered in the Department of Justice Bureau of Firearms Armed Prohibited Persons System, and illegal importation of large-capacity magazines." But AB 893 makes no effort to show that these incidents are any more likely to occur at gun shows in California, which are regulated at least as heavily as retailers operating out of brick-and-mortar stores.

109.   AB 893 also claims that "between the years 2013 and 2017, the San Diego County Sheriff recorded 14 crimes" at gun shows at the Fairgrounds. Ex. 6. But even if the Legislature had proof of these crimes, AB 893 makes no attempt to compare this to the number of crimes recorded at other similarly sized events at the Fairgrounds during that period. Nor does it distinguish between the type of crimes this bill purports to target (e.g., illegal firearm transfers, straw purchases, sales of illegal firearms or accessories) and run-of-the-mill crimes that are likely to occur whenever thousands of people descend on one venue for a trade show or fair (e.g., petty thefts, parking or traffic violations, public drunkenness, simple assault).

110.   Instead, AB 893's legislative history reveals only general concerns about gun violence occurring all over the country and legislators' beliefs that the state should not profit from sales of firearms and ammunition. *See* Matthew Fleming, Assem. Comm. Pub. Safety, Bill Analysis Re: AB 819 (Gloria), 2019-2020 Reg. Sess., at 3 (Cal. 2019) attached as Exhibit 7.

111.   Indeed, AB 893 opens with a list of tragedies, including the horrific

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1   mass murders that took place at Columbine High School, Sandy Hook Elementary

2   School, and Marjory Stoneman Douglas High School—none of which were carried

3   out with firearms traced to gun show events at the Fairgrounds. Ex. 6.

4        112.   What's more, a March 26, 2019 analysis of AB 893 presented to the

5   Assembly Committee on Public Safety quoted claims by Assembly member Gloria,

6   the bill's sponsor, that "[t]here is an ever apparent link between the gun violence we

7   see virtually every week and the number of guns in our communities." These

8   statements, however, made no attempt to link gun violence to gun shows, generally,

9   or to gun shows at the Fairgrounds, specifically. Ex. 7 at 2.

10       113.   The Public Safety Committee's March 26, 2019 analysis also quoted

11   Gloria as lamenting that "the State of California should not be profiting or

12   benefitting from the sale of firearms." He continued, "[f]undamentally, I believe it is

13   wrong for the state of California to profit or to benefit from the sale of firearms and

14   ammunition." Ex. 7 at 2.

15       114.   Assembly member Lorena Gonzalez, who co-sponsored AB 893,

16   expressed a similar sentiment, arguing that "[t]he State of California shouldn't be in

17   the business of using our public land to join with the firearms industry to profit off

18   the sale of guns and ammo." Chris Jennewein, *Assembly Passes Todd Gloria's Bill*

19   *to Thwart Gun Shows at Del Mar Fairgrounds*, timesofsandiego.com (April 25,

20   2019), https://timesofsandiego.com/politics/2019/04/25/assembly-passes-todd-

21   glorias-bill-to-thwart-gun-shows-at-del-mar-fairgrounds/ (last visited Sept. 29,

22   2021).

23       115.   The Public Safety Committee's March 26, 2019 analysis also cited a

24   decade-old report from the Violence Prevention Research Program at the UC Davis

25   School of Medicine, identifying gun shows as a source of illegally trafficked

26   firearms. Ex. 7 at 3. But neither the VPRP report nor AB 893's legislative history

27   links any illegally trafficked firearm or gun used in crime to gun shows at the

28   Fairgrounds (or even to gun shows in California). *See* Garen Wintemute, MD, *Inside*

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

*Gun Shows: What Goes on When Everybody Thinks Nobody's Watching*, ch. 1 (2009), attached as Exhibit 8. This is unsurprising because, as the study states, "[m]uch of the concern about gun shows as a source of crime guns focuses on private party gun sales, *since no background checks are conducted and no records are kept*." Ex. 8 at 32. But such concerns are simply irrelevant in California where private party transfers—even those initiated at gun shows—must be processed by a licensed firearm dealer and are subject to background checks and registration under state law.

116.   The VPRP report cited by the Public Safety Committee's analysis of AB 893 also attempts to implicate licensed firearm retailers operating at gun shows as sources of crime guns in America, claiming that "30% of dealers with gun show sales, but 22% of all dealers, had previously had a crime gun traced to them." But it expressly recognizes that "in California, where both gun shows themselves and gun commerce generally are regulated, *sales at gun shows are not a risk factor among licensed retailers for disproportionate sales of crime guns*." Ex. 8 at 33 (emphasis added).

117.   The Public Safety Committee's March 26, 2019 analysis also cited a report from the Government Accountability Office, claiming that a GAO report "regarding gun trafficking to Mexico confirmed that many traffickers buy guns at gun shows." Ex. 7 at 3. But again, neither the BATFE report nor AB 893's legislative history links any illegally trafficked firearm to gun shows at the Fairgrounds (or even to gun shows in California). *See* U.S. Gov't Accountability Off., GAO-16-223, *Firearms Trafficking: U.S. Efforts to Combat Firearms Trafficking to Mexico Have Improved, but Some Collaboration Challenges Remain* (2016) attached as Exhibit 9. To be sure, the GAO report identifies U.S. Southwest border states, including Texas (41%), California (19%), and Arizona (15%), as the largest sources of firearms illegally trafficked into Mexico from the United States. Ex. 9 at 14. But it does not trace these illegally trafficked guns to licensed dealers,

generally, or to those operating at gun shows, specifically. Rather, it says only that "there were about 10,134 licensed dealers and pawnbrokers in the four Southwest border states, many of them along the border," and that "these licensed dealers and pawnbrokers can operate in locations such as gun shops, pawn shops, their own homes, or gun shows." *Id.*

118.   The Public Safety Committee's March 26, 2019 analysis did concede that "less than one percent of inmates incarcerated in state prisons for gun crimes acquired their firearms at a gun show"—though it transparently tries to diminish that fact by citing only a website of the National Rifle Association as the source of the statistic, instead of the U.S. Department of Justice, Bureau of Justice Statistics reports from which the NRA drew it. Ex. 7 at 2-3 (citing NRA-ILA, *Background Checks/NICS*, https://www.nraila.org/get-the-facts/background-checks-nics (last visited Sept. 29, 2021)); *but see* Caroline Wolf Harlow, Ph.D., Bureau of Justice Statistics, *Firearm Use by Offenders* (Nov. 2001) attached as Exhibit 10.

119.   While the Public Safety Committee's March 26, 2019 analysis also concedes that "violent criminals do not appear to regularly purchase their guns directly from gun shows," the analysis immediately shifts to "criticism" (from the partisan Center for American Progress) that gun shows are somehow "the critical moment in the chain of custody for many guns, the point at which they move from the somewhat-regulated legal market to the shadowy, no-questions-asked illegal market." Ex. 7 at 3 (citing Arkadi Gerney, Center for American Progress, *The Gun Debate 1 Year After Newtown: Assessing Six Key Claims About Gun Background Checks* (Dec. 2013), *available at* https://www.americanprogress.org/issues/guns-crime/reports/2013/12/13/80795/the-gun-debate-1-year-after-newtown/ (last visited Sept. 29. 2021). Neither the Center for American Progress editorial nor AB 893's bill analysis show how, in California where sales at gun shows are regulated *at least* as heavily as sales at brick-and-mortar retailers, guns originating at gun shows are any more likely to enter the "shadowy, no-questions-asked illegal market" than

34

those sold at gun stores.

120.   Councilman Dwight Worden from the city of Del Mar, which was "at the helm of city-level efforts to oppose the shows," spoke in strong support of AB 893. He made clear that hostility toward the pro-gun speech that occurs at gun shows has long driven the movement to put an end to the events: "Councilman Dwight Worden said Del Mar's City Council is 'unanimously on the same page with this [AB 893] and very much behind the effort to discontinue the sale of guns and ammo' at the Fairgrounds. 'For decades in Del Mar, we felt that the *promotion and glorification of guns at the gun show are not consistent with our community values*.' " Lexy Brodt, *Boerner Horvath, Gloria Introduce Bill to Ban Gun Shows at Fairgrounds*, Coast News Group (Feb. 28, 2019), https://thecoastnews.com/boerner-horvath-gloria-introduce-bill-to-ban-gun-shows-on-state-land-2/ (last visited Sept. 29, 2019) (emphasis added).

121.   On October 11, 2019, Governor Newsom signed AB 893 into law.

122.   Defendant Newsom, who is ultimately responsible for the enforcement of the law, has long harbored animus towards gun show promotion.

123.   Indeed, Defendant Newsom has supported the closure of gun shows at other state venues and specifically wrote to Defendant District in 2018 in support of its unconstitutional gun show moratorium. He wrote: "[p]ermitting the sale of firearms and ammunition on state owned property only perpetuates America's gun culture at a time when 73 percent of Californians support gun reform measures."

**[The Impact of AB 893 on the Del Mar Gun Show]**

124.   The sale of firearms and ammunition is an essential function of gun shows, and it is one of the main reasons people attend these events; if gun shows are not economically viable because they have been stripped of an essential function, they will cease to exist.

125.   AB 893 thus has the same practical effect as the District's unconstitutional gun show moratorium—that is, by permanently banning the

commercial sale of firearms and ammunition at the Fairgrounds, it has the effect of banning gun shows at the Fairgrounds.

126.   The Legislature was well-aware when it passed AB 893 that a "gunless" gun show would not survive financially. Indeed, the intended purpose of AB 893 was to end gun shows at the Fairgrounds.

127.   Indeed, the Public Safety Committee's March 26, 2019 analysis of AB 893 expressly admitted that:

> This bill would add a section to the Food and Agricultural Code that prohibits the sale of firearms and ammunitions at the Del Mar Fairgrounds. By default, a violation of any provision of the Food and Agricultural code is a misdemeanor, unless otherwise specified. Therefore, this bill would effectively terminate the possibility for future gun shows at the Del Mar Fairgrounds.

Ex. 7 at 4.

128.   Similarly, the April 1, 2019 Assembly Appropriations Committee's April 1, 2019 analysis of AB 893 acknowledged:

> This bill would add a section to the Food and Agricultural Code that prohibits the sale of firearms and ammunitions at the Del Mar Fairgrounds. By default, a violation of any provision of the Food and Agricultural code is a misdemeanor, unless otherwise specified. Therefore, this bill would effectively terminate the possibility for future gun shows at the Del Mar Fairgrounds. On three prior occasions, former Governors Brown and Schwarzenegger vetoed similar legislation to ban gun shows at the Cow Palace in San Francisco.

*See* Kimberly Horiuchi, Assem. Comm. Approps., Bill Analysis Re: AB 819 (Gloria), 2019-2020 Reg. Sess., at 1-2 (Cal. 2019) attached as Exhibit 11.

129.   Reporting that AB 893 "would effectively shut down gun shows like Crossroads of the West at the fairgrounds," the Times of San Diego quoted Gloria as saying that "[t]he communities around the Del Mar Fairgrounds have been clear: they do not want these gun shows taking place on this state-owned land." Chris Jennewein, *Assembly Passes Todd Gloria's Bill to Thwart Gun Shows at Del Mar Fairgrounds*, timesofsandiego.com (April 25, 2019), https://timesofsandiego.com/politics/2019/04/25/assembly-passes-todd-glorias-bill-

36

1    to-thwart-gun-shows-at-del-mar-fairgrounds/ (last visited Sept. 29, 2021).

2        130.   And further evidencing the Legislature's intended effect of AB 893,

3    Senator Dave Min recently wrote to the Board of the 32nd District Agricultural

4    Association in Orange County, warning the Board Members not to stand in the way

5    of his bill that would ban sales of firearms, firearm precursor parts, and ammunition

6    at the Orange County Fairgrounds in Costa Mesa. In that letter, he addressed

7    members' concerns that their venue was being unfairly and exclusively targeted,

8    responding that AB 893 was a similar action banning gun shows at a single

9    fairground:

> Furthermore, the substantive merits of any such communication to
> the Governor are dubious. While Item 6A expresses a concern that
> SB 264 "exclusively targets the 32nd DAA," such action to **ban gun**
> **shows** at a single fairground site has recent precedent. In 2019, Gov.
> Newsom signed Assembly Bill 893 (Gloria) into law, ending the sale
> of firearms and ammunition at the Del Mar Fairgrounds, operated by
> the 22nd District Agricultural Association.

14   Letter from Senator Dave Min to Board Members of 32nd District Agricultural

15   Association attached as Exhibit 12 (emphases added).

16       131.   Nonetheless, Plaintiff Crossroads has repeatedly reached out to

17   Defendant District to request dates for events at the Fairground in 2021.

18       132.   Plaintiff Crossroads has been unable to secure dates and enter into new

19   contracts for events at the Fairgrounds in 2021 due to the Defendants' intentional act

20   of adopting and enforcing AB 893.

21       133.   Indeed, in compliance with AB 893, Defendant District cannot and will

22   not enter into contracts for gun shows at the Fairgrounds if firearms and ammunition

23   will be sold.

24       134.   Even though Plaintiff Crossroads has offered to attempt to hold events

25   without sales of firearms or ammunition to preserve its longstanding relationship

26   with the District, mitigate damages, and continue planning and promoting its family-

27   friendly events until its claims can be heard, Defendant District has dragged its feet

28   and has not provided dates for events in 2021.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

135.   As a result of Defendant District's stalling, most of Plaintiff Crossroads' requested dates in 2021 have either passed or have become unavailable.

136.   Because of the time and resources needed to plan and implement its gun show events, Plaintiff Crossroads must plan its shows about one year in advance, but Defendant District has not allowed Plaintiff Crossroads to secure dates in 2022 either.

137.   What's more, Defendant District seems to have stripped Plaintiff Crossroads of its effective right of first refusal under the District's "hold" system described above. Indeed, it has not only failed to give Crossroads first choice of its dates for the coming year, but it has also prohibited Crossroads from securing dates for gun show events at the Fairgrounds since 2020.

138.   Because California prohibits the building of similar venues within their districts as a way of preventing competition for available space, there are no venues in the area that offer comparable space and parking needed for gun show events. Plaintiff Crossroads has thus been unable to find a suitable alternate location to the Fairgrounds.

139.   Defendants' adoption and enforcement of AB 893, which has the intended and practical effect of banning gun shows at the Fairgrounds, has and will continue to cause Plaintiff Crossroads significant economic damages, including loss of event revenue, breakdown of relationships and agreements with long-time event vendors and companies used as suppliers for gun show events, relinquishment of future show dates, and loss of business reputation and goodwill that has been built by Plaintiff Crossroads for more than 30 years.

140.   Plaintiff Crossroads has already lost all revenue for gun show events at the Fairgrounds in 2021 because the Fair Board will not finalize event dates, citing AB 893 as the reason. If shows do not return to the Fairgrounds in 2022, Plaintiff Crossroads will lose all revenue for gun show events at the Fairgrounds in 2022 as well.

141.   Even if Plaintiff Crossroads could secure dates, plan, promote, and host gun shows in the remainder of 2021 and in 2022, AB 893 stands in the way of Crossroads generating the profits the events typically generate because the ban on firearm and ammunition sales will significantly impact paid event attendance and the types and numbers of paid vendors who will do business with Crossroads at the Del Mar gun show.

142.   Plaintiff Crossroads has and will continue to suffer loss of business goodwill resulting from Defendants' adoption and enforcement of AB 893 under the (unsupported) pretense that gun shows, generally, and Crossroads' shows, in particular, threaten public safety. The message this sends to other venues, attendees, and vendors that do business with Crossroads will no doubt affect Crossroads for years.

143.   Defendants' adoption and enforcement of AB 893, which has the intended and practical effect of banning gun shows at the Fairgrounds, also causes economic damage to the organizational plaintiffs, CRPA, SAF, and South Bay, which use their vendor spaces, in part, to sell organization memberships, advertise their educational courses, request donations, and sell organization merchandise, like hats and stickers.

144.   Defendants' adoption and enforcement of AB 893, which has the intended and practical effect of banning gun shows at the Fairgrounds, also causes economic damage to the vendor plaintiffs, Solis, Walsh, Captain Jon's, and LAX Ammo, who uses their vendor spaces, in part, to sell firearms, ammunition, and/or related accessories.

145.   Defendants' adoption and enforcement of AB 893, which has the intended and practical effect of banning gun shows at the Fairgrounds, prohibits Plaintiffs and all those similarly situate from making sue of a state-owned "public assembly facility" to host gun show events, a lawful business activity, in violation of Plaintiffs' rights to engage in free speech and peaceful assembly, and their right to

equal protection under the law.

146.   Specifically, Defendants' conduct complained of here strips Plaintiffs Bardack, Diaz, Dupree, Irick, Solis, and Walsh, as well as the organizational plaintiffs, CRPA, SAF, and South Bay, of a vital opportunity to assemble and engage in pure speech about, among other things, the rights and responsibilities of gun owners, the Second Amendment, patriotism, and political activism with like-minded individuals.

147.   Defendants' conduct complained of here also strips Plaintiff Crossroads of the right to promote gun show events, acting as a "clearinghouse" for both political speech and commercial speech.

148.   Defendants' conduct complained of here also strips Plaintiffs Solis, Walsh, Captain Jon's, and LAX Ammo of a vital opportunity to assemble and engage in lawful commercial speech, including the offer and acceptance of sales of firearms, ammunition, and related accessories.

149.   Furthermore, even if the Court grants injunctive relief, Plaintiff Crossroads will have incurred damages in having to devote extraordinary advertising dollars to inform the public that gun shows will continue to be held and have not been banned at the Fairgrounds.

150.   The economic and non-economic harms and injuries to Plaintiffs are of a continuing nature; they continue to compound everyday AB 893 remains the law.

**[Government Tort Claim]**

151.   On August 2, 2021, Plaintiffs Crossroads, Walsh, LAX Ammo, CRPA and SAF notified Defendants Newsom, Bonta, Ross, and District of their claims for intentional and/or negligent interference with prospective advantage by filing a timely Government Tort Claim pursuant to California's Tort Claims Act. B&L Productions, Inc., et al., Government Tort Claim (filed Aug. 2, 2021) attached Exhibit 13.

152.   Defendants Newsom, Bonta, Ross, and District neither accepted nor

40

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

rejected Plaintiffs' Government Tort Claim in writing within 45 days, so the claim was rejected by operation of law.

153.   On August 2, 2021, Plaintiff Crossroads of its claim for intentional interference with contract by filing a timely Government Tort Claim pursuant to California's Tort Claims Act. Ex. 7.

154.   Defendants Newsom, Bonta, Ross, and District neither accepted nor rejected Plaintiffs' Government Tort Claim in writing within 45 days, so the claim was rejected by operation of law.

## FIRST CAUSE OF ACTION

### Violation of Right to Free Speech Under U.S. Const., amend. I
### 42 U.S.C. § 1983

(By Plaintiffs CRPA, South Bay, SAF, and All Individuals Against All Defendants)

155.   Plaintiffs incorporate by reference paragraphs 1 through 154 of this Complaint as though fully set forth herein in their entirety.

156.   The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech. . .."

157.   The First Amendment's Freedom of Speech Clause is incorporated and made applicable to the states and their political subdivisions by the Fourteenth Amendment to the United States Constitution and by 42 U.S.C. § 1983.

158.   The First Amendment does not tolerate the suppression of speech based on the viewpoint of the speaker. Public property made available for lease by community groups to engage in expressive activity must thus be available without regard to the viewpoint sought to be expressed. *Cinevision*, 745 F.2d 560. Such venues cannot be opened to some and closed to others, suppressing protected expression, absent a compelling government interest. *Id.* at 571.

159.   The state of California owns the Fairgrounds, a public venue. It is rented to the public, including community-based organizations and businesses, for its use and enjoyment, including for concerts, festivals, and industry shows.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

160.   Defendants Newsom, Becerra, Summers, and Montgomery are the state and local actors responsible for ensuring that AB 893 is enforced and thus have the authority to prosecute violations of AB 893.

161.   Defendants Ross and District interpret, implement, and enforce state laws and policies as regards the Fairgrounds, including AB 893.

162.   Plaintiffs CRPA, South Bay, SAF, and Individuals Bardack, Diaz, Dupree, Irick, Solis, and Walsh have attended in the past and wish to again attend Crossroads of the West Gun Show at the Fairgrounds so they may exchange ideas, information, and knowledge, as well discuss political issues and the importance of protecting and defending the Second Amendment.

163.   Plaintiffs CRPA, South Bay, SAF, and Individuals Bardack, Diaz, Dupree, Irick, Solis and Walsh have a right under the First Amendment to use the Fairgrounds for their expressive activity on the same basis as other members of the public without regard to the viewpoints they seek to express.

164.   Defendants' enforcement of AB 893, which prohibits the sale of firearms and ammunition at the Fairgrounds with the purpose and intention (or at least the effect) of ending gun show events at the Fairgrounds, is an impermissible content-based restriction of speech. Such enforcement constitutes a direct violation of the First Amendment.

165.   There is no compelling (or even legitimate) governmental interest to support the ban on the commercial sales of all firearms and ammunition at the Fairgrounds, effectively shuttering gun show events at the Fairgrounds and destroying a vital outlet for the expression and exchange of ideas related to promoting and preserving the "gun culture" in California and elsewhere.

166.   As a direct and proximate result of Defendants' conduct, Plaintiffs CRPA, South Bay, SAF and Individuals Bardack, Diaz, Dupree, Irick, Solis, and Walsh have suffered irreparable harm, including the violation of their constitutional right to freedom of expression, entitling them to declaratory and injunctive relief.

**SECOND CAUSE OF ACTION**

**Violation of Right to Free Speech Under U.S. Const., amend. I**

**42 U.S.C. § 1983**

(By Plaintiff Crossroads Against All Defendants)

167.   Plaintiffs incorporate by reference paragraphs 1 through 166 of this Complaint as though fully set forth herein in their entirety.

168.   The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech. . .."

169.   The First Amendment's Freedom of Speech Clause is incorporated and made applicable to the states and their political subdivisions by the Fourteenth Amendment to the United States Constitution and by 42 U.S.C. § 1983.

170.   The First Amendment does not tolerate the suppression of speech based on the viewpoint of the speaker. Public property made available for lease by community groups to engage in expressive activity must thus be available without regard to the viewpoint sought to be expressed. *Cinevision*, 745 F.2d 560. Such venues cannot be opened to some and closed to others, suppressing protected expression, absent a compelling government interest. *Id.* at 571.

171.   Event promoters, though they generally promote events for profit, "still enjoy the protections of the First Amendment." *Id.* at 567. For "[t]he role of a promoter in ensuring access to the public is at least as critical as the role of a bookseller or theater owner and . . . is in a far better position than a concert goer or individual performers to vindicate First Amendment rights and ensure public access." *Id*. at 568. The conduct they engage in is protected expression.

172.   The state of California owns the Fairgrounds, a public venue. It is rented to the public, including community-based organizations and businesses, for its use and enjoyment, including for concerts, festivals, and industry shows.

173.   Defendants Newsom, Becerra, Summers, and Montgomery are the state and local actors responsible for ensuring that AB 893 is enforced and thus have the

43

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1    authority to prosecute violations of AB 893.

2       174.   Defendants Ross and District interpret, implement, and enforce state

3    laws and policies as regards the Fairgrounds, including AB 893.

4       175.   Plaintiff Crossroads seeks to engage in protected speech at the

5    Fairgrounds, a noted "public assembly facility," through the promotion and

6    production of events for lawful expressive activity, including events that bring

7    together like-minded individuals to engage in pure political and educational speech,

8    as well as commercial speech of vendor and individual participants to communicate

9    offer and acceptance for the sale of legal goods and services.

10      176.   Plaintiff Crossroads has a right under the First Amendment to use the

11   Fairgrounds for its expressive activity on the same basis as other members of the

12   public without regard to the content or viewpoint it seeks to express and promote.

13      177.   Defendants' enforcement of AB 893, which prohibits the sale of

14   firearms and ammunition at the Fairgrounds with the purpose and intention (or at

15   least the effect) of ending gun show events at the Fairgrounds, is an impermissible

16   content-based restriction of speech. Such enforcement constitutes a direct violation

17   of the First Amendment.

18      178.   There is no compelling (or even legitimate) governmental interest to

19   support the ban on the commercial sales of all firearms and ammunition at the

20   Fairgrounds, effectively shuttering gun show events at the Fairgrounds and

21   destroying a vital outlet for the expression and exchange of ideas related to

22   promoting and preserving the "gun culture" in California and elsewhere.

23      179.   As a direct and proximate result of Defendants' conduct, Plaintiff

24   Crossroads has suffered and will continue to suffer irreparable harm, including the

25   violation of its constitutional right to freedom of expression, entitling Plaintiff to

26   declaratory and injunctive relief.

27   / / /

28   / / /

**THIRD CAUSE OF ACTION**

**Violation of Right to Free Speech Under U.S. Const., amend. I**

**42 U.S.C. § 1983**

(By Plaintiffs Solis, Walsh, Captain Jon's, and LAX Ammo Against All Defendants)

180.   Plaintiffs incorporate by reference paragraphs 1 through 179 of this Complaint as though fully set forth herein in their entirety.

181.   The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech. . .."

182.   The First Amendment's Freedom of Speech Clause is incorporated and made applicable to the states and their political subdivisions by the Fourteenth Amendment to the United States Constitution and by 42 U.S.C. § 1983.

183.   The First Amendment does not tolerate the suppression of speech based on the viewpoint of the speaker. Public property made available for lease by community groups to engage in expressive activity must thus be available without regard to the viewpoint sought to be expressed. *Cinevision*, 745 F.2d 560. Such venues cannot be opened to some and closed to others, suppressing protected expression, absent a compelling government interest. *Id.* at 571.

184.   AB 893 violates the commercial free speech rights of the Plaintiffs, both on its face and as applied. This violation is especially egregious given the well-established law of this Circuit with regard to the commercial speech rights at gun shows that are protected by the First Amendment. *Nordyke v. Santa Clara Cty.*, 110 F.3d 707 (9th Cir. 1997).

185.   The state of California owns the Fairgrounds, a public venue. It is rented to the public, including community-based organizations and businesses, for its use and enjoyment, including for concerts, festivals, and industry shows.

186.   Defendants Newsom, Becerra, Summers, and Montgomery are the state and local actors responsible for ensuring that AB 893 is adequately enforced and thus have the authority to prosecute violations of AB 893.

45

187.   Defendants Ross and District interprets, implements, and enforces state laws and policies as regards the Fairgrounds, including AB 893.

188.   Plaintiffs Solis, Walsh, Captain Jon's, and LAX Ammo have attended in the past and wish to again attend Crossroads gun shows at the Fairgrounds to engage in lawful commercial speech with individual attendees.

189.   Plaintiffs Solis, Walsh, Captain Jon's, and LAX Ammo have a right under the First Amendment to use the Fairgrounds for expressive activity on the same basis as other members of the public without regard to the viewpoints they seek to express and promote.

190.   Defendants' enforcement of AB 893, which prohibits the sale of firearms and ammunition at the Fairgrounds with the purpose and intention (or at least the effect) of ending gun show events at the Fairgrounds, is an impermissible content-based restriction of speech. Such enforcement constitutes a direct violation of the First Amendment commercial speech rights of the Plaintiffs.

191.   Further, by directly barring the rights of vendors, like Plaintiffs Solis, Walsh, and LAX Ammo, to sell firearms and ammunition (which necessarily involves commercial speech), AB 893 defies existing case law in the Ninth Circuit protecting the commercial speech associated with firearm sales on public property. *See Nordyke v. Santa Clara Cty.*, 110 F. 3d 707 (9th Cir. 1997).

192.   There is no governmental interest—let alone a substantial one—to support the ban on the commercial sales of all firearms and ammunition at the Fairgrounds, effectively shuttering gun show events at the Fairgrounds and destroying a vital outlet for the expression and exchange of ideas related to promoting and preserving the "gun culture" in California and elsewhere. This is especially true where the state maintains an interest in tax revenue from the lawful sale of firearms and ammunition at locations other than gun shows.

193.   Even if there were a substantial governmental interest in restricting gun shows and the commercial speech that occurs at such events, banning commercial

46

speech about firearms and ammunition at the Fairgrounds altogether is more extensive than necessary to serve any such interest. *See Nordyke*, 110 F.3d 707 (holding that a ban on the sale of firearms on county-owned land was overbroad as abridging commercial speech associated with the sale of lawful products).

194.   As a direct and proximate result of Defendants' conduct, Plaintiffs Solis, Walsh, Captain Jon's, and LAX Ammo will suffer irreparable harm, including the violation of their constitutional right to freedom of expression, entitling them to declaratory and injunctive relief.

## FOURTH CAUSE OF ACTION

### Prior Restraint on Right to Free Speech Under U.S. Const., amend. I

### 42 U.S.C. § 1983

(By All Plaintiffs Against All Defendants)

195.   Plaintiffs incorporate by reference paragraphs 1 through 194 of this Complaint as though fully set forth herein in their entirety.

196.   The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech. . .."

197.   The First Amendment's Freedom of Speech Clause is incorporated and made applicable to the states and their political subdivisions by the Fourteenth Amendment to the United States Constitution and by 42 U.S.C. § 1983.

198.   The First Amendment affords special protection against policies or orders that impose a previous or prior restraint on speech. "[P]rior restraints on speech and publication are the most serious and least tolerable infringement on First Amendment Rights." *Ass'n for L.A. Deputy Sheriffs*, 239 Cal. App. 4th at 811 (citing *Neb. Press Ass'n*, 427 U.S. at 559. A prior restraint is particularly egregious when it falls upon the communication of news, commentary, current events, political speech, and association. *N.Y. Times Co.*, 403 U.S. at 715.

199.   Prior restraint also involves the "unbridled discretion doctrine" where a policy, or lack thereof, allows for a single person or body to act at their sole

47

1  discretion, without regard for any constitutional rights possessed by the person upon

2  which the action is taken, and where there is no remedy for challenging the

3  discretion of the decision makers. *Lakewood*, 486 U.S. at 757.

4  200.  The Defendants are the state and local actors responsible for enforcing

5  AB 893, which is a content-based restriction of speech that will have a chilling

6  effect on Plaintiffs' First Amendment rights, thus acting as a de facto prior restraint

7  on Plaintiffs' rights.

8  201.  Under AB 893, Defendant District has unfettered discretion to

9  determine what constitutes a "sale" under the law and is thereby prohibited at the

10  Fairgrounds.

11  202.  Defendants' policies and practices complained of here impose an

12  unconstitutional prior restraint because they vest the District with unbridled

13  discretion to permit or refuse protected expression by members of the public,

14  including Plaintiffs.

15  203.  Defendants' policies and practices complained of here give unbridled

16  discretion to local agricultural district boards and board members to decide what

17  forms of expression members of the public may engage in on at the Fairgrounds and

18  to ban any other expression at the whim of those boards and board members in

19  violation of the First Amendment.

20  204.  As a direct and proximate result of Defendants' conduct, Plaintiffs have

21  suffered and will continue to suffer irreparable harm, including the violation of their

22  constitutional right to freedom of expression, entitling them to declaratory and

23  injunctive relief and nominal damages.

24  **FIFTH CAUSE OF ACTION**

25  **Violation of Right to Assembly and Association Under U.S. Const., amend. I**

26  **42 U.S.C. § 1983**

27  (By All Plaintiffs Against All Defendants)

28  205.  Plaintiffs incorporate by reference paragraphs 1 through 204 of this

48

1   Complaint as though fully set forth herein in their entirety.

2        206.   The First Amendment protects the rights to association and assembly.

3   Indeed, "[e]ffective advocacy of both public and private points of view, particularly

4   controversial ones, is undeniably enhanced by group association." *NAACP*, 377 U.S.

5   at 462.

6        207.   Plaintiffs are attempting to engage in their protected right to free

7   assembly and association through lawful activities that bring together like-minded

8   individuals to engage in lawful commerce, expressive activities, including political

9   and educational speech, and fellowship.

10       208.   Defendants violate Plaintiffs' right to freedom of assembly by denying

11   them the right to use the Fairgrounds, a "public assembly facility", to assemble and

12   engage in political and other types of expression—a right Defendants extend to other

13   members of the public so long as they are not meeting for the purposes of holding a

14   gun show event.

15       209.   Defendants have no legitimate and substantial interest in prohibiting the

16   sale of firearms and ammunition, effectively shuttering gun shows at the

17   Fairgrounds, and by extension the rights of Plaintiffs to associate and assemble at

18   the Fairgrounds.

19       210.   Defendants have expressly banned the sale of firearms and ammunition

20   at the Fairgrounds, which is an essential function of gun show and one of the main

21   reasons people attend these events. By eliminating the sale of firearms and

22   ammunition, Defendants have stripped gun shows of an essential function, limiting

23   the number and types of vendors at the gun shows and the number of individuals in

24   attendance. Thus, having a chilling effect on the First Amendment.

25       211.   Not only does AB 893 eliminate Plaintiffs' ability to engage in

26   discussion with event attendees about the sale and purchase of firearms and

27   ammunition, but it does also so unnecessarily because of California's already

28   extensive regulation of gun show events. For instance, California's mandatory 10-

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

day waiting period prevents any attendee from taking possession of firearms on the premises of the Fairgrounds, requiring that they instead go to a *different* location at least 10 days later to take possession of any firearm purchased at the gun show. Before a gun show attendee would take possession of ammunition purchased on the premises, the attendee would have to rely on a vendor to retrieve the ammunition from stock, pass a background check conducted electronically by the California Department of Justice, pay a fee, and wait for the vendor to upload the purchaser's personal information and details of the specific ammunition being transferred. What's more, no person other than security personnel or law enforcement may possess both a firearm and ammunition for that firearm at the same time, with the exception of vendors who are selling both.

212.   But even if Defendants had a "legitimate and substantial" interest in limiting a key aspect of gun show events, and thus barring Plaintiffs from freely assembling at the Fairgrounds, they have imposed an unconstitutional and overly broad restriction on Plaintiffs' rights to assembly by prohibiting the sale of firearms and ammunition at the Fairgrounds.

<div align="center">

**SIXTH CAUSE OF ACTION**

**Violation of the Right to Equal Protection Under U.S. Const., amend. XIV**

**42 U.S.C. § 1983**

(By All Plaintiffs Against All Defendants)

</div>

213.   Plaintiffs incorporate by reference paragraphs 1 through 212 of this Complaint as if fully set forth herein in their entirety.

214.   The Fourteenth Amendment to the United States Constitution, enforceable under 42 U.S.C. § 1983, provides that no state shall deny to any person within its jurisdiction the equal protection of the laws.

215.   Generally, equal protection is based upon protected classes of person who are similarly situated; however, individuals who suffer irrational and intentional discrimination or animus can bring claims of equal protection where the government

<div align="center">50</div>

is subjecting only the Plaintiffs to differing and unique treatment compared to others who are similarly situated, *Engquist*, 553 U.S. 591, even if not based on group characteristics, *Village of Willowbrook*, 528 U.S. 562.

216.   Disparate treatment under the law, when one is engaged in activities that are fundamental rights, is actionable under the Equal Protection Clause of the Fourteenth Amendment. *Mosley*, 408 U.S. 92; *Carey*, 447 U.S. 455.

217.   Although Plaintiff Crossroads operates a legal and legitimate business and the Fairgrounds is suitable for the purposes of hosting a gun show at its public facility, as demonstrated by over 30 years of uninfringed use of the Fairgrounds, AB 893 prevents Plaintiffs from equally participating in the use of the publicly owned venue by unconstitutionally eliminating Plaintiffs' ability to freely conduct otherwise lawful business transactions and freely express their beliefs with like-minded people.

218.   Defendants' refusal to permit Plaintiffs equal access to the Fairgrounds for its promotion of gun shows does not further any compelling governmental interest.

219.   Defendants' refusal to allow Plaintiffs equal use of the public facility while continuing to allow contracts for the use of the facility with other similarly situated legal and legitimate businesses is a violation of Plaintiffs' right to equal protection under the law because it is based on a "bare desire to harm a politically unpopular group." *Moreno*, 413 U.S. at 534.

220.   As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered irreparable harm, including the violation of their constitutional right to equal protection under the law, entitling them to declaratory and injunctive relief and nominal damages.

/ / /

/ / /

/ / /

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**SEVENTH CAUSE OF ACTION**

**Intentional Interference with Prospective Economic Advantage**

(By Plaintiffs Crossroads, Walsh, LAX Ammo, CRPA and SAF Against Defendants Newsom, Bonta, Ross, and District)

221.   Plaintiffs incorporate by reference paragraphs 1 through 220 of this Complaint as if fully set forth herein in their entirety.

222.   For more than 30 years, Plaintiff Crossroads has maintained contracts with Defendant District, under which Plaintiff Crossroads annually hosts about five gun-show events at the Fairgrounds. An economic relationship has been in effect between Plaintiff Crossroads and Defendant District to operate gun shows on the state fairground property for over 30 years.

223.   In turn, Plaintiff Crossroads maintains countless economic relationships with for-profit and nonprofit vendors, including but not limited to, Plaintiffs Walsh, LAX Ammo, CRPA and SAF. These vendors pay for space at Plaintiff Crossroads' Del Mar gun shows in order to sell merchandise (including firearms and ammunition) and organization memberships, among other things.

224.   Defendants Newsom, Bonta, Ross, and District had actual knowledge of the existence of these relationships.

225.   By adopting and enforcing AB 893, which bans the sale of firearms and ammunition at the Fairgrounds and effectively bans gun shows at the Fairgrounds, Defendants Newsom, Bonta, Ross, and District engaged in an intentional act designed to disrupt these economic relationships.

226.   The adoption and enforcement of AB 893 by Defendants Newsom, Bonta, Ross, and District did, in fact, disrupt the known economic relationships between Plaintiff Crossroads and Defendant 2nd DAA and between Plaintiff Crossroads and its vendors, including Plaintiffs Walsh, LAX Ammo, CRPA and SAF.

227.   Plaintiffs Crossroads, Walsh, LAX Ammo, CRPA and SAF have

52

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1  suffered actual damages as a result of the conduct of Defendants Newsom, Bonta,

2  Ross, and District complained of herein.

3      228.   Plaintiffs Crossroads, Walsh, LAX Ammo, CRPA and SAF notified

4  Defendants Newsom, Bonta, Ross, and District of this claim by filing a Government

5  Tort Claim pursuant to California's Tort Claims Act. Ex. 7.

6      229.   Defendants Newsom, Bonta, Ross, and District neither accepted nor

7  rejected Plaintiffs' Government Tort Claim in writing within 45 days, so the claim

8  was rejected by operation of law.

9                          **EIGHTH CAUSE OF ACTION**

10       **Negligent Interference with Prospective Economic Advantage**

11  (By Plaintiffs Crossroads, Walsh, LAX Ammo, CRPA and SAF Against Defendants

12                    Newsom, Bonta, Ross, and District)

13      230.   Plaintiffs incorporate by reference paragraphs 1 through 229 of this

14  Complaint as if fully set forth herein in their entirety.

15      231.   For more than 30 years, Plaintiff Crossroads has maintained contracts

16  with Defendant District, under which Plaintiff Crossroads annually hosts about five

17  gun-show events at the Fairgrounds. An economic relationship has been in effect

18  between Plaintiff Crossroads and Defendant District to operate gun shows on the

19  state fairground property for over 30 years.

20      232.   In turn, Plaintiff Crossroads maintains countless economic relationships

21  with for-profit and nonprofit vendors, including but not limited to, Plaintiffs Walsh,

22  LAX Ammo, CRPA and SAF. These vendors pay for space at Plaintiff Crossroads'

23  Del Mar gun shows in order to sell merchandise (including firearms and

24  ammunition) and organization memberships, among other things.

25      233.   Defendants Newsom, Bonta, Ross, and District had actual knowledge

26  of the existence of these relationships.

27      234.   Defendants Newsom, Bonta, Ross, and District knew that, by adopting

28  and enforcing AB 893, which bans the sale of firearms and ammunition at the

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1   Fairgrounds and effectively bans gun shows at the Fairgrounds, these economic

2   relationships would be disrupted if they did not act with reasonable care.

3   235.   Defendants Newsom, Bonta, Ross, and District knew that, by adopting

4   and enforcing AB 893, which bans the sale of firearms and ammunition at the

5   Fairgrounds and effectively bans gun shows at the Fairgrounds, in fact failed to act

6   with reasonable care.

7   236.   The adoption and enforcement of AB 893 by Defendants Newsom,

8   Bonta, Ross, and District did, in fact, disrupt the known economic relationships

9   between Plaintiff Crossroads and Defendant 2nd DAA and between Plaintiff

10   Crossroads and its vendors, including Plaintiffs Walsh, LAX Ammo, CRPA and

11   SAF.

12   237.   Plaintiffs Crossroads, Walsh, LAX Ammo, CRPA and SAF have

13   suffered actual damages as a result of the conduct of Defendants Newsom, Bonta,

14   Ross, and District complained of herein.

15   238.   Plaintiffs Crossroads, Walsh, LAX Ammo, CRPA and SAF notified

16   Defendants Newsom, Bonta, Ross, and District of this claim by filing a Government

17   Tort Claim pursuant to California's Tort Claims Act. Ex. 7.

18   239.   Defendants Newsom, Bonta, Ross, and District neither accepted nor

19   rejected Plaintiffs' Government Tort Claim in writing within 45 days, so the claim

20   was rejected by operation of law.

21   <center>**NINTH CAUSE OF ACTION**</center>

22   <center>**Intentional Interference with Contract**</center>

23   <center>(By Plaintiff Crossroads Against Defendants Newsom, Bonta, Ross, and District)</center>

24   240.   Plaintiffs incorporate by reference paragraphs 1 through 239 of this

25   Complaint as if fully set forth herein in their entirety.

26   241.   For more than 30 years, Plaintiff Crossroads has maintained contracts

27   with Defendant District, under which Plaintiff Crossroads annually hosts about five

28   gun-show events at the Fairgrounds. Thus, an economic relationship has been in

<center>54</center>

1  effect between Plaintiff Crossroads and the District to operate gun shows on state

2  fairground property for over 30 years.

3      242.   For decades, Defendant District has given Plaintiff Crossroads an

4  effective right of first refusal to secure event dates for the coming year as a returning

5  contractor at the Fairgrounds under the District's longstanding "hold" system.

6      243.   Defendants Newsom, Bonta, Ross, and District had actual knowledge

7  of the existence of these relationships.

8      244.   By adopting and enforcing AB 893, which bans the sale of firearms and

9  ammunition at the Fairgrounds and effectively bans gun shows at the Fairgrounds,

10  Defendants Newsom, Bonta, Ross, and District engaged in an intentional act

11  designed to disrupt these economic relationships.

12      245.   The adoption and enforcement of AB 893 by Defendants Newsom,

13  Bonta, Ross, and District did, in fact, disrupt the known economic relationships

14  between Plaintiff Crossroads and Defendant 2nd DAA and between Plaintiff

15  Crossroads and its vendors, including Plaintiffs Walsh, LAX Ammo, CRPA and

16  SAF.

17      246.   Plaintiffs Crossroads has suffered actual damages as a result of the

18  conduct of Defendants Newsom, Bonta, Ross, and District complained of herein.

19      247.   Plaintiff Crossroads notified Defendants Newsom, Bonta, Ross, and

20  District of this claim by filing a Government Tort Claim pursuant to California's

21  Tort Claims Act. Ex. 7,

22      248.   Defendants Newsom, Bonta, Ross, and District neither accepted nor

23  rejected Plaintiffs' Government Tort Claim in writing within 45 days, so the claim

24  was rejected by operation of law.

25                     **PRAYER FOR RELIEF**

26  WHEREFORE, Plaintiffs pray for:

27      1.   A declaration that AB 893, codified at California Food & Agricultural

28  Code section 4158, violates the free speech rights of Plaintiffs CRPA, South Bay,

SAF, and Individual Plaintiffs Bardack, Diaz, Dupree, Irick, Solis, and Walsh under the First Amendment to the United States Constitution;

2.     A declaration that AB 893 violates the free speech rights of Plaintiff Crossroads under the First Amendment to the United States Constitution;

3.     A declaration that AB 893, codified at California Food & Agricultural Code section 4158, violates the free speech rights of Plaintiffs Solis, Walsh, Captain Jon's, and LAX Ammo under the First Amendment to the United States Constitution;

4.     A declaration that AB 893, codified at California Food & Agricultural Code section 4158, violates the free speech rights of all Plaintiffs under the First Amendment to the United States Constitution because it imposes a prior restraint on their speech;

5.     A declaration that AB 893, codified at California Food & Agricultural Code section 4158, violates the rights of assembly and association of all Plaintiffs under the First Amendment to the United States Constitution;

6.     A declaration that AB 893, codified at California Food & Agricultural Code section 4158, violates the rights of all Plaintiffs to equal protection under the law per the Fourteenth Amendment to the United States Constitution;

7.     An preliminary and permanent injunction prohibiting all Defendants or any of their agents from enforcing AB 893, codified at California Food & Agricultural Code section 4158;

8.     An order for damages, including nominal damages, according to proof;

9.     An award of costs and expenses, including attorney's fees, pursuant to 42 U.S.C. § 1988 or other appropriate state or federal law; and

/ / /

/ / /

/ / /

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

10.    Any such other relief the Court deems just and equitable.

Dated  October 4, 2021                    **MICHEL   ASSOCIATES  P.C.**

_s/ Anna M. Barvir_
Anna M. Barvir
Counsel for Plaintiffs  &L Productions, Inc.,
 Barry Bardack, Ronald J. Diaz, Sr., John
Dupree, Christopher Irick, Robert Solis,
Lawrence Michael Walsh, Captain Jon's
Lockers, LLC, L.A.X. Firing Range, Inc.,
California Rifle & Pistol Association,
Incorporated, South Bay Rod and Gun Club,
Inc.

Dated  October 4, 2021                    LAW   OFFICES OF DON KILMER

_s/ Don Kilmer_
Don Kilmer
Counsel for Plaintiff Second Amendment
Foundation

57
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF CONTENTS FOR EXHIBITS

| Exhibit No. | Description | Page Number |
|---|---|---|
| 1 | Table of Fairground Information (Dec. 31. 2010) | 0002 |
| 2 | Letter from Governor Gavin Newsom to Board Members of 22nd District Agricultural Association (April 23, 2018) | 0004 |
| 3 | Letter from Assembly Member Todd Gloria to Board Members of 22nd District Agricultural Association (Sept. 10, 2018) | 0006 |
| 4 | *B&L Prods. v. 22nd Dist. Agric. Ass'n*, 394 F. Supp. 3d 1226 (S.D. Cal. 2019) | 0010 |
| 5 | Parties' Joint Notice of Settlement and Motion for Dismissal, *B&L Prods. v. 22nd Dist. Agric. Ass'n*, 394 F. Supp. 3d 1226 (S.D. Cal. 2020) | 0029 |
| 6 | Bill 893, 2019-2020 Reg. Sess. (Cal. 2019) | 0053 |
| 7 | Matthew Fleming, Assem. Comm. Pub. Safety, Bill Analysis Re: AB 819 (Gloria), 2019-2020 Reg. Sess., at 3 (Cal. 2019) | 0057 |
| 8 | Garen Wintemute, MD, *Inside Gun Shows: What Goes on When Everybody Thinks Nobody's Watching*, ch. 1 (2009) | 0065 |
| 9 | U.S. Gov't Accountability Off., GAO-16-223, *Firearms Trafficking: U.S. Efforts to Combat Firearms Trafficking to Mexico Have Improved, but Some Collaboration Challenges Remain* (2016) | 0114 |
| 10 | Caroline Wolf Harlow, Ph.D., Bureau of Justice Statistics, *Firearm Use by Offenders* (Nov. 2001) | 0160 |
| 11 | Kimberly Horiuchi, Assem. Comm. Approps., Bill Analysis Re: AB 819 (Gloria), 2019-2020 Reg. Sess., at 1-2 (Cal. 2019) | 0176 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

12      Letter from Senator Dave Min to Board Members        0180
        of 32nd District Agricultural Association

13      Government Tort Claim (filed Aug. 2, 2021)           0185

14      Memorandum of Patrick Kerins, Public Safety          0303
        Director, 22nd District Agricultural Association,
        to Board of Directors, 22nd District Agricultural
        Association, at 17 (2016)

TABLE OF CONTENTS FOR EXHIBITS

# EXHIBIT 1

## TABLE OF FAIRGROUND INFORMATION

| Fair Name and Location | Property Ownership | Incorporated in City | Unincorporated in County | Vesting Title | Site Area (Acres) | Ownership |
|---|---|---|---|---|---|---|
| 14th DAA, Santa Cruz County Fair, Watsonville | 14th DAA | | Unincorporated Santa Cruz County | 14th District Agricultural Association, an institution of the State of California | 105 | DAA |
| 15th DAA Kern County Fair, Bakersfield (Leased) | Lease from Kern County | | Unincorporated Kern County | County of Kern, a political subdivision of the State of California | 168 | County |
| 16th DAA, Mid-State Fair, Paso Robles | 16th DAA | City of El Paso de Robles | | State of California as to Lots 3, 5,6,7,8 and 10 in Block 1; and 16th District Agricultural Association, as to the remainder | 42 | DAA |
| 17th DAA, Nevada County Fair, Grass Valley | 17th DAA | | | No information available | 100 | DAA |
| 18th DAA, Eastern Sierra Tri-County Fair, Bishop | Lease from Los Angeles Water and Power | City of Bishop | | The City of Los Angeles, a Municipal Corporation | 65 | LADWP |
| 19th DAA, Earl Warren Show grounds, Santa Barbara | 19th DAA | | Unincorporated Santa Barbara County | State of California, acting by and through the manager of the 19th District Agricultural Association, with the approval of the California Department of Food and Agriculture, who acquired title as 19th District Agricultural Association | 34 | DAA |
| 20th DAA, Gold Country Fair, Auburn | 20th DAA | City of Auburn | | 20th District Agricultural Association, and Institution of the State of California | 38 | DAA |
| 21st DAA, Big Fresno Fair, Fresno | Lease from Fresno County | | Unincorporated Fresno County | The County of Fresno, a public corporation. | 82 | DAA |
| 21-A DAA, Madera District Fair, Madera | 21-A DAA | | Unincorporated Madera County | 21-A District Agricultural Association, an Institution of the State of California, as to Parcels 1 and 3; and 21-A District Agricultural Association, as to Parcel 2 | 165 | County |
| 22nd DAA  San Diego County Fair, Del Mar | 22nd DAA | | Unincorporated San Diego County | 22nd District Agricultural Association of the State of California | 364 | DAA |
| 23rd DAA, Contra Costa County Fair, Antioch | 23rd DAA | | Unincorporated Contra Costa County | 23rd District Agricultural Association, an institution of the state of California, as to parcels one and two, the State of California, as to parcel three. | 80 | DAA |

# EXHIBIT 2



**GAVIN NEWSOM**
LIEUTENANT GOVERNOR

ATTN: Board of Directors
22nd District Agricultural Association
2260 Jimmy Durante Blvd.
Del Mar, CA 92014

RE: Gun shows on the Del Mar Fairgrounds

April 23, 2018

Dear Members of the Board,

I write to urge that the Board of Directors ban gun shows at the Del Mar Fairgrounds, a public-owned land, and invite the Board of Directors to discuss the issue at its next hearing and facilitate a productive conversation with public input.

In the wake of recent mass shootings, the public has demonstrated outpouring support for gun reform. Permitting the sale of firearms and ammunition on state-owned property only perpetuates America's gun culture at a time when 73% of Californians support gun reform measures and 73% of Californians cite concern about the threat of mass shootings in our schools, according to a recent poll conducted by the Public Policy Institute of California.

There is widespread support for this ban within immediate communities; the neighboring cities of the Del Mar Fairgrounds—Del Mar, Solana Beach, and Encinitas—have adopted resolutions supporting the ban of gun shows at the Fairgrounds. As Mayor of San Francisco, I pressed to end gun shows in neighboring Daly City because the impact of gun violence isn't hindered by municipal boundaries.

The public is demanding action from government, evident in the significant participation in recent protests and walkouts. It is imperative that we answer their call to action and make meaningful strides toward ending gun violence. If California continues to permit the sale of firearms and ammunition on state-owned property, we are sending a signal that we value the sale of firearms above the lives of Americans.

Sincerely,

Gavin Newsom
Lieutenant Governor of California

0004

# EXHIBIT 3



**STATE CAPITOL**
P.O. BOX 942849
SACRAMENTO, CA 94249-0078
(916) 319-2078
FAX (916) 319-2178

**DISTRICT OFFICE**
1350 FRONT STREET, SUITE 6054
SAN DIEGO, CA 92101
(619) 645-3090
FAX (619) 645-3094

**E-MAIL**
Assemblymember.Gloria@assembly.ca.gov

*Assembly*
**California Legislature**

**TODD GLORIA**
MAJORITY WHIP
ASSEMBLYMEMBER, SEVENTY-EIGHTH DISTRICT

**COMMITTEES**
AGING AND LONG-TERM CARE
GOVERNMENTAL ORGANIZATION
HOUSING AND COMMUNITY
DEVELOPMENT
VETERANS AFFAIRS
WATER, PARKS, AND WILDLIFE

September 10, 2018

22nd District Agricultural Association
Attn: Board of Directors
2260 Jimmy Durante Blvd.
Del Mar, CA 92014

Dear Members of the Board,

As the Assemblymember representing the 78th District, which includes the Del Mar Fairgrounds, I am writing in support of the Contracts Committee recommendation that no new contracts with producers of gun shows be approved. As stated in my letter of March 12, 2018, it is my firm belief that the State of California should in no way help to facilitate the sale of firearms.

I applaud the 22nd District Agricultural Association (22nd DAA)'s willingness to consider options for limiting or eliminating these gun shows, and believe that this recommendation reflects the desires of the surrounding community. It is my firm belief that the Board itself should carry out this directive, however, I am prepared to act by way of legislation should the 22nd DAA Board be unable to take meaningful action. I have prepared language for introduction in the next legislative session should that become necessary.

With the continued prevalence of gun violence in our nation, it is impossible to ignore the link to the number of guns in our communities. That is why I believe it is imperative to remove the State, to the extent possible, from complicity in these tragedies by restricting gun shows at the Del Mar Fairgrounds.

I appreciate the Board's time and consideration of this matter.

Sincerely,

TODD GLORIA
Assemblymember, 78th District

CC: Tim Fennell, Del Mar Fairgrounds CEO/General Manager

0006



**STATE CAPITOL**
P.O. BOX 942849
SACRAMENTO, CA 94249-0078
(916) 319-2078
FAX (916) 319-2178

**DISTRICT OFFICE**
1350 FRONT STREET, SUITE 6054
SAN DIEGO, CA 92101
(619) 645-3090
FAX (619) 645-3094

**E-MAIL**
Assemblymember.Gloria@assembly.ca.gov

**Assembly**
**California Legislature**

**TODD GLORIA**
MAJORITY WHIP
ASSEMBLYMEMBER  SEVENTY-EIGHTH DISTRICT

**COMMITTEES**
AGING AND LONG-TERM CARE
GOVERNMENTAL ORGANIZATION
HOUSING AND COMMUNITY
DEVELOPMENT
VETERANS AFFAIRS
WATER, PARKS, AND WILDLIFE

March 12, 2018

22nd District Agricultural Association
Attn: Board of Directors
2260 Jimmy Durante Blvd.
Del Mar, CA 92014

Dear Members of the Board,

As the California State Assemblymember representing the 78th District, I am writing to urge you to limit the reoccurrences of gun shows at the Del Mar Fairgrounds. It is my firm belief that the State of California should in no way help to facilitate the sale of firearms.

According to the U.S. Centers for Disease Control and Prevention, 96 Americans are killed every day with a firearm. Sixty-two percent of firearm deaths are suicides. The CDC also estimates more than 200 people are injured daily by firearms -- double the lives lost. Just this year alone, more than 2,500 people in the U.S. have been killed due to gun violence and we have experienced more than 40 mass shootings -- including the massacre of seventeen students and faculty at Stoneman Douglas High School in Parkland, Florida.

Although California has some of the most restrictive gun laws in the nation, we must do more to prevent gun violence and injuries. With the continued prevalence of gun violence in our nation, it is impossible to ignore the link to the number of guns in our communities. That is why I believe it is imperative to remove the State, to the extent possible, from complicity in these tragedies by limiting the frequency of gun shows at the Del Mar Fairgrounds.

I appreciate your time and consideration to this matter. Should you have any questions, please feel free to contact me at (619) 645-3090.

Sincerely,

TODD GLORIA
Assemblymember, 78th District

CC: Tim Fennell, Del Mar Fairgrounds CEO

# EXHIBIT 4



**User Name:** Laura Palmerin
**Date and Time:** Thursday, September 30, 2021 5:02:00 PM PDT
**Job Number:** 154238224

## Document (1)

1. _B & L Prods. v. 22nd Dist. Agric. Ass'n, 394 F. Supp. 3d 1226_
   **Client/Matter:** 2518
   **Search Terms:** 394 F. Supp. 3d 1226 (S.D. Cal. 2019)
   **Search Type:** Natural Language
   **Narrowed by:**

   | Content Type | Narrowed by |
   | --- | --- |
   | Cases | -None- |



Neutral
As of: October 1, 2021 12:02 AM Z

# *B & L Prods. v. 22nd Dist. Agric. Ass'n*

United States District Court for the Southern District of California

June 25, 2019, Decided; June 25, 2019, Filed

Case No.: 3:19-CV-134-CAB-NLS

**Reporter**
394 F. Supp. 3d 1226 *; 2019 U.S. Dist. LEXIS 106334 **; 2019 WL 2602546

B & L PRODUCTIONS, INC. d/b/a CROSSROADS OF THE WEST et al., Plaintiffs, v. 22ND DISTRICT AGRICULTURAL ASSOCIATION et al., Defendants.

**Subsequent History:** Motion denied by *B & L Prods. v. 22nd Dist. Agric. Ass'n, 2020 U.S. Dist. LEXIS 73950 (S.D. Cal., Apr. 27, 2020)*

## Core Terms

Moratorium, gun show, discovery, Fairgrounds, content-based, regulation, gun, summary judgment, public safety, rights, motion to dismiss, restrictions, content-neutral, viewpoint, strict scrutiny, quotation, marks, governmental interest, public forum, allegations, firearm, preliminary injunction, irreparable, satisfies, immunity, subject to strict scrutiny, compelling state interest, summary judgment motion, constitutional right, narrowly tailored

**Counsel:** [**1] For B & L Productions, Inc., doing business as Crossroads of the West, Barry Bardack, Ronald J. Diaz, Sr., John Dupree, Christopher Irick, Lawrence Walsh, Maximum Wholesale, Inc., doing business as Ammo Bros., California Rifle & Pistol Association, Incorporated, South Bay Rod and Gun Club, Inc., Plaintiffs: Carl D. Michel, Sean Brady, LEAD ATTORNEYS, Tiffany D. Cheuvront, Michel & Associates PC, Long Beach, CA; Anna M. Barvir, Michel &

Associates, P. C., Long Beach, CA.

For *Second Amendment* Foundation, Plaintiff: Carl D. Michel, LEAD ATTORNEY, Michel & Associates PC, Long Beach, CA; Donald Edward Kilmer, Jr., LEAD ATTORNEY, Law Offices of Donald Kilmer, A Professional Corporation, San Jose, CA.

For 22nd District Agricultural Association, Defendant: Peiyin Patty Li, LEAD ATTORNEY, California Department of Justice, Office of the Attorney General, San Francisco, CA.

**Judges:** Hon. Cathy Ann Bencivengo, United States District Judge.

**Opinion by:** Cathy Ann Bencivengo

## Opinion

### [*1233] MEMORANDUM OPINION RE JUNE 18, 2019 ORDER

[*1234] At a hearing on June 17, 2019, and in an order dated June 18, 2019, the Court granted in part and denied in part a motion to dismiss filed by Defendants, denied Plaintiffs' request for entry of summary judgment, and issued a preliminary [**2] injunction against Defendant 22nd District Agricultural District (the "District"). The purpose of this opinion is to provide the reasoning for the Court's order.

394 F. Supp. 3d 1226, *1234; 2019 U.S. Dist. LEXIS 106334, **2

## I. Background

Plaintiff B&L Productions, Inc. d/b/a Crossroads of the West ("Crossroads") operates gun show events in California, including at the Del Mar Fairgrounds (the "Fairgrounds"). [Doc. No. 1 at ¶ 1.] Plaintiffs California Rifle & Pistol Association, Inc. ("CRPA"); South Bay Rod and Gun Club, Inc. ("SBRGC"); *Second Amendment* Foundation, Inc. ("SAF"); Barry Bardack; Ronald J. Diaz, Sr.; John Dupree; Christopher Irick; Lawrence Michael Walsh; and Maximum Wholesale, Inc. d/b/a Ammo Bros ("MW"), attend and participate in the Crossroads gun show at the Fairgrounds. [*Id.* at ¶ 7.] The Complaint describes gun shows as:

> a modern bazaar—a convention of like-minded individuals who meet in this unique public forum that has been set aside by state local governments for all manner of commerce. Gun shows just happen to include the exchange of products and ideas, knowledge, services, education, entertainment, and recreation, related to the lawful uses of firearms. Those lawful uses include (but are not limited to):
>
> a. Firearm safety training;
>
> b. Self-defense; **[**3]**
> c. Defense of others;
> d. Defense of community;
> e. Defense of state;
> f. Defense of nation;
> g. Hunting;
> h. Target shooting;
> i. Gunsmithing;
> j. Admiration of guns as art;
> k. Appreciation of guns as technological artifacts; and
> l. Study of guns as historical objects.

[*Id.* at ¶ 47.] The complaint further alleges that:

> Gun shows in general, and the Del Mar show in particular, are a celebration of America's "gun culture" that is a natural

and essential outgrowth of the constitutional rights that flow from the *Second Amendment to the United States Constitution*. Participating in that culture is one of the primary reasons people attend Crossroads gun shows as vendors, exhibitors, customers, and guests (even if particular vendors/attendees are not in the firearm business or in the market to buy a gun at a particular event.)

[*Id.* at ¶ 49.]

According to the complaint, individuals attending and participating in these gun shows engage in commercial activities [*id.* at ¶ 3], but "[a]ctual firearm transfers are prohibited from taking place at any gun show in California absent very limited exceptions applicable only to law enforcement" [*id.* at ¶ 43]. "Only a small percentage (usually less than 40%) of the vendors actually offer firearms or ammunition for sale. The **[**4]** remaining vendors offer accessories, collectibles, home goods, lifestyle **[*1235]** products, food and other refreshments." [*Id.* at ¶ 48.]

In addition, according to the complaint, these gun show events include activities and discussions related to: "firearms, firearm technology, firearm safety, gun-politics, and gun-law (both pending legislation and proper compliance with existing law.) Other topics include: where to shoot, where and from whom to receive training, gun-lore, gun-repair, gunsmithing, gun-art, and many other topics, that arise from the right to acquire, own, possess, enjoy, and celebrate arms as a quintessentially American artifact with Constitutional significance." [*Id.* at ¶ 3.] The complaint also alleges that at gun shows, "literature and information are shared, speakers provide valuable live lectures, classes are conducted, political forums are held where gun rights discussions take place, and candidates for political office can meet to

394 F. Supp. 3d 1226, *1235; 2019 U.S. Dist. LEXIS 106334, **4

discuss political issues, the government, and the Constitution with constituents who are part of the California gun culture." [*Id.* at ¶ 52.]

The Fairgrounds is owned by the state of California and managed by the board of directors of Defendant 22nd **[**5]** District Agricultural Association (the "District"). [*Id.* at ¶¶ 23, 58, 112.] According to the complaint, the Fairgrounds "is used by many different public groups and is a major event venue for large gatherings of people to engage in expressive activities, including concerts, festivals, and industry shows." [*Id.* at ¶ 63.] The Fairgrounds' website allegedly describes its mission as "'[t]o manage and promote a world-class, multi-use, *public assembly facility* with an emphasis on agriculture, education, entertainment, and recreation in a fiscally sound and environmentally conscientious manner *for the benefit of all*.'" [*Id.* at ¶ 66 (*emphasis* originally in complaint); Doc. No. 1-2 at 2-33; Doc. No. 14-5 at 206.][1]

Defendant Karen Ross is the Secretary of the California Department of Food & Agriculture (the "CDFA"), the entity responsible for policy oversight of the Fairgrounds. [Doc. No. 1 at ¶ 24.] According to the complaint, she oversees the operation of the District, and authorized the other Defendants "to interpret, enforce, and implement [the CDFA's] policies for the operation and management of the [Fairgrounds]." [*Id.* at ¶¶ 59, 113.]

Defendants Steve Shewmaker and Richard Valdez **[**6]** are president and vice-president of the District Board of Directors, respectively. [*Id.* at ¶¶ 25, 26.] Shewmaker and Valdez were also the members of an "ad hoc committee responsible for developing the plan, in closed session, to effectively ban gun shows from the [Fairgrounds]." [*Id.; see also* ¶ 84] At a public

hearing on September 11, 2018, this committee:

recommended that the District not consider any contracts with the producers of gun shows beyond December 31, 2018 until such time as the District has put into place a more thorough policy regarding the conduct of gun shows that:

a. Considers the feasibility of conducting gun shows for only educational and safety training purposes and bans the possession of guns and ammunition on state property[;]

b. Aligns gun show contract language with recent changes to state and federal law[;]

c. Details enhanced security plan for the conduct of future shows[;]

d. Proposes a safety plan[;]

e. Considers the age appropriateness of the event[;]

**[*1236]** f. Grants rights for the [District] to perform an audit to ensure full compliance with *California Penal Code Sections 171b* and 12071.1 and 12071.4.

[*Id.* at ¶ 88.] The District then "voted (8-to-1) to impose a one-year moratorium (for the year 2019) on gun show **[**7]** events at the Venue while they study potential safety concerns." [*Id.* at ¶ 94.] According to the complaint, there was "no finding that allowing the (already heavily regulated) gun show events to continue at the [Fairgrounds] posed a definite or unique risk to public safety." [*Id.* at ¶ 92.] The complaint also alleges that the Fairgrounds "has held other non-gun-show events in which criminal activity has taken place—including theft and a shooting. These criminal incidents are no more likely to happen at a gun show event [than at] the non-gun-show event. The District has taken no actions to ban or impose a moratorium on these promoters or events." [*Id.*

---

[1] *See* *also* http://www.delmarfairgrounds.com/index.php?fuseaction=about.home

Case 3:21-cv-01718-AJB-KSC  Document 1  Filed 10/04/21  PageID.72  Page 72 of 366

Page 4 of 18

394 F. Supp. 3d 1226, *1236; 2019 U.S. Dist. LEXIS 106334, **7

at ¶ 67.]

## II. Procedural History

On January 21, 2019, Plaintiffs filed the complaint in this action. The complaint asserts several claims for violation of the right to free speech under the *First Amendment to the Constitution* by various combinations of Plaintiffs, as well as claims by all Plaintiffs for violation of the right to assembly and association under the *First Amendment*, violation of the right to equal protection under the *Fourteenth Amendment to the Constitution*, and conspiracy to violate civil rights under *42 U.S.C. § 1985*. The complaint prays for declaratory relief that Defendants' actions in enacting the moratorium on gun shows violated [**8] Plaintiffs' *First Amendment* Rights, injunctive relief compelling Defendants to allow Crossroads to hold gun shows at the Fairgrounds in 2019, compensatory damages, and punitive damages.

On March 27, 2019, Defendants moved to dismiss the complaint in its entirety. In their opposition to the motion, Plaintiffs asked the Court to convert the motion to dismiss into cross-motions for summary judgment. Upon review of the briefing, and because in a *First Amendment* case, "plaintiffs have a special interest in obtaining a prompt adjudication of their rights," *Sorrell v. IMS Health Inc., 564 U.S. 552, 563, 131 S. Ct. 2653, 180 L. Ed. 2d 544 (2011)*, the Court was inclined to adopt Plaintiffs' proposal. The Court then ordered further briefing to give Defendants the opportunity to fully oppose summary judgment in favor of Plaintiffs. After that supplemental briefing was complete, the Court held a hearing on June 17, 2019. As memorialized by a written order the following day, at that hearing the Court informed the parties that it was granting in part and denying in part Defendants' motion to dismiss, denying without

prejudice Plaintiffs' motion for summary judgment based on Defendants' claim that they need discovery to adequately oppose the motion, and set a discovery schedule and briefing schedule for motions for [**9] summary judgment. The Court also granted a preliminary injunction to Plaintiffs that enjoined Defendants from enforcing the moratorium on gun shows adopted at the September 11, 2018 meeting (the "Moratorium"). This opinion provides the Court's reasoning for the rulings it issued at the June 17, 2019 hearing and memorialized in the June 18, 2019 order.

## III. Defendants' Motion to Dismiss

Although one might think otherwise based on the quantity of outside evidence submitted by Defendants with their motion to dismiss, "evidence outside the pleadings . . . cannot normally be considered in deciding a 12(b)(6) motion." *Cervantes v. City of San Diego, 5 F.3d 1273, 1274 (9th Cir. 1993)* (quoting [*1237] *Farr v. United States, 990 F.2d 451, 454 (9th Cir. 1993))*.[2] "The question presented

---

[2] Defendants ask for judicial notice of various policies, manuals, reports, meeting minutes and transcripts from the District, on the grounds that they are public records. [Doc. 12-2.] "Judicial notice under *Rule 201* permits a court to notice an adjudicative fact if it is 'not subject to reasonable dispute.'" *Khoja v. Orexigen Therapeutics, Inc., 899 F.3d 988, 999 (9th Cir. 2018)* (quoting *Fed. R. Evid. 201(b)*). Although "a court may take judicial notice of matters of public record without converting a motion to dismiss into a motion for summary judgment, . . . [it] cannot take judicial notice of disputed facts contained in such public records." *Id.* (internal citation and quotation marks omitted). Here, it is not clear from the request for judicial notice which facts from these documents Defendants are asking the Court to notice because the request asks the Court only to take notice of the documents themselves. The accuracy of the documents may not reasonably be questioned, "but accuracy is only part of the inquiry under *Rule 201(b)*." *Id.* "Just because the document itself is susceptible to judicial notice does not mean that every assertion of fact within that document is judicially noticeable for its truth." *Id.* Regardless, even after considering the documents attached to Defendants' request, the Court finds that the complaint states a claim against the District.

Case 3:21-cv-01718-AJB-KSC   Document 1   Filed 10/04/21   PageID.73   Page 73 of 366

Page 5 of 18

394 F. Supp. 3d 1226, *1237; 2019 U.S. Dist. LEXIS 106334, **9

. . . is not whether the plaintiff will ultimately prevail, but whether the plaintiff has alleged sufficient factual grounds to support a plausible claim to relief, thereby entitling the plaintiff to offer evidence in support of its claim." *Mazal Grp., LLC v. Espana, No. 217CV05856RSWLKS, 2017 U.S. Dist. LEXIS 200108, 2017 WL 6001721, at *2 (C.D. Cal. Dec. 4, 2017)*.

Thus, when considering a motion to dismiss the Court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co., 519 F.3d 1025, 1031 (9th Cir. 2008)*. To survive the motion, the "complaint must contain sufficient [**10] factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)* (quoting *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007))*. On the other hand, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal, 556 U.S. at 678* (quoting *Twombly, 550 U.S. at 555*). Nor is the Court "required to accept as true allegations that contradict exhibits attached to the Complaint or matters properly subject to judicial notice, or allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Daniels-Hall v. Nat'l Educ. Ass'n, 629 F.3d 992, 998 (9th Cir. 2010)*. "In sum, for a complaint to survive a motion to dismiss, the non-conclusory factual content, and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv., 572 F.3d 962, 969 (9th Cir. 2009)* (internal quotation marks omitted).

Accordingly, the need not address the merits of Defendants' request for judicial notice.

## A. Claims Against the District

In the motion to dismiss, Defendants argue that the free speech claims should be dismissed because the Moratorium does not regulate speech or expressive conduct, is viewpoint and content-neutral, and survives either rational basis review or intermediate scrutiny. As discussed in detail below, the Court disagrees with Defendants and finds that the Moratorium is a content-based restriction of speech on its face. As a result, [**11] the Court is satisfied that the complaint states plausible claims against the District for violation of Plaintiffs' *First Amendment* rights and for violation of Plaintiffs' rights under the *Equal Protection Clause of the Fourteenth Amendment*. [*1238] It is for this reason that the Court denied the motion to dismiss with respect to the District.[3]

---

[3] Defendants make a host of objections to evidence submitted by Plaintiffs with their opposition to the motion to dismiss and request for summary judgment. [Doc. No. 15-1.] Because the language of the Moratorium and allegations in the complaint were sufficient for this ruling, the Court did not need to consider any of this evidence to determine that the complaint states a claim against the District and to deny the motion to dismiss as to the District. Nor was this evidence material to the Court's decision to deny Plaintiffs' motion for summary judgment based on Defendants' claimed need for discovery. Regardless, Defendants' formulaic objections to the relevance of Plaintiffs' evidence are generally inappropriate in the context of a motion for summary judgment. Instead of objecting to the relevance of the evidence, Defendants would be better served by *arguing* that the facts are not material. *See Burch v. Regents of Univ. of California, 433 F.Supp. 2d 1110, 1119 (E.D. Cal. 2006)*. As to objections as to the foundation for the evidence, many of the objections are targeted to the exact sort of evidence Defendants submitted in their request for judicial notice. Defendants even object to Plaintiff's submission of some of the exact same documents it included with its motion as also being irrelevant. Compare Exhibit D to Defendants' Request for Judicial Notice [Doc. No. 12-3 at 30] with Exhibit 18 to the Barvir Declaration [Doc. No. 14-6 at 304]. It is unclear what Defendants intend to accomplish with such objections, considering that Defendants believe the evidence is admissible and relevant in some form. Ultimately, the District bears the burden of proof that the gun show moratorium satisfies the requisite level of scrutiny, *see United*

394 F. Supp. 3d 1226, *1238; 2019 U.S. Dist. LEXIS 106334, **11

## B. Qualified Immunity as to Shewmaker and Valdez

The motion to dismiss also argues that Defendants Shewmaker and Valdez are entitled to qualified immunity. "Qualified immunity shields government actors from civil liability under *42 U.S.C. § 1983* if 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Castro v. Cty. of Los Angeles, 833 F.3d 1060, 1066 (9th Cir. 2016)* (en banc) (quoting *Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)*). It "protects 'all but the plainly incompetent or those who knowingly violate the law,'" *Mueller v. Auker, 576 F.3d 979, 992 (9th Cir. 2009)* (quoting *Malley v. Briggs, 475 U.S. 335, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986)*), and it assumes that government actors "do not knowingly violate the law," *Gasho v. United States, 39 F.3d 1420, 1438 (9th Cir. 1994)*. Because "[i]t is 'an *immunity from suit* rather than a mere defense to liability . . . it is effectively lost if a case is erroneously permitted to go to trial.'" *Mueller, 576 F.3d at 992* (*emphasis* in original) (quoting *Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S. Ct. 2806, 86 L. Ed. 2d 411 (1985)*). To that end, the Supreme Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in [**12] litigation." *Hunter v. Bryant, 502 U.S. 224, 227, 112 S. Ct. 534, 116 L. Ed. 2d 589 (1991)*.

To determine whether Shewmaker and Valdez are immune from suit, the court must "evaluate

_____

*States v. Playboy Entmt. Grp., Inc., 529 U.S. 803, 816, 120 S. Ct. 1878, 146 L. Ed. 2d 865 (2000)*, and it is the District's complete lack of evidence, rather than Plaintiffs' evidence, that causes the Court to conclude that Plaintiffs have a likelihood of success on the merits and otherwise satisfy the requirements for a preliminary injunction. Accordingly, Defendants' objections to Plaintiffs' evidence [Doc. No. 15-1] are **OVERRULED**.

two independent questions: (1) whether [their] conduct violated a constitutional right, and (2) whether that right was clearly established at the time of the incident." *Castro, 833 F.3d at 1066*. "[A] right is clearly established when the 'contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Id. at 1067* (quoting **[*1239]** *Serrano v. Francis, 345 F.3d 1071, 1077 (9th Cir. 2003)*). "This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." *Mueller, 576 F.3d at 994* (internal quotation marks and citation omitted). "[T]he clearly established law must be 'particularized' to the facts of the case." *White v. Pauly, 137 S.Ct. 548, 552, 196 L. Ed. 2d 463 (2017)* (citing *Anderson v. Creighton, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987)*). "The standard is an objective one that leaves 'ample room for mistaken judgments.'" *Mueller, 576 F.3d at 992* (quoting *Malley, 475 U.S. at 343*).

Here, the Court need not resolve whether Plaintiffs' Shewmaker and Valdez violated Plaintiffs' constitutional rights, because even assuming they did, those rights were not clearly established. Plaintiffs' constitutional rights "would be 'clearly established' if 'controlling authority or a robust consensus of cases of persuasive authority' had previously held that" it is a violation **[**13]** of the *First Amendment* right to free speech or *Fourteenth Amendment* right to equal protection to propose or vote for a rule banning gun shows from a public fairground. *Hines v. Youseff, 914 F.3d 1218, 1229-30 (9th Cir. 2019)* (quoting *Dist. of Columbia v. Wesby, ___ U.S. ___, 138 S.Ct. 577, 589-90, 199 L.Ed.2d 453 (2018)*). Plaintiffs point to no such precedent, and the Court has not located any on its own. The absence of such authority means that the rights in question here were not clearly established when Shewmaker and Valdez took actions related to the Moratorium. Accordingly,

Case 3:21-cv-01718-AJB-KSC   Document 1   Filed 10/04/21   PageID.75   Page 75 of 366

Page 7 of 18

394 F. Supp. 3d 1226, *1239; 2019 U.S. Dist. LEXIS 106334, **13

they are entitled to qualified immunity.

## C. Sovereign Immunity as to Ross

The motion to dismiss argues that the claims against Ross should be dismissed because she has sovereign immunity under the *Eleventh Amendment to the Constitution*. The *Eleventh Amendment* states:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

It "enacts a sovereign immunity from suit." *Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 267, 117 S. Ct. 2028, 138 L. Ed. 2d 438 (1997)*. The Supreme Court has "extended a State's protection from suit to suits brought by the State's own citizens . . . [and] suits invoking the federal-question jurisdiction of Article III courts may also be barred by the Amendment." *Id. at 268*. Thus, "*Eleventh Amendment* immunity represents a real limitation on a federal [**14] court's federal-question jurisdiction." *Id. at 270*. Sovereign immunity is an affirmative defense, and therefore, "[l]ike any other such defense . . . must be proved by the party that asserts it and would benefit from its acceptance." *ITSI TV Prods., Inc. v. Agric. Associations, 3 F.3d 1289, 1291 (9th Cir. 1993)*.

"Naming state officials as defendants rather than the state itself will not avoid the *eleventh amendment* when the state is the real party in interest. The state is the real party in interest when the judgment would tap the state's treasury or restrain or compel government action." *Almond Hill Sch. v. U.S. Dep't of Agric., 768 F.2d 1030, 1033 (9th Cir. 1985)*. Under the exception created by *Ex Parte Young, 209 U.S. 123, 28 S. Ct. 441, 52 L. Ed.*

*714 (1908)*, however, "individuals who, as officers of the state, are clothed with some duty in regard to the enforcement of the laws of the state, and who threaten and are about to commence proceedings, either of a civil [*1240] or criminal nature, to enforce against parties affected an unconstitutional act, violating the Federal Constitution, may be enjoined by a Federal court of equity from such action." *Ex parte Young, 209 U.S. at 155-56*. Pursuant to this exception, "the *eleventh amendment* does not bar an injunctive action against a state official that is based on a theory that the officer acted unconstitutionally." *Almond Hill Sch., 768 F.2d at 1034*. This exception does not allow suit against officers of the state simply "to enjoin the enforcement of an act alleged to [**15] be unconstitutional" unless the officer has "some connection with the enforcement of the act." *Ex parte Young, 209 U.S. at 157*. Otherwise, the suit "is merely making [the officer] a party as a representative of the state, and thereby attempting to make the state a party." *Id.*

Ross does not have a connection with the enforcement of the Moratorium.[4] The only allegations about Ross in the complaint are that she delegated operation and management of the Fairgrounds to the District and left it within the District's discretion to have gun

―――――――――――――――

[4] Plaintiffs argue in their opposition that Ross does not have sovereign immunity regardless of *Ex Parte Young* because "when Ross acts as supervisor of and delegates authority to the local District, she is not acting in her capacity as a state actor." [Doc. No. 14 at 24.] Yet, on the previous page of their brief, Plaintiffs state that they are suing Ross "in her official capacity as a state actor only." [*Id.* at 23.] Moreover, the complaint itself identifies Ross as "Secretary of the California Department of Food & Agriculture—the entity responsible for the policy oversight of the network of California fair venues" [Doc. No. 1 at ¶ 24], indicating that she is a party simply because of her title and not because of any specific actions she took with respect to the Moratorium. By suing her in her official capacity as a state actor, the suit can stand only if an exception to sovereign immunity applies. *Almond Hill Sch., 768 F.2d at 1033*.

Case 3:21-cv-01718-AJB-KSC   Document 1   Filed 10/04/21   PageID.76   Page 76 of 366

Page 8 of 18

394 F. Supp. 3d 1226, *1240; 2019 U.S. Dist. LEXIS 106334, **15

show events at the Fairgrounds. [*See, e.g.*, Doc. No. 1 at ¶ 127.] There are no allegations that Ross was tasked with enforcing the Moratorium by preventing gun shows at the Fairgrounds. Instead, Ross' alleged wrongdoing amounts to supervision over the District, Shewmaker, and Valdez, who are alleged to have been responsible for the Moratorium. This "general supervisory power over the persons responsible for enforcing" the Moratorium does not subject Ross to suit. *Los Angeles Cty. Bar Ass'n v. Eu, 979 F.2d 697, 704 (9th Cir. 1992)*. Accordingly, Ross is entitled to sovereign immunity.

## IV. Plaintiffs' Motion for Summary Judgment and Defendants' *Rule 56(d)* Declaration

Under *Federal Rule of Civil Procedure 56*, the court shall grant summary judgment "if the movant shows that there is no genuine **[**16]** dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P 56(a)*. To avoid summary judgment, disputes must be both 1) material, meaning concerning facts that are relevant and necessary and that might affect the outcome of the action under governing law, and 2) genuine, meaning the evidence must be such that a reasonable judge or jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. When ruling on a summary judgment motion, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." **[*1241]** *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987)*.

In opposition to summary judgment here, however, the District's primary argument is that it is entitled to discovery needed to oppose the motion. *Federal Rule of Civil Procedure 56(d)*[5] "provides that if a party opposing summary judgment demonstrates a need for further discovery in order to obtain facts essential to justify the party's opposition, the trial court may deny the motion for summary judgment or continue the hearing to allow for such discovery." *Margolis v. Ryan, 140 F.3d 850, 853 (9th Cir. 1998)*. In making a *Rule 56(d)* motion, "a party opposing summary judgment 'must make clear what information is sought and **[**17]** how it would preclude summary judgment.'" *Id.* (quoting *Garrett v. City and County of San Francisco, 818 F.2d 1515, 1518 (9th Cir. 1987)*). "The facts sought must be 'essential' to the party's opposition to summary judgment . . . and it must be 'likely' that those facts will be discovered during further discovery." *Sec. & Exch. Comm'n v. Stein, 906 F.3d 823, 833 (9th Cir. 2018)*. "In other words, there must be a 'basis or factual support for [the] assertions that further discovery would lead to the facts and testimony' described in an affidavit submitted pursuant to *Rule 56(d)*." *Haines v. Home Depot U.S.A., Inc., No. 1:10-CV-01763-SKO, 2012 U.S. Dist. LEXIS 8087, 2012 WL 217767, at *2 (E.D. Cal. Jan. 24, 2012)* (quoting *Margolis, 140 F.3d at 854*)). Evidence that is "the object of mere speculation . . . is insufficient to satisfy the rule." *Stein, 906 F.3d at 833* (citing *Ohno v. Yasuma, 723 F.3d 984, 1013 n.29 (9th Cir. 2013))*.

Although this rule "facially gives judges the discretion to disallow discovery when the non-

---

[5] *Federal Rule of Civil Procedure 56(d)* states: "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order."

Case 3:21-cv-01718-AJB-KSC   Document 1   Filed 10/04/21   PageID.77   Page 77 of 366

Page 9 of 18

394 F. Supp. 3d 1226, *1241; 2019 U.S. Dist. LEXIS 106334, **17

moving party cannot yet submit evidence supporting its opposition, the Supreme Court has restated the rule as requiring, rather than merely permitting, discovery 'where the nonmoving party has not had the opportunity to discover information that is essential to its opposition.'" *Metabolife Int'l, Inc. v. Wornick, 264 F.3d 832, 846 (9th Cir. 2001)* (quoting *Anderson, 477 U.S. at 250 n.5*). Thus, when "a summary judgment motion is filed so early in the litigation, before a party has had any realistic opportunity to pursue discovery relating to its theory of the case, district courts should grant any [*Rule 56(d)*] [**18] motion fairly freely." *Burlington N. Santa Fe R. Co. v. Assiniboine & Sioux Tribes of Fort Peck Reservation, 323 F.3d 767, 773 (9th Cir. 2003)*.

This right to discovery does not fit well with litigation like this one involving prior restraints on speech. Content-based restrictions on speech, of which the District's moratorium on gun shows is one, "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert, Ariz., 135 S. Ct. 2218, 2226, 192 L. Ed. 2d 236 (2015)*. In other words, as discussed in the next section, the Moratorium is subject to strict scrutiny. This finding is compelled by the language of the Moratorium itself. No discovery is needed from either side to arrive at this conclusion, and no additional discovery would result in a different standard of scrutiny being applied by the Court. *See id. at 2228* ("A law that is content based on its face is subject to strict scrutiny regardless of the government's [*1242] benign motive, content-neutral justification, or lack of 'animus toward the ideas contained'"). Thus, the only question on which discovery could be useful is whether the Moratorium satisfies strict scrutiny.

The District, however, has never taken the position that the Moratorium satisfies strict scrutiny. To the contrary, the District's position is that the Moratorium [**19] does not regulate speech at all and that it is subject only to rational basis review. [Doc. No. 12-1 at 20-22.] In the alternative, the District argues that the Moratorium satisfies intermediate scrutiny. It was only when faced with summary judgment in favor of Plaintiffs that the District asserts that it needs discovery to satisfy its burden. Yet, considering that the District has never argued that the Moratorium satisfies strict scrutiny, the discovery it now purports to need necessarily is based merely on speculation that the District will uncover evidence supporting a finding that the Moratorium satisfies strict scrutiny. The Court is not persuaded that the government can enact a facially content-based speech restriction based on a misguided belief that the regulation would have to satisfy only rational basis review, and then when told strict scrutiny applies, be allowed to delay summary judgment in favor of the party whose speech has been restricted in the hopes of finding support for the new position that the restriction satisfies strict scrutiny. Surely, the District's right to discovery to justify a facially content-based speech restriction does not take precedence over the [**20] *First Amendment* rights of Plaintiffs that would be restricted while such discovery takes place.

Moreover, the Court is not convinced that any of the discovery sought by the District will help it overcome summary judgment in favor of Plaintiffs. First, the District contends it needs discovery on whether the Moratorium regulates non-commercial speech that is inextricably intertwined with commercial speech. Yet, if both commercial and noncommercial speech occur at gun shows, the Moratorium restricts both commercial and noncommercial speech. If these types of speech at guns shows are inextricably intertwined, strict scrutiny applies to them both.

Case 3:21-cv-01718-AJB-KSC   Document 1   Filed 10/04/21   PageID.78   Page 78 of 366

Page 10 of 18

394 F. Supp. 3d 1226, *1242; 2019 U.S. Dist. LEXIS 106334, **20

Cf. *Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc., 487 U.S. 781, 795-96, 108 S. Ct. 2667, 101 L. Ed. 2d 669 (1988)* (holding that strict scrutiny applies where the commercial and non-commercial "component parts of a single speech are inextricably intertwined"). On the other hand, even if the non-commercial and commercial speech at gun shows are not inextricably intertwined, the Moratorium remains subject to strict scrutiny based on its restriction of non-commercial speech. Either way, the discovery the District contends it needs will not result in an easing of the District's burden.

Next, the District claims it needs discovery on whether the Moratorium "targets gun culture." **[**21]** Yet, even if the Moratorium does not target gun culture, it is still subject to strict scrutiny. See *Reed, 135 S.Ct. at 2230* (noting that although "discrimination among viewpoints—or the regulation of speech based on the specific motivating ideology or the opinion or perspective of the speaker—is a more blatant and egregious form of content discrimination . . . the *First Amendment's* hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic.") (internal quotation marks and citations omitted). Thus, it is unclear how such discovery would preclude summary judgment here.

Finally, the District contends that it requires discovery on "how the [Moratorium] serves the compelling government interest **[*1243]** of protecting public safety." [Doc. No. 20 at 20.] Yet, despite its arguments to the contrary, an amorphous concern for "public safety" is not the public interest that the District stated was the interest served by the Moratorium. Instead, the interest purportedly served by the Moratorium, based on the language of the Moratorium itself, is the District's ability to "put into place a more thorough policy regarding

the conduct of gun shows." **[**22]** In other words, the District does not seek discovery to support its stated interest for the Moratorium; it seeks discovery in the hopes of supporting a new state interest. This speculative discovery does not satisfy *Rule 56(d)*. *Stein, 906 F.3d at 833*.

Notwithstanding the foregoing, there is a middle ground here that would protect both any entitlement to discovery that the District may have before ruling on summary judgment, as well as Plaintiffs' constitutional rights—a preliminary injunction. As discussed below, Plaintiffs satisfy the requirements for a preliminary injunction on enforcement of the Moratorium. Accordingly, although the Court is skeptical that any of the discovery sought by the District would preclude summary judgment for Plaintiffs, Plaintiffs' motion for summary judgment is denied without prejudice based on *Rule 56(d)*. The June 18, 2019 order provides a briefing schedule for a renewed motion for summary judgment by Plaintiffs (and the District if desired) after the discovery period.

## V. Preliminary Injunction

Although Plaintiffs did not expressly move for a preliminary injunction, the briefing demonstrates that such an injunction is warranted while the District pursues the discovery it contends it needs to oppose **[**23]** summary judgment. "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008)*. Each of these four requirements is satisfied here.

394 F. Supp. 3d 1226, *1243; 2019 U.S. Dist. LEXIS 106334, **23

## A. Likelihood of Success Against the District

### 1. *First Amendment* Claims

"The *First Amendment*, applicable to the States through the *Fourteenth Amendment*, prohibits laws that abridge the freedom of speech." *Nat'l Inst. of Family & Life Advocates v. Becerra, 138 S.Ct. 2361, 2371, 201 L. Ed. 2d 835 (2018)*. Under the *First Amendment*, "a government, including a municipal government vested with state authority, 'has no power to restrict expression because of its message, its ideas, its subject matter, or its content.'" *Reed, 135 S.Ct. at 2226* (quoting *Police Dep't of Chicago v. Mosley, 408 U.S. 92, 95, 92 S. Ct. 2286, 33 L. Ed. 2d 212 (1972))*; *see also Texas v. Johnson, 491 U.S. 397, 414, 109 S. Ct. 2533, 105 L. Ed. 2d 342 (1989)* ("If there is a bedrock principle underlying the *First Amendment*, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."). "Content-based regulations 'target speech based on its communicative content.'" *Nat'l Inst. of Family & Life Advocates, 138 S.Ct. at 2371* (quoting *Reed, 135 S.Ct. at 2226*). "[T]he *First Amendment's* hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic." *Reed, 135 S.Ct. at 2230*.

Content-based [**24] regulations "are presumptively unconstitutional and may be [*1244] justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed, 135 S.Ct. at 2226*; *see also R.A.V. v. City of St. Paul, Minn., 505 U.S. 377, 382, 112 S. Ct. 2538, 120 L. Ed. 2d 305 (1992)* ("Content-based regulations are presumptively invalid."). "It is rare that a regulation restricting speech

because of its content will ever be permissible." *Playboy Entm't Grp., Inc., 529 U.S. at 818*; *see also Arkansas Writers' Project, Inc. v. Ragland, 481 U.S. 221, 230, 107 S. Ct. 1722, 95 L. Ed. 2d 209 (1987)* ("Regulations which permit the Government to discriminate on the basis of the content of the message cannot be tolerated under the *First Amendment*.") (quoting *Regan v. Time, Inc., 468 U.S. 641, 648-649, 104 S. Ct. 3262, 82 L. Ed. 2d 487 (1984))*. On the other hand, "[a] regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Ward v. Rock Against Racism, 491 U.S. 781, 791, 109 S. Ct. 2746, 105 L. Ed. 2d 661 (1989)*. "A content-neutral regulation will be sustained under the *First Amendment* if it advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests." *Turner Broad. Sys., Inc. v. F.C.C., 520 U.S. 180, 189, 117 S. Ct. 1174, 137 L. Ed. 2d 369 (1997)*. Accordingly, the Court first must decide whether the Moratorium is content neutral because resolution of that question determines the appropriate level of scrutiny. *See McCullen v. Coakley, 573 U.S. 464, 478, 134 S. Ct. 2518, 189 L. Ed. 2d 502 (2014)* ("The content-neutrality prong of the *Ward* test is logically antecedent to the narrow-tailoring [**25] prong, because it determines the appropriate level of scrutiny.").

### a. Is the Moratorium Content-Based or Content-Neutral?

"Although it is common to place the burden upon the Government to justify impingements on *First Amendment* interests, it is the obligation of the person desiring to engage in assertedly expressive conduct to demonstrate that the *First Amendment* even applies." *Clark*

Case 3:21-cv-01718-AJB-KSC   Document 1   Filed 10/04/21   PageID.80   Page 80 of 366

Page 12 of 18

394 F. Supp. 3d 1226, *1244; 2019 U.S. Dist. LEXIS 106334, **25

*v. Community for Creative Non-Violence, 468 U.S. 288, 293 n.5, 104 S. Ct. 3065, 82 L. Ed. 2d 221 (1984)*. Here, there is little question that speech and conduct protected by the *First Amendment* occurs at Crossroads' gun shows. Moreover, the speech in question is not merely commercial speech, as Defendants attempt to frame it in their motion. Rather, the types of speech alleged to occur at gun shows includes pure speech that warrants full *First Amendment* protection.

Further, the Moratorium is a restriction on speech based on the "communicative content" of that speech, *Reed, 135 S.Ct. at 2226*, with the communicative content being guns, gun rights, and gun-related issues. By its plain terms, the Moratorium applies only to gun shows. Put differently, on its face, the Moratorium accords preferential treatment to shows featuring speech on all issues aside from these gun-related subjects. The Moratorium "thus slips from the neutrality of time, place, and circumstance **[**26]** into a concern about content. This is never permitted." *Mosley, 408 U.S. at 99* (internal quotation marks and citation omitted). Notwithstanding this seemingly obvious conclusion, Defendants argue that "the fact that the [Moratorium] applies only to gun shows, and not all other types of events, does not transform it into a content-based regulation; otherwise, any legislative or regulatory action taken with respect to a particular type of activity or subject matter would be deemed to be content-based and subject to **[*1245]** strict scrutiny." [Doc. No. 12-1 at 25.] Defendants' reliance on *McCullen v. Coakley, 573 U.S. 464, 134 S. Ct. 2518, 189 L. Ed. 2d 502 (2014)*, for this argument is misplaced.

In *McCullen*, the regulation in question was a Massachusetts statute making "it a crime to knowingly stand on a 'public way' or sidewalk' within 35 feet of an entrance to any place,

other than a hospital, where abortions are performed." *McCullen, 573 U.S. at 469*. In holding that the statute was content-neutral, the Supreme Court noted that the statute "does not draw content-based distinctions on its face," and stated that the statute "would be content based if it required 'enforcement authorities 'to examine the content of the message that is conveyed to determine whether' a violation has occurred." *Id. at 479* (quoting *FCC v. League of Women Voters of Cal., 468 U.S. 364, 383, 104 S. Ct. 3106, 82 L. Ed. 2d 278 (1984))*. Here, in contrast, **[**27]** the content of a show or event, i.e., whether it is a gun show or is not a gun show, is determinative of whether it is eligible to hold an event at the Fairgrounds in 2019. Thus, whereas the buffer zone in *McCullen* may have had the "'*inevitable* effect' of restricting abortion-related speech more than speech on other subjects," *id. at 480* (*emphasis* added), the Moratorium here has the *intended* effect of restricting gun-related speech more than speech on other subjects.

Defendants conflate the government interests purportedly served by the Moratorium with the determination of whether the Moratorium is content-based or content-neutral. A court, however, must consider "whether a law is content neutral on its face *before* turning to the law's justification or purpose." *Reed, 135 S.Ct at 2228* (*emphasis* in original). Ignoring *Reed*, Defendants argue that because, according to Defendants, the Moratorium is focused on public safety issues, it "'serves purposes unrelated to the content of expression,' and so should be 'deemed neutral.'" [Doc. No. 12-1 at 26 (quoting *McCullen, 573 U.S. at 480*).]

Defendants' justifications for the Moratorium may be relevant to the determination of whether it satisfies the requisite level of scrutiny, but they do not render **[**28]** a content-based law content neutral. *Reed, 135 S.Ct. at 2228* ("[A]n innocuous justification

394 F. Supp. 3d 1226, *1245; 2019 U.S. Dist. LEXIS 106334, **28

cannot transform a facially content-based law into one that is content-neutral."). In *McCullen*, because the statute was facially neutral, the Court needed to go beyond the face of the statute to determine whether its purposes were intended to be content-based. *See Reed, 135 S.Ct. at 2228* ("Because strict scrutiny applies either when a law is content based on its face or when the purpose and justification for the law are content based, a court must evaluate each question before it concludes that the law is content neutral and thus subject to a lower level of scrutiny."). Here, on the other hand, the Moratorium is content-based on its face, the content being gun shows, which include speech related to guns and gun issues. "A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." *Id. at 2228.* Defendants' proffered content-neutral justification does not render the Moratorium, a facially content-based policy, content-neutral.

Indeed, because the speech at gun shows is likely to be predominantly, [**29] if not exclusively, favorable to guns and gun rights, "[i]n its practical operation," the Moratorium "goes even beyond mere content discrimination, to actual viewpoint discrimination." *R.A.V., 505 U.S. at 391.* "A regulation engages in viewpoint [*1246] discrimination when it regulates speech based on the specific motivating ideology or perspective of the speaker." *Interpipe Contracting, Inc. v. Becerra, 898 F.3d 879, 899 (9th Cir. 2018)* (internal quotation marks and citation omitted). "The government may not regulate use based on hostility—or favoritism—towards the underlying message expressed." *R.A.V., 505 U.S. at 386.* "Discrimination against speech because of its message is presumed to be unconstitutional." *Rosenberger v. Rector & Visitors of Univ. of Virginia, 515 U.S. 819, 828, 115 S. Ct. 2510,*

*132 L. Ed. 2d 700 (1995).* "When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the *First Amendment* is all the more blatant." *Id. at 829.* "Viewpoint discrimination is the most noxious form of speech suppression." *R.A.V., 505 U.S. at 386.* Here, it is difficult to conceive of the Moratorium on gun shows as anything other than a restriction of speech with a *pro-gun* or *pro-second amendment* viewpoint. Normally, this conclusion is all but dispositive. *Sorrell, 564 U.S. at 571* ("In the ordinary case it is all but dispositive to conclude that a law is content-based and, in practice, viewpoint-discriminatory.").

In this context, whether the Fairgrounds is a [**30] public forum, as Plaintiffs argue, or a "limited public forum" or nonpublic forum, as Defendants argue, has no impact on the result here. The Supreme Court has "identified three types of fora: the traditional public forum, the public forum created by government designation, and the nonpublic forum." *Cornelius v. NAACP Legal Defense & Ed. Fund, Inc., 473 U.S. 788, 802, 105 S. Ct. 3439, 87 L. Ed. 2d 567 (1985).* Regardless of the type of forum, however, "the fundamental principle that underlies [the Court's] concern about 'content-based' speech regulations [is] that 'government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views.'" *City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 48-49, 106 S. Ct. 925, 89 L. Ed. 2d 29 (1986)* (quoting *Mosley, 408 U.S. at 95-96*). "Although a speaker may be excluded from a nonpublic forum if he wishes to address a topic not encompassed within the purpose of the forum, or if he is not a member of the class of speakers for whose special benefit the forum was created, the government violates the *First Amendment* when it denies access to a speaker solely to suppress the point of view

he espouses on an otherwise includible subject." *Cornelius, 473 U.S. at 806* (internal citations omitted); *see also Christian Legal Soc. Chapter of the Univ. of California, Hastings Coll. of the Law v. Martinez, 561 U.S. 661, 679, 130 S. Ct. 2971, 177 L. Ed. 2d 838 (2010)* (holding that any restrictions based on the limited or nonpublic nature of the forum are subject to a "key caveat: Any access **[**31]** barrier must be reasonable and viewpoint neutral.").

"The Constitution forbids a state to enforce certain exclusions from a forum generally open to the public even if it was not required to create the forum in the first place." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45, 103 S. Ct. 948, 74 L. Ed. 2d 794 (1983)*; *see also Cinevision Corp. v. City of Burbank, 745 F.2d 560, 571 (9th Cir. 1984)* ("Although the City was not required to open the Starlight Bowl and is not required to leave it open indefinitely, it cannot, absent a compelling governmental interest, open the forum to some and close it to others solely in order to suppress the content of protected expression."). "Once a forum is **[*1247]** opened up to assembly or speaking by some groups, government may not prohibit others from assembling or speaking on the basis of what they intend to say. Selective exclusions from a public forum may not be based on content alone, and may not be justified by reference to content alone." *Mosley, 408 U.S. at 96* (internal footnote omitted). "Reasonable time, place and manner regulations are permissible, [but] a content-based prohibition must be narrowly drawn to effectuate a compelling state interest." *Perry Educ. Ass'n, 460 U.S. at 46*. Here, having opened up the Fairgrounds to shows of all types that are put on by all members of the public, the District cannot restrict use of the Fairgrounds based on the content, **[**32]** let alone viewpoint, expressed by the show and its participants. *See Martinez, 561 U.S. at 685* ("Once it has

opened a limited public forum, . . . the State must respect the lawful boundaries it has itself set.") (internal quotation marks and brackets omitted).

In sum, "[i]t is well established that '[t]he *First Amendment's* hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to a public discussion of an entire topic.'" *Reed, 135 S.Ct. at 2230* (quoting *Consol. Edison Co. v. Pub. Serv. Comm'n of New York, 447 U.S. 530, 537, 100 S. Ct. 2326, 65 L. Ed. 2d 319 (1980)*); *cf. Rosenberger, 515 U.S. at 831* ("If the topic of debate is, for example, racism, then exclusion of several views on that problem is just as offensive to the *First Amendment* as exclusion of only one. It is as objectionable to exclude both a theistic and an atheistic perspective on the debate as it is to exclude one, the other, or yet another political, economic, or social viewpoint."). At a minimum, based on the allegations in the complaint, the Moratorium is a "content-based" regulation of speech. Because the Moratorium regulates speech based on its content, it is subject to strict scrutiny, meaning "it must be narrowly tailored to promote a compelling Government interest." *Playboy Entm't Grp., Inc., 529 U.S. at 813*. Further, because the District is a political body, its decision on the Moratorium "must be scrutinized most carefully—if **[**33]** only because such a body is at all times, by its very nature, the object of political pressures." *Cinevision Corp., 745 F.2d at 575*.

### b. Compelling State Interest

Having determined that the Moratorium is a content-based restriction of speech, it is presumptively unconstitutional. *Reed, 135 S.Ct. at 2226*; *R.A.V., 505 U.S. at 382*. Content based restrictions are rarely upheld. "When the Government restricts speech, the

394 F. Supp. 3d 1226, *1247; 2019 U.S. Dist. LEXIS 106334, **33

Government bears the burden of proving the constitutionality of its actions." *McCutcheon v. Fed. Election Comm'n, 572 U.S. 185, 210, 134 S. Ct. 1434, 188 L. Ed. 2d 468 (2014)* (quoting *Playboy Entm't Grp., Inc., 529 U.S. at 816*). Thus, the District bears the burden of proving that the Moratorium is narrowly tailored to promote a compelling government interest.

In its briefs (and again at the hearing), the District relies vague claims that the Moratorium is based on an interest in "public safety." Both the language of the Moratorium itself and the District's briefs, however, are largely silent as what members of the public are endangered by gun shows or the speech therein. Nor does the District point to any evidence that attendees of gun shows at the Fairgrounds have suffered injuries in the past or are in greater danger than attendees of other events at the Fairgrounds.[6] Indeed, at the **[*1248]** hearing, counsel for the District could not answer why, after years of gun shows at the Fairgrounds, the **[**34]** District decided to enact the Moratorium when it did. The District's "[m]ere speculation of harm does not constitute a compelling state interest." *Consol. Edison Co. of New York, 447 U.S. at 543*. A general fear that people attending gun shows will violate state and local laws about gun possession or even commit acts of gun violence in the community upon leaving the show cannot justify the Moratorium. *See Cinevision Corp., 745 F.2d at 572* ("[A] general fear that state or local narcotics or other laws will be broken by people attending the concerts cannot justify a content-based restriction on expression."); *see also Sorrell, 564 U.S. at 577* ("Those who seek to censor or burden free expression often assert that disfavored speech has adverse effects. But the

fear that people would make bad decisions if given truthful information cannot justify content-based burdens on speech.") (internal quotation marks and citation omitted); *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 773, 96 S. Ct. 1817, 48 L. Ed. 2d 346 (1976)* (holding that a State may not "completely suppress the dissemination of concededly truthful information about entirely lawful activity, fearful of that information's effect upon its disseminators and its recipients"); *Bay Area Peace Navy v. United States, 914 F.2d 1224, 1228 (9th Cir. 1990)* ("[The government] is not free to foreclose expressive activity in public areas on mere speculation about danger.").

Although "[t]here is no doubt that **[**35]** the City has a substantial interest in safeguarding its citizens against violence," *Edwards v. City of Coeur d'Alene, 262 F.3d 856, 863 (9th Cir. 2001)*, "even the most legitimate goal may not be advanced in a constitutionally impermissible manner," *Carey v. Brown, 447 U.S. 455, 464-65, 100 S. Ct. 2286, 65 L. Ed. 2d 263 (1980)*. "[M]erely invoking interests . . . is insufficient. The government must also show that the proposed communicative activity endangers those interests." *Kuba v. 1-A Agric. Ass'n, 387 F.3d 850, 859 (9th Cir. 2004)* (citation omitted). Thus, "the *First Amendment* demands that municipalities provide tangible evidence that speech-restrictive regulations are necessary to advance the proffered interest in public safety." *Edwards, 262 F.3d at 863* (internal quotation marks and citation omitted). That the District enacted the Moratorium without *any* evidence of actual public safety concerns caused by the speech that takes place at gun shows (as opposed to general gun violence in the community) makes it exceedingly likely that the District will not be able to satisfy its burden of demonstrating the existence of a compelling state interest for the Moratorium.

---

[6] Plaintiffs, on the other hand, submitted records from the San Diego County Sherriff's office indicating that recent gun shows at the Fairgrounds did not result in any major safety incidents. [Doc. No. 14-2 at 13-46.]

394 F. Supp. 3d 1226, *1248; 2019 U.S. Dist. LEXIS 106334, **35

*First Amendment* free speech claims.

### c. Narrowly Tailored

Regardless, even if the Moratorium serves a compelling governmental interest in "public safety", the Moratorium is not narrowly tailored to serve that interest. "To meet the requirement of narrow tailoring, [**36] the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." *McCullen, 573 U.S. at 495*. Indeed, the complete ban on gun shows effected by the Moratorium would not even survive lesser scrutiny because it unquestionably burdens substantially more [*1249] speech than necessary to accomplish the District's alleged goal of ensuring public safety. *Cf. id. at 496-97* (applying lesser scrutiny applicable to content neutral speech restrictions to statute creating buffer zones around abortion clinics and holding that it was not narrowly tailored to the government's claimed interests, one of which was public safety); *Turner Broad. Sys., Inc., 520 U.S. at 213-14* ("Under intermediate scrutiny, the Government may employ the means of its choosing so long as the regulation promotes a substantial governmental interest that would be achieved less effectively absent the regulation, and does not burden substantially more speech than is necessary to further that interest.") (internal quotation marks and ellipses omitted). In reality, the District appears to have taken "the path of least resistance," because of a belief that the gun-related speech that takes place [**37] at gun shows "is associated with particular problems," namely gun violence in the community. *See McCullen, 573 U.S. at 485*. Such a path is not narrowly tailored to the District's stated interest in public safety and therefore does not survive scrutiny.

Accordingly, for the foregoing reasons, Plaintiffs have a likelihood of success on their

### 2. Equal Protection Claim Against the District

Because the Moratorium treats some events (and therefore event promotors, vendors, and attendees) differently from others, it implicates the *Equal Protection Clause of the Fourteenth Amendment* as well. *Mosley, 408 U.S. at 94-95* ("Because Chicago treats some picketing differently from others, we analyze this ordinance in terms of the *Equal Protection Clause of the Fourteenth Amendment*."); *see also Dariano v. Morgan Hill Unif. Sch. Dist., 767 F.3d 764, 779-780 (9th Cir. 2014)* ("Government action that suppresses protected speech in a discriminatory manner may violate both the *First Amendment* and the *Equal Protection Clause*.") The analysis of this claim is "essentially the same" as under the *First Amendment. Dariano, 767 F.3d at 780*.

"The *Equal Protection Clause* requires that statutes affecting *First Amendment* interests be narrowly tailored to their legitimate objectives." *Mosley, 408 U.S. at 101*. "When government regulation discriminates among speech-related activities in a public forum, the *Equal Protection Clause* mandates that the legislation be finely tailored to serve substantial state interests, and the justifications offered for any distinctions it draws must be carefully [**38] scrutinized." *Carey, 447 U.S. at 461-62*. "Necessarily, then, under the *Equal Protection Clause*, not to mention the *First Amendment* itself, government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views." *Mosley, 408 U.S. at 96*.

As with the *First Amendment*, "under the *Equal Protection Clause*, . . . [o]nce a forum is

394 F. Supp. 3d 1226, *1249; 2019 U.S. Dist. LEXIS 106334, **38

opened up to assembly or speaking by some groups, government may not prohibit others from assembling or speaking on the basis of what they intend to say. Selective exclusions from a public forum may not be based on content alone, and may not be justified by reference to content alone." *Id. at 96* (internal footnote omitted). Thus, the District may not maintain that gun shows pose a safety risk unless those shows are clearly more dangerous than the shows and events the District permits at the Fairgrounds. *Id. at 100* ("[U]nder the *Equal Protection Clause*, Chicago may not maintain that other picketing **[*1250]** disrupts the school unless that picketing is clearly more disruptive than the picketing Chicago already permits."). As discussed above, the District, who has the burden of proof, offers no evidence that gun shows pose a greater safety risk to the public than any other shows at the Fairgrounds. General statements about gun violence or dislike **[**39]** of gun culture do not justify the unequal treatment resulting from the Moratorium. "'(I)n our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression.'" *Id. at 101* (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 508, 89 S. Ct. 733, 21 L. Ed. 2d 731 (1969)*). Accordingly, Plaintiffs also have a likelihood of success on their claims under the *Equal Protection Clause of the Fourteenth Amendment*.

**B. Irreparable Harm**

"The loss of *First Amendment* freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns, 427 U.S. 347, 373, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976)*; *see also Melendres v. Arpaio, 695 F.3d 990, 1002 (9th Cir. 2012)* ("It is well established that the deprivation of constitutional rights unquestionably constitutes

irreparable injury.") (internal quotation marks omitted). "Under the law of this circuit, a party seeking preliminary injunctive relief in a *First Amendment* context can establish irreparable injury sufficient to merit the grant of relief by demonstrating the existence of a colorable *First Amendment* claim." *Warsoldier v. Woodford, 418 F.3d 989, 1001 (9th Cir. 2005)* (internal brackets and citation omitted). Here, the harm suffered by Plaintiffs is the violation of their *First Amendment* rights. By demonstrating a likelihood of success on the merits of their *First Amendment* claims, Plaintiffs have demonstrated that irreparable harm will result from the continued restriction of their protected speech.

**C. Balance of Equities**

Balanced against the irreparable injury **[**40]** faced by Plaintiffs as a result of the continued enforcement of the Moratorium is the District's interest in evaluating the feasibility of gun shows at the Fairgrounds and in determining whether gun shows impact public safety. Considering the complete lack of evidence of any public safety concerns resulting from gun shows at the Fairgrounds (or at least any greater concerns than those resulting from any show at the Fairgrounds), the scales tilt decidedly in favor of Plaintiffs. The District is fully able to revise its policies and procedures for gun shows while gun shows continue to occur at the Fairgrounds. Indeed, the District even allowed a gun show to occur in 2018 after it passed the Moratorium banning gun shows in 2019.

**D. Public Interest**

For similar reasons, the public interest favors Plaintiffs' exercise of their *First Amendment* rights. The Ninth Circuit has "consistently recognized the significant public interest in

upholding *First Amendment* principles." *Doe v. Harris, 772 F.3d 563, 583 (9th Cir. 2014)*. Neither the District's speculative general interest in "public safety" nor its specific interest in re-evaluating its gun show policies and procedures outweigh the public interest in ensuring that *First Amendment* free speech rights are upheld.

## VI. Conclusion

For the foregoing **[**41]** reasons, Plaintiffs claims against the individual defendants are dismissed, the motion to dismiss claims against the District is denied, and the District is enjoined from enforcing the Moratorium, **[*1251]** as stated in the Court's June 18, 2019 order.

Dated: June 25, 2019

/s/ Cathy Ann Bencivengo

Hon. Cathy Ann Bencivengo

United States District Judge

---

End of Document

# EXHIBIT 5

C.D. Michel-SBN 144258
Anna M. Barvir-SBN 268728
Tiffany D. Cheuvront-SBN 317144
MICHEL & ASSOCIATES, P.C.
180 East Ocean Blvd., Suite 200
Long Beach, CA 90802
Telephone: (562) 216-4444
Fax: (562) 216-4445
Email: cmichel@michellawyers.com
  *Attorneys for Plaintiffs B & L Productions, Inc., Barry Bardack, Ronald J. Diaz,
  Sr., John Dupree, Christopher Irick, Lawrence Walsh, Maximum Wholesale, Inc.,
  California Rifle & Pistol Association, Incorporated, South Bay Rod and Gun Club,
  Inc.*

Donald Kilmer-SBN 179986
Law Offices of Donald Kilmer, APC
1645 Willow Street Suite 150
San Jose, CA 95125
Telephone: (408) 264-8489
Fax: (408) 264-8487
Email: Don@DKLawOffice.com
  *Attorney for Plaintiff Second Amendment Foundation*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| B & L PRODUCTIONS, INC., d/b/a CROSSROADS OF THE WEST, et al., <br><br> Plaintiffs, <br><br> v. <br><br> 22nd DISTRICT AGRICULTURAL ASSOCIATION, et al., <br><br> Defendants. | CASE NO.: 3:19-cv-00134-CAB-NLS <br><br> **PARTIES' JOINT NOTICE OF SETTLEMENT AND MOTION FOR DISMISSAL** |

TO THE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE THAT Plaintiffs B & L Productions, Inc., Barry

Bardack, Ronald J. Diaz, Sr., John Dupree, Christopher Irick, Lawrence Walsh,

Maximum Wholesale, Inc., California Rifle & Pistol Association, Incorporated,

South Bay Rod and Gun Club, Inc., and Second Amended Foundation, ("Plaintiffs")

and Defendant 22nd District Agricultural Association ("Defendant"), collectively

1

"Parties," have reached and circulated a settlement agreement to resolve the issues in the above-referenced case, which all parties have executed.

PLEASE TAKE FURTHER NOTICE THAT pursuant to Local Rule 7.2 and Federal Rule of Civil Procedures 41, the Parties, by and through their counsel of record, submit this joint motion for dismissal of Plaintiffs' claims against Defendant with prejudice, subject to the Court retaining jurisdiction for the purpose of enforcing the terms of the Parties' settlement agreement.

WHEREAS, at a public meeting held on September 11, 2018, the Defendant's Board of Directors voted not to consider any contracts with producers of gun show events beyond December 31, 2018, until such time as the District put into place a more thorough policy regarding the conduct of gun show events that considers certain criteria (the "September 2018 Policy").

WHEREAS, on January 21, 2019, Plaintiffs brought suit against Defendant in the above-named court under 42 U.S.C. §§ 1983 and 1985, seeking declaratory and injunctive relief, and as well as various types of money damages.

WHEREAS, in addition to the District, Plaintiffs originally sued Steve Shewmaker, former President of the District, in his official and individual capacity; Richard Valdez, Vice President of the District, in his official and individual capacity; and Karen Ross, Secretary of the California Department of Food & Agriculture, in her official capacity (collectively, "Individual Defendants"). By order dated June 18, 2019, the Court dismissed all claims against the Individual Defendants.

WHEREAS, the gravamen of Plaintiffs' complaint was that Defendant's September 2018 Policy violated Plaintiffs' rights to free speech, free association, and equal protection.

WHEREAS, Defendant denied Plaintiffs' claims.

WHEREAS, the Court, by order dated June 18, 2019, issued a preliminary injunction, enjoining the District "from enforcing the policy it adopted on

2

1  September 11, 2018, pursuant to which it refused to allow any gun show events to

2  be held at the Del Mar Fairgrounds during the 2019 calendar year." The Court also

3  ordered the District to allow Crossroads "to reserve dates for gun show events (and

4  to hold such events) at the Fairgrounds as the District would any other show

5  promoters who have previously held events at the Fairgrounds."

6      WHEREAS, in order to avoid the delay, uncertainty, inconvenience, and

7  expense of protracted litigation of these disputed claims, and as a result of a mutual

8  desire to settle their disputes, the Parties have reached a full and final settlement

9  agreement (attached hereto as Attachment 1).

10      NOW, THEREFORE, pursuant to the mutual agreement of the Parties, the

11  Parties respectfully request that the Court enter an order:

12      1.    Dismissing with prejudice all claims asserted in Plaintiffs' Complaint for

13  Monetary, Declaratory & Injunctive Relief (ECF No. 1), and dismissing this action

14  without costs;

15      2.    Retaining jurisdiction to enforce the terms of the Parties' settlement

16  agreement.

17

18  Dated: April 30, 2020        MICHEL & ASSOCIATES, P.C.

19

20                      *s/ Anna M. Barvir*
                    Anna M. Barvir

21                      *Attorneys for Plaintiffs B & L Productions, Inc.,*
*Barry Bardack, Ronald J. Diaz, Sr., John Dupree,*

22  *Christopher Irick, Lawrence Walsh, Maximum*
*Wholesale, Inc., California Rifle & Pistol*

23  *Association, Incorporated, South Bay Rod and Gun*
*Club, Inc.*
                    Email: abarvir@michellawyers.com

24

25  Dated: April 30, 2020        LAW OFFICES OF DONALD KILMER, APC

26

27                      *s/ Donald Kilmer*
                    Donald Kilmer
                    *Attorney for Plaintiff Second Amendment Foundation*

28                      Email: Don@DKLawOffice.com

Dated: April 30, 2020

XAVIER BECERRA
Attorney General of California
PAUL STEIN
Supervising Deputy Attorney General

*s/ P. Patty Li*
P. PATTY LI
Deputy Attorney General
*Attorneys for Defendants 22nd District Agricultural*
*Association, Steve Shewmaker, Richard Valdez, and*
*Karen Ross*
Email: patty.li@doj.ca.gov

## ATTESTATION OF E-FILED SIGNATURES

I, Anna M. Barvir, am the ECF User whose ID and password are being used to file this Parties' Joint Notice of Settlement and Motion for Dismissal. In compliance with Southern District of California Electronic Case Filing Administrative Policies and Procedures Section 2(f)(4), I attest that Defendant's Counsel P. Patty Li has concurred in this filing.

*s/ Anna M. Barvir*
Anna M. Barvir

Case 3:19-cv-00134-CAB-AHG   Document 44   Filed 04/30/20   PageID.2601   Page 9 of 23

# Attachment 1

## SETTLEMENT AGREEMENT

This settlement agreement ("Agreement") is made and entered into between B&L Productions, Inc., d/b/a/ Crossroads of the West ("Crossroads"), Barry Bardack, Ronald J. Diaz, Sr., John Dupree, Christopher Irick, Lawrence Walsh, Maximum Wholesale, Inc., d/b/a Ammo Bros., California Rifle & Pistol Association, Incorporated, South Bay Rod and Gun Club, Inc., Second Amendment Foundation (collectively, "Plaintiffs"), and the 22nd District Agricultural Association ("District" or "Defendant").  All the parties to this Agreement may collectively be referred to as "the Parties."

**WHEREAS,** Plaintiffs and Defendant are the Parties to the action entitled *B&L Productions, Inc., et al. v. 22nd District Agricultural Association, et al.*, currently pending before the United States District Court for the Southern District of California (the "Court"), Case Number 19-CV-0134 (the "Action").

**WHEREAS,** the Parties, through counsel, have negotiated in good faith to resolve this matter on the terms set forth below with the Court retaining jurisdiction to enforce the settlement if necessary.

**WHEREAS,** the Court has jurisdiction over the Action pursuant to 28 U.S.C. §§ 1331 and 1343.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2).

**WHEREAS,** Plaintiffs brought suit under 42 U.S.C. §§ 1983 and 1985, and the Court has subject matter jurisdiction over Plaintiffs' claims, which arise under federal law.  28 U.S.C. § 1331.

**WHEREAS,** the District is responsible for operating the San Diego County Fairgrounds ("Fairgrounds"), and is managed by a Board of Directors.  The District is a proper party to this action.

**WHEREAS,** at a public meeting held on September 11, 2018, the District's Board of Directors voted not to consider any contracts with producers of gun show

0034

events beyond December 31, 2018 until such time as the District put into place a more thorough policy regarding the conduct of gun show events that considers certain criteria (the "September 2018 Policy").

**WHEREAS**, in addition to the District, Plaintiffs originally sued Steve Shewmaker, former President of the District, in his official and individual capacity; Richard Valdez, Vice President of the District, in his official and individual capacity; and Karen Ross, Secretary of the California Department of Food & Agriculture, in her official capacity (collectively, "Individual Defendants"). By order dated June 18, 2019, the Court dismissed all claims against the Individual Defendants.

**WHEREAS,** the Court, by order dated June 18, 2019, issued a preliminary injunction, enjoining the District "from enforcing the policy it adopted on September 11, 2018, pursuant to which it refused to allow any gun show events to be held at the Del Mar Fairgrounds during the 2019 calendar year." The Court also ordered the District to allow Crossroads "to reserve dates for gun show events (and to hold such events) at the Fairgrounds as the District would any other show promoters who have previously held events at the Fairgrounds."

**WHEREAS**, Assembly Bill 893, Cal. Stats. 2019 Ch. 731 ("A.B. 893"), which was signed into law in October 2019, prohibits the sale of firearms or ammunition at the Fairgrounds, effective January 1, 2021.

**WHEREAS**, in order to avoid the delay, uncertainty, inconvenience, and expense of protracted litigation of these disputed claims, and as a result of a mutual desire to settle their disputes, the Parties have reached a full and final settlement as set forth in this Agreement.

**WHEREAS**, on March 27, 2020, Plaintiffs filed in this Action a motion for leave to file a supplemental complaint.

**WHEREAS**, the Parties agree to work in a fair, reasonable, and

collaborative fashion under the terms of this Agreement as set forth below.

**NOW, THEREFORE**, in consideration of the mutual promises and releases set forth below, and for other good and valuable consideration, the receipt and sufficiency of which the Parties hereby acknowledge, the Parties hereby agree as follows:

1.     This Agreement is a compromise and settlement of disputed claims and nothing contained in this Agreement is or shall be construed as an admission of any kind on the part of the District.  However, as this Agreement is a public record, the language and terms of the Agreement may not be excluded from evidence in any state or federal proceeding, except under applicable rules of civil procedure or evidence.

2.     The District will allow Crossroads to reserve dates for gun show events (and to hold such events) at the Fairgrounds as the District would any other show promoters who have previously held events at the Fairgrounds, so long as the District may lawfully contract for, authorize, or allow gun show events to take place at the Fairgrounds.  The security and operation requirements governing the December 2019 gun show will remain in place for future gun show events, subject to the provisions of Paragraphs 3 through 6 of this Agreement.

3.     The District maintains authority to evaluate, consider, propose, and implement changes to its policies, consistent with state and federal law, regarding the operation of all events at the Fairgrounds, including gun show events.  The District agrees that it will not preclude gun show events from taking place at the Fairgrounds while the process of evaluation and consideration is ongoing.  This process will involve good-faith consideration of input from members of the public and stakeholders, including Plaintiffs.  This paragraph does not preclude the District from postponing or rescheduling gun show events in the event of a public

health or other emergency, consistent with guidance or directives from local, state, or federal officials.

4.      Crossroads and the District will engage in extended, good-faith meet-and-confer efforts regarding any proposed changes to the security and operation requirements described in Paragraph 2 of this Agreement.  These efforts shall include, but are not limited to, communications between District staff and Crossroads staff, and communications between counsel for Crossroads and counsel for the District.  If Crossroads and the District are not able to resolve a dispute about a proposed change to the security and operation requirements described in Paragraph 2 of this Agreement, Crossroads and the District shall seek assistance in resolving the dispute from a third-party neutral, before seeking judicial or other relief, as described in Paragraphs 5 and 6 of this Agreement.  Crossroads and the District will jointly select the third-party neutral and shall equally share the cost of the third-party neutral's services.  The requirement to use a third-party neutral may be waived with the written consent of Crossroads and the District.  During any period that the Parties are engaged in active good faith efforts to resolve a dispute about a proposed change to the security and operation requirements described in Paragraph 2 of this Agreement, the status quo ante shall remain in full force and effect.  Nothing in this Paragraph shall limit the Parties' rights to seek judicial or other relief as to any claims unrelated to the security and operations requirements described in Paragraph 2 of this Agreement.

5.      If, after engaging in the process described in Paragraph 4 of this Agreement, Plaintiffs believe that changes to security and operations requirements governing future gun show events at the Fairgrounds violate the First Amendment or other constitutional or statutory provisions, nothing in this Agreement limits Plaintiffs' ability to seek judicial relief with respect to those requirements.

6.      Nothing in this Agreement limits any Party's ability to seek judicial or other relief regarding the operation of gun show events at the Fairgrounds after the Effective Date of this Agreement (as defined in Paragraph 12 of this Agreement).

7.      The District will pay Crossroads $221,900 to settle Plaintiffs' claims for damages, no later than 30 days after the Effective Date of this Agreement (as defined in Paragraph 12 of this Agreement).

8.      The District will pay Plaintiffs $284,100 to settle Plaintiffs' claims for attorneys' fees and costs, no later than 30 days after the Effective Date of this Agreement (as defined in Paragraph 12 of this Agreement).

9.      Nothing in this Agreement is intended or shall be construed to release, discharge, or dismiss any claim(s) of any Plaintiff regarding A.B. 893 or any future law or policy not presently in existence.  If any Plaintiff files a constitutional or statutory challenge to A.B. 893 in the United States District Court for the Southern District of California that names the District as a defendant, the District will not oppose any designation of that lawsuit as a related action to this Action.

10.      This Agreement is the result of a compromise of disputed claims arising from the District's September 2018 Policy asserted by Plaintiffs in this Action, and is intended to be a full and complete settlement, discharge and release of all such claims.  None of the Parties admits to nor concedes any liability or wrongdoing whatsoever.

11.      No action carried out in accordance with this Agreement is intended to modify or violate the provisions of A.B. 893.

### *Enforcement and Term*

12.      The Parties acknowledge and agree that this Agreement shall not become effective until (1) this Agreement has been approved by the District's Board of Directors; (2) this Agreement has been approved by the California Department of Food and Agriculture in accordance with California Food &

Agriculture Code section 4051.2; and (3) the Court has dismissed the Action as described hereafter in this paragraph.  The Parties further agree that within three (3) business days after the later of (a) the approval of this Agreement by the District's Board of Directors, (b) the approval of this Agreement by the California Department of Food and Agriculture in accordance with California Food & Agriculture Code section 4051.2, or (c) an order of the Court granting or denying Plaintiffs' March 27, 2020 motion for leave to file a supplemental complaint, the Parties will submit to the Court for its signature and approval a stipulated order which either (i) dismisses with prejudice all claims asserted in the original complaint filed in this Action (ECF No. 1), or (ii) dismisses with prejudice Causes of Action 1 through 7 of the supplemental complaint and strikes from the Prayer for Relief portion of the supplemental complaint Paragraphs 1-7, 14, 18, and the first sentence of Paragraph 16 (ending with "July 5, 2018"), but retains the Court's jurisdiction to enforce this Agreement if necessary.  This Agreement shall take effect once the Court has either (i) dismissed with prejudice all claims asserted in the original complaint filed in this Action (ECF No. 1), or (ii) dismissed with prejudice Causes of Action 1 through 7 of the supplemental complaint and stricken from the Prayer for Relief portion of the supplemental complaint Paragraphs 1-7, 14, 18, and the first sentence of Paragraph 16 (ending with "July 5, 2018"), and retained jurisdiction to enforce this Agreement (the "Effective Date").

13.     Nothing in this Agreement constitutes a consent or waiver of objections by the District, any previously dismissed defendants, or any defendants named in a supplemental complaint, to the filing of a supplemental complaint in this Action.

14.     The Parties agree to work cooperatively to ensure that the Court retains jurisdiction over this Action and to enter such further relief as may be necessary for the effectuation of the terms of this Agreement.

0039

15.     Except as specified in Paragraphs 7 and 8 above, each party shall bear its own costs and fees in connection with the Action.

16.     The signatories to this Agreement represent that they are authorized to execute and bind themselves or their respective organizations or agencies to this Agreement.

### *Releases*

17.     Except for claims to enforce the terms of this Agreement, and in consideration of the mutual promises set forth in this Agreement:

> (a)   Plaintiffs hereby release and discharge the District and each of its predecessors-in-interest, successors-in-interest, divisions, subsidiaries (whether wholly, partially or indirectly owned), co-venturers, affiliates under common ownership, executors, heirs, administrators, parents, officers, managers, shareholders, directors, employees, insurers, attorneys, agents and each of their respective successors and assigns from any and all liabilities, actions, claims, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bills, covenants, contracts, controversies, agreements, obligations, promises, acts, costs, expenses (including, but not limited to, reasonable attorneys' fees), damages, judgments and demands, contingent or vested, in law or equity, Plaintiffs ever had or now have against the District arising out of or relating to the District's September 2018 Policy, from the beginning of the world through the Effective Date of this Agreement.

> (b)   The District hereby releases and discharges the Plaintiffs and each of their predecessors-in-interest, successors-in-interest, divisions, subsidiaries (whether wholly, partially or indirectly owned), co-venturers, affiliates under common ownership, executors, heirs,

0040

administrators, parents, officers, managers, shareholders, directors, employees, insurers, attorneys, agents and each of their respective successors and assigns from any and all liabilities, actions, claims, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bills, covenants, contracts, controversies, agreements, obligations, promises, acts, costs, expenses (including, but not limited to, reasonable attorneys' fees), damages, judgments and demands, contingent or vested, in law or equity, the District ever had or now have against Plaintiffs arising out of or relating to the District's September 2018 Policy, from the beginning of the world through the Effective Date of this Agreement.

18. Nothing in this Agreement is intended or shall be construed to release or discharge any claim(s) of the California Attorney General, or any officer or agency of the State of California, other than the District.

### *Entire Agreement*

19. This Agreement contains the sole and entire agreement and understanding of the Parties with respect to the entire subject matter hereof, and any and all prior discussions, negotiations, commitments, or understandings related thereto, if any, are hereby merged herein. No supplementation, modification, waiver, or termination of this Agreement shall be binding unless executed in writing by the Party to be bound thereby.

### *Counterparts*

20. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, all of which shall constitute one document.

0041

**Accepted and Agreed:**

B&L Productions, Inc.

By: _Gary S Olcott_
Its: _President_

Maximum Wholesale, Inc.

By: _[signature]_
Its: _Chief Operations Officer_

California Rifle & Pistol Association, Inc.

By:_____
Its:_____

South Bay Rod and Gun Club, Inc.

By:_____
Its:_____

22nd District Agricultural Association

By:_____
Its:_____

_____
Barry Bardack

_____
Ronald J. Diaz, Sr.

_____
John Dupree

_____
Christopher Irick

_____
Lawrence Walsh

Second Amendment Foundation

By:_____
Its:_____

9

0042

**Accepted and Agreed:**

B&L Productions, Inc.

_____
Barry Bardack

By:_____
Its:_____

_____
Ronald J. Diaz, Sr.

Maximum Wholesale, Inc.

_____
John Dupree

By:_____
Its:_____

_____
Christopher Irick

California Rifle & Pistol Association, Inc.

_____
Lawrence Walsh

By:_____
Its:_ Vice President _____

South Bay Rod and Gun Club, Inc.          Second Amendment Foundation

By:_ Jon Sivert  4-16-2020            By:_____
Its:_ Treasurer _____            Its:_____

22nd District Agricultural Association

By:_____
Its:_____

0043

**Accepted and Agreed:**

B&L Productions, Inc.

*Barry Bardack*

Barry Bardack

By:_____
Its:_____

_____
Ronald J. Diaz, Sr.

Maximum Wholesale, Inc.

_____
John Dupree

By:_____
Its:_____

_____
Christopher Irick

California Rifle & Pistol Association, Inc.

_____
Lawrence Walsh

By:_____
Its:_____

South Bay Rod and Gun Club, Inc.

Second Amendment Foundation

By:_____
Its:_____

By:_____
Its:_____

22nd District Agricultural Association

By:_____
Its:_____

9

0044

**Accepted and Agreed:**

B&L Productions, Inc.

By:_____
Its:_____

Maximum Wholesale, Inc.

By:_____
Its:_____

California Rifle & Pistol Association, Inc.

By:_____
Its:_____

South Bay Rod and Gun Club, Inc.

By:_____
Its:_____

22nd District Agricultural Association

By:_____
Its:_____

_____
Barry Bardack

_Ronald J. Diaz, Sr._
Ronald J. Diaz, Sr.

_____
John Dupree

_____
Christopher Irick

_____
Lawrence Walsh

Second Amendment Foundation

By:_____
Its:_____

0045

**Accepted and Agreed:**

B&L Productions, Inc.

_____
Barry Bardack

By:_____

Its:_____          _____
                                         Ronald J. Diaz, Sr.

Maximum Wholesale, Inc.

                                         John Dupree

By:_____

Its:_____          _____
                                         Christopher Irick

California Rifle & Pistol Association, Inc.

                                         _____
                                         Lawrence Walsh

By:_____

Its:_____


South Bay Rod and Gun Club, Inc.        Second Amendment Foundation


By:_____          By:_____

Its:_____          Its:_____



22nd District Agricultural Association


By:_____

Its:_____

0046

**Accepted and Agreed:**

B&L Productions, Inc.

By:_____
Its:_____

Maximum Wholesale, Inc.

By:_____
Its:_____

California Rifle & Pistol Association, Inc.

By:_____
Its:_____

South Bay Rod and Gun Club, Inc.

By:_____
Its:_____

22nd District Agricultural Association

By:_____
Its:_____

_____
Barry Bardack

_____
Ronald J. Diaz, Sr.

_____
John Dupree

_____
Christopher Irick

_____
Lawrence Walsh

Second Amendment Foundation

By:_____
Its:_____

9

**Accepted and Agreed:**

B&L Productions, Inc.

_____
Barry Bardack

By:_____
Its:_____

_____
Ronald J. Diaz, Sr.

Maximum Wholesale, Inc.

_____
John Dupree

By:_____
Its:_____

_____
Christopher Irick

California Rifle & Pistol Association, Inc.

_____
Lawrence Walsh

By:_____
Its:_____

South Bay Rod and Gun Club, Inc.

Second Amendment Foundation

By:_____
Its:_____

By:_____
Its:_____

22nd District Agricultural Association

By:_____
Its:_____

9

0048

**Accepted and Agreed:**

B&L Productions, Inc.

_____
Barry Bardack

By:_____
Its:_____

_____
Ronald J. Diaz, Sr.

Maximum Wholesale, Inc.

_____
John Dupree

By:_____
Its:_____

_____
Christopher Irick

California Rifle & Pistol Association, Inc.

_____
Lawrence Walsh

By:_____
Its:_____

South Bay Rod and Gun Club, Inc.

Second Amendment Foundation

By:_____
Its:_____

By: _____
Its: *ATTORNEY of RECORD)*

22nd District Agricultural Association

By:_____
Its:_____

9

0049

**Accepted and Agreed:**

B&L Productions, Inc.

_____
Barry Bardack

By:_____
Its:_____

_____
Ronald J. Diaz, Sr.

Maximum Wholesale, Inc.

_____
John Dupree

By:_____
Its:_____

_____
Christopher Irick

California Rifle & Pistol Association, Inc.

_____
Lawrence Walsh

By:_____
Its:_____

South Bay Rod and Gun Club, Inc.                Second Amendment Foundation

By:_____          By:_____
Its:_____          Its:_____

22nd District Agricultural Association

By:_____
Its:_____

# CERTIFICATE OF SERVICE
## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

Case Name: *B & L Productions, Inc., et al. v. 22nd District Agricultural Association, et al.*
Case No.: 3:19-cv-00134 CAB (NLS)

IT IS HEREBY CERTIFIED THAT:

I, the undersigned, am a citizen of the United States and am at least eighteen years of age. My business address is 180 East Ocean Boulevard, Suite 200, Long Beach, California 90802.

I am not a party to the above-entitled action. I have caused service of:

**PARTIES' JOINT NOTICE OF SETTLEMENT
AND MOTION FOR DISMISSAL**

on the following party by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them.

Xavier Becerra
Attorney General of California
P. Patty Li
Deputy Attorney General
E-mail: patty.li@doj.ca.gov
Natasha Saggar Sheth
Deputy Attorney General
E-mail: natasha.sheth@doj.ca.gov
Chad A. Stegeman
Deputy Attorney General
E-mail: chad.stegeman@doj.ca.gov
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
    *Attorneys for Defendants*

I declare under penalty of perjury that the foregoing is true and correct.

Executed April 30, 2020.

*s/ Laura Palmerin*
Laura Palmerin

# EXHIBIT 6



# Assembly Bill No. 893

## CHAPTER 731

An act to add Section 4158 to the Food and Agricultural Code, relating to agricultural districts.

[Approved by Governor October 11, 2019. Filed with Secretary of State October 11, 2019.]

### LEGISLATIVE COUNSEL'S DIGEST

AB 893, Gloria. 22nd District Agricultural Association: firearm and ammunition sales at the Del Mar Fairgrounds.

Existing law generally regulates the transfer of firearms and divides the state into agricultural districts. The 22nd District Agricultural Association is comprised of the County of San Diego and includes the Cities of Del Mar and San Diego. A violation of the statutes governing agricultural districts is generally a misdemeanor.

This bill would, on and after January 1, 2021, prohibit the sale of firearms and ammunition at the Del Mar Fairgrounds property located in the 22nd District Agricultural Association, as specified, and would thereby make a violation of that prohibition a misdemeanor. The bill would exclude from its provisions a gun buyback event held by a law enforcement agency.

By creating a new crime, this bill would impose a state-mandated local program.

The California Constitution requires the state to reimburse local agencies and school districts for certain costs mandated by the state. Statutory provisions establish procedures for making that reimbursement.

This bill would provide that no reimbursement is required by this act for a specified reason.

*The people of the State of California do enact as follows:*

SECTION 1.   The Legislature finds and declares all of the following:

(a)  The property known as the Del Mar Fairgrounds (DMFG) is owned by the State of California and managed by the Board of Directors of the 22nd District Agricultural Association (22nd DAA). The 22nd DAA has leased a portion of the DMFG to entities that sponsor marketplaces popularly known as "gun shows," at which firearms and ammunition and other items are sold to the public approximately five times a year.

(b)  The United States has experienced many gun-related tragedies with increasing severity and frequency in the last 30 years, including mass murders at Columbine High School, Sandy Hook Elementary School, and

94

Marjory Stoneman Douglas High School, and an increasing rate of suicide by gun among all levels of society.

(c)  The Cities of Del Mar, Solana Beach, and Encinitas have adopted resolutions requesting that the DMFG Board discontinue leasing any portion of its property for use as a gun show. A committee appointed by the Board of Directors of the 22nd DAA to study gun shows conducted research, including inspection tours of the Del Mar Gun Show by members of the committee as well as by several other members of the DMFG Board.

(d)  On September 11, 2018, the DMFG Board, by a vote of eight in favor and one against, adopted a recommendation to consider the feasibility of conducting gun shows for only educational and safety training purposes and to prohibit the possession of guns and ammunition on state property.

(e)  Gun shows bring grave danger to a community, and the following dangerous incidents, among others, have occurred at gun shows, including, but not limited to, an official vendor accused of trafficking illegal firearms, sales of firearms to individuals registered in the Department of Justice Bureau of Firearms Armed Prohibited Persons System, and illegal importation of large-capacity magazines.

(f)  Each of the foregoing arrests was based on gun show enforcement efforts under the Armed Prohibited Persons System, and the department announced in late 2018 that these gun show enforcement efforts had been discontinued and, between the years 2013 and 2017, the San Diego County Sheriff recorded 14 crimes at the Crossroads of the West Gun Shows at the DMFG.

(g)  Promoters maintain relationships with a core group of vendors, some selling guns and some selling other merchandise, who travel as the schedule dictates from city to city and state to state and in the West, for example, many of the same vendors can be seen at Crossroads of the West Gun Shows from San Francisco, California, to Tucson, Arizona.

SEC. 2.  Section 4158 is added to the Food and Agricultural Code, to read:

4158.  (a)  Notwithstanding any other law, an officer, employee, operator, lessee, or licensee of the 22nd District Agricultural Association, as defined in Section 3873, shall not contract for, authorize, or allow the sale of any firearm or ammunition on the property or in the buildings that comprise the Del Mar Fairgrounds in the County of San Diego, the City of Del Mar, the City of San Diego, or any successor or additional property owned, leased, or otherwise occupied or operated by the district.

(b)  For purposes of this section:

(1)  The definition of "firearm" means the term as included in Section 12001 of the Penal Code.

(2)  The term "ammunition" includes assembled ammunition for use in a firearm and components of ammunition, including smokeless and black powder, and any projectile capable of being fired from a firearm with deadly consequence.

(c)  This section does not apply to a gun buyback event held by a law enforcement agency.

94

(d)  This section shall become operative on January 1, 2021.

SEC. 3.   No reimbursement is required by this act pursuant to Section 6 of Article XIII B of the California Constitution because the only costs that may be incurred by a local agency or school district will be incurred because this act creates a new crime or infraction, eliminates a crime or infraction, or changes the penalty for a crime or infraction, within the meaning of Section 17556 of the Government Code, or changes the definition of a crime within the meaning of Section 6 of Article XIII B of the California Constitution.

O

# EXHIBIT 7

Date of Hearing:  March 26, 2019
Counsel:          Matthew Fleming

ASSEMBLY COMMITTEE ON PUBLIC SAFETY
Reginald Byron Jones-Sawyer, Sr., Chair

AB 893 (Gloria)  – As Introduced  February 20, 2019

**SUMMARY**:  Prohibits, as of January 1, 2021, the sale of firearms and ammunitions at the Del Mar Fairgrounds in the County of San Diego and the City of Del Mar and thereby creates a misdemeanor offense for a violation of that prohibition.  Specifically, **this bill**:

1) Prohibits any officer, employee, operator, or lessee of the 22nd District Agricultural Association, as defined, from authorizing, or allowing the sale of any firearm or ammunition on the property or in the buildings that comprise the Del Mar Fairgrounds in the County of San Diego and the City of Del Mar or any successor or additional property owned, leased, or otherwise occupied or operated by the district.

2) Provides that the term "ammunition" includes assembled ammunition for use in a firearm and components of ammunition, including smokeless and black powder, and any projectile capable of being fired from a firearm with deadly consequence.

3) Provides that the prohibition on firearms and ammunitions sales at the Del Mar Fairgrounds does not apply to gun buy-back events held by a law enforcement agency.

4) States that this section will become operative on January 1, 2021.

**EXISTING LAW**:

1) Divides the state in agricultural districts and designates District 22 as San Diego County. (Food and Agr.,§§ 3851, 3873.)

2) Allows for the establishment of District Agricultural Associations within each agricultural district, for the purposes of holding fairs, expositions and exhibitions, and constructing, maintaining, and operating recreational and cultural facilities of general public interest. (Food & Agr. Code, § 3951.)

3) Provides that bringing or possessing a firearm within any state or local public building is punishable by imprisonment in a county jail for not more than one year, or in the state prison, unless a person brings any weapon that may be lawfully transferred into a gun show for the purpose of sale or trade. (Pen. Code §§ 171b subd. (a), 171b subd. (b)(7)(A).)

4) Prohibits the sale, lease, or transfer of firearms without a license, unless the sale, lease, or transfer is pursuant to operation of law or a court order, made by a person who obtains the firearm by intestate succession or bequest, or is an infrequent sale, transfer, or transfer, as defined. (Pen. Code § 26500, 26505, 26520.)

0057

5) Excludes persons with a valid federal firearms license and a current certificate of eligibility issued by the Department of Justice from the prohibitions on the sale, lease, or transfer of used firearms, other than handguns, at gun shows or events. (Pen. Code § 26525.)

6) Permits licensed dealers to sell firearms only from their licensed premises and at gun shows. (Pen. Code § 26805.)

7) States that a dealer operating at a gun show must comply with all applicable laws, including California's waiting period law, laws governing the transfer of firearms by dealers, and all local ordinances, regulations, and fees. (Pen. Code § 26805.)

8) States that no person shall produce, promote, sponsor, operate, or otherwise organize a gun show, unless that person possesses a valid certificate of eligibility from the Department of Justice. (Pen. Code § 27200.)

9) Specifies the requirements that gun show operators must comply with at gun shows, including entering into a written contract with each gun show vendor selling firearms at the show, ensuring that liability insurance is in effect for the duration of a gun show, posting visible signs pertaining to gun show laws at the entrances of the event, and submitting a list of all prospective vendors and designated firearms transfer agents who are licensed firearms dealers to the Department of Justice, as specified. (Pen. Code §§ 27200, 27245.)

10) Specifies that unless a different penalty is expressly provided, a violation of any provision of the Food and Agricultural code is a misdemeanor. (Food and Agr. Code, § 9.)

**FISCAL EFFECT**: Unknown

**COMMENTS**:

1) **Author's Statement**: According to the author, "There is an ever apparent link between the gun violence we see virtually every week and the number of guns in our communities. Additionally, the State of California should not be profiting or benefitting from the sale of firearms. This bill demonstrates that we value people over guns and public safety above all

"Fundamentally, I believe it is wrong for the State of California to profit or to benefit from the sale of firearms and ammunition. I acknowledge that gun ownership is a Constitutional right in the United States, and I know that there are plenty of responsible gun owners out there. However, the fact remains that widespread accessibility to these deadly weapons produces a public safety threat that we must address."

2) **Gun Shows**: A "gun show" is a trade show for firearms. At gun shows, individuals may buy, sale, and trade firearms and firearms-related accessories. These events typically attract several thousand people, and a single gun show can have sales of over 1,000 firearms over the course of one weekend. (Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), *Gun Shows: Brady Checks and Crime Gun Traces*, January 1999, available at: https://www.atf.gov/file/57506/download, [as of March 18, 2019].)

According to the NRA's Institute for Legislative Action (NRA-ILA), less than one percent of inmates incarcerated in state prisons for gun crimes acquired their firearms at a gun show.

(NRA-ILA, https://www.nraila.org/get-the-facts/background-checks-nics.)  However, according to a report published by Uc Davis, gun shows have been identified as a source for illegally trafficked firearms.  (https://www.ucdmc.ucdavis.edu/vprp/pdf/IGS/IGS1web.pdf, [as of March 20, 2019].)  Though violent criminals do not appear to regularly purchase their guns directly from gun shows, gun shows have received criticism as being "the critical moment in the chain of custody for many guns, the point at which they move from the somewhat-regulated legal market to the shadowy, no-questions-asked illegal market."  (Gerney, *The Gun Debate 1 Year After Newtown*, Center for American Progress, December 13, 2013, available at: http://www.americanprogress.org/issues/guns-crime/report/2013/12/13/80795/the-gun-debate-1-year-after-newtown/, [as of March 18, 2019].)

A report by the Government Accountability Office regarding gun trafficking to Mexico confirmed that many traffickers buy guns at gun shows. (https://www.gao.gov/assets/680/674570.pdf, [as of March 15].)  87 percent of firearms seized by Mexican authorities and traced in the last 5 years originated in the United States, according to data from Department of Justice's Bureau of Alcohol, Tobacco, Firearms and Explosives.  According to United States and Mexican government officials, these firearms have been increasingly more powerful and lethal in recent years. Many of these firearms come from gun shops and gun shows in south-west border states. (https://www.ucdmc.ucdavis.edu/vprp/pdf/IGS/IGS1web.pdf, [as of March 15].)

3) **Gun Show Regulations in California**: In 1999, California enacted the nation's broadest legislation to increase oversight at gun shows.  AB 295 (Corbett), Chapter 247, Statutes of 1999, the Gun Show Enforcement and Security Act of 2000, added a plethora of requirements for gun shows.  To obtain a certificate of eligibility from the DOJ, a promoter must certify that he or she is familiar with existing law regarding gun shows; obtain at least $1,000,000 of liability insurance; provide an annual list of gun shows the applicant plans to promote; pay an annual fee; make available to local law enforcement a complete list of all entities that have rented any space at the show; submit not later than 15 days before the start of the show an event and security plan; submit a list to DOJ of prospective vendors and designated firearms transfer agents who are licensed dealers; provide photo identification of each vendor and vendor's employee; prepare an annual event and security plan; and require all firearms carried onto the premises of a show to be checked, cleared of ammunition, secured in a way that they cannot be operated, and have an identification tag or sticker attached.  AB 295 also provided for a number of penalties for a gun show producer's willful failure to comply with the specified requirements.

In California, gun transactions at gun shows are treated no differently than any other private party transaction.  This means that such transfers must be completed through a licensed California dealer.  Such a transfer requires a background check and is subject to the mandatory ten day waiting period prior to delivering the firearm to the purchaser.

California's strict gun show regulations may help to prevent increases in firearm deaths and injuries following gun shows. (*See* Elliott C. Matthay, et al., "In-State and Interstate Associations Between Gun Shows and Firearm Deaths and Injuries," Annals of Internal Medicine (2017) Vol. 1 Iss. 8.)

0059

4) **Current State of Gun Shows at the Del Mar Fairgrounds**:  According to a Fairgrounds press release, last year the 22nd District Agricultural Association's Board of Directors voted 8 to 1 to not consider any contracts with producers of gun shows beyond Dec. 31, 2018, until it has adopted a more thorough policy regarding the conduct of gun shows. (Available at: http://www.delmarfairgrounds.com/index.php?fuseaction=about.press_details&newsid=1396 [as of March 20, 2019].) The policy is to be presented to the Board no later than December, 2019 and would:

- Consider the feasibility of conducting gun shows for only educational and safety training purposes and bans the possession of guns and ammunition on state property,

- Align gun show contract language with recent changes in state and federal law

- Detail an enhanced security plan for the conduct of future shows

- Propose a safety plan

- Consider the age appropriateness of such an event

- Grant rights for the DAA to perform an audit to ensure full compliance with California Penal Code Sections 171b and 12071.1 and 12071.4. These audit rights may be delegated at the discretion of the 22nd DAA. (*Id.*)

According to local reporting, the operator of the Del Mar Fairgrounds gun show has filed a lawsuit challenging the Board of Directors' decision on the grounds that it violates the U.S. Constitution's First Amendment guarantee to free expression. (Williams, *Lawsuit to hang up Del Mar Fairgrounds gun show policy recommendations*, Del Mar Times, March 15, 2019, available at: https://www.delmartimes.net/news/sd-cm-nc-gun-show-20190315-htmlstory.html, [as of March 20, 2019].)

This bill would add a section to the Food and Agricultural Code that prohibits the sale of firearms and ammunitions at the Del Mar Fairgrounds. By default, a violation of any provision of the Food and Agricultural code is a misdemeanor, unless otherwise specified. Therefore, this bill would effectively terminate the possibility for future gun shows at the Del Mar Fairgrounds.

5) **Veto Messages on Previous Attempts to Ban Gun Shows in Agricultural Districts**: There have been several legislative attempts to regulate gun shows in Agricultural District 1A in San Mateo and San Francisco Counties at a location commonly known as the "Cow Palace." The Cow Palace is substantially similar to the Del Mar Fairgrounds inasmuch as it is a state-owned property located within the jurisdiction of a county. SB 221 (Wiener), of 2018, SB 475 (Leno) of 2013, SB 585 (Leno) of 2009, and others, all attempted to either ban gun shows at the Cow Palace altogether, or require prior approval from the county Board Supervisors prior to entering into a contract for holding a gun show there. All three attempts were vetoed by the Governor.

In regards to SB 221, Governor Brown stated: "This bill would prohibit the sale of firearms and ammunition at the District Agricultural Association 1A, commonly known as the Cow

Palace. This bill has been vetoed twice over the last ten years, once by myself, and once by Governor Schwarzenegger. The decision on what kind of shows occur at the Cow Palace rests with the local board of directors which, incidentally, represents a broad cross section of the community. They are in the best position to make these decisions."

SB 475 was also vetoed by Governor Brown with the following message: "This bill requires the District Agricultural Association 1-A (Cow Palace) to obtain approval from the County of San Mateo and the City and County of San Francisco prior to entering into a contract for a gun show on state property. I encourage all District Agricultural Associations to work with their local communities when determining their operations and events. This bill, however, totally pre-empts the Board of Directors of the Cow Palace from exercising its contracting authority whenever a gun show is involved. I prefer to leave these decisions to the sound discretion of the Board."

SB 585 was vetoed by Governor Schwarzenegger, who stated: "This bill would prohibit the sale of firearms and ammunition at the Cow Palace. This bill would set a confusing precedent at the state level by statutorily prohibiting one District Agricultural Association (DAA) from selling firearms and ammunition, a legal and regulated activity, while allowing other DAAs to continue to do so. In addition, this bill would result in decreased state and local tax revenues by restricting events at the Cow Palace."

6) **Argument in Support**: According to the *NeverAgainCA*: "NeverAgainCA organized large, peaceful protests at every gun show at the Del Mar Fairgrounds. attended and spoke at every meeting of the 22nd District Agricultural Association Board, and joined students protesting gun violence and gun shows at many area schools. NeverAgainCA presented resolutions calling for the elimination of the gun shows at the Del Mar Fairgrounds to the City Councils of the adjacent cities of Del Mar, Solana Beach and Encinitas; these resolutions were adopted and are part of the record of this hearing. Candidate and now Congressman Mike Levin addressed several of our rallies against the gun shows. At the request of NeverAGainCA, then Lt. Governor, now Governor, Gavin Newsom, called on the Fair Board to end gun shows and put an end to valuing the sale of firearms above the value of lives.

"NeverAgainCA is proud to support AB 893. The residents of the 78th AD and adjacent districts, and their elected representatives, have demonstrated the broad public support for ending gun shows at the Del Mar Fair Grounds on a permanent basis."

7) **Argument in Opposition**: According to the *California Rifle and Pistol Association, Inc.*: "Promoters and operators of gun shows in California must comply with no less than twenty-six sections of the penal code. Gun sales are highly-regulated in California and the rules are no less stringent for those vendors at gun shows (Refer Exhibit #2 attached). Vendors that participate in gun shows may not do so unless all their licenses have been submitted to the California Department of Justice before the event for the purposes of determining whether the vendors possess the proper valid licenses. If they do not pass the review of the California DOJ, they are prohibited from participating.

…

"Gun shows are very much a family event. Many of them have training and education, guest speakers, lifestyle vendors, safety training, and more. Ever hear of a shooting spree at a gun

0061

show? No, because people that attend gun shows are the law-abiding citizens that attend for the educational value and to stay up on new products that are available. It is no different than any other trade show that occurs in other industries across the state. Criminals would never subject themselves to this much scrutiny and regulation in the hopes of getting their hands on a firearm. These types of false and scare-tactic narratives have no place in modern discourse."

8) **Related Legislation**: SB 281 (Wiener), among other things, would prohibit the sale of firearms and ammunitions at the Cow Palace located in San Mateo County and San Francisco County.

9) **Prior Legislation**:

   a) SB 221 (Wiener) of the 2017-18 Legislative Session, would have prohibited the sale of firearms and ammunitions at the Cow Palace located in San Mateo County and San Francisco County. SB 221 was vetoed by Governor Brown.

   b) SB 475 (Leno), of the 2013-14 Legislative Session, would have required gun shows at the Cow Palace to have prior approval of both the Board of Supervisors of the County of San Mateo and the City and County of San Francisco, as specified. SB 475 was vetoed by Governor Brown.

   c) SB 585 (Leno), of the 2009-10 Legislative Session, would have prohibited events at which any firearm or ammunition is sold at the Cow Palace, as specified. SB 585 was vetoed by Governor Schwarzenegger.

   d) AB 2948 (Leno), of the 2007-08 Legislative Session, would have prohibited the sale of firearms or ammunition at the Cow Palace. AB 2948 failed passage on the Senate Floor.

   e) SB 1733 (Speier), of the 2003-04 Legislative Session, would have required gun shows at the Cow Palace to have prior approval of both the Board of Supervisors of the County of San Mateo and the City and County of San Francisco, as specified. SB 1733 failed passage on the Assembly Floor.

   f) AB 295 (Corbett), Chapter 247, Statutes of 1999, established the Gun Show Enforcement and Security Act of 2000, which includes a number of requirements for producers that promote gun shows.

   g) AB 1107 (Ortiz), of the 1997-98 Legislative Session, would have authorized any city, county or agricultural association to prohibit gun sales at gun shows or events. AB 1107 failed in the Assembly Appropriations Committee.

## REGISTERED SUPPORT / OPPOSITION:

## Support

Bay Area Student Activists
City of Del Mar
City of Encinitas

City of Solana Beach
NeverAgainCA

**Oppose**

B & L Productions, d.b.a. Crossroads of the West Gun Shows
California Rifle and Pistol Association, Inc.
California Sportsman's Lobby, Inc.
Gun Owners of California, Inc.
National Rifle Association - Institute For Legislative Action
National Shooting Sports Foundation, Inc.
Outdoor Sportsmen's Coalition of California
Safari Club International - California Chapters
Western Fairs Association

**Analysis Prepared by**:   Matthew Fleming / PUB. S. / (916) 319-3744

# EXHIBIT 8

# Gun Shows in Context



## The United States and Gun Violence

    Americans owned between 220 and 280 million guns in 2004, including at least 86 million handguns.[1]  Millions of guns are added to that total each year.  Just ten years earlier, America's gun stockpile was estimated to hold 192 million weapons.[2]  As of 2004, some 38% of households and 26% of all adults had at least one gun; 41% of gun-owning households, and 48% of individual gun owners, had four guns or more.[1]

    More than 360,000 violent crimes involving guns, including an estimated 11,512 homicides, were committed in the United States in 2007.[3,4]  After dropping steadily through much of the 1990s,[5] rates of gun-related and other violent crimes have changed little in recent years and have risen rapidly in some areas.[6,7]  Preliminary data for 2008[8] and early 2009[9] suggest a downward trend, which would be very good news, but rates of gun-related violence remain unacceptably high.

### American Exceptionalism

    America's rates of gun ownership are unique.  We account



*Assault rifles for sale, Dayton, Ohio.*

for less than 5% of the world's population but 35% to 50% of all firearms in civilian hands.[10]  Not surprisingly, death rates from gun violence are far higher in the United States than in other high -income countries.[11, 12]

But America is not a uniquely violent society.  As Franklin Zimring and Gordon Hawkins demonstrated some years ago,[13] our rates of violent crime do not exceed those of other high-income countries—though they are above average.  It is our rate of death from violent crime that is unique, and this high mortality rate results from our unique propensity to use firearms to commit violent crimes.

*Exporting Crime Guns*

Sadly, American firearms now also figure prominently in crimes committed elsewhere.  Most crime guns that are recovered by law enforcement agencies in major Canadian cities, and for which a point of origin can be established, are imported illegally from the United States.[14, 15]  The problem has become particularly acute in Mexico, where drug-related gun violence has become so prevalent that the United States Joint Forces Command has warned of a possible "rapid and sudden collapse" with "serious implications for [US] homeland security."[16]  By April 2008, Mexican drug trafficking organizations had established a presence in at least 46 U.S. states.[17]  Of crime guns recovered in Mexico since 2006 for which the U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) has established a chain of ownership, more than 90% come across the border from the United States, and nearly 70% are American-made.[17, 18]

**Gun Shows and Gun Violence: An Introductory Case**

At lunchtime on April 20, 1999, high schoolers Eric Harris and Dylan Klebold shot and killed 12 fellow students and a teacher at Columbine High School in Littleton, Colorado, and wounded 23 others.  After exchanging fire with the police, they shot themselves.

All four guns used in the massacre were purchased at local gun shows, but none of them by Harris and Klebold.[19]  Three guns—two Savage shotguns and a Hi-Point 9mm carbine—were bought for them by an 18-year-old friend, Robyn Anderson, at a Tanner Gun Show near Denver the previous December.

*Mexico and Canada pose very different images when it comes to violent crime.  [They] have one thing in common when it comes to armed violence—the underground gun market in the United States, which is a major source of supply to criminals and gangs in both nations…The USA represents a low-cost supplier of guns both because of lax regulations and of the great number of guns already circulating in private hands.*

*—Researchers Philip Cook, Wendy Cukier, and Keith Krause.[15]*

*There is "no reason why [Mexican] drug cartels would go through the difficulty of acquiring a gun somewhere else in the world and transporting it to Mexico when it is so easy for them to do so from the United States.*

*—U.S. and Mexican government and law enforcement officials interviewed by the Government Accountability Office for its study of cross-border gun trafficking.[17]*

12

Anderson bought the guns from private parties rather than from licensed gun retailers. "While we were walking around [the show]," she would later testify, "Eric and Dylan kept asking sellers if they were private or licensed. They wanted to buy their guns from someone who was private—and not licensed—because there would be no paperwork or background check."[20] Anderson stressed that "[a]ll I had to do was show my driver's license to prove I was 18. I would not have bought a gun for Eric and Dylan if I had to give any personal information or submit to any kind of check at all."[21]

Just the day before, in fact, Harris and Klebold had tried to buy guns themselves at the show. The boys were 17 years old at the time. No one who would sell to them, but they were told that they could buy the guns if they brought someone with them who was at least 18 years old. Anderson believed it should have been obvious that she was buying the guns for Harris and Klebold; though she was making the payment, "they were handling the guns and asking the questions."[22]

The fourth gun, a semiautomatic TEC-DC9 assault pistol, was bought at a Tanner Gun Show in August 1998 by Mark Manes—again from a private party, not a licensed retailer—and sold to Harris and Klebold the following January.[19] Because the TEC-DC9 is a handgun, Manes was charged with providing a firearm to a minor (Harris and Klebold were still 17 when they bought the gun).

Anderson's rifle and shotgun purchases broke no federal or state laws, and she was not charged with any crime. J. D. Tanner, promoter of the shows, had this to say about her gun purchases: "All I can say is apparently it was all done legally. That makes me have a good feeling."[23]

The first Tanner Gun Show held after the massacre took place the weekend of June 5 and 6; Tanner had canceled a show scheduled for the weekend after the shootings. On June 6, Corey Tucker, age 18, and David Winkler, age 17, used $600 in cash provided by the Colorado Coalition Against Gun Violence to buy a TEC-9 pistol similar to the gun used by Harris and Klebold. They believed they were buying from a private party—there was apparently no evidence to the contrary—and their intent was to demonstrate how easily this could be done. "He didn't ask me my name or my age," Tucker said at a news conference the following week, and there was no identification check.[24] But the seller had been interviewed at the show on June 5 by *Denver*

*While we were walking around, Eric and Dylan kept asking sellers if they were private or licensed. They wanted to buy their guns from someone who was private—and not licensed—because there would be no paperwork or background check.[20]*

*All I had to do was show my driver's license to prove I was 18. I would not have bought a gun for Eric and Dylan if I had to give any personal information or submit to any kind of check at all.[21]*

*—Robyn Anderson, on buying three of the guns used in the Columbine High School shootings.*

*All I can say is apparently it was all done legally. That makes me have a good feeling.*

*—J. D. Tanner of Tanner Gun Shows.[23]*

*Post* reporter David Olinger, who was writing a story on the resumption of the Tanner shows. He was Terry Kern, a licensed gun retailer and gun store owner. When Olinger contacted him following Tucker and Winkler's news conference, Kern confirmed that he had sold the gun. But when told that his failure to document the sale or perform any identification check had become public knowledge, "Kern changed his account. The sale 'didn't have anything to do with me,' he said."[24]

The sale was investigated by the Bureau of Alcohol, Tobacco and Firearms (ATF) and determined to have been illegal. Kern surrendered his firearms license.[25]

Promoter J. D. Tanner himself sells guns at Tanner Gun Shows as an unlicensed vendor. A year after the massacre in Littleton, the prospective buyer of a handgun asked him, "You have to do a background check on this?" "No," he replied, "there's no law says I have to."[26]

## A Paradox

The events surrounding the Columbine massacre exemplify many of the difficult problems posed by gun shows. Prohibited persons are able to acquire guns by using others as their agents. Guns can be sold anonymously, without background checks or records. Sellers, including licensed retailers, can be corrupt.

There is solid evidence that gun shows are an important source of crime guns, which we will review later in the chapter. The best of that evidence comes from ATF investigations of illegal gun trafficking—the organized procurement of guns for criminal use.[27-29]

But two highly-regarded surveys conducted under the auspices of the U.S. Bureau of Justice Statistics have found that less than 2% of felons incarcerated for crimes involving guns acquired those guns themselves at gun shows.[30, 31] This poses a seeming paradox: How can gun shows be an important source of crime guns if criminals get their guns elsewhere? To clarify this, we need to take a step back and examine American gun commerce generally and the role gun shows play in that larger enterprise.

## America's Two Systems of Gun Commerce

Modern gun commerce operates under the terms of the oft-amended Gun Control Act of 1968 (GCA), which is enforced by ATF.  Congress drew on its authority to regulate interstate commerce in drafting GCA as it had with GCA's predecessor, the Federal Firearms Act of 1938.[32]  Those "engaged in the business" of selling guns, as the law terms it, were required to obtain federal licenses and to buy and sell guns following specified procedures.  Private parties who sold guns infrequently and not in the course of business were exempted, however.  As a result, the United States has two very different systems of gun commerce that operate in parallel.  At gun shows, they can operate literally side by side.

In 1995, Philip Cook and colleagues published a study that has done much to shape and clarify our understanding of how gun commerce operates.[33]  By convention, the two systems mentioned above are referred to as the *primary market* and the *secondary market* for guns.  The primary market comprises all transfers of guns by federally licensed firearms retailers such as gun dealers and pawnbrokers.  These transfers may be of new or used guns.

The secondary market consists of transfers involving unlicensed sellers, such as the unlicensed vendors and individual attendees at gun shows.[33, 34]  This secondary gun market is much larger than is commonly thought.  According to the Police Foundation's National Survey of Private Ownership of Firearms, it accounted for approximately 40% of all gun acquisitions in the mid-1990s.[2, 33]  Thirty years earlier, at the time Congress was debating the Gun Control Act, at least 25% of all gun acquisitions occurred through the private party transfers that were exempted from the terms of the Act.[35]

As with other commodities, there is a *legal market* and an *illegal market* for guns.  The movement of guns from the legal to the illegal market is the illegal market's chief source of supply.  Gun trafficking is the intentional diversion of guns from the legal to the illegal market.

Finally, in considering how guns become available for use in crime, it is useful to consider *point sources* and *diffuse sources* of those guns.[34]  Point sources are the venues linked to many known crime guns, usually licensed retailers.  Diffuse sources are the many small-volume transactions between individuals that are

Inside Gun Shows

dispersed in time and place, such as transfers of single guns between acquaintances or fellow gang members.  Point sources provide the most readily identifiable targets for prevention activity, but diffuse sources, taken together, are the leading proximate source of crime guns.

An overview of America's gun markets is in Figure 1-1.

Figure 1-1.  An overview of gun commerce in the United States.  Activities within the shaded area occur at gun shows.



Gun manufacturers typically sell their products to distributors, who in turn sell them to federally licensed retailers such as gun dealers or pawnbrokers.  Sales by manufacturers, distributors, and retailers make up the primary gun market.  After its first sale by a licensed retailer to a private party, a gun may experience many subsequent sales or other changes of possession between private parties (through trades, for example).  These transactions make up the secondary gun market.  A private party may also sell his gun to a licensed retailer; most retailers sell both new and used guns.  Guns enter the illegal market predominantly through sales to prohibited persons, straw purchasing and other trafficking operations, and theft.  As with the legal market, guns in the illegal market may undergo many subsequent transfers of ownership.  The shaded area of the figure identifies transactions that occur at gun shows.

Modified from Wintemute GJ.  Where guns come from: the gun industry and gun commerce.  *The Future of Children* 2002;12 (2):55-71.

0070

## Regulating Gun Sellers

### *Federal Policy*

In order to sell a gun to you, whether at a gun show or elsewhere, a federally licensed retailer such as a gun dealer or pawnbroker must see your identification.  He must have you complete a lengthy Firearms Transaction Record on which you certify, under penalty of perjury, that you are buying the gun for yourself and that you are not prohibited from owning it.  He must submit your identifying information to the National Instant Criminal Background Check System (NICS), administered by the Federal Bureau of Investigation.

Staff at NICS perform a background check on you, comparing your information to the records in a centralized archive of criminal histories and other databases to verify your eligibility to purchase firearms.  In over 90% of cases this back-ground check is completed within minutes,[36] but if important information is missing you may have to wait up to three business days to get your gun.  (In 17 states, the background check can be waived for holders of permits to carry concealed weapons.)

The retailer must keep a permanent record of your purchase.  If you buy more than one handgun from him within five business days, the retailer must file a special report with ATF.  (This requirement does not apply to purchases of rifles or shotguns.)

These procedural safeguards are intended to ensure that you are who you say you are, that you and not someone else will be the actual owner of the gun, and that you are not prohibited from owning it.  They also establish a paper trail that will help law enforcement authorities link the gun to you if it is used in a crime later.

But a private party, such as an unlicensed vendor or individual attendee at a gun show, can sell you that same gun—or as many guns as you want—and none of these federal safeguards will be in place.  Private party gun sellers are not required to ask for your identification.  They *cannot* initiate a background check, except in Delaware, Nevada, and Oregon, where they may do so voluntarily.  There are no forms for you to fill out, and no records need be kept.

Again, the provisions of the Gun Control Act regulating gun sales apply only to those who are engaged in the business of



*Attendee with several guns for sale, Houston, Texas.*

*There is no limit to the amount of guns that a private collector can have. Some have 10, some have 1,000. If I go to a gun show and state that this is my private collection, I am not required by law to ask you for identification, ask you to fill out any paperwork, or conduct a background check. It is simply cash and carry.*

*—Tom Mangan, Special Agent, ATF, Phoenix, Arizona.*[39]

*Unfortunately, the effect of the 1986 amendments has often been to frustrate the prosecution of unlicensed dealers masquerading as collectors or hobbyists but who are really trafficking firearms to felons or other prohibited persons.*

*—ATF gun show study, 1999.*[37]

selling guns. As originally enacted, GCA established that standard but did not define it. ATF considered the sale of five or more firearms annually to signify engagement in the business,[34] and federal courts upheld convictions for selling guns without a license in cases involving as few as six firearms.[37]

Any clear understanding of what "engaged in the business" might mean was abolished by the 1986 Firearm Owners Protection Act (FOPA). The new law ambiguously defined a person as "engaged in the business" who "devotes time, attention, and labor to dealing in firearms as a regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms."[38] Muddying the waters further, FOPA defined "with the principal objective of livelihood and profit" to mean "that the intent underlying the sale or disposition of firearms is predominantly one of obtaining livelihood and pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection."[38] It specifically excluded from its definition of engagement in the business a person who makes "occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms."[28, 38]

The practical result was to make it much more difficult to set an upper limit to the frequency of buying and selling guns that did not require a license and compliance with the procedural safeguards described above. Today, private parties sometimes sell large numbers of new and used firearms while claiming hobbyist status and exemption from the requirements imposed on licensed retailers.[28] ATF put it this way in an important study of gun shows in 1999: "Unfortunately, the effect of the 1986 amendments has often been to frustrate the prosecution of unlicensed dealers masquerading as collectors or hobbyists but who are really trafficking firearms to felons or other prohibited persons."[37]

### State Policy

In 33 states, statutes regulating gun sales do not go beyond the ambiguous standards set by Congress. But 17 states regulate at least some sales by unlicensed private parties (Table 1-1). Some require that these transactions be routed through a licensed retailer; such transactions are subject to the same procedural safeguards that apply to the licensed retailer's own sales.

0072

Other states require that purchasers obtain a permit or undergo a background check through a law enforcement agency.[40]  Of these 17 states, six regulate all private party gun sales and nine more regulate all private party sales of handguns.  Two states, Colorado and Oregon, regulate all private party sales at gun shows only.

Table 1-1.  State regulation of private party gun sales*

| State | Handgun Sales | | Long Gun Sales | |
|---|---|---|---|---|
| | All Sales | Gun Shows Only | All Sales | Gun Shows Only |
| California | ● | | ● | |
| Colorado | | ● | | ● |
| Connecticut | ● | | | ● |
| Hawaii | ● | | ● | |
| Illinois | ● | | ● | |
| Iowa | ● | | | |
| Maryland | ● | | | |
| Massachusetts | ● | | ● | |
| Michigan | ● | | | |
| Missouri | ● | | | |
| Nebraska | ● | | | |
| New Jersey | ● | | ● | |
| New York | ● | | | ● |
| North Carolina | ● | | | |
| Oregon | | ● | | ● |
| Pennsylvania | ● | | | |
| Rhode Island | ● | | ● | |

\*  In the remaining 33 states, private party gun sales are not regulated.

From *Survey of state procedures related to firearm sales, 2005.*  Washington, DC: Bureau of Justice Statistics; 2006.  NCJ 214645.  See Table 6.

Inside Gun Shows

## Regulating Gun Buyers

### *Federal Policy*

Federal statutes prohibit several categories of persons from purchasing or otherwise acquiring firearms, whether from a licensed retailer or a private party, and from possessing firearms at any time.[40]  (See Table 1-2.)  Most of the prohibitions arise from criminal convictions.  These were expanded to include convictions for misdemeanor crimes of domestic violence in 1996.  Convictions for other violent and firearm-related misdemeanors, such as battery and brandishing a firearm, do not prohibit firearm ownership under federal law.  A federal prohibition is permanent unless it arises from a domestic violence restraining order, in which case it exists only as long as the restraining order remains in effect.

Persons less than 21 years of age may not purchase handguns from licensed retailers, but persons ages 18 to 20 may purchase handguns from private parties.  Those less than 18 years of age cannot purchase long guns (rifles and shotguns).[40]

Table 1-2.  Categories of persons who are generally prohibited from purchasing or possessing firearms under federal law

| A person is prohibited who: |
| --- |
| • Is under indictment for, or has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year |
| • Is a fugitive from justice |
| • Is an unlawful user of or addicted to any controlled substance |
| • Has been adjudicated as a mental defective or has been committed to any mental institution |
| • Who, being an alien, is illegally or unlawfully in the United States or has been admitted to the United States under a nonimmigrant visa |
| • Who has been discharged from the Armed Forces under dishonorable conditions |
| • Who, having been a citizen of the United States, has renounced his citizenship |
| • Is subject to a court order that restrains such person from harassing, stalking, or threatening an intimate partner of such person or child of such intimate partner or person |
| • Has been convicted in any court of a misdemeanor crime of domestic violence |

From *United States Code*, Title 18, Section 922(d).

20

0074

Federal law also makes it a felony to purchase a firearm from a licensed retailer for another person while representing oneself to be the intended owner of that firearm. Such transactions are known as surrogate or "straw" purchases. Although illegal, such purchases are common and are an important source of guns for prohibited persons. Straw purchases will be discussed in more detail later in the chapter and in Chapter 3.

### State Policy

Many states have broadened the federal criteria for prohibiting the purchase and possession of firearms. Details for each state are available in the regularly-updated *Survey of State Procedures Related to Firearm Sales*, compiled by the Justice Department's Bureau of Justice Statistics and available at http://www.ojp.usdoj.gov/bjs/. In California, for example, persons convicted of most violent misdemeanors are prohibited from possessing firearms for 10 years following their convictions.

California, Maryland, Virginia, and New Jersey also prohibit individuals from purchasing more than one handgun in any 30-day period. Because California has a centralized record of handgun purchases, this prohibition applies statewide, not just to multiple purchases from an individual retailer. Private party sales are exempted, however.

## Screening and Denial

Since March 1, 1994, the Brady Handgun Violence Prevention Act has required background checks on persons purchasing firearms from federally licensed firearm retailers. Federal and state agencies have conducted 97,080,000 Brady Act background checks as of December 2008. The checks have resulted in 1,778,000 denials, for a denial rate of 1.8%.[41]

In 2008 alone, 9,901,000 background checks were conducted, 147,000 of which led to denials (a denial rate of 1.5%). A large majority of these denials resulted from the fact that the prospective purchasers had been convicted of, or were under indictment for, serious crimes. (See Table 1-3.)

Prior to the Brady Act, in 32 states no background check was required to verify purchasers' statements that they were not prohibited persons. The 18 other states had enacted background check requirements of their own, sometimes many years earlier.[42]

*Okay, I want it, but I just bought a gun June 2. I'll have to wait.*

*—An attendee making a deposit on a Walther pistol on June 6, in Orange County, California. Because of the state's prohibition on the purchase of more than one handgun within 30 days, he will not be able to purchase the gun until July.*

*Vendor: It's my understanding that if you've got a conviction, you can't buy guns forever.*

*Attendee: That's right. You don't ever want to hit the old lady, 'cause then you're through.*

*—Advice given to a man shopping for parts for an AR rifle, Las Vegas, Nevada.*

Inside Gun Shows

When the Brady Act first took effect, states where no background checks had previously been required found that as many as 9.4% of persons who sought to purchase firearms from licensed retailers, and who had just certified under penalty of perjury that they were eligible to own guns, were in fact prohibited from owning them.[43]

Table 1-3.  Reasons for denial of firearm transfer application in 2008

| Reason for Denial | Agency Type | |
|---|---|---|
| | Federal (%) | State (%) |
| Felony indictment/conviction | 55.9 | 45.7 |
| State law prohibition | 6.8 | 10.5 |
| Domestic violence | | |
| Misdemeanor conviction | 7.3 | 9.9 |
| Restraining order | 4.1 | 4.0 |
| Fugitive | 13.4 | 8.6 |
| Illegal alien | 1.4 | 0.5 |
| Mental illness or disability | 1.1 | 3.7 |
| Drug user/addict | 9.5 | 3.1 |
| Other | 0.6 | 13.9 |
| Total | 100 | 100 |

From *Background checks for firearm transfers, 2008—statistical tables.*
Washington, DC: Bureau of Justice Statistics, 2008.  NCJ 227471.
See Table 4.  Results for local agencies are omitted.

### Does Denial Work?

The goal of screening and denial programs is to prevent gun-related violence by preventing persons thought to be at high risk of committing such violence from acquiring guns.  There are no systematic data on the intermediate question: How often do people who are denied the purchase of a gun from a licensed retailer go on to acquire a gun from some other source?  There are, however, several studies that collectively describe the effect of these programs on violent crime.

It appears that denial of gun purchase significantly lowers the risk of committing violent and gun-related crimes among the persons who are directly affected.  The best example of this effect

comes from California, which in 1991 expanded its criteria for a prohibition on gun ownership to include prior convictions for almost all violent misdemeanors. Over three years of follow-up, there was a 23% drop in crimes involving guns or violence among those whose gun purchases were denied in the year after the new policy took effect, as compared to a group of violent misdemeanants who legally purchased handguns under the previous policy.[44] For persons ages 21 to 24, among whom absolute rates of violent criminal activity were highest, the decrease was 27%. There was no difference for crimes involving neither guns nor violence. This specificity of effect supports the inference that the observed results were produced by the change in policy rather than some other factor.

Similarly, denial based on a felony conviction appears to result in a decrease in risk for crimes involving guns or violence of 20% to 25%.[45] This is a sizeable effect. Its importance is reinforced by a new research finding concerning risk for new criminal activity among persons who have previously been arrested for serious crimes.[46] As much as 20 years may need to pass before their risk of re-arrest falls enough to approximate the risk of first arrest among persons their age who have no prior arrest record. Policies intended to reduce that elevated risk for new criminal activity appear to be well-advised.

However, the federal screening and denial program put in place by the Brady Act may have had little effect on population-wide rates of gun-related violent crime. Careful researchers studying rates of gun homicide determined that while a decrease occurred in states where Brady led to the institution of screening and denial for the first time, that decrease also occurred in states where similar programs had been in place all along.[42] They found no effect on rates of gun homicide that could be attributed to the Brady Act itself.

Several explanations have been proposed for these seemingly contradictory findings. One is that the federal criteria for prohibiting an individual from purchasing a gun are quite narrow. Most violent misdemeanors are not prohibiting offenses, for example. As a result, many high-risk persons are still able to purchase guns, and the number of persons denied may be too small for any beneficial effect on them as individuals to be reflected in overall crime rates.[47]

Another, probably more important, is that the Brady Act's mandate applies only to gun sales by federally licensed retailers.

Inside Gun Shows

The secondary market's private party gun sales—accounting, again, for perhaps 40% of all gun transfers every year—are unaffected.  A new evaluation of state-level regulations on gun sales provides evidence in support of this possibility.  Gun trafficking, which facilitates firearm-related violent crime, appears to be significantly reduced in states that regulate private party sales of handguns.[48]

## Summing Up: Why Private Party Gun Sales Matter

*Of course, if I don't ask, nobody knows.*

*— A seller contemplating the sale of a handgun to a possibly prohibited party, Reno, Nevada.*

*Three and a half out the door.  I'm not a dealer so just pay cash for it and you're outta here.*

*— An unlicensed vendor selling a Ruger revolver, tagged at $425, Waukesha, Wisconsin.*

Private party gun sales are quick and convenient.  Even a completely law-abiding gun purchaser might appreciate the absence of paperwork that characterizes private party sales.  And their anonymity will attract those who put privacy at a premium.

But the same attributes of private party sales that make them convenient for legal gun buyers make them the principal option for a felon, fugitive, domestic violence offender, or other prohibited person.  The key is that while it is always illegal for a prohibited person to buy a gun, it is only illegal to sell a gun to a prohibited person if the seller knows or has "reasonable cause to believe" that he is doing so.[49]  Again, a private party seller *cannot* initiate a background check.  He is under no obligation to inquire directly.  The matter is easily finessed.  As one gun seller said while contemplating a possibly illegal handgun sale, "Of course, if I don't ask, nobody knows."

## Where Crime Guns Come From

### Licensed Retailers: The Primary Gun Market

In the early 1990s, the United States had more licensed gun retailers than gas stations.[50]  More rigorous licensing and oversight policies led to a large decrease in licensed retailers by 2001.[5, 34, 51]  The sellers of one-third of crime guns traced in 1994 were out of business by 1998.[52]

Licensed retailers remain an important source of crime guns, however.[27, 28, 53-55]  Of persons incarcerated during the 1990s for serious crimes involving guns, 12% to 19% of those in state prisons[31] and 19% of those in federal prisons[30] purchased their guns personally from a retail store or pawnshop.

Others employ surrogate or "straw" purchasers to buy guns from licensed retailers on their behalf.  In a typical straw

24

purchase, the actual buyer determines which gun is to be bought and provides the funds. The straw purchaser, acting as the buyer's agent, makes the purchase by falsely representing himself (or, frequently, herself) to be the actual buyer of the gun. The details can vary. For example, the actual buyer may make the selection at the time of purchase and transfer the funds to the straw purchaser in full view of the retailer. Alternatively, the straw purchaser may operate with a shopping list of desirable guns or communicate with the actual buyer by cell phone (sometimes sending pictures of the guns in question).[56] Straw purchasers may be compensated with cash, drugs, or other currency.

Criminal gang members may be particularly likely to use straw purchasers, even if they themselves are not prohibited persons, for the simple reason that it is unsafe for them to travel outside their territories to a licensed retailer's place of business.[57] Gun traffickers, needing to mask their gun purchases, may employ whole networks of straw purchasers. Straw purchases have emerged as a leading source of supply for Mexican drug trafficking organizations.

Consider, for example, the case of John Philip Hernandez of Houston.[58, 59] Between June 2006 and June 2007, Hernandez spent nearly $25,000 to buy 23 firearms, including 5.7mm FN Herstal Five-seveN "cop killer" pistols and 15 AR rifles, from Houston-area retailers. The guns were smuggled into Mexico, where several have since been used in homicides and other violent crimes—as soon as two months after Hernandez purchased them. Hernandez recruited others to buy guns for him; they purchased another approximately 80 guns. The larger operation of which Hernandez and his confederates were just one segment is believed to have shipped well over 300 guns across the border. Most of the 22 members of that operation remain at large.

When all this began, Hernandez was 24 years old. In April 2009, he was sentenced to 97 months in prison by a judge who held that the maximum term recommended by the U.S. Sentencing Guidelines was not a sufficient deterrent to others.

Straw purchasers are often the intimate partners of actual buyers. Women make up about 10% of gun owners overall,[1, 2] but 18% of straw purchasers working with gun trafficking operations were the girlfriends or spouses of the traffickers.[27]

A straw purchase is a felony under federal law for both the actual buyer and the straw purchaser—and for the retailer, if he

*If she's buying the gun, she's got to act like she's buying the gun. Come on up here.*

*—A licensed retailer in Las Vegas, Nevada, to two young men who are negotiating the purchase of a handgun and have just indicated that one of two women standing well behind them will be the purchaser. All four leave immediately.*

25

0079

Inside Gun Shows

sells the gun despite knowledge or reasonable cause for belief that a straw purchase is in progress. There is clear evidence from criminal investigations that straw purchases are nonetheless an important source of crime guns.[27, 55] In a 1993 survey, 32% of student-age correctional inmates and, perhaps even more surprisingly, 18% of inner city high school students had asked someone to purchase a gun for them from a retail outlet.[60, 61] More recently, 53% of licensed retailers telephoned by a sham prospective purchaser indicated that they would sell a handgun to that person because his or her intimate partner "needs it."[62]

The question arises: Why risk a straw purchase from a licensed retailer when private party gun sales offer a convenient and anonymous, if still illegal, alternative? The answer may be in part that licensed retailers have larger inventories than private party sellers do[63] and in particular are more likely to stock new assault rifles and similar weapons sought after by criminal users. Buying a new gun also avoids the risk of being linked through the gun to prior crimes in which it was used. This proposition would be unconvincing if the risk of apprehension during a straw purchase were high, but it is not.[63]

*Tracing Crime Guns*

An individual licensed retailer's importance as a source of crime guns is estimated by determining the number of recovered crime guns sold by that retailer. Linking crime guns to their points of sale is accomplished by a procedure called gun tracing, which ordinarily reconstructs the chain of ownership of a gun from its manufacturer to its first retail purchaser. Gun traces are conducted by ATF in response to requests from law enforcement agencies all over the world, and annual reports on traced guns for each state in the U.S. are provided by ATF at its web site: http://www.atf.gov/firearms/trace_data/index.htm. In 2005, ATF received more than 260,000 requests for gun traces.[64]

Some retailers sell more crime guns than others do. In 1998, of 83,272 licensed retailers nationwide, just 1,020 (1.2%) accounted for 57.4% of all traced guns.[65] At that time, many licensed retailers sold few guns or none at all, however. In a later California study of 421 retailers who sold at least 100 handguns a year, just 10 retailers (2.4%) accounted for 29.2% of all handguns sold by the entire group that were traced after use in a violent or firearm-related crime.[66]



*PRIVATE SALES
SEE KEVIN.*

*—Multiple signs at this licensed retailer specializing in custom-assembled AR and AK rifles. The signs were seen at a show in Reno, Nevada, but not at subsequent shows in Las Vegas, Nevada; Phoenix, Arizona; or San Francisco, California. The photograph was taken in San Francisco.*

0080

The National Rifle Association has suggested that the number of traced guns linked to an individual retailer reflects only that retailer's sales volume.[67] This is not the case. Some licensed retailers are linked to crime guns not just frequently, but *disproportionately*: more frequently than would be expected from the overall number of guns they sell. In the California study cited above, the 11.2% of retailers who had disproportionate sales of crime guns accounted for 46.1% of handguns linked to violent or firearm-related crimes.[66]

Perhaps of greatest concern, some licensed retailers are corrupt. Such retailers are the immediate source of nearly half of all guns that are trafficked—diverted intentionally into illegal gun commerce.[27] They account for two-thirds of trafficked guns coming from gun shows.[28]

### Private Parties: The Secondary Gun Market

Far and away, the leading proximate source of crime guns is the secondary gun market. More than 85% of the recovered crime guns traced by ATF are in the possession of someone other than their first retail purchaser when the crime is committed; the percentage is even higher for guns recovered from juveniles and youth.[68-70] These guns have gone through at least one private party gun sale (or some other type of private party transfer of possession, such as a trade). Correspondingly, the great majority of persons who have committed violent crimes with guns report that they acquired their guns through a private party transaction.[31] (See Table 1-4.)

At least two of the reasons for this are clear. As discussed, private party gun sales offer anonymity and are available to those who would be prohibited from buying from licensed retailers. Accessibility is also important. Licensed retailers can be few and far between, at least in some large cities. There are an estimated 57 million adult gun owners in the United States,[1] any one of whom can become a private party gun seller.

The lack of documentation for private party gun sales creates missing links in the chain connecting the first retail purchaser and the criminal from whom the gun has been recovered. Finding those missing links can be impossible, or at best very expensive. In states that require records to be kept for all gun sales, however, investigators seek to identify the most recent purchaser of a crime gun, not just the first.[70] This is of real practical value; it can

*Gun shows, flea markets, hotel rooms, just about anywhere. He's not asking for any identification, he's not asking to have somebody have a record check being done, so he'll sell to anybody for a price.*

*— ATF agent Thomas Stankiewicz describing Kurt Radovich, accused of gun trafficking in Pennsylvania in 2008. More than 500 guns and thousands of rounds of ammunition were taken from Radovich's home at the time of his arrest.[71]*

*I don't fill out any paperwork or anything.*

*—An unlicensed vendor in San Antonio, Texas, buying a Smith & Wesson .357 revolver for $350 from an attendee at the show. The vendor has about 60 guns for sale, including at least 5 AK rifles.*

convert a crime gun whose first retail purchase was in another state several years earlier into a gun sold just weeks before the crime, just miles from the crime scene.  (Examples are in Table 1-5.)  The same information can be critically important in identifying gun trafficking networks and in linking one crime to another.

Table 1-4.  Sources of guns used in crime by state prison inmates

| Source | Percentage | |
|---|---|---|
| | 1997 | 1991 |
| Purchased or traded from retail outlet | 13.9 | 20.8 |
| Retail store, pawnshop | 12.1 | 18.9 |
| Flea market, gun show | 1.7 | 1.9 |
| Family or friend | 39.6 | 33.8 |
| Purchased or traded | 12.8 | 13.5 |
| Rented or borrowed | 18.5 | 10.1 |
| Other | 8.3 | 10.2 |
| Street, illegal source | 39.2 | 40.8 |
| Theft, burglary | 9.9 | 10.5 |
| Drug dealer, off street | 20.8 | 22.5 |
| Fence, black market | 8.4 | 7.8 |
| Other | 7.4 | 4.6 |

From Harlow CW.  *Firearm use by offenders*.  Washington, DC: Bureau of Justice Statistics; 2001.  NCJ 189369.  See Table 8.

0082

Table 1-5.  Results of standard ATF traces and traces incorporating additional California sales records for handguns recovered from young people in California and traced in 1999

| Gun | Date of Recovery by Law Enforcement | ATF Sale Date | ATF Time from Sale to Recovery | California Sale Date | California Time from Sale to Recovery |
|---|---|---|---|---|---|
| GLC 23, .40 | 03/06/99 | Unknown | Unknown | 06/08/96 | 2.7 y |
|  |  |  |  | 05/22/98 | 288 d |
|  |  |  |  | 06/13/98 | 266 d |
| SW 910, 9mm | 02/01/99 | 02/28/96 | 2.9 y | 02/28/96 | 2.9 y |
|  |  |  |  | 09/20/98 | 135 d |
| SW Sigma, 9mm | 09/28/99 | 04/28/95 | 4.4 y | 03/19/97 | 2.5 y |
|  |  |  |  | 06/25/99 | 95 d |
| GLC 19, 9mm | 12/22/98 | 04/21/98 | 245 d | 12/01/98 | 22 d |
| CLT .25 | 02/17/99 | Unknown | Unknown | 12/19/98 | 62 d |

Summary of example cases:

In case 1, a Glock Model 23, .40 caliber semiautomatic pistol was recovered on March 6, 1999 in Los Angeles.  The standard trace identified the retailer who first sold the gun, but the date of purchase and time from sale to recovery were unknown.  California sales records identified three transactions, two of which occurred less than a year before the gun's recovery.

In Case 2, a Smith and Wesson Model 910, 9mm semiautomatic pistol was recovered February 1, 1999.  Both the standard trace and the sales records identified a first sale in February, 1996, but the sales records included a subsequent transfer just over four months prior to the gun's recovery.

(Y denotes years; d denotes days.)

From Wintemute GJ.  The life cycle of crime guns: a description based on guns recovered from young people in California.  *Annals of Emergency Medicine* 2004;43:733-742.

## Gun Shows and Gun Commerce

Since the adoption of the Firearm Owner's Protection Act in 1986, federal law has permitted licensed retailers to sell guns of any type at gun shows in their home states.  They can sell long guns at shows elsewhere.[34]  Prior to 1984, retailers could sell only at the premises listed on their license; from 1984 to 1986, they were allowed to conduct business at gun shows under a new ATF

regulation.[72]  By creating an ambiguous definition of the term "engaged in the business," FOPA also expanded opportunities for private parties to buy and sell guns regularly while claiming to be indulging a hobby.

Although systematic data are lacking, the result appears to have been a rapid increase in both the number and size of gun shows during the 1980s and 1990s.  An informal survey in 1996 by the Violence Policy Center yielded the following impressions, among others.[72]  From a regional ATF official: "Several out of my eight supervisors said we definitely had an increase of more than 50 percent in the last 10 years."  From David Cook, show organizer for the North Texas Gun Club, a promoter of large gun shows in Dallas: "They've become more popular.  I remember the days when there was a show only once every three months.  Now you can go to one just about every weekend."

Today, gun shows continue to play a unique role in gun commerce, stemming from the fact that dozens to hundreds of gun sellers—licensed retailers, unlicensed vendors, and individual attendees—are present and competing with one another for business.  Licensed retailers rent table space from the shows' promoters and display their inventory from a fixed location, but unlicensed vendors do this as well.  ATF, based on interviews with promoters, estimates that 25% to 50% of all gun sellers at gun shows who rent table space are unlicensed vendors.[37]  A separate study, based on observations at gun shows, raises this estimate to 70%.[63]  (The reasons for the discrepancy will be discussed later.)

The same absence of regulation that characterizes private party gun sales generally is also true of sales by unlicensed vendors at gun shows.  Some advertise their unregulated status; at one show, an unlicensed vendor posted this sign: "No background checks required; we only need to know where you live and how old you are."[37]  It is of great concern that some unlicensed vendors are likely to be "corrupt licensed gun dealers who were squeezed out of the primary market by recent...ATF efforts to make it more difficult to obtain and renew a federal firearms license."[28]

Individual attendees who have brought guns to sell probably outnumber licensed retailers and unlicensed vendors put together.  Some are active traders, both buying and selling guns.





*Signs posted by unlicensed vendors, Tucson and Phoenix, Arizona.*

*Economies of Scale*

Major gun shows can usefully be considered the big-box retailers of gun commerce.  Some individual licensed retailers at these shows are as large and well-staffed as a good-sized gun store.  When dozens or hundreds of gun sellers are together in the same place along with thousands of potential customers, collective effects become important.  Competition allows for multiple business strategies to be successful.  Larger retailers can stock a wide range of products and maximize their sales volume at the expense of profit per item sold; small vendors may specialize to achieve excellence in a niche market.  As a result, these gun shows offer their customers a breadth and depth of weaponry to choose from that can be found nowhere else, at prices that are as low as the market will bear.

This effect may not be particularly important for conventional handguns and long guns—the core of the inventory of a typical gun dealer or pawnshop.  On the other hand, a customer might need to visit several retailers scattered across a metropolitan area in order to inspect a single .50 BMG rifle or one of the new semiautomatic pistols based on AR or AK rifle designs (more on these in Chapter 4).  At a large gun show, however, he is likely to find at least half a dozen licensed retailers with several of these weapons to sell.  Simply by walking back and forth between them he can comparison shop and negotiate a low selling price.  Not uncommonly, he can buy them anonymously from an unlicensed vendor or another attendee.

The sheer quantity of weapons for sale at any one time, whether arrayed on tables or carried by attendees, can be eye-opening.  A reasonable working estimate of the number of guns per seller renting table space is 25.  (In a prior study, the median number of guns per seller was 22 in California and 26 in other states.[63])  At the low end are unlicensed vendors who have just one or two guns on display and are mostly selling something else.  At the other extreme, Shoot Straight Sports (see Chapter 2) had an estimated 1,354 guns laid out at a show in Orlando, Florida; some of these were atop stacks of boxes holding additional guns.

At a show with 200 gun vendors, then, an attendee walking the aisles might have about 5,000 guns on display to choose from at any one time.  This does not include guns still in their boxes or carried by other attendees.

Inside Gun Shows

## Gun Shows and Crime Guns

*See that guy over there?  He's at every show.  And he sells some of the same guns I do, only he charges more.  Now why do you think some people are willing to pay more at his table than mine?  Because he doesn't have to run them through a background check.*

*—Licensed retailer Merlin Scales at a 2008 gun show in Norfolk, Virginia, describing a nearby unlicensed seller.[73]*

*Seller: I'm not really supposed to sell handguns to…non-Vermont residents.*

*Buyer: I was just hoping I'd be able to find somebody up here and let money do the talking, you know?*

*Seller: Well, you know the old Italian saying: make me an offer I can't refuse.  You know what I mean?  Then we can do something illegal.*

*Buyer: I'm willing to do $2,500 cash.*

*Seller: Twenty-five hundred cash, that's tempting.  I was figuring around the same thing.  You got that kind of money?*

*Buyer: I'll go do what I gotta do.*

*—Conversation between an unlicensed vendor and a reporter, posing as a gun buyer, at a gun show in Vermont in 2008 or late 2007.  The reporter is from Massachusetts.  It is illegal for the vendor to sell a handgun to a buyer from another state.[74]*

Much of the concern about gun shows as a source of crime guns focuses on private party gun sales, since no background checks are conducted and no records are kept.[28, 37, 63]  ATF emphasizes that "[u]nder current law, large numbers of firearms at these public markets are sold anonymously... there is virtually no way to trace them."  As a result, "too often the shows provide a ready supply of firearms to prohibited persons, gangs, violent criminals, and illegal firearms traffickers."[37]  A 2009 Government Accountability Office report identified both the lack of background checks and the lack of records for private party gun purchases, including specifically those at gun shows, as "key challenges" to efforts to interdict gun trafficking across the border to criminal organizations in Mexico.[17]

Licensed retailers have not been silent.  "Many Federal firearms licensees," ATF notes, "have complained to ATF about the conduct of non-licensees at gun shows."[37]  At ATF briefings for licensed retailers attended by the author, licensees have reported flagrantly illegal activity by unlicensed vendors and private party sellers.

Perhaps the most vocal of these licensed retailers was the late Bill Bridgewater, head of the National Association of Stocking Gun Dealers.  In 1993 he wrote to the House Judiciary Committee's Subcommittee on Crime and Criminal Justice:

> The BATF has established rules and regulations for these things they call "gun shows."  The opportunity for the black marketers is that the BATF doesn't enforce those regulations and there isn't anyone else to do so.  Consequently, there are literally hundreds of "gun shows" scattered around the country where you may rent tables, display your wares, sell what you please to whomever you please and once again the sale that is made with no records, no questions and no papers, earns the highest sales price…There are wide open "gun shows" the length and breadth of the United States, wherein anyone may do as he chooses, including buy firearms for children.[72]

But licensed retailers themselves are implicated; there is

32

evidence that among gun dealers, at least, those who sell at gun shows are more likely to have crime guns traced to them than are those who do not. ATF's 1998 Operation Snapshot, which compiled data on random samples of 382 gun dealers and 370 pawnbrokers, found that 30% of dealers with gun show sales, but 22% of all dealers, had previously had a crime gun traced to them. For pawnbrokers the difference was in the opposite direction; 36% of those with sales at gun shows, but 44% overall, had prior gun traces.[75] And in California, where both gun shows themselves and gun commerce generally are regulated, sales at gun shows are not a risk factor among licensed retailers for disproportionate sales of crime guns.[66]

The best available data on gun shows as a source of crime guns come from ATF investigations of illegal gun trafficking.[27-29] Example cases are given in Table 1-6.

In 2000, ATF published a detailed study of 1,530 such investigations initiated from July 1996 through December 1998, of which 212 (13.9%) involved gun shows and flea markets.[27] These cases accounted for 25,862 guns—30.7% of all the guns in the study.[27] Half the cases involved 40 guns or more. Nearly half (46%) involved felons either buying or selling guns at the shows. In more than a third, one or more of the involved guns were known to have been used in subsequent crimes, including homicide, assault, robbery, and drug offenses.[37]

A follow-up study of 314 gun show investigations found that individual cases involved as many as 10,000 guns.[28] Trafficking at gun shows accounted for 9.9% of all firearms in cases linked to juveniles and youth.[54]

ATF trafficking investigations also suggest that corrupt licensed retailers may preferentially do business at gun shows, as oversight is less stringent.[27, 28] Nearly 20% of investigations concerning gun shows involved FFLs selling firearms without conducting background checks or retaining records.[37]

### Gun Show Exports

Gun shows are now frequently identified as the source of guns exported to Mexico,[17, 58, 76] Canada,[77] and elsewhere. A lack of information, most importantly the absence of records for private party sales, has made it impossible to quantify the extent of the problem.[17] Sales by licensed retailers and by private parties are both involved.

*I use my discretion. Most people who come to the shows, you see them a lot. You know who's "right" and who's "wrong." I don't have to, but I ask everybody to see their driver's license, and if they're not "right," they usually move on at that point.*

*—Unlicensed vendor Jim Caton at a 2008 gun show in Norfolk, Virginia.[73]*

Inside Gun Shows

*They send over a scout on Saturday to see if there's anything they want.  Then they show up on Sunday with a big wad of money and somebody who's got a clean record, who's legal to buy.*

*—A seller of trigger activators—devices that increase the rate of fire of semi-automatic guns—on how Mexican gangs acquire guns at gun shows, Tucson, Arizona.[76]*

*When somebody walks in and says, "I need eight of these," it becomes apparent what's happening.*

*—A licensed retailer in Tucson, Arizona.  As reported by the* New York Times*, "[o]n May 18, 2008, a man bought two military-style rifles from him at a gun show on the Arizona State Fairgrounds.  Two days later, the man showed up at the dealer's home with a friend and bought eight more rifles for more than $5,000 cash.  Despite the dealer's help [to law enforcement], members of the ring managed to smuggle at least 112 weapons, bought at a half dozen locations, into Mexico before they were arrested in February [2009]."[68]*

Table 1-6.  Examples of gun trafficking cases involving gun shows

| Year | Case Description |
|------|------------------|
| 1993 | A licensed retailer in Tennessee "purchased more than 7,000 firearms, altered the serial numbers, and resold them to two unlicensed [vendors] who…sold the firearms at gun shows and flea markets."  The licensed retailer was sentenced to 15 months in prison and the unlicensed vendors to 21 and 25 months, respectively.[37] |
| 1995 | A convicted felon in Michigan "used a false police identification to buy handguns at gun shows and resold them for profit."  The guns included 16 new, inexpensive, 9mm and .380 semiautomatic pistols.  The subject was sentenced to 27 months in prison.[37] |
| 1996 | An unlicensed vendor who was a convicted felon operated a network of straw purchasers and had trafficked more than 1,000 guns, some acquired at gun shows.  He "offered to sell agents an unlimited number of firearms, including fully automatic weapons and silencers."  One gun "was recovered from the scene of a shootout in which two Mexican military officials were killed by drug traffickers."  Another was recovered from the apartment of a Mexican drug czar.  The trafficker was eventually sentenced to 78 months in prison; two licensed retailers who collaborated with him received probation.[27] |
| 2004 | Dorian Bennett Carr, Jr., and Alvin Eugene Edwards were indicted for operating a straw purchasing ring that acquired approximately 240 new semiautomatic pistols from licensed retailers at Oklahoma gun shows and gun stores in six months.  The guns were trafficked to Baltimore.  Seven alleged straw purchasers were also indicted.[81] |
| 2006 | "Operation Flea Collar" began as an investigation of two traffickers who purchased firearms from a licensed retailer in Alabama and sold them at gun shows and flea markets there.  The investigation grew to involve thousands of firearms recovered from at least 12 states; gangs routinely sent buyers to Alabama to purchase the guns in bulk.  Twelve guns were linked to homicides.  Eighteen persons were arrested and convicted, and 556 firearms, including a Streetsweeper shotgun, were seized.[82, 83] |
| 2006 | Between 1994 and 2001, unlicensed vendor Richard Clausen bought and resold 300-400 firearms at gun shows and swap meets in Arizona.  Clausen bought the guns from licensed retailers; the guns were sometimes resold, without background checks or records, within days.  Clausen was sentenced to 27 months in prison.  The judge said this of Clausen's conduct: "It was like spreading poison in the public water supply."[84] |

Table 1-6, continued.

| Year | Case Description |
|------|------------------|
| 2006 | Mark Andrew Nelson of Ohio pleaded guilty to operating a straw purchasing ring that acquired guns from licensed retailers for him to sell at area gun shows and directly to prohibited persons.  The straw purchasers, who also pleaded guilty, were members of his family: Phaedra Ann Nelson, his wife (173 guns); Ricky Frank Nelson, his brother (83 guns); and James Robert Crook, his father-in-law (71 guns).  Licensed retailer Robert L. Cook pleaded guilty of selling a firearm to a prohibited person.[85] |
| 2008 | In October, 2005, Antrinna Collins purchased 3 semi-automatic pistols and 3 AK-47 rifles at the Cuyahoga County gun show in Ohio.  One of the pistols was used by a convicted felon in a shooting 27 days later.  On at least 3 occasions, guns she purchased were found in the possession of convicted felons.  She was sentenced to 4 years in prison.[86] |
| 2008 | During 2006-2007, Ernesto Olvera-Garza directed a trafficking network in San Antonio, Texas, that specialized in "high-powered, high-capacity handguns and assault rifles"[87] acquired at gun shows and elsewhere.  At least 9 straw purchasers were involved.[88]  A woman who straw purchased a gun for him at a San Antonio gun show testified that, when she delivered the gun to him in the parking lot, he showed her 10 more guns that other straw purchasers had bought.[89]  Garza's operation smuggled at least 50 guns into Mexico, one of which was used in a gunfight that killed two Mexican soldiers.  He was sentenced to 12 years in prison.[90] |
| 2008 | During 2007-2008, Jonatan Lopez-Gutierrez and John Avelar operated a straw-purchasing ring in El Paso, Texas, that bought more than 90 firearms from licensed retailers at gun shows and elsewhere.  The guns were smuggled into Mexico.  Twenty-four guns were seized, including .50-caliber and .308-caliber sniper rifles and AR-15 rifles.  The men were sentenced to 48 and 37 months in prison, respectively.[91] |
| 2009 | Marvin Acevedo, a 35-year-old Guatemalan linked to a narcotics cartel in that country, was sentenced to four years in prison in February.  He had purchased "more than ten" FN Five-seveN pistols and several thousand rounds of ammunition at gun shows and gun stores in North Texas and elsewhere.[92] |

*I have had people that failed background checks, and yet they are carrying guns out of here that they bought from someone else.*

*—Licensed retailer Bruce A. Schluderman, at a gun show in Pharr, Texas.[58]*

Referring to the widely-reported increase in gun trafficking from this country to Mexico, ATF's Assistant Director for Field Operations, William Hoover, emphasized the importance of "a readily accessible source of firearms and ammunition originating in mostly the secondary market such as gun shows, flea markets and private sales."[78]  Canada's Criminal Intelligence Service, in its 2005 annual report on organized crime, referred to unregulated gun shows in the United States as a "serious threat."[79] And in 2003, the Congressional Research Service suggested that gun shows may be an attractive source of firearms for foreign terrorists.[80]

## Federal and State Policy on Gun Shows

### Federal Policy

There is no federal regulation of gun shows *per se*.  Existing law sets the terms for legal gun sales by licensed retailers and private parties, whether at a gun show or elsewhere.  ATF regulations define gun shows and specify that the business procedures licensed retailers are required to follow at their usual premises apply at gun shows as well.  Figure 1-2 reproduces an ATF circular outlining "activities permitted at bona fide gun shows."

### State Policy

Eight states regulate gun shows, but the nature and scope of those regulations vary widely.[40, 93]  California "requires a show organizer to obtain a Certificate of Eligibility from the Department of Justice, provide local law enforcement with a list of the show's sellers, and exclude minors unless they are accompanied at all times by a parent or guardian."[40]  Details for each state are in Table 1-7.

Table 1-7.  Summary of state statutes regulating gun shows

| State | Key Provisions of Statutes |
|---|---|
| California | Promoters must obtain a certificate of eligibility; provide a list of licensed retailers who will be attending, and of all vendors if requested; provide an approved security plan; and maintain liability insurance.  Vendors must execute written contracts, certify that they will not display prohibited items and will process all gun sales through licensed retailers, and provide a list of all employees in attendance.  All firearms brought by attendees must be tagged with the possessor's name, signature, and identifying information.  Persons under 18 years of age are not admitted unless accompanied by a parent or legal guardian.  (Other requirements have been omitted; see CA Penal Code Sections 12070-12071.4.) |
| Colorado | Records must be kept of all firearm transfers at gun shows, including private party transfers, by licensed retailers.  (A licensed retailer must initiate a background check for a private party transfer at a gun show.) |
| Connecticut | Promoters must provide 30 days' advance notice of gun shows to law enforcement.  (The Department of Public Safety must conduct a background check for a private party transfer at a gun show, which is requested by the seller.) |
| Illinois | Records must be kept of all firearm transfers at gun shows by gun sellers, including private party sellers, for 10 years.  The record must include the buyer's Firearm Owner Identification Card number.  (The Department of State Police must conduct a background check for a private party transfer at a gun show, which is requested by the seller.) |
| Maryland | Private party sellers of handguns and assault weapons at gun shows must obtain a temporary transfer permit for each show they attend, but only if they sell "from a table or fixed display."  The permit requires a background check, and an individual may only be issued five permits per year. |
| New York | Promoters must post signs and provide written notification to vendors that all firearm sales require background checks initiated by licensed retailers and must identify a retailer who will initiate checks for private party sales.  The retailer must retain records of sales at gun shows for 10 years. |
| Oregon | Promoters must post signs stating the requirement for a background check prior to the sale of any firearm at a gun show and must provide forms for requesting background checks.  Records must be kept of all firearm transfers at gun shows by gun sellers, including private party sellers, for 5 years.  (The Department of State Police must conduct a background check for a private party transfer at a gun show, which is requested by the seller.) |
| Virginia | Promoters must provide 30 days' advance notice of gun shows to law enforcement and provide a list of all vendors within five days following the show.  There is an exemption for "shows held in any town with a population of not less than 1,995 and not more than 2,010, according to the 1990 United States census." |

Adapted in part from *Regulating guns in America: an evaluation and comparative analysis of federal, state and selected local gun laws.*  San Francisco, CA: Legal Community Against Violence, 2008.

Inside Gun Shows

Figure 1-2  ATF circular outlining procedures to be followed at gun shows

**U.S. Department of Justice**
Bureau of Alcohol, Tobacco, Firearms and Explosives

### Important Notice to Dealers and Other Participants at this Gun Show



This **NOTICE** applies to activities permitted at bona fide gun shows, as defined in Title 27 of the Code of Federal Regulations, Section 478.100.  Federal firearms licensees ("FFLs" or "Dealers") may only sell firearms at gun shows within the State in which their licensed premises is located.

#### DEALERS LICENSED IN THIS STATE

- **MUST** display license.
- **MUST** comply with all recordkeeping requirements of ATF regulations concerning acquisitions and dispositions of firearms, including the recording of the place of sale.
- **MAY** dispose of handguns to residents of this State only, provided that the purchaser is at least 21 years of age and all provisions of the Brady law are met.
- **MAY** dispose of long guns to residents of any State, provided that the purchaser is at least 18 years of age, the laws of both States are complied with, and all provisions of the Brady law are met.
- **MAY** dispose of firearms to any FFL.
- **MAY** acquire firearms from any FFL licensed in the State and from any non-licensed individual.
- **MAY** take orders of any firearm from a non-licensee and ship the same to a licensee in the purchaser's State of residence from whom the purchaser can then take possession after the provisions of the Brady law are met.

#### DEALERS NOT LICENSED IN THIS STATE

- **MUST** display license.
- **MUST** comply with all ATF recordkeeping requirements concerning the acquisition of firearms.
- **MAY** acquire firearms from any FFL licensed in this State and from any non-licensed individual.
- **MAY** make a sale and deliver curio or relic firearms to any other FFL licensed in any State as long as the laws of both States are complied.
- **MAY** ship curio or relic firearms from this show to any other FFL.
- **MAY** display and take orders.

#### NON-LICENSED RESIDENTS OF THIS STATE

- **MAY** acquire long guns or handguns from FFLs licensed in this State, provided all provisions of the Brady law are met.
- **MAY** dispose of personal firearms to any FFL.
- **MAY** acquire from and dispose of personal firearms to non-licensed residents of the State.  However, non-licensed individuals may not be engaged in the business of dealing in firearms without a Federal firearms license.
- **CANNOT** acquire from or dispose of firearms to non-licensed residents of any other State.
- **CANNOT** ship in interstate commerce, except to themselves or an FFL, a firearm that has otherwise been lawfully acquired; must, when shipping to themselves, declare the firearm to the commercial or contract carrier.

#### NON-LICENSED RESIDENTS FROM ANOTHER STATE

- **MAY** dispose of firearms to any FFL.
- **MAY** acquire long guns only from FFLs licensed in the State, provided the laws of both States are complied with and all provisions of the Brady law are met.
- **MAY** order firearms from any FFL and have them shipped from the show to an FFL in their State of residence by a commercial or contract carrier in accordance with State and Federal law.
- **CANNOT** acquire handguns.
- **CANNOT** acquire from or dispose of firearms to non-licensed individuals.

ATF 15300.23A
Revised March 2006

## Law Enforcement at Gun Shows

ATF has had no proactive program of gun show enforcement.[94]  Instead, its investigations traditionally have been reactive, originating in information developed from complaints or, more recently, patterns developed in gun tracing data or reports of multiple handgun sales.  For example, of the 314 ATF trafficking investigations involving gun shows in the late 1990s, over 40% began with complaints or tips from informants (including 9% from FFLs or show promoters), and another 23% arose from analysis of trace and multiple sales records.  Only 14% arose from "prior ATF attention to gun shows."[28]

From 2004 to 2006, gun show operations accounted for 3.2% of all trafficking investigations initiated by ATF and affected 3.3% of the gun shows estimated by the Department of Justice to have occurred during those years.[94]  During those years ATF conducted 202 investigative operations at 195 gun shows, resulting in 121 arrests (with at least 83 convictions) and the seizure of 5,345 firearms.[94]  Of the 202 operations, 156 (77%) focused on specific individuals who were suspected of gun trafficking; only 46 (23%) addressed "general illegal activity related to firearms trafficking occurring at gun shows."[94]  Examples of operations directed at firearms trafficking generally at gun shows are in Table 1-8.  These have been covert operations, conducted in some cases without the knowledge of the shows' promoters.  ATF's operations at a series of gun shows in Richmond will be discussed in Chapter 7.

Gun show operations are also part of ATF's recently established Project Gunrunner, intended to disrupt the flow of guns from the United States into Mexico for use by drug trafficking organizations.  The project's gun show component targets "widespread international trafficking by individuals and gangs that cross the U.S. border carrying drugs and then return to Mexico carrying guns that they obtained through straw purchases at gun shows in the southwestern states."[94]  No separate data have been published on Gunrunner's impact on gun shows.  Altogether, from its onset in 2004 through mid-February of 2009, Gunrunner "has referred for prosecution 795 cases involving 1,658 defendants; those cases include 382 firearms trafficking cases involving 1,035 defendants and an estimated 12,835 guns."[18]

The limitations on ATF's enforcement activities stem in

*Alcohol, Tobacco, Firearms should be a convenience store, not a government agency.*

*—T-shirt worn by an attendee, Phoenix, Arizona.*

large part from a lack of resources.  For a sense of how serious a problem the under-resourcing of ATF has been, consider the border states of the Southwest.  ATF estimated in 2008 that there were 6,647 licensed retailers in the area, while their workforce comprised just 100 special agents and 35 industry operations investigators.  Nationwide, ATF at that time employed only about 2,500 investigators and 750 special agents.[78]  When asked by a reporter in 2007 about the possibility of routine patrols at gun shows, William Newell, the head of ATF's office in Phoenix, responded simply, "We don't have enough agents to do that."[95]

Table 1-8.  Examples of ATF enforcement operations at gun shows targeting general firearms trafficking, by ATF field division

| Year | Field Division | Description of Operation |
|------|----------------|--------------------------|
| 2006 | Columbus, OH | Investigations were conducted at 3 gun shows in Cleveland based on intelligence that "many of the guns recovered in high-crime areas of the city had been purchased at local gun shows" and that others were trafficked to other states and to Canada. The operations resulted in the seizure of 5 guns, 1 indictment, and 2 pending indictments. |
| 2005-2006 | Houston, TX | Operations were undertaken at 2 shows in Pharr, a suburb of McAllen on the border with Mexico.  Four Mexican nationals were arrested.  Three had purchased 14 firearms and 3,000 rounds of ammunition; the fourth had coordinated the straw purchases of 10 "high-priced" firearms. |
| 2004-2006 | New Orleans, LA | Gun shows in Kenner, a suburb of New Orleans, were identified through a review of tracing records as "a source used by local gang members and other criminals" for guns acquired through straw purchases or private party transfers.  Operations resulted in 12 arrests, 6 convictions, and the seizure of 4 guns. |
| 2004-2006 | Phoenix, AZ | Gun shows in the Southwest "attracted large numbers of gang members from Mexico and California" who "bought large quantities of assault weapons."  Operations at 8 shows in Phoenix, Yuma, and Tucson, AZ, and in Albuquerque, NM resulted in 13 arrests, 3 convictions, and the seizure of 193 guns. |
| 2004-2005 | San Francisco, CA | Gun shows in Reno are "a gateway for illegal firearms trafficking into California."  In undercover operations at 6 shows, ATF agents identified illegal sales to out-of-state residents, illegal off-paper sales, and cases of dealing in firearms without a license.  The operations resulted in 14 arrests and 11 convictions; 1000 firearms were purchased or seized. |

Adapted from *The Bureau of Alcohol, Tobacco, Firearms and Explosives' investigative operations at gun shows*. Washington, DC: Office of the Inspector General, US Department of Justice; 2007.  The report was published not long after the operations were conducted.  Outcomes for criminal cases arising from the investigations were not always available, and additional filings were expected.

0094

### Public Education

ATF occasionally sets up educational displays at gun shows; staff answer questions and distribute materials covering gun laws and purchase procedures.  In collaboration with ATF, the National Shooting Sports Foundation administers a public education program, "Don't Lie for the Other Guy," intended to prevent straw purchases.[96]  Begun in 2000, the program is now operational in approximately 15 states or metropolitan areas selected by ATF.  Don't Lie is not specific to gun shows; it offers training and display materials to all licensed retailers in the targeted areas.  The materials stress the fine (up to $250,000) and long prison term (up to ten years) that await a convicted straw purchaser.

These educational efforts, like ATF's operations generally, receive a mixed reception at gun shows (see pages 42-43).

### Other Federal Efforts

United States Immigration and Customs Enforcement (ICE), now the primary investigative agency of the Department of Homeland Security, has targeted cross-border gun trafficking generally since 2005, if not earlier.  Fifteen multi-agency Border Enforcement Security Task Forces have seized more than 2,000 weapons and made high-profile arrests of traffickers.[97]  An apparently separate partnership with other agencies and the government of Mexico, Operation Armas Cruzadas, has recovered more than 1,400 firearms and 120,000 rounds of ammunition.  No results specific to operations at gun shows are available.

A June 2009 review by the Government Accountability Office of efforts to combat gun trafficking into Mexico criticized both ATF and ICE for a failure to "consistently and effectively coordinate their efforts," which "has resulted in some instances of duplicate initiatives and confusion during operations."[17]  By the end of the month, the agencies had signed an agreement intended to clarify their areas of responsibility and facilitate collaborative work.[98]

Inside Gun Shows











# ATF and Its "Don't Lie" Campaign

ATF rents table space at gun shows (1-3).  This is not common, and it is a lonely job.  The emphasis is on their "Don't Lie" campaign to deter straw purchases.  Some licensed retailers display Don't Lie materials prominently; purchasers cannot help but see them.  (In the straw purchase on pages 148-149, four piles of cash were counted out on a Don't Lie counter mat.)  Some view ATF's work with hostility.  Manifestations include displaying Firearms Transaction Records beside a Nazi flag (10) and throwing Don't Lie postcards on the ground (11,12).  The photographs were taken in Orlando, FL (1,3,10); Atlanta, GA (2); Dayton, OH (4); Reno, NV (5); Dallas, TX (6); Richmond, VA (7,9); and Phoenix, AZ (8,11,12).

0096















Inside Gun Shows

*State-Level Enforcement*

The California Department of Justice has conducted systematic law enforcement operations at gun shows at least since 2001. Its Gun Show Enforcement Program (GSEP), which is supported by allocations from the state's general funds, was mandated by the legislature as part of a larger effort to regulate gun shows. Teams of experienced special agents, working undercover, are at "every single major gun show" in the state—and most of the smaller shows as well—according to agency officials interviewed for this report. Individual operations are sometimes collaborative efforts involving local law enforcement, agencies from other states (particularly Arizona and Nevada), and ATF. A continuing series of joint operations involving gun shows in Reno, for example, was initiated at the request of chiefs of police in the San Francisco Bay Area after it became clear that the shows were important sources of guns used in crimes in Bay Area cities. As measured by gun recoveries, investigative operations generally have been "very lucrative" and have "put a dent" in gun trafficking. Individual cases have involved dozens of guns.

GSEP agents work closely with promoters, both as enforcers of the law and as educators. Promoters "assume we're always there and know we're not an absentee landlord," said agency officials. The program makes active use of the materials that gun show promoters must provide in advance of each event: a security plan and a list of all those who are renting table space to sell guns, among others. The administrative requirements of the law have teeth; a promoter who does not meet them faces the loss of his license.

The program appears to have undergone an important transition. After some initial resistance, many promoters and individual retailers have become quite supportive. With them, at least, program operations have entered what might be considered a maintenance phase. Agency officials report "a sizeable amount" of self-policing and stress the importance of ethical promoters and retailers as sources of leads on criminal activity.

## Some Additional Data and Preliminary Inferences

As the discussion to this point hopefully establishes, the role that gun shows play in gun commerce and gun violence cannot be described simply. As the Columbine massacre and many

*WARNING. Undercover law enforcement officers are actively working at this show. Do not under any circumstances allow yourself to sell a firearm without conducting the sale through a licensed dealer.*

*—Sign posted at a licensed retailer acting as a transfer station for private party gun sales, Orange County, California.*

44

gun trafficking cases demonstrate, gun shows may be particularly important as an indirect source of crime guns—they supply guns to intermediaries who in turn supply active criminals. This point has been most clearly made by Anthony Braga and David Kennedy, two leading experts in the field:

> Assessing any problem presented by gun shows is a difficult analytic task. While an important question is *whether prohibited persons personally buy firearms at gun shows*, which might be answered by surveys, an equally important one is *whether gun shows are sources of firearms that are trafficked to prohibited persons by straw purchasers, street dealers, and the like*. However, this question cannot be answered by surveys.[28] [Italics in original.]

At the same time, the available evidence suggests the following interim conclusions, which are worth considering as additional evidence accumulates.

> ### The proportion of all gun sales nationwide that occurs at gun shows is relatively small.

The best published information we have on where guns come from is in the Police Foundation's 1996 National Survey on Private Ownership of Firearms (NSPOF). In that survey, gun owners were asked a series of questions about the most recent gun they had acquired, including where they had acquired it. Four percent of the guns had been acquired at gun shows; the survey did not ask these gun buyers if they had made their purchases from licensed retailers or private parties.[2] Unpublished data from a second nationwide survey[1] yield a similar result; of 566 gun owners, 9% acquired their most recent guns at a gun show.

Such estimates do not come from surveys alone. California's records of handgun sales identify transactions occurring at gun shows. For the 10 years 1998 through 2007, the archive contains records for more than 1.8 million transactions. Of these, 2.7% were recorded as occurring at gun shows. This figure would include both direct sales by licensed retailers and private party sales that were processed by licensed retailers, as required by state law.

Survey results can be imprecise, particularly for infrequent events as appears to be the case here. Clearly, a gun most recently purchased by a survey respondent at a location other than a gun show may have passed through a gun show earlier in its lifetime. And it is entirely possible that some gun show sales in the California records were not identified as such. That said, all the available estimates support the general statement that gun shows account for a relatively small proportion of overall gun commerce.

### Most sales at gun shows involve licensed retailers.

ATF estimates that 50% to 75% of gun sellers who rent table space at gun shows are licensed retailers.[37] Our prior study[63] yielded an estimate of only 30%, but this was based on observational data and almost certainly an underestimate. Many licensed retailers at gun shows do not identify themselves as such—at least not until consummating a gun sale—though they are required to do so. The largest and most active vendors at gun shows are almost always licensed retailers.

Given that licensed retailers probably make up a majority of vendors who rent table space, and that they account for essentially all the largest and most active vendors, it is likely that they account for most sales at gun shows. Even allowing for sales by individual attendees who have not rented table space, it is reasonable to estimate that perhaps two-thirds of gun sales are made by licensed retailers. There are, unfortunately, no published data on this point.

### Private party sales at gun shows account for a relatively small percentage of gun sales in the United States.

Taken together, three estimates—that 40% of all gun sales are private party transactions, that 4% to 9% of all gun sales occur at gun shows, and that two thirds of gun show sales are made by licensed retailers—allow for the rough approximations in Table 1-9 of the importance of private party gun sales at gun shows to gun commerce generally. If the 4% estimate is used, then of 1,000 hypothetical gun sales overall, 13 would be private party sales occurring at gun shows. These 13 guns account for 3.3% of private party gun sales and 1.3% of gun sales overall. Using the

9% estimate, 30 of every 1,000 hypothetical gun sales would be private party sales at gun shows.  These 30 guns account for 7.5% of private party gun sales and 3% of gun sales overall.

Table 1-9.  Allocation of 1,000 hypothetical gun sales between licensed retailers and private party gun sellers, and between gun shows and other venues

a.  Assuming that 4% of all gun sales occur at gun shows

| Venue | Private Party | Licensed Retailer | Total |
|---|---|---|---|
| Gun Show | 13 | 27 | 40 |
| Other | 387 | 573 | 960 |
| Total | 400 | 600 | 1,000 |

b.  Assuming that 9% of all gun sales occur at gun shows

| Venue | Private Party | Licensed Retailer | Total |
|---|---|---|---|
| Gun Show | 30 | 60 | 90 |
| Other | 370 | 540 | 910 |
| Total | 400 | 600 | 1,000 |

*Licensed retailers are probably the primary source of crime guns acquired at gun shows.*

The one peer-reviewed study of gun shows as sources of crime guns, discussed previously, developed data from 314 ATF investigations of gun trafficking at gun shows.[28]  Nearly 55,000 guns were involved.  While an unlicensed seller was the main subject in most of the investigations (54.1%), two thirds of the trafficked guns were linked to investigations in which the main suspect was (or had been) a licensed retailer.  These retailer cases involved an average of 452 guns apiece and 33,445 guns in total; those centered on unlicensed sellers involved an average of 112 guns each and 15,551 guns altogether.  Licensed retailers are able to buy guns in large quantities, and an increase in the number of guns linked to trafficking investigations when licensed retailers are involved is not unique to gun shows.[27]

These data are not the whole story, however.  First, trafficking operations that do not involve licensed retailers might be less likely to be brought to ATF's attention and trigger an investigation, precisely because they are smaller than operations in

which retailers participate. This could lead an assessment based just on trafficking investigations to underestimate the importance of private-party trafficking.

Complicating this is the fact that ATF, because of limitations in the data it is allowed to collect, is not able to provide an estimate other than from those trafficking investigations of the number of trafficked guns that are obtained at gun shows, whether from licensed retailers or private parties.[17] Records of trafficking investigations cannot possibly capture all the guns acquired at gun shows with criminal intent—recall that ATF enforcement operations affect a very small percentage of gun shows. This means that the best available evidence we have on the role of gun shows as a source of crime guns probably underestimates their importance.

## References

1. Hepburn LM, Miller M, Azrael D, et al. The U.S. gun stock: results from the 2004 national firearms survey. *Injury Prevention*. 2007;13:15-19.
2. Cook PJ, Ludwig J. *Guns in America: results of a comprehensive national survey on firearms ownership and use.* Washington (DC): The Police Foundation; 1996.
3. Rand MR. *Criminal victimization, 2007*. Washington (DC): Bureau of Justice Statistics; 2008. Report No.: NCJ 224390.
4. Federal Bureau of Investigation. *Crime in the United States, 2007.* Washington (DC): Federal Bureau of Investigation; 2008.
5. Wintemute GJ. Guns and gun violence. In: Blumstein A, Wallman J, editors. *The crime drop in America*. New York: Cambridge University Press; 2000. p. 45-96.
6. Police Executive Research Forum. *Violent crime in America: 24 months of alarming trends*. Washington (DC): Police Executive Research Forum; 2007.
7. Police Executive Research Forum. *Violent crime in America: a tale of two cities*. Washington (DC): Police Executive Research Forum; 2007.
8. Federal Bureau of Investigation. *Preliminary annual Uniform Crime Report*, 2008. 2009 June 1. Available from: http://www.fbi.gov/ucr/08aprelim/index.html
9. Klein A. Major cities' plummeting crime rates mystifying. *The Washington Post*. 2009 Jul 20. Available from: http://www.washingtonpost.com/wp-dyn/content/article/2009/07/19/AR2009071902154_pf.html.
10. Graduate Institute of International Studies. *Small arms survey 2007*. Geneva: Cambridge University Press; 2007.
11. Krug EG, Powell K, Dahlberg L. Firearm-related deaths in the United States and 35 other high- and upper-middle-income countries. *International Journal of Epidemiology*. 1998;27:214-221.
12. Richmond T, Cheney R, Schwab C. The global burden of non-conflict related firearm mortality. *Injury Prevention*. 2005;11(6):348-352.

0102

13. Zimring FE, Hawkins G. *Crime is not the problem: lethal violence in America*. New York: Oxford University Press; 1997.

14. Graduate Institute of International Studies. *Small arms survey 2002: counting the human cost*. Oxford: Oxford University Press; 2002.

15. Cook PJ, Cukier W, Krause K. The illicit firearms trade in North America. *Criminology & Criminal Justice*. 2009;9(3):265-286.

16. United States Joint Forces Command. *The joint operating environment (JOE) 2008*. Suffolk (VA): United States Joint Forces Command; 2008.

17. Government Accountability Office. *Firearms trafficking: U.S. efforts to combat arms trafficking to Mexico face planning and coordination challenges*. Washington (DC): Government Accountability Office; 2009. Report No.: GAO-09-709.

18. Testimony of William Newell before the Committee on Appropriations, Subcommittee on Commerce, Justice, Science and Related Agencies. United States House of Representatives. Washington (DC). March 24, 2009.

19. Olinger D. Following the guns. *The Denver Post*. 1999 Aug 2. Available from: http://extras.denverpost.com/news/shot0801.htm.

20. Testimony of Robyn Anderson before the Judiciary Committee. Colorado House of Representatives. As quoted by Lautenberg F. *Congressional record-Senate*. February 9, 2000. S555.

21. Bartles L. Gun dealers rejected Columbine killers. *Rocky Mountain News*. 2000 Jan 27. Available from: http://rockymountainnews.com/shooting/0127roby1.shtml.

22. Soraghan M. Owens: Columbine gun buyer no victim. *The Denver Post*. 2000 Jan 29. Available from: http://extras.denverpost.com/news/shotarch1.htm.

23. Olinger D. Only the name has changed. Tanner gun show back with a new moniker. *The Denver Post*. 1999 Jun 6.

24. Olinger D. Teen's gun purchase may have been illegal. Licensed dealer claims sale was private. *The Denver Post*. 1999 Jun 11.

25. Olinger D. Gun dealer surrenders firearms license. *The Denver Post*. 1999 Oct 14. Available from: http://extras.denverpost.com/news/shot1014b.htm.

26. Crowder C. A look inside the gun show world. *Rocky Mountain News*. 2000 Mar 22.

27. Bureau of Alcohol, Tobacco and Firearms. *Following the gun: enforcing federal laws against firearms traffickers*. Washington (DC): Bureau of Alcohol, Tobacco and Firearms; 2000.

28. Braga AA, Kennedy DM. Gun shows and the illegal diversion of firearms. *Georgetown Public Policy Review*. 2000;6:7-24.

29. Testimony of Michael Bouchard before the Committee on the Judiciary, Subcommittee on Crime, Terrorism, and Homeland Security. United States House of Representatives. Washington (DC). February 28, 2006.

30. Scalia J. *Federal firearm offenders, 1992-98*. Washington (DC): Bureau of Justice Statistics; 2000. Report No.: NCJ 180795.

31. Harlow CW. *Firearm use by offenders*. Washington (DC): Bureau of Justice Statistics; 2001. Report No.: NCJ 189369.

32. Zimring FE. Firearms and federal law: the Gun Control Act of 1968. *Journal of Legal Studies*. 1975;4:133-198.

33. Cook PJ, Molliconi S, Cole TB. Regulating gun markets. *Journal of Criminal Law and Criminology*. 1995;86:59-92.

34. Braga AA, Cook PJ, Kennedy DM, et al. The illegal supply of firearms. In: Tonry M, editor. *Crime and justice: a review of research*. Chicago: The University of Chicago Press; 2002. p. 319-352.

35. Newton G, Zimring FE. *Firearms and violence in American life: a staff report submitted to the National Commission on the Cause and Prevention of Violence*. Washington (DC): National Commission on the Causes and Prevention of Violence; 1969.

36. Federal Bureau of Investigation. *National Instant Criminal Background Check System (NICS) operation 2006*. Washington (DC): Federal Bureau of Investigation; 2007.

37. Bureau of Alcohol, Tobacco and Firearms. *Gun shows: Brady checks and crime gun traces*. Washington (DC): Bureau of Alcohol, Tobacco and Firearms; 1999.

38. United States Code. Title 18, Part 1, Chapter 44, Section 921(a)(21)(C).

39. Montini E. Pursuing honor students more than gangsters. *Arizona Republic*. 2007 Sep 16. Available from: http://www.azcentral.com/arizonarepublic/local/articles/0916montini0916.html.

40. Bureau of Justice Statistics. *Survey of state procedures related to firearm sales, 2005*. Washington (DC): Bureau of Justice Statistics; 2006. Report No.: NCJ 214645.

41. Bureau of Justice Statistics. *Background checks for firearm transfers 2008 - statistical tables*. Washington (DC): Bureau of Justice Statistics; 2009. Report No.: NCJ 227471.

42. Ludwig JA, Cook PJ. Homicide and suicide rates associated with implementation of the Brady Handgun Violence Prevention Act. *Journal of the American Medical Association*. 2000;284:585-591.

43. Manson D, Gilliard D. *Presale handgun checks, 1996: a national estimate*. Washington (DC): Bureau of Justice Statistics; 1997. Report No.: NCJ-165704.

44. Wintemute GJ, Wright MA, Drake CM, et al. Subsequent criminal activity among violent misdemeanants who seek to purchase handguns: risk factors and effectiveness of denying handgun purchase. *Journal of the American Medical Association*. 2001;285:1019-1026.

45. Wright MA, Wintemute GJ, Rivara FA. Effectiveness of denial of hand gun purchase to persons believed to be at high risk for firearm violence. *American Journal of Public Health*. 1999;89:88-90.

46. Blumstein A, Nakamura K. Redemption in the presence of widespread criminal background checks. *Criminology*. 2009;47(2):327-359.

47. Wintemute GJ. Impact of the Brady Act on homicide and suicide rates (letter). *Journal of the American Medical Association*. 2000;284:2719-2720.

48. Webster DW, Vernick JS, Bulzacchelli MT. Effects of state-level firearm seller accountability policies on firearm trafficking. *Journal of Urban Health*. 2009;86:525-537.

49. United States Code. Title 18, Part 1, Chapter 44, Section 922(d).

50. Sugarmann J, Rand K. *More gun dealers than gas stations: a study of federally licensed firearm dealers in America*. Washington (DC): Violence Policy Center; 1992.

51. Bureau of Alcohol, Tobacco and Firearms. *Firearms commerce in the United States, 2001/2002*. Washington (DC): Bureau of Alcohol, Tobacco and Firearms; 2002.

52. Koper CS. Federal legislation and gun markets: How much have recent reforms of the federal firearms licensing system reduced criminal gun suppliers? *Criminology and Public Policy*. 2002;1:151-178.

53. Wachtel J. Sources of crime guns in Los Angeles, California. *Policing: An International Journal of Police Strategies & Management*. 1998;21:220-239.

54. Braga AA, Kennedy DM. The illicit acquisition of firearms by youth and juveniles. *Journal of Criminal Justice*. 2001;29:379-388.

55. Cook PJ, Braga AA. Comprehensive firearms tracing: strategic and investigative uses of new data on firearms markets. *Arizona Law Review*. 2001;43:277-309.

56. Hartocollis A. Officials say gunrunners used cellphone pictures to advertise. *The New York Times*. 2007 Mar 22. Available from: http://www.nytimes.com/2007/03/22/nyregion/22guns.html?pagew.

57. Cook PJ, Ludwig JA, Venkatesh SA, et al. *Underground gun markets*. Cambridge: National Bureau of Economic Research; 2005. Working paper No. 11737.

58. McKinley Jr. JC. U.S. stymied as guns flow to Mexican cartels. *The New York Times*. 2009 April 15. Available from: http://www.nytimes.com/2009/04/15/us/15guns.html?_r=1&scp=1&sq=u.s.%20stymied%20as%20guns%20flow%20to%20Mexican%20cartels&st=cse.

59. U.S. Attorney's Office, Southern District of Texas. Houstonian sentenced to prison for lying to buy guns. Houston (TX): U.S. Attorney's Office, Southern District of Texas; April 17, 2009.

60. Sheley JF, Wright JD. *Gun acquisition and possession in selected juvenile samples*. Washington (DC): National Institute of Justice/Office of Juvenile Justice and Delinquency Prevention; 1993. Report No.: NCJ-145326.

61. Smith MD. Sources of firearm acquisition among a sample of inner-city youths: research results and policy implications. *Journal of Criminal Justice*. 1996;24:361-367.

62. Sorenson SB, Vittes K. Buying a handgun for someone else: firearm dealer willingness to sell. *Injury Prevention*. 2003;9:147-150.

63. Wintemute GJ. Gun shows across a multistate American gun market: observational evidence of the effects of regulatory policies. *Injury Prevention*. 2007;13:150-156.

64. Bureau of Alcohol, Tobacco, Firearms and Explosives. *ATF 2005 annual report*. Washington (DC): Bureau of Alcohol, Tobacco, Firearms and Explosives; 2006. Report No.: 1000.4.

65. Bureau of Alcohol, Tobacco and Firearms. *Commerce in firearms in the United States*. Washington (DC): Bureau of Alcohol, Tobacco and Firearms; 2000.

66. Wintemute GJ, Cook P, Wright MA. Risk factors among handgun retailers for frequent and disproportionate sales of guns used in violent and firearm related crimes. *Injury Prevention*. 2005;11:357-363.

67. National Rifle Association. White House plan nothing new, targets licensed, lawful dealers. 2000 Feb 4. Available from: http://www.nraila.org/News/Read/InTheNews.aspx?ID=538.

68. Bureau of Alcohol, Tobacco and Firearms. *Crime gun trace reports (1999)*. Washington (DC): Bureau of Alcohol, Tobacco and Firearms; 2000.

69. Bureau of Alcohol, Tobacco and Firearms. *Crime gun trace reports (2000)*. Washington (DC): Bureau of Alcohol, Tobacco and Firearms; 2002.

70. Wintemute GJ, Romero MP, Wright MA, et al. The life cycle of crime guns: a description based on guns recovered from young people in California. *Annals of Emergency Medicine*. 2004;43:733-742.

71. KDKA-TV. Police, ATF raid Butler home, remove 500 guns. *KDKA-TV*. 2008 Feb 7. Available from: http://kdka.com/local/Butler.Gun.Raid.2.648818.html.

72. Violence Policy Center. *Gun shows in America: Tupperware parties for criminals*. Washington (DC): Violence Policy Center; 1996.

73. Kimberlin J. Gun sale rules can be easy to avoid. Virginia's gun shows offer weapons to almost any buyer—with few questions asked. *The (Norfolk) Virginian-Pilot*. 2008 Mar 3. Available from: http://www.roanoke.com/news/roanoke/wb/152970.

74. Kelly S. Team 5 Investigates exposes underground gun trade. Weapons easy to get; traffickers go unpunished. *WCVB-TV News (Boston)*. 2008 Feb 1. Available from: http://www.thebostonchannel.com/news/15189840/detail.html?rss=bos&psp=news.

75. Bureau of Alcohol, Tobacco and Firearms. *Operation Snapshot: an analysis of the retail regulated firearms industry*. Washington (DC): Bureau of Alcohol, Tobacco and Firearms; 2000.

76. Hawley C, Solache S. U.S. guns pour into Mexico: arms race among drug cartels, end of ban in America result in flood of high-power weapons over border. *The Arizona Republic*. 2007 Jan 16. Available from: www.azcentral. com/ arizonarepublic/news/articles/0116americanguns 0116.html.

77. Montgomery S. Gunrunner gets six years. *The Gazette (Montreal)*. 2006 May 27. Available from: http://www.canada.com/montrealgazette/news/montreal/story.html?id=66aa79c0-190f-4c46-8c6d-d7759ef42baa&k= 60047.

78. Testimony of William Hoover before the Committee on Foreign Affairs, Subcommittee on the Western Hemisphere. United States House of Representatives. Washington (DC). February 7, 2008.

79. Criminal Intelligence Service Canada. *Annual report on organized crime in Canada*. Ottawa (Canada): Criminal Intelligence Service Canada; 2005.

80. Krouse W. Memorandum to Senator Frank Lautenberg: Foreign terrorists and the availability of firearms and black powder in the United States. Washington (DC): Congressional Research Service; May 16, 2003.

81. U.S. Department of Justice. Ten individuals charged in interstate firearms trafficking scheme (news release). Tulsa (OK): U.S. Department of Justice; 2004.

82. Testimony of Michael J. Sullivan before the Committee on Appropriations, Subcommittee on Commerce, Justice, Science, and Related Agencies. United States House of Representatives. Washington (DC). March 28, 2007.

83. U.S. Department of Justice. Operation Flea Collar - Alabama ICE strikes illegal suppliers selling guns at area flea markets (press release). Birmingham (AL): U.S. Department of Justice; 2006.

84. Bureau of Alcohol, Tobacco, Firearms and Explosives. Mesa man sentenced to prison for dealing in hundreds of firearms without a license (press release). Phoenix (AZ): Bureau of Alcohol, Tobacco, Firearms and Explosives; 2006.

85. Bureau of Alcohol, Tobacco, Firearms and Explosives. Five plead guilty to illegal gun trafficking (press release). Columbus (OH): Bureau of Alcohol, Tobacco, Firearms and Explosives; 2006.

86. Bureau of Alcohol, Tobacco, Firearms and Explosives. Female firearm trafficker sentenced to 4 years. Cleveland woman bought firearms and provided them to felons and criminals. Columbus (OH): Bureau of Alcohol, Tobacco, Firearms and Explosives; 2008.

87. U.S. Immigration and Customs Enforcement. Mexican national pleads guilty to smuggling firearms to Mexico. San Antonio (TX): U.S. Immigration and Customs Enforcement; 2008.

88. Testimony of Marcy Forman before the Committee on Appropriations, Subcommittee on Homeland Security. United States House of Representatives. Washington (DC). March 10, 2009.

89. Violence Policy Center. *Indicted: types of firearms and methods of gun trafficking from the United States to Mexico as revealed in U.S. court documents*. Washington (DC): Violence Policy Center; 2009.

90. U.S. Immigration and Customs Enforcement. Mexican national sentenced to 12 years in federal prison for firearms smuggling. San Antonio (TX): U.S. Immigration and Customs Enforcement; 2008.

91. U.S. Immigration and Customs Enforcement. Two men sentenced to federal prison for firearms trafficking. Arms traffickers were part of conspiracy to smuggle weapons into Mexico. El Paso (TX): U.S. Immigration and Customs Enforcement; 2008.

92. Solis D. Dallas-Fort Worth cases highlight weapons trafficking problem. *Dallas Morning News*. 2009 Apr 18. Available from: http://www.dallasnews.com/sharedcontent/dws/news/politics/local/stories/DN-gunsside_17int.ART.State.Edition1.4a8f6ec.html.

93. Legal Community Against Violence. *Regulating guns in America: an evaluation and comparative analysis of federal, state and selected local gun laws*. San Francisco (CA): Legal Community Against Violence; 2008.

94. Office of the Inspector General. *The Bureau of Alcohol, Tobacco, Firearms and Explosives' investigative operations at gun shows*. Washington (DC): Office of the Inspector General, US Department of Justice; 2007. Report No.: I-2007-007.

95. Hawley C. Feds short of agents to patrol U.S. gun shows. *The Arizona Republic* 2007 Jun 15; Sect. A:8.

96. The National Shooting Sports Foundation; Bureau of Alcohol, Tobacco, Firearms & Explosives. *Don't lie for the other guy*. 2000. Available from: http://www.dontlie.org

97. Testimony of John P. Torres before the Committee on the Judiciary, Subcommittee on Immigration, Refugees and Homeland Security. United States Senate. Washington (DC). May 20, 2009.

98. U.S. Immigration and Customs Enforcement. ATF, ICE update partnership agreement to maximize investigative efforts (news release). Albuquerque (NM): U.S. Immigration and Customs Enforcement; 2009.



# Inside Gun Shows

## What Goes On When Everybody Thinks Nobody's Watching

0109

# Inside Gun Shows

## What Goes On
## When Everybody Thinks
## Nobody's Watching

## Garen Wintemute, MD, MPH



Violence Prevention Research Program
Department of Emergency Medicine
UC Davis School of Medicine
2315 Stockton Blvd.
Sacramento, CA 95817

© 2009 by Garen Wintemute, MD, MPH
All rights reserved.  Published September 2009.

Copies may be downloaded and related video may be viewed at
http://www.ucdmc.ucdavis.edu/vprp.

Support for this project was provided by the Eli and Edythe L. Broad
Foundation, The Joyce Foundation, and The California Wellness Foundation.


I acknowledge with gratitude the contributions of Jeri Bonavia of the
Wisconsin Anti-Violence Effort.  She put gun shows on my radar and is an
ace straw-purchase spotter.  Thanks also to Barbara Claire and Vanessa
McHenry of the Violence Prevention Research Program for their highly
competent technical assistance.

This report and the work on which it is based could not have been
completed without the support, made manifest in many ways, of my
colleagues in the Department of Emergency Medicine.  Thanks to all.

The project would never have been undertaken but for the uncompromising
support given by the University of California to the principle that the pursuit
of knowledge is a great privilege and therefore an obligation, come what may.
Stan Glantz once wrote that this behavior is what makes the University of
California a great public institution.  He was right.

# Contents

Preface                                     v

Executive Summary                           1

Gun Shows in Context                        11

How Gun Shows Work                          55

Buying and Selling                          91

What's for Sale                             159

Culture                                     219

Politics                                    231

Interventions                               253

# EXHIBIT 9



**United States Government Accountability Office**

## Report to Congressional Requesters

**January 2016**

# FIREARMS TRAFFICKING

# U.S. Efforts to Combat Firearms Trafficking to Mexico Have Improved, but Some Collaboration Challenges Remain

0114



# GAO Highlights

Highlights of GAO-16-223, a report to congressional requesters

**January 2016**

## FIREARMS TRAFFICKING

## U.S. Efforts to Combat Firearms Trafficking to Mexico Have Improved, but Some Collaboration Challenges Remain

## Why GAO Did This Study

Violent crimes committed by drug trafficking organizations in Mexico often involve firearms, and a 2009 GAO report found that many of these firearms originated in the United States. ATF and ICE have sought to stem firearms trafficking from the United States to Mexico.

GAO was asked to undertake a follow-up review to its 2009 report (GAO-09-709) addressing these issues. This report examines, among other things, (1) the origin of firearms seized in Mexico that have been traced by ATF, (2) the extent to which collaboration among U.S. agencies combating firearms trafficking has improved, and (3) the extent to which the *National Southwest Border Counternarcotics Strategy* measures progress by U.S. agencies to stem firearms trafficking to Mexico. To address these objectives, GAO analyzed program information and firearms tracing data from 2009 to 2014, and met with U.S. and Mexican officials on both sides of the border.

## What GAO Recommends

GAO recommends that the Secretary of Homeland Security and the Attorney General of the United States take steps to formally monitor implementation of the 2009 MOU between ATF and ICE. GAO also recommends that ONDCP establish comprehensive indicators that more accurately reflect progress made in efforts to stem arms trafficking to Mexico. The Departments of Homeland Security and Justice, and ONDCP agreed with GAO's recommendations.

View GAO-16-223. For more information, contact Jessica Farb at (202) 512-6991 or farbj@gao.gov.

## What GAO Found

According to data from the Department of Justice's Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), 73,684 firearms (about 70 percent) seized in Mexico and traced from 2009 to 2014 originated in the United States. ATF data also show that these firearms were most often purchased in Southwest border states and that about half of them were long guns (rifles and shotguns). According to Mexican government officials, high caliber rifles are the preferred weapon used by drug trafficking organizations. According to ATF data, most were purchased legally in gun shops and at gun shows in the United States, and then trafficked illegally to Mexico. U.S. and Mexican law enforcement officials also noted a new complicating factor in efforts to fight firearms trafficking is that weapons parts are being transported to Mexico to be later assembled into finished firearms, an activity that is much harder to track.

**Origin of Firearms Seized in Mexico and Traced by ATF, 2009-2014**



**13%**
13,622 Undetermined origin

**17%**
17,544 Non-U.S. origin

**70%**
73,684 of U.S. origin

Source: GAO analysis of Bureau of Alcohol, Tobacco, Firearms and Explosives.  |  GAO-16-223
Note: These figures reflect firearms seized by Mexican authorities and traced by ATF, not all firearms seized in Mexico.

In 2009, GAO reported duplicative initiatives, and jurisdictional conflicts between ATF and the Department of Homeland Security's Immigration and Customs Enforcement (ICE). That year, in response to GAO's recommendations on these problems, ATF and ICE updated an interagency memorandum of understanding (MOU) to improve collaboration. ATF and ICE have taken several steps since then to improve coordination on efforts to combat firearms trafficking, such as joint training exercises and conferences to ensure that agents are aware of the MOU and its jurisdictional parameters and collaboration requirements. However, GAO found that ATF and ICE do not regularly monitor the implementation of the MOU. In the absence of a mechanism to monitor MOU implementation and ensure that appropriate coordination is taking place between the two agencies, GAO found that gaps in information sharing and misunderstandings related to their roles and responsibilities persist.

The indicator used to track U.S. agencies' efforts to stem firearms trafficking to Mexico in the Office of National Drug Control Policy's (ONDCP) *National Southwest Border Counternarcotics Strategy*, by itself, does not adequately measure progress. ONDCP tracks progress based on the number of arms seized in Mexico and traced to the United States; however, this number does not reflect the total volume of firearms trafficked from the United States, and it does not take into account other key supporting agency actions and activities as measures.

# Contents

| Letter | | 1 |
|---|---|---|
| | Background | 3 |
| | Most Firearms Seized in Mexico That Are Traced by ATF Come from the United States, and Most Are Purchased in Southwest Border States | 8 |
| | ATF and ICE Have Taken Steps to Improve Collaboration, but Lack of Monitoring May Contribute to Coordination Challenges | 20 |
| | U.S.-Mexico Collaboration on Firearms Trafficking Was Scaled Back after 2012, but While Challenges Continue, Bilateral Efforts Have Recently Been Gaining Momentum | 25 |
| | The Current Weapons Chapter Indicator in the *National Southwest Border Counternarcotics Strategy* Does Not Adequately Measure the Progress of U.S. Agencies in Stemming Firearms Trafficking to Mexico | 29 |
| | Conclusions | 32 |
| | Recommendations for Executive Action | 32 |
| Appendix I | Scope and Methodology | 35 |
| Appendix II | Comments from the Department of Homeland Security | 38 |
| Appendix III | GAO Contact and Staff Acknowledgments | 40 |

Tables

| | Table 1: Key Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) Efforts and Resources to Stem Firearms Trafficking to Mexico | 6 |
|---|---|---|
| | Table 2: Key Immigration and Customs Enforcement (ICE) Efforts and Resources to Stem Firearms Trafficking to Mexico | 7 |
| | Table 3: Supporting Actions and Activities in the Weapons Chapter of Office of National Drug Control Policy's (ONDCP) 2013 *National Southwest Border Counternarcotics Strategy* | 31 |

Figures

Figure 1: Numbers of Firearms Seized in Mexico and Submitted
for Tracing, by U.S. and Non-U.S. Origin, 2009 to 2014          9
Figure 2: Examples of Long and Short Guns          11
Figure 3: Number and Type of Firearms Destined to Mexico
Seized in the United States by Immigration and Customs
Enforcement, 2009 to 2014          12
Figure 4: Number and Type of Firearms Seized in Mexico and
Submitted to the Bureau of Alcohol, Tobacco, Firearms
and Explosives for Tracing, 2009 to 2014          13
Figure 5: Top Source States for Firearms Seized in Mexico of U.S.
Origin and Numbers Seized, 2009-2014          15
Figure 6: Basic Firearm Components from Firearms Parts Kits          17
Figure 7: Comparison between a Receiver (Considered a Firearm)
and a Casting (Not Considered a Firearm)          18
Figure 8: A Flat with All of the Required Holes Drilled but That Has
Not Been Bent into Shape          19

## Abbreviations

| | |
|---|---|
| ATF | Bureau of Alcohol, Tobacco, Firearms and Explosives |
| CBP | Customs and Border Protection |
| DHS | Department of Homeland Security |
| DOJ | Department of Justice |
| DTO | drug trafficking organization |
| FTE | full-time equivalent |
| ICE | Immigration and Customs Enforcement |
| INL | Bureau of International Narcotics and Law Enforcement Affairs |
| MOU | memorandum of understanding |
| NTC | National Tracing Center |
| ONDCP | Office of National Drug Control Policy |
| State | Department of State |
| *Strategy* | the *National Southwest Border Counternarcotics Strategy* |

This is a work of the U.S. government and is not subject to copyright protection in the United States. The published product may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.

0117



U.S. GOVERNMENT ACCOUNTABILITY OFFICE

441 G St. N.W.
Washington, DC 20548

January 11, 2016

The Honorable Eliot L. Engel
Ranking Member
Committee on Foreign Affairs
House of Representatives

The Honorable Jeff Duncan
Chairman
Subcommittee on the Western Hemisphere
Committee on Foreign Affairs
House of Representatives

Violence perpetrated by Mexican drug trafficking organizations (DTO) continues to raise security concerns on both sides of the U.S.-Mexico border. Mexican authorities consider firearms trafficking to be a major factor in these organizations' capacity to resist government efforts to combat organized crime. Similarly, U.S. law enforcement agencies have acknowledged the role firearms smuggling across the Southwest border plays in fueling violent criminal activity in Mexico. As we reported in 2009, trace data[1] on firearms seized from criminals in Mexico confirm that tens of thousands of weapons seized in Mexico came from the U.S. side of the border.[2] Over the past decade, U.S. and Mexican administrations have recognized that addressing firearms trafficking requires bilateral attention, and they have pledged to collaborate in their efforts to combat it.

You requested that we update our 2009 report and review U.S. efforts to stem the flow of firearms trafficking into Mexico. In this report, we examine (1) the origin of firearms seized in Mexico that have been traced by the Department of Justice's (DOJ) Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF); (2) the extent to which collaboration among U.S. agencies combating firearms trafficking has improved; (3) the

---

[1]Firearms tracing is the systematic tracking of the movement of a firearm recovered by law enforcement officials from its first sale by the manufacturer or importer through the distribution chain (wholesaler/retailer) to identify the first retail purchaser.

[2]GAO, *Firearms Trafficking: U.S. Efforts to Combat Arms Trafficking to Mexico Face Planning and Coordination Challenges*, GAO-09-709 (Washington, D.C.: June 18, 2009).

status of coordination between U.S. agencies and their Mexican counterparts combating firearms trafficking; and (4) the extent to which the *National Southwest Border Counternarcotics Strategy* (*Strategy*) measures progress by U.S. agencies to stem firearms trafficking to Mexico.

To identify the number, source, and types of firearms trafficked to Mexico that have been seized and traced, we relied primarily on ATF's trace data compiled by that agency's National Tracing Center Firearms Tracing System through eTrace.[3] We also reviewed the Department of Homeland Security's (DHS) Immigration and Customs Enforcement (ICE) data on seizures of southbound firearms and cases involving firearms trafficking to Mexico. To address collaboration among U.S. agencies, we reviewed and analyzed documentation and reports on collaborative activities among those agencies responsible for combating firearms. To obtain a better understanding of the scope and progress of various U.S. agencies' activities related to firearms trafficking, we met with officials from ATF, ICE, DHS's Customs and Border Protection (CBP), and the Department of State (State). To examine the status of cooperation between U.S. agencies and their Mexican counterparts, we met with U.S. and Mexican officials to discuss their cooperative activities. To discuss cooperation by U.S. and Mexican law enforcement officials to stem the flow of firearms smuggling across the border, we met with U.S. and Mexican officials at two major Southwest border locations—San Diego/Tijuana and El Paso/Juarez. We traveled to Mexico City and Guadalajara, Mexico, to meet with U.S. embassy and consulate officials responsible for implementing programs to combat firearms trafficking and Mexican government officials responsible for related activities. We also met with the Office of National Drug Control Policy (ONDCP) to discuss the Weapons Chapter of the *Strategy*.[4] We assessed the reliability of data provided by various U.S. agencies by interviewing agency officials knowledgeable about the data and reviewing related supporting documentation about the data and the systems that produced them. We determined that data were sufficiently reliable for the purpose of this

---

[3]ATF has a paperless firearm trace submission system (eTrace) that is accessible through the Internet, through which authorized users can submit, retrieve, query, and store firearms trace information, as applicable.

[4]The *National Southwest Border Counternarcotics Strategy* is issued on a biennial basis by ONDCP consistent with requirements in the Office of National Drug Control Policy Reauthorization Act of 2006, Pub. L. No. 109-469, § 1110, Dec. 29, 2006.

0119

report. Appendix I contains additional details about our scope and methodology.

We conducted this performance audit from December 2014 to January 2016 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

# Background

## U.S.-Mexico Collaboration to Stem Firearms Trafficking

For almost a decade, the government of Mexico has sought to combat the growing power of criminal groups that initially emerged as DTOs in the 1980s and 1990s. This struggle became a national priority in 2006 when then-President Felipe Calderón mobilized the Mexican military and law enforcement agencies to disrupt DTO operations and target their leadership structures. As the Congressional Research Service reported, while these efforts have continued, under current President Enrique Peña Nieto, who was elected in 2012, there has been a shift in emphasis toward reducing criminal violence that threatens the security of civilians and the business sector.[5] According to a RAND Corporation report, besides trafficking billions of dollars' worth of narcotics into the United States annually, Mexican DTOs' criminal activity now extends to other areas, including human trafficking, kidnapping, money laundering, extortion, bribery, racketeering, and weapons trafficking.[6]

According to the *Strategy* DTOs require a constant supply of firearms and ammunition to assert control over the territory where they operate, eliminate rival criminals, enforce illicit business dealings, and resist government operations. The *Strategy* indicates that firearms that criminal

---

[5]Congressional Research Service, *U.S.-Mexican Security Cooperation: The Mérida Initiative and Beyond* (Washington, D.C.: April 2014).

[6]RAND Corporation, *Mexico Is Not Colombia: Alternative Historical Analogies for Responding to the Challenge of Violent Drug-Trafficking Organizations* (Santa Monica, Calif.: 2014).

organizations acquire from the United States are primarily transported overland into Mexico using the same routes and methods employed when smuggling bulk cash south and drugs north across the U.S.-Mexico border. The *Strategy* also notes that within the United States, DTOs or their agents typically rely on "straw purchasers." According to ATF, a "straw purchase" occurs when a person who is a convicted felon (or otherwise prohibited by federal law from purchasing a firearm) or who wishes to remain anonymous, uses a third party, the straw purchaser, to execute the paperwork necessary to purchase a firearm from a federally licensed firearms dealer. The straw purchaser is a person who, but for making false statements on the license application, would otherwise be eligible under federal law to purchase a firearm and is therefore able to pass the mandatory background check conducted by the federal firearms licensee.[7] Although straw purchasers may legally purchase firearms for their own possession and use, when they purchase firearms on behalf of criminals or others, they violate federal law by making a false statement to a federal firearms licensee on the required forms.[8] Firearm trafficking organizations also frequently obtain firearms from unlicensed private sellers in secondary markets, particularly at gun shows and flea markets or through classified ads or private-party Internet postings, according to ATF officials.

The surge in criminal activity by DTOs along the U.S.-Mexico border has generated concern among policymakers that this violence is spilling over into the United States. Since 2009, according to the *National Drug Threat Assessment*—which is produced by the U.S. Department of Justice's National Drug Intelligence Center, Mexican-based DTOs have been known to operate in more than a thousand cities in the United States.

---

[7]U.S. federal law requires that a person file for and obtain a license from the U.S. Attorney General before engaging "in the business of importing, manufacturing, or dealing in firearms or importing or manufacturing ammunition" (18 U.S.C. § 923(a)). ATF lists nine separate types of federal firearms licensees on its website: (1) dealers in firearms other than destructive devices, (2) pawnbrokers in firearms other than destructive devices, (3) collectors of curios and relics, (4) manufacturers of ammunition for firearms, (5) manufacturers of firearms other than destructive devices, (6) importers of firearms other than destructive devices, (7) dealers in destructive devices, (8) manufacturers of destructive devices, and (9) importers of destructive devices.

[8]A straw purchase violates 18 U.S.C. § 922(a)(6), which prohibits purchasers from knowingly making false oral or written statements or furnishing false identification intended to deceive licensed importers, manufacturers, or dealers as to the lawfulness of the sale. Straw purchasers are subject to fines or imprisonment up to 5 years under 18 U.S.C. § 924(a)(1)(A).

While the extent of violence seen in Mexico has not been reported in the United States, law enforcement officials in two border cities we visited told us that murders and other criminal activity on the U.S. side are often linked to Mexican DTO activities.

The governments of the United States and Mexico have committed to work together to stem the activities of these criminal organizations, including illicit arms trafficking. From fiscal year 2008 to fiscal year 2015, Congress appropriated about $2.5 billion in assistance for Mexico that has been provided through the Mérida Initiative, including approximately $194 million provided in the Consolidated and Further Continuing Appropriations Act, 2015. For fiscal year 2016, the administration's budget request for the Mérida Initiative is $119 million, from various accounts.[9] The Mérida Initiative is a bilateral security partnership between the United States and Mexico to fight organized crime and build the capacity of Mexico's justice sector and law enforcement institutions to uphold the rule of law. Among the many activities supported under the Mérida Initiative, some assistance is provided to help combat firearms trafficking, such as providing canines trained to detect weapons and ammunition, and non-intrusive inspection equipment to detect the flow of illicit goods, including firearms.

## Principal U.S. Agencies Involved in Combating Firearms Trafficking

DOJ's ATF and DHS's ICE are the two primary agencies combating illicit sales and trafficking of firearms across the Southwest border. ATF combats firearms trafficking within the United States and from the United States to other countries as part of its mission under the Gun Control Act (see table 1).[10] ATF is responsible for investigating criminal and regulatory violations of federal firearms laws, among other responsibilities. In carrying out its responsibilities, ATF licenses and regulates federal firearms licensees to ensure that they comply with applicable laws and regulations. ATF also traces U.S. and foreign manufactured firearms for international, federal, state, and local law enforcement agencies to link a firearm recovered in a criminal

---

[9]Mérida Initiative assistance is allocated from various appropriations accounts, including International Narcotics Control and Law Enforcement; Economic Support Fund; Foreign Military Financing; International Military Education and Training; Nonproliferation, Antiterrorism, Demining, and Related Programs; Global Health and Child Survival; and Development Assistance.

[10]18 U.S.C. § 921 et seq.

0122

investigation to its first retail purchaser. This information can be used to help link a suspect in the criminal investigation to a firearm or identify potential traffickers. ATF is the only entity within the U.S. government with the capacity to trace firearms seized in crimes in Mexico. The agency has conducted investigations to identify and prosecute individuals involved in firearms trafficking schemes and has provided training to Mexican law enforcement officials on firearms identification and tracing techniques, among other efforts.

**Table 1: Key Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) Efforts and Resources to Stem Firearms Trafficking to Mexico**

| Key activities | Estimated funding expenditures (fiscal years 2009-2014) | Personnel (fiscal year 2014) |
|---|---|---|
| • Internationally, ATF works with other U.S. agencies to investigate criminal and regulatory violations of federal firearms laws. ATF has primary jurisdiction over firearms and ammunition imports and works with the Departments of Homeland Security and State on illicit firearms exports. ATF also provides training for foreign counterparts on a variety of firearms topics, such as weapons identification, and collaborates on tracing firearms seized abroad.<br><br>• Domestically, ATF identifies, investigates, and arrests individuals and organizations that illegally supply firearms to prohibited individuals. ATF deters the diversion of firearms from lawful commerce into the illegal market with enforcement strategies and technology. | • $55.1 million ($14.8 million for operations within Mexico, and over $40 million for certain domestic operations and operations along the U.S.-Mexico border) | • A total of 423 agents, 157 industry operations investigators, and 88 task force officers.<br><br>• One agent, 4 intelligence research specialists, and 2 investigative analysts assigned to the El Paso Intelligence Center.<br><br>• 4 agents assigned and 1 industry operations investigator to the U.S. Embassy and 6 special agents in Monterrey, Tijuana, and Ciudad Juarez. |

Source: GAO analysis of ATF information. | GAO-16-223

Note: The figures in this table represent what ATF expends on various activities to stem firearms trafficking in Mexico and throughout the Southwest region. According to ATF, this includes funding for border field division offices in Dallas, Houston, Los Angeles, and Phoenix; support for the El Paso Intelligence Center; and staff in Mexico. However, these figures do not fully reflect costs for the agency's domestic efforts to investigate Mexico-related cases.

ICE enforces U.S. export laws, and ICE agents and other staff address a range of issues, including combating the illicit smuggling of money, people, drugs, and firearms (see table 2). As the primary federal law enforcement agency responsible for investigating international smuggling operations and enforcing U.S. export laws, ICE's Homeland Security Investigations division targets the illegal movement of U.S.-origin firearms, ammunition, and explosive weapons with the goal of preventing the procurement of these items by DTOs and other transnational criminal organizations. ICE's investigative strategy includes the identification and

prosecution of criminal networks and individuals responsible for the acquisition and movement of firearms from the United States.

**Table 2: Key Immigration and Customs Enforcement (ICE) Efforts and Resources to Stem Firearms Trafficking to Mexico**

| Key activities | Estimated funding expenditures (fiscal years 2009-2014) | Personnel (fiscal year 2014) |
|---|---|---|
| ICE, under certain legal authorities (specifically, the Arms Export Control Act and International Traffic in Arms Regulation), contributes to the U.S. effort to stem firearms trafficking to Mexico by enforcing U.S. export laws through some of its programs, including its Counter Proliferation Investigations Program and Border Enforcement Security Teams. | $94.8 million (expended for counter-firearms trafficking efforts related to Mexico) | ICE reports its personnel contributions in terms of full-time equivalent (FTE) hours. Thus, for efforts to counter firearms and ammunition trafficking ICE reports that in fiscal year 2014 it expended 102,906 Mexico-related hours with 61 FTEs. |

Source: GAO analysis of ICE information. | GAO-16-223

Other U.S. agencies that contribute to the effort to stem firearms trafficking to Mexico include:

- CBP. DHS's CBP is charged with managing, securing, and controlling the nation's borders for both people and cargo entering and leaving the United States. CBP's outbound mission is to facilitate the movement of legitimate cargo, while interdicting the illegal export of weapons and other contraband out of the United States.

- State. State's Bureau of International Narcotics and Law Enforcement Affairs (INL) advises the President, Secretary of State, and government agencies on policies and programs to combat international narcotics and crime. INL programs support State's strategic goals to reduce the entry of illegal drugs into the United States and to minimize the impact of international crime on the United States and its citizens. INL oversees funding provided to build the capacity of Mexico to fight organized crime under the Mérida Initiative, including funds to support efforts to combat firearms trafficking.

- ONDCP. ONDCP is a White House component whose principal purpose is to establish policies, priorities, and objectives for the nation's drug control program. It produces a number of publications, including the *Strategy*—first issued in 2007. The *Strategy* is intended to serve as an overarching guide for combating criminal activity along the U.S.-Mexico border; since 2009 it has included a Weapons Chapter in recognition of the threat posed by the smuggling of firearms across the Southwest border. Given ATF's and ICE's roles in combating firearms trafficking, these agencies share responsibility for preparing the information presented in the Weapons Chapter of the

0124

*Strategy*. While ONDCP tracks progress by U.S. agencies in meeting these objectives, it is not directly involved in planning or implementing their activities.

# Most Firearms Seized in Mexico That Are Traced by ATF Come from the United States, and Most Are Purchased in Southwest Border States

## Most Firearms Recovered in Mexico That Are Traced by ATF Come from the United States

Data from ATF on firearms seized in Mexico and traced from calendar year 2009 to 2014 indicate that the majority originated in the United States. Because of the illicit nature of the trafficking, the exact number of firearms trafficked from the United States into Mexico is unknown. Similarly, ATF officials noted that since firearms seized in Mexico are not always submitted for tracing the same year they were seized, or are not submitted at all, it is not possible to develop data to track trends on firearms seized. However, ATF uses the number of firearms seized and traced as an indicator to estimate extent of illicit firearms trafficking. While the government of Mexico collects data on the number of firearms its law enforcement entities seize each year, our analysis and findings refer exclusively to the universe of firearms seized in Mexico that were submitted for tracing using eTrace.[11]

According to ATF data, of the 104,850 firearms seized by Mexican authorities and submitted for tracing from 2009 to 2014, there were 73,684, or 70 percent, found to have originated in the United States. About 17 percent of the total, 17,544 firearms, were traced to a country

---

[11]According to data provided by the government of Mexico, Mexican authorities seized 158,560 firearms from 2009 to 2014. However, we were unable to independently verify the reliability of these data. Therefore, we did not compare figures provided by Mexican authorities to ATF tracing data.

other than the United States.[12] ATF could not determine the origin of 13,622 (13 percent) of these firearms because of incomplete information.[13] See figure 1.

**Figure 1: Numbers of Firearms Seized in Mexico and Submitted for Tracing, by U.S. and Non-U.S. Origin, 2009 to 2014**



Source: GAO analysis of Bureau of Alcohol, Tobacco, Firearms and Explosives data.  |  GAO-16-223

Note: U.S. origin includes firearms manufactured in the United States or legally imported into the United States. Non-U.S. origin refers to those firearms for which the trace request indicated a non-U.S. (foreign) manufacturer and for which there is no evidence that they were ever imported to the

---

[12]According to ATF data, from 2009 to 2014, after the United States the top five countries of origin of firearms seized in Mexico and traced were Spain (3,786), China (3,027), Italy (2,186), Germany (1,522), and Romania (1,287).

[13]In 2009, GAO reported data provided by ATF indicating that 87 percent of firearms seized in Mexico and traced from 2004 to 2008 originated in the United States (see GAO-09-709). ATF explained that data provided to GAO for the years 2004 to 2008 for that report are not comparable to the data provided for this report because the agency has established different parameters for analysis and reporting of the data for the period 2009 to 2014. Current ATF standards entail more extensive review of Mexican data submitted in the eTrace system for completeness and accuracy. Additionally, more recent data on traces are reported on a calendar year rather than a fiscal year basis.

United States. Undetermined origin refers to those firearms for which the trace information was unclear as to the manufacturer, country of origin, importer, or a combination of these.

ªFirearms may have been seized in prior years but submitted for tracing from 2009 to 2014.

From 2009 to 2011, numbers of firearms seized by Mexican authorities and submitted for tracing fluctuated significantly, followed by a steady decline after 2011. According to ATF officials, shifts in the number of guns seized and traced do not necessarily reflect fluctuations in the volume of firearms trafficked from the United States to Mexico from one year to the next. ATF staff explained that there are several factors that have influenced the year-to-year variance in the number of firearms traced since 2009. For example, they explained that the high number of firearms traced in 2009 reflects a single submission by the Mexican military to ATF for tracing of a backlog of thousands of firearms.[14] Conversely, ATF officials noted there was a lower number of firearms submitted for tracing in 2010 because that is the year eTrace in Spanish was initially deployed in Mexico, and Mexican law enforcement officials at the local, state, and federal level had to be trained on using the system. In 2011, a much higher number of firearms were traced as Mexican officials became proficient in using the system. Finally, U.S. and Mexican officials suggest the decline since 2011 may reflect a period of adjustment in cooperation under the Peña Nieto administration. This included the centralization of access to eTrace in Mexico's Attorney General's Office and retraction of eTrace accounts from federal, state, and local law enforcement, which resulted in fewer Mexican law enforcement officials able to trace firearms using the system.

## Long Guns Account for about Half of All Firearms Seized in Mexico and Traced

According to Mexican law enforcement officials we interviewed, DTOs prefer high caliber weapons with greater firepower, including high caliber rifles or long guns, and military grade equipment. Officials explained that the firearms of choice for drug traffickers are high caliber assault rifles, such as AK type and AR 15 type, which are available for purchase in the United States and which can be converted to fully automatic fire (i.e., converted into machine guns). Officials also noted that in recent years they have seen DTOs acquire military equipment, such as .50 caliber

---

[14]According to Mexican officials, Mexican law requires that all firearms seized in Mexico must be stored by the Mexican military (Secretaría de Defensa Nacional—SEDENA). Before the deployment of eTrace in Spanish in 2010, the Mexican military had accumulated a sizable collection of seized firearms that were subsequently submitted for tracing using ATF's eTrace system.

machine guns, rocket launchers, and grenade launchers. However, they said that unlike firearms typically used by DTOs, which often can be traced back to the United States, this type of equipment is known to often be trafficked into Mexico from leftover Central American military stockpiles from past conflicts. See figure 2 for examples of long and short guns (also referred to as handguns).

**Figure 2: Examples of Long and Short Guns**

**Short guns**

9mm



.38 Cal. (38 Special)



**Long guns**

AR Type



12 gauge pump action shotgun



Source: Bureau of Alcohol, Tobacco, Firearms and Explosives.  |  GAO-16-223

According to data provided by ICE, the agency seized 5,951 firearms that were destined for Mexico in the last 6 years.[15] Of firearms seized by ICE from 2009 to 2014, 2,341, or 39 percent, were long guns—including rifles and shotguns. During the same period, ICE seized 3,610 short guns—including revolvers and pistols (see fig. 3).

**Figure 3: Number and Type of Firearms Destined to Mexico Seized in the United States by Immigration and Customs Enforcement, 2009 to 2014**



Number of firearms seized

Source: GAO analysis of Immigration and Customs Enforcement data.  |  GAO-16-223

Note: Pistols and revolvers are considered short guns. Rifles and shotguns are considered long guns.

According to data provided by ATF, almost half of all firearms seized in Mexico and traced in the last 5 years were long guns. From 2009 through 2014, 49,566 long guns—rifles and shotguns—were seized and traced. During that same period, 53,156 short guns—including revolvers and pistols—were seized and traced. The data also show a substantial decline in the number of long guns traced since 2011 (see fig. 4). Mexican law enforcement officials said that in the last 2 years they often

---

[15]According to ICE, this number includes seizures made that were enabled or assisted by other DHS components.

seized more handguns than rifles, but stated that the use of high caliber rifles by cartels is still widespread.

**Figure 4: Number and Type of Firearms Seized in Mexico and Submitted to the Bureau of Alcohol, Tobacco, Firearms and Explosives for Tracing, 2009 to 2014**



Source: GAO analysis of Bureau of Alcohol, Tobacco, Firearms and Explosives data.  |  GAO-16-223

[a]Firearms may have been seized in prior years but submitted for tracing from 2009 to 2014.

[b]Pistols and revolvers are considered short guns. Rifles and shotguns are considered long guns.

According to ATF officials, steps the bureau has taken to combat firearms trafficking to Mexico have made it more difficult for firearms traffickers to acquire long guns. Specifically, they noted implementation of Demand Letter 3, which requires licensed dealers and pawnbrokers in Arizona, California, New Mexico, and Texas to report multiple sales of certain rifles.[16] According to ATF, information from multiple sales reports on long guns allows the bureau to identify indicators of suspicious or high-volume purchasing by individuals, repetitive purchasing, and purchases by

---

[16]Pursuant to 18 U.S.C. § 923(g)(5), ATF issued *Demand Letter 3* to licensed dealers and pawnbrokers in Arizona, California, New Mexico, and Texas, requiring them to submit information to ATF concerning sales or other dispositions to an unlicensed purchaser, within 5 business days, of two or more rifles that have semiautomatic action, a caliber greater than .22, and the ability to accept a detachable magazine.

associates, as well as geographical trends for such sales. ATF officials reported that this information has helped them identify firearms traffickers and others involved in a timelier manner, which on several occasions has led to arrests and seizures of firearms intended for trafficking to Mexico. From 2011 to 2014, 490 long guns that had been recorded as part of multiple sales transactions under Demand Letter 3 were seized in crime scenes—259 in the United States, 209 in Mexico, and 22 in undetermined locations.

## Most Firearms Seized in Mexico and Traced to the United States Were Purchased in Southwest Border States

Most of the firearms seized in Mexico that were traced and found to be of U.S. origin from 2009 to 2014 came from U.S. Southwest border states. While guns seized in Mexico of U.S. origin were traced to all of the 50 states, most came from Texas, California, and Arizona. As shown in figure 5, of all firearms seized in Mexico that were traced and identified to be of U.S. origin, about 41 percent came from Texas, 19 percent from California, and 15 percent from Arizona. According to ATF, in fiscal year 2014, there were about 10,134 licensed dealers and pawnbrokers in the four Southwest border states, many of them along the border. This represents about 16 percent of the approximately 63,311 licensed dealers and pawnbrokers nationwide. These licensed dealers and pawnbrokers can operate in locations such as gun shops, pawn shops, their own homes, or gun shows.[17]

---

[17]See discussion of gun shows in GAO-09-709.

**Figure 5: Top Source States for Firearms Seized in Mexico of U.S. Origin and Numbers Seized, 2009-2014**



Sources: GAO analysis of Bureau of Alcohol, Tobacco, Firearms and Explosives data; Map Resources (map).  |  GAO-16-223

Note: Percentages in the pie chart do not add up 100 because of rounding. Actual number of firearms purchased in selected states represented in parenthesis.

According to ATF officials, most firearms seized in Mexico and traced back to the United States are purchased in the United States then transferred illegally to Mexico. ATF has been able to determine the original retail purchaser for about 45 percent of firearms seized in Mexico and traced to the United States from 2009 to 2014. However, ATF was unable to determine a purchaser for 53 percent,[18] because of factors such

---

[18]According to ATF, the other 3 percent of firearms were traced to a purchaser in a foreign country. Percentages do not add up to 100 because of rounding.

as incomplete identifying data on trace request forms, altered serial numbers, no response from the federal firearm licensee to ATF's request for trace information,[19] or incomplete or never received out-of-business licensee records.[20]

## Trafficking in Firearms Parts May Facilitate DTOs' Acquisition of Firearms and Complicates Authorities' Efforts to Prevent Trafficking

ATF and Mexican government officials told us that a new complicating factor in their efforts to fight firearms trafficking is the use of weapons parts transported to Mexico to be later assembled into finished firearms. According to documents provided by ATF, firearm parts include unfinished receivers barrels, triggers and hammers, buttstocks, pistol grips, pins, bolts, springs, and other items. Figure 6 shows some of these firearms parts. None of these firearm parts are classified as firearms under the Gun Control Act.[21] In general, U.S. federal laws and regulations requiring manufacturers and importers of firearms to identify firearms with a serial number do not apply to parts, unless otherwise specified by law.[22] Federal firearms licensees and other retailers are not required to report on the acquisition and disposition of firearm parts as they must for firearms. Furthermore, any individual in the United States may legally acquire and possess certain firearm parts that are not otherwise proscribed by law, including persons prohibited from possessing firearms and ammunition, such as convicted felons.

---

[19]Generally, 18 U.S.C. § 923 (g)(7) requires federal firearms licensees to respond immediately to, and in no event later than 24 hours after, the receipt of a request by the Attorney General for information contained in the records required to be kept.

[20]In accordance with 18 U.S.C. § 923(g)(4), upon discontinuance of business by federal firearms licensees, records shall be delivered within 30 days after the business discontinuance to ATF.

[21]Under the Gun Control Act, the term firearm means (1) any weapon, including a starter gun, which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (2) the frame or receiver of any such weapon; (3) any firearm muffler or firearm silencer; or (4) any destructive device. The definition of firearm does not include antique firearms. 18 U.S.C. § 922(a)(3).

[22]Under the National Firearms Act, firearms include machine gun parts that are designed and intended solely and exclusively for use in converting a weapon into a machine gun and any combination of parts from which a machine gun can be assembled. See 26 U.S.C. § 5812(a); 5845(b). Additionally, the National Firearms Act defines firearms to include silencers, which are subject to the requirement for manufacturers to identify them with serial numbers. See 26 U.S.C. § 5845(a); 5842(a).

**Figure 6: Basic Firearm Components from Firearms Parts Kits**



Source: Bureau of Alcohol, Tobacco, Firearms and Explosives.  |  GAO-16-223

Firearms may be assembled by using parts kits that include all of the components of a fully operable firearm minus the firearm receiver or frame, which may be obtained separately. ATF officials explained that in order to circumvent marking requirements on transactions involving firearms and thus avoid tracing, criminals will sometimes use unfinished receivers, such as "castings" or "flats," rather than fully functional receivers. A frame or receiver by itself is classified as a firearm by definition under the Gun Control Act. The receiver is the part of the firearm that houses the operating parts, typically the bolt or bolt carrier group, the magazine well, and the trigger group. A casting is essentially a piece of metal fabricated with the exterior features and contours of the firearm receiver for which it is intended to substitute, but that without further machining will not function as a firearm. Castings and flats are commonly referred to as 80 percent receivers in marketing materials and advertisements promoting their sale. The "80 percent" label is intended to convey that the product has been cast or fabricated with most of the

features of a finished, functional firearm receiver, but it will require further machining to function as a firearm (see fig. 7).

**Figure 7: Comparison between a Receiver (Considered a Firearm) and a Casting (Not Considered a Firearm)**





Source: Bureau of Alcohol, Tobacco, Firearms and Explosives.   |   GAO-16-223

0135

A receiver flat is a piece of metal that has the same dimensions as a receiver, but that has not been shaped into a firearm configuration. In this form, it cannot accept any component parts, but with the proper equipment it can be readily bent into shape and molded into a receiver (see fig. 8).

**Figure 8: A Flat with All of the Required Holes Drilled but That Has Not Been Bent into Shape**



Source: Bureau of Alcohol, Tobacco, Firearms and Explosives.  |  GAO-16-223

According to documents provided by ATF, since kits, castings, and flats are not classified as firearms, transfers of those items are not regulated under the Gun Control Act or National Firearms Act. Although ICE officials noted they are subject to export control laws, they have no serial numbers and generally no markings; thus, firearms assembled with them are untraceable.[23] In addition, receivers and firearms parts are small and when transported separately may not be easily identified as items intended for the production of firearms. They are also easy to conceal, making it more challenging for customs authorities to detect illicit shipments of such parts.

---

[23]The Arms Export Control Act, as implemented through the International Traffic in Arms Regulations, regulates the export of defense articles classified on the United States Munitions List. Components, parts, accessories and attachments for certain firearms and receivers are included as items on the U.S. Munitions List and are considered defense articles that are subject to export control laws. See 22 C.F.R. § 121.1 & 120.45.

According to ATF officials, there are no reliable data on the extent of firearm parts trafficking from the United States into Mexico. They noted, however, that recent seizures of firearms parts, firearms made with unmarked parts, and equipment used to assemble or manufacture firearms in Mexico suggest an emerging reliance by criminal organizations on this source of weapons. For example, law enforcement officials in Mexico described to us two high-profile cases in 2014 involving illicit firearm parts assembly of this type. One was in Guadalajara, where Jalisco state police seized hundreds of unfinished receivers and pieces of sophisticated equipment being used to complete high caliber rifles. The second was in Tijuana, where Baja California state police seized 25 rifles in the process of assembly with firearm parts from the United States.[24]

# ATF and ICE Have Taken Steps to Improve Collaboration, but Lack of Monitoring May Contribute to Coordination Challenges

## ATF and ICE Have Taken Steps to Improve Collaboration, but Some Challenges Remain

ATF and ICE have taken several steps to improve coordination on efforts to combat firearms trafficking that we previously identified.[25] In 2009, we reported instances of dysfunctional operations, duplicative initiatives, and jurisdictional conflicts between ATF and ICE.[26] In response to our recommendations on how to address these challenges, ATF and ICE updated and signed an interagency collaboration memorandum of understanding (MOU) in June 2009. In their revised MOU, the agencies

---

[24]Mexican authorities indicated that they could not share more specific information on these cases because they are part of ongoing federal investigations.

[25]GAO-09-709.

[26]GAO-09-709.

committed to a shared goal of keeping the public safe by using the tools given to both agencies and which are vital to the effective control of domestic and international trafficking of firearms, ammunition, explosives, weapons, and munitions. Specifically, the MOU set forth roles and requirements for each agency with respect to (1) intelligence and information sharing, (2) general investigative guidelines, (3) specific investigative guidelines, (4) sources of information, and (5) conflict resolution. This effort to improve coordination and optimize use of the agencies' expertise provided the basis to address the issues that had hampered interagency collaboration prior to the MOU's implementation.

ICE and ATF officials said that after the MOU was signed, they held joint training exercises and conferences to ensure that agents had knowledge of the MOU and its jurisdictional parameters and collaboration requirements. Officials from each agency in headquarters, Mexico, and border locations we visited indicated that personnel working on firearms trafficking to Mexico were generally aware of the MOU's key provisions and collaborated on this basis. Agency officials also highlighted a more recent joint interagency conference in September 2014, which sought to provide participants with a common understanding of collaborative efforts and respective areas of jurisdiction. Additionally, senior agency headquarters officials asserted that there is extensive cooperation between ATF and ICE, at the headquarters and field office levels. ATF and ICE officials in border field offices we visited confirmed that they were familiar with the MOU and that it provides them guidance on interagency collaboration. Similarly, ATF and ICE officials in Mexico stated that since they are co-located physically, they have a greater opportunity to work together closely on firearms trafficking-related cases, and an ICE official said that they rely on the MOU to help define their respective roles.

Nevertheless, we identified persistent challenges in information sharing and some disagreement on the agencies' respective roles in investigations. For example, ATF and ICE disagree on the extent to which trace data on firearms seized in Mexico collected through eTrace should be shared to support ICE firearms trafficking investigations. According to an ICE assistant deputy director, these firearms trace data from Mexico are currently only shared on a limited basis with ICE. Several ICE officials expressed an interest in obtaining access to these data and indicated that this access would enhance their ability to identify methodologies used by firearms traffickers and trends in criminal activity along the Southwest border. ICE officials responsible for investigations said that trace data should be shared in accordance to the MOU, which states "ATF shall report to the appropriate ICE field office in a timely manner any

intelligence received relating to the illegal exportation, attempted exportation, or planned exportation of any item on the United States Munitions List..." However, the MOU does not address how general trafficking information, such as that submitted through eTrace by a third law enforcement agency, may be shared.

ATF officials asserted that their agency shares trace data on firearms seized in Mexico with ICE according to established agency polices, which currently only allow ATF to provide non-case-specific information to other agencies in aggregate form. With respect to the results of individual trace requests, ATF officials explained that they are provided only to the law enforcement agency that submits the trace information; generally, this information is not shared with third parties, including other law enforcement agencies. ATF would have to obtain authorization from the third-party law enforcement agency that submitted the trace information to share it with ICE. Thus, ATF cannot automatically share information with ICE on firearm traces submitted by Mexican law enforcement agencies without their authorization. ATF staff said these policies are set forth in the agreements ATF signs with each law enforcement agency for the use of eTrace. Officials from ATF and ICE said there are joint efforts under way to find a mechanism to share this information.

Additionally, the 2009 MOU sets forth investigative guidelines to define the roles and responsibilities of ATF and ICE pursuant to their respective statutory authorities. For example, the MOU states that "the regulation and inspection of the firearms industry is within the sole purview of ATF" and that "all investigative activities at the port of entry, borders and their functional equivalents must be coordinated through ICE." Notwithstanding these guidelines, we found some confusion among some agency officials about the appropriate roles of their counterparts in conducting investigations. For example, a senior ICE official responsible for investigations questioned the involvement of ATF in firearms trafficking investigations to Mexico, because, according to the official, ATF's jurisdiction focuses on combating domestic firearms violations. ICE officials also expressed concerns that the involvement of ATF's international desk with Mexican agencies may create confusion among Mexican government authorities over the roles that ICE and ATF play in addressing firearms trafficking cases. However, an ICE assistant deputy director explained that pursuant to the Arms Export Control Act, ICE has primary jurisdiction over violations related to the international trafficking of firearms, but many such trafficking investigations begin with domestic criminal activities for which ATF has jurisdiction. Therefore, he stressed that it is essential that the two agencies collaborate to leverage ICE's

international and ATF's domestic legal authorities. He added that ATF's international operations also provide much-needed capacity building regarding forensics and e-Trace activities in Mexico. However, ICE and ATF must work to ensure that confusion is not created among Mexican agencies regarding the responsibilities for the investigation of international firearms trafficking by U.S. authorities.

ATF officials agree that their agency's efforts to combat firearms trafficking are concentrated in the United States, and that they recognize the role of ICE in addressing transnational weapons trafficking. However, some ATF officials said that it is incorrect to suggest that ICE has exclusive jurisdiction with respect to illicit cross-border firearms trafficking to Mexico. According to these officials, most investigations involving the smuggling of firearms from the United States to Mexico implicate ATF jurisdiction, because they typically involve the illegal acquisition of firearms inside the United States. ATF's jurisdiction extends to unlawful acquisition of firearms by prohibited persons, straw purchasing, and other unlawful transfers of firearms. ATF officials added that the bureau's statutory responsibility for tracing firearms includes the deployment of eTrace to Mexican and other foreign law enforcement entities, and noted that eTrace entries from Mexico can result in the opening of firearm trafficking investigations focused on criminal activity in the United States. ATF officials also acknowledge that because of the nature of firearms trafficking to Mexico, many investigations involve overlapping jurisdiction with respect to cross-border offenses squarely within ICE's jurisdiction. They also noted the critical role ATF plays in providing training and capacity building on firearms and explosives identification and tracing for Mexican law enforcement. During our fieldwork, Mexican law enforcement agencies confirmed the benefits they derived from ATF capacity-building efforts, and they said they regarded ATF as their lead U.S. counterpart in investigating firearms trafficking. Thus, although ATF has established productive cooperative relations with Mexican agencies, there may also be some confusion in Mexico over ATF's and ICE's roles in combating firearms trafficking, as expressed by some ICE officials.

0140

## ATF and ICE Do Not Consistently Monitor Implementation of the 2009 MOU, Resulting in Continued Coordination Challenges

In prior work, we have identified several interagency mechanisms that can be used to improve collaboration among agencies working on a shared mission, such as information sharing, agency roles and responsibilities, and oversight and monitoring.[27] We have also reported that written interagency agreements, such as MOUs, are most effective when they are regularly updated and monitored. We observed that when implementation of such agreements is not regularly monitored, there is sporadic and limited collaboration among agencies. We also have found that agencies that create a means to monitor, evaluate, and report the results of collaborative efforts can better identify areas for improvement.

Immediately after the MOU was updated in 2009, the agencies committed to undertake efforts to ensure that its provisions would be implemented accordingly. For example, at that time, ICE informed GAO that headquarters had a process to obtain information from ICE field offices every 60 days to identify coordination issues with ATF that could not be resolved at the field level within the framework of the MOU. In such situations, ICE headquarters would then work with the appropriate ATF component to resolve the issue. ICE officials explained these initial monitoring efforts were designed to ensure that the updated MOU was being effectively followed as it introduced several provisions or guidelines on how ATF and ICE should collaborate on firearms trafficking. However, according to ICE officials, this process was only in place during the initial implementation period of the MOU, and the effort was not sustained.

Currently, officials from both agencies acknowledged that there is no specific mechanism in place to monitor implementation of the MOU. However, each agency's officials referred to different efforts that they said provide an opportunity to monitor interagency collaboration under the MOU. For example, a deputy assistant director for ICE stated that coordination between ICE and ATF on firearms trafficking cases occurs at the Export Enforcement Coordination Center as well as at the field level. ICE's Export Enforcement Coordination Center is intended to serve as the primary forum within the federal government for executive departments

---

[27]Other key features identified include policy development; program implementation; and building organizational capacity, such as staffing and training. For additional information, see GAO, *Managing for Results: Key Considerations for Implementing Interagency Collaborative Mechanisms*, GAO-12-1022 (Washington, D.C.: Sept. 27, 2012), and *Export Promotion: Trade Agencies Should Enhance Collaboration with State and Local Partners*, GAO-14-393 (Washington, D.C.: May 21, 2014).

and agencies to coordinate their export control enforcement efforts. The Center seeks to maximize information sharing, consistent with national security and applicable laws. Thus, it is likely that coordination challenges between ICE and ATF on firearms trafficking could potentially be detected at the Center. However, given the Center's broader responsibility to enhance export control enforcement efforts with multiple agencies, it is not directly intended to monitor implementation of the MOU. Moreover, coordination challenges related to the MOU persist even though the Center has been in place for 5 years, indicating that this may not be an effective means to monitor the MOU's implementation.

Senior ATF officials said that although there is no formal arrangement to regularly monitor implementation of the MOU, they consider joint interagency training to be an effective approach to ensure that officials from both agencies are familiar with the provisions of the MOU and are working together effectively. However, only two such training exercises have taken place—one in 2014 and another in September 2015. The training is intended to acquaint officials from both agencies with how the agencies coordinate firearms trafficking efforts, and as part of the training, the MOU provisions are discussed, but these training exercises do not constitute a mechanism for consistent monitoring of implementation of the MOU. By not sustaining a monitoring process for the MOU, the agencies have no assurance that its provisions are being implemented effectively, and challenges we identified are continuing to persist without a process for resolution.

## U.S.-Mexico Collaboration on Firearms Trafficking Was Scaled Back after 2012, but While Challenges Continue, Bilateral Efforts Have Recently Been Gaining Momentum

**Bilateral Firearms Trafficking Efforts Slowed Following Mexican Moves to Consolidate Law Enforcement Collaboration**

Mexican and U.S. officials described how upon coming to power in December 2012, the current administration of Mexican President Enrique Peña Nieto undertook a reevaluation of U.S.-Mexico law enforcement collaboration, including efforts to combat firearms trafficking.[28] According to some officials, the government of Mexico took steps to consolidate law enforcement cooperative activities under an approach termed *Ventanilla Única*—which translates to Single Window. Under *Ventanilla Única*, Mexico's Interior Ministry has become the primary entity through which Mérida Initiative training and equipment are coordinated, including capacity-building activities related to firearms trafficking. The government of Mexico also established a single point of contact within Mexico's Office of the Attorney General to approve joint investigations with U.S. counterparts. Additionally, Mexican officials explained that Mexican law categorizes firearms trafficking as a federal crime and permits only federal authorities to work on such cases. This has led to some notable changes in the way U.S. and Mexican authorities work together on firearms trafficking efforts.

One of these changes stemmed from the decision to centralize access to ATF's eTrace in the Mexican Attorney General's Office. Consistent with our prior recommendations, in 2010, ATF reached an agreement for deployment of eTrace in Spanish in Mexico, with Mexican authorities. According to ATF, this was a significant investment for which ATF provided training to numerous officials from various Mexican federal, state, and local law enforcement agencies on the use of eTrace, while assigning accounts to allow them to access the system. However, by 2013 the Mexican government retracted access to many of these accounts, effectively limiting eTrace in Mexico to certain authorized officials in the office of Mexico's Attorney General. Mexican officials explained that the decision to consolidate access at the Attorney General's office was intended to provide the government of Mexico with more effective control over the information associated with eTrace, and to support a central repository of evidence related to federal crimes such as trafficking of firearms. However, U.S. officials and some Mexican authorities said that limiting access to eTrace to a single governmental entity has restricted opportunities for bilateral collaboration. Some U.S.

---

[28]U.S. law enforcement agencies conduct their work in Mexico in cooperation with Government of Mexico counterparts under the Treaty of Cooperation Between the United States of America and the United Mexican States for Mutual Legal Assistance. U.S.-Mexico, S. Treaty Doc. No. 100-13 (1988).

0143

officials based in Mexico similarly noted that limiting access to eTrace diminished tracing of total firearms seized by Mexican authorities.

Another significant change following the reassessment of bilateral collaboration, which began in 2012, was the suspension of periodic meetings of a working group known as *GC Armas*, which brought together U.S. and Mexican officials from various agencies involved in combating firearms trafficking. According to ATF officials, prior to 2013, *GC Armas* held periodic meetings annually with the participation of approximately 70 to 100 officials from both governments. These officials shared useful information on firearms trafficking trends, trace data, investigations, collaboration questions, and many other issues. ATF officials said that oftentimes very productive cooperative efforts on firearms trafficking began informally at *GC Armas* meetings and were subsequently formalized. Mexican officials similarly characterized *GC Armas* meetings as contributing in a fundamental manner to reaching significant agreement between law enforcement in both countries on how to combat firearms trafficking. They noted one such bilateral effort that resulted in a comprehensive assessment of firearms and explosives trafficking with recommendations for each country on sharing information and cooperating on cross-border investigations. Officials from both countries explained that while bilateral coordination did not cease after the suspension of *GC Armas* meetings, overall collaboration slowed down with fewer opportunities to promote bilateral firearms trafficking initiatives.

## Corruption and Frequent Turnover Continue to Hamper Bilateral Collaboration on Firearms Trafficking

U.S. and Mexican authorities acknowledge the challenges to law enforcement efforts posed by continuing corruption among some Mexican officials. As we discussed in our 2009 report, concerns about corruption within Mexican government agencies often limit U.S. officials' ability to develop a full partnership with their Mexican counterparts. Officials we met with from ATF, ICE, CBP, and State continued to express such concerns regarding corruption in Mexico. Some Mexico-based ICE officials, for example, stated that they are conscious that their U.S.-based colleagues will not always share with them all of the information they have on firearms trafficking investigations because of concerns about corruption. That is, ICE officials in the United States and along the U.S.-Mexican border are concerned about sharing information with ICE officials based in Mexico, fearing that the information may unintentionally reach corrupt Mexican authorities and compromise their investigations. According to ICE officials, concerns they had about corruption in Mexico were exacerbated early in the Peña Nieto administration when a vetted

0144

unit of Mexican law enforcement officials that they trusted and that ICE had trained and worked with for several years was disbanded.

U.S. officials also highlighted the problems frequent turnover in Mexican law enforcement pose for bilateral efforts to combat criminal activities, including firearms trafficking. Some U.S. officials explained that recurring personnel changes aggravate the issue of corruption. In a country such as Mexico, where there is an underlying concern about government corruption, frequent turnover complicates efforts to develop trust with counterpart officials. Other U.S. officials noted that there are no civil service protections in Mexico, so there can be a virtually complete change in the staff of a government agency when a new administration comes into office, or even when the head of an agency is reassigned. As a result, all of the people who received specialized training, such as firearms recognition, can be removed suddenly leaving no institutional memory, which complicates planning future collaboration and program implementation. Similarly, ATF officials commented that oftentimes Mexican law enforcement personnel in key positions for whom they provided firearms training were subsequently replaced. While turnover has been a recurring challenge for U.S. agencies working in Mexico, various U.S. officials said that it appears to have been particularly frequent in the past few years. For example, the spokesperson for one U.S. agency in Mexico noted that in the past 5 years the division responsible for implementing professional development at a key Mexican law enforcement entity has been replaced seven times.

## Over the Past Year, Bilateral Collaboration on Firearms Trafficking Efforts Has Gained Momentum

While both U.S. and Mexican officials collaborating on firearms trafficking said that bilateral efforts had been scaled back after the Peña Nieto administration came into power, these officials noted that over the past year collaborative activities have been bolstered and are gaining momentum. For example, around the time of our fieldwork in Mexico, CBP was working with Mexican authorities to deploy specially trained canine units able to detect firearms and explosives around the country. Similarly, ATF was providing training on firearms identification for Mexican Customs. A Mexican Customs spokesman stressed the importance of such training in helping front-line customs officers recognize and safely secure not just firearms but also ammunition, firearms' components, and explosives that criminals try to smuggle across the border. He explained that this training has been critical in allowing officers at the border to perform their mission.

Mexican Attorney General officials also noted their increasing level of cooperation with U.S. authorities on firearms trafficking. They highlighted ATF training on the use of eTrace and the resumption of *GC Armas* meetings in 2015. ICE officials also told us that they have recently reestablished the vetted unit in Mexico, which improves trusted working relationships with Mexican counterparts. Finally, in addition to renewing existing collaborative efforts with Mexican law enforcement counterparts, ATF has also sought to reach out to other Mexican government entities. For example, this year ATF has been collaborating with the Mexican Navy on training for firearms and explosives detection, identification, and seizure. Mexican Navy officers expressed gratitude for this training, noting that they are increasingly confronting real-world situations that require this type of knowledge.

## The Current Weapons Chapter Indicator in the *National Southwest Border Counternarcotics Strategy* Does Not Adequately Measure the Progress of U.S. Agencies in Stemming Firearms Trafficking to Mexico

The indicator used in the *Strategy* to track progress by U.S. agencies to stem firearms trafficking to Mexico does not adequately measure implementation of the strategic objective. The *Strategy* includes strategic objectives and indicators for each of its nine issue chapters to ensure effective implementation. The strategic objective for the Weapons Chapter is to "stem the flow of illegal weapons across the Southwest border into Mexico." ONDCP's indicator for this chapter is the "number of firearms trafficking/smuggling seizures with a nexus to Mexico." The *Strategy* does not further define the indicator, but ONDCP staff explained that it refers to the number of firearms seized in Mexico that are traced by ATF.

While ONDCP's *Strategy* asserts that it is critical to have indicators that enable tracking the implementation of objectives, this indicator for the Weapons Chapter does not effectively track the status of efforts to stem the flow of illegal weapons across the Southwest border. As previously noted in this report, ATF officials readily acknowledge that shifts in the number of guns seized and traced do not necessarily reflect fluctuations in the volume of firearms trafficked from the United States to Mexico in any particular year. There are many factors that could account for the number of firearms traced in a given year beside the number of firearms smuggled from the Unites States. Moreover, as discussed above, for various reasons the number of firearms seized in Mexico and traced back to the United States shifted significantly year to year after 2009 and then declined steadily since 2011. Thus, while the number of firearms seized and traced by ATF is useful to provide an overall indication of firearms of U.S. origin found in Mexico, by itself it is not an adequate measure of progress agencies are making to stem the flow of firearms trafficked from

0146

the United States into Mexico. Additionally, ONDCP has not reported progress made on the strategic objective in the Weapons Chapter in 2011 or 2013. ONDCP staff said they anticipate that the 2015 *Strategy* will include a section to report on the outcomes of the last 2 years, and they plan to report on this indicator.

Beside the strategic objective and indicator, the Weapons Chapter of the *Strategy* also includes five supporting actions, along with associated activities to achieve those actions; see table 3. According to an ONDCP spokesman, while the number of firearms seized in Mexico and traced by ATF may be an indicator of the flow of firearms across the border, these five supporting actions and their associated activities should also be considered to get a full picture of the agencies' progress in combating arms trafficking. ONDCP officials said that they monitor progress in combating arms trafficking by obtaining periodic information from ATF and ICE on their implementation of these and other activities.

**Table 3: Supporting Actions and Activities in the Weapons Chapter of Office of National Drug Control Policy's (ONDCP) 2013 *National Southwest Border Counternarcotics Strategy***

| Supporting actions | Activities |
|---|---|
| Improve criminal intelligence and information sharing related to illegal weapons trafficking | • Facilitate U.S. government interagency criminal intelligence sharing<br>• Enhance programs at El Paso Intelligence Center targeting illegal weapons smuggling/trafficking<br>• Continue to employ programs to rapidly share weapons seizure information among U.S. law enforcement agencies |
| Increase the interdiction of illegal weapons shipments to Mexico | • Expand intelligence-driven interdiction of illicit weapons shipments destined for Mexico through multiagency investigative efforts |
| Enhance cooperation with international partners in weapons smuggling/trafficking investigations | • Engage in international training on border security, postblast investigations, firearms identification, and detection of concealment traps used for smuggling/trafficking of firearms in vehicles<br>• Complete and enhance the deployment of Spanish eTrace capabilities among appropriate Mexican law enforcement agencies<br>• Continue to monitor the end use of firearms legally exported from the United States to Mexico through the Department of State's Blue Lantern Program<br>• Maintain Drug Enforcement Administration; Federal Bureau of Investigation; Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF); and Immigration and Customs Enforcement liaison officers in Mexico<br>• Modernize, expand, and network ballistics imaging technology with Mexican law enforcement agencies |
| Strengthen domestic coordination on weapons smuggling/trafficking investigations | • Improve support to state and local law enforcement efforts targeting illegal weapons trafficking<br>• Increase ATF staffing levels in the Southwest border region<br>• Expand the use of the Border Enforcement Security Teams to disrupt cross-border weapons trafficking networks<br>• Continue applying standard proviso on export licenses requiring the provision of serial numbers for firearms exported to Mexico<br>• Improve U.S. government outreach to and coordination with federal firearms licensees |
| Increase successful federal prosecutions for illegal weapons trafficking | • Assign Organized Crime and Gang Section prosecutors to the Southwest border<br>• Target gun trafficking gangs |

Source: GAO analysis of ONDCP's 2013 *National Southwest Border Counternarcotics Strategy*. | GAO-16-233

Our review of the Weapons Chapter in the 2011 and 2013 *Strategies* determined that, generally, accomplishments under each supporting action were discussed. For example, in the 2011 *Strategy*, one supporting action called for ATF to increase staffing at the El Paso Intelligence Center Firearms and Explosives Trafficking Intelligence Unit through the incorporation of partner agencies. In 2013, the *Strategy* included an update that the unit had incorporated a CBP analyst dedicated to weapons-related intelligence. Similarly, in 2011, the agencies said they

0148

had plans under way to train over 200 Mexican law enforcement personnel in how to correctly use eTrace. The 2013 *Strategy* noted that 350 Mexican law enforcement personnel had received training on using eTrace. Nevertheless, the supporting actions described in the *Strategy* are not consistently linked to indicators or regularly measured. Currently, the narrative related to these supporting actions typically covers ongoing efforts by the agencies to address these actions, but it does not include a measure of overall progress. By including these supporting actions and activities in the Weapons Chapter as measures, ONDCP could better assess the agencies' efforts in combating firearms trafficking because this would provide a more comprehensive assessment.

## Conclusions

Although ATF and ICE have pledged, through the 2009 MOU, to collaborate effectively to combat firearms trafficking, these agencies have not set up a mechanism to monitor implementation of the MOU that would allow them to identify and address information sharing and collaboration challenges. Consequently, gaps in information sharing and some disagreement about agency roles in the broader effort to combat firearms trafficking have emerged that weaken the effectiveness of the MOU.

It is unclear to what extent ONDCP's *Strategy* has advanced U.S. government efforts to combat firearms trafficking, since the indicator used to track progress, by itself, is not sufficient to measure progress made by U.S. agencies in stemming arms trafficking to Mexico. Other actions that agencies take to stem the flow of firearms from the United States into Mexico may be worth considering as additional measures of progress, such as the number of interdictions of firearms destined for Mexico, the number of investigations leading to indictments for firearms trafficking related to Mexico, and the number of convictions of firearms traffickers with a nexus to Mexico. By including these types of measures in a comprehensive indicator or set of indicators, ONDCP will be better positioned to monitor progress on stemming firearms trafficking across the Southwest border.

## Recommendations for Executive Action

We recommend that the Attorney General of the United States and the Secretary of Homeland Security convene cognizant officials from ATF and ICE to institute a mechanism to regularly monitor the implementation of the MOU and inform agency management of actions that may be needed to enhance collaboration and ensure effective information sharing.

0149

To ensure effective implementation of the strategic objective of the Weapons Chapter of the *Strategy*, we recommend that the ONDCP Director establish a more comprehensive indicator, or set of indicators, that more accurately reflects progress made by ATF and ICE in meeting the strategic objective.

## Agency Comments

We provided a draft of this report for review and comment to the Departments of Homeland Security, Justice, and State; and the Office of National Drug Control Policy.

DHS agreed with our recommendation regarding monitoring implementation of the MOU and provided written comments in response to the draft, reproduced in appendix II. In comments on the draft report provided via e-mail by a designated ATF Audit Liaison Officer, DOJ also agreed with this recommendation, noting that ATF officials will work with counterparts at DHS to create a mutually acceptable method to further enhance implementation of the MOU. State did not provide comments on the draft report.

In e-mail comments provided by a designated General Counsel official, ONDCP concurred with our recommendation to establish a more comprehensive set of indicators for the Weapons Chapter of the *Strategy*. Accordingly, ONDCP indicated that it would work with ICE and ATF to develop additional indicators to evaluate their progress. The indicators developed through this collaborative process will be used in future iterations of the *Strategy* beginning with the next report in 2017.

ICE and ATF also provided technical comments which we incorporated throughout the report where appropriate.

We are sending copies of this report to the appropriate congressional committees, the Secretary of Homeland Security; the Attorney General of the United States; the Director of the Office of National Drug Control Policy; the Secretary of State; and other interested parties. In addition, the report is available at no charge on the GAO website at http://www.gao.gov.

0150

If you or your staff have any questions about this report, please contact me at (202) 512-6991 or farbj@gao.gov. Contact points for our Offices of Congressional Relations and Public Affairs may be found on the last page of this report. GAO staff who made key contributions to this report are listed in appendix III.

Jessica Farb
Acting Director, International Affairs and Trade

# Appendix I: Scope and Methodology

To identify data available on the origin of firearms trafficked to Mexico that were seized and traced, we relied primarily on the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) data compiled by its National Tracing Center (NTC).The data provided by NTC were obtained from ATF's Firearms Tracing System, most of which is developed through eTrace submissions. We discussed with cognizant NTC officials the methodology used to collect these data and reviewed supporting agency documentation. Based on these discussions, we determined that NTC data were sufficiently reliable to permit an analysis of where the firearms seized in Mexico that were submitted for tracing had been manufactured and whether they had been imported into the United States before arriving in Mexico. For those firearms that were traced to a retail dealer in the United States before being trafficked to Mexico, NTC data also contained information on the states where they had originated. NTC trace data also contained information allowing identification of the types of firearms that were most commonly seized in Mexico and subsequently traced. We corroborated this information in discussions with U.S. and Mexican law enforcement officials.

Since firearms seized in Mexico are not always submitted for tracing within the same year as they were seized, it was not possible for us to develop data to track trends on the types of firearms seized year to year. Similarly, we were unable to obtain quantitative data from U.S. or Mexican government sources on the users of illicit firearms in Mexico. However, there was consensus among U.S. and Mexican law enforcement officials that most illicit firearms seized in Mexico had been in the possession of organized criminal organizations linked to the drug trade. The involvement of criminal organizations with ties to drug trafficking in the trafficking of illicit firearms into Mexico was confirmed by law enforcement intelligence sources. We learned about the use of firearms parts for the assembly of firearms in Mexico through our interviews with cognizant U.S. and Mexican government and law enforcement officials and through review of ATF-provided documents.

To learn more about U.S. government efforts to combat illicit sales of firearms in the United States and to stem the flow of these firearms across the Southwest border into Mexico, we interviewed cognizant officials from the Department of Justice's (DOJ) ATF, the Department of Homeland Security's (DHS) Immigration and Customs Enforcement (ICE) and Customs and Border Protection (CBP), and the Department of State (State) regarding their relevant efforts. We obtained data from ATF and ICE on funding for their respective efforts to address firearms trafficking to Mexico, and data from ICE on seizures of southbound firearms. To

assess the reliability of the data, we discussed sources and the methodology use to develop the data with agency officials. We determined that the information provided to us was sufficiently reliable to describe agencies' efforts to combat firearms trafficking. We also conducted fieldwork at U.S.-Mexico border crossings at El Paso, Texas, and San Diego, California. In these locations, we interviewed ATF, CBP, and ICE officials responsible for overseeing and implementing efforts to stem the flow of illicit firearms trafficking to Mexico and related law enforcement initiatives.

We reviewed and analyzed DOJ and DHS documents relevant to U.S. government efforts and collaboration to address arms trafficking to Mexico, including funding data provided to us by ATF and ICE, the 2009 memorandum of understanding (MOU) between ICE and ATF, data from ICE on seizures of firearms destined for Mexico, data from ATF and ICE on efforts to investigate and prosecute cases involving arms trafficking to Mexico, and agency reports and assessments related to the issue. We also reviewed relevant prior GAO reports, Congressional Research Service reports and memorandums, and reports from DOJ's Office of Inspector General related to ATF's efforts to enforce federal firearms laws. We reviewed provisions of federal firearms laws relevant to U.S. government efforts to address firearms trafficking to Mexico, including the Gun Control Act of 1968, the National Firearms Act of 1934, and the Arms Export Control Act of 1976. We did not independently review any Mexican laws for this report.

To determine how well agencies collaborated with Mexican authorities to combat illicit firearms trafficking, we conducted fieldwork in Mexico City, Guadalajara, and border locations in Ciudad Juarez and Tijuana, Mexico. In Mexico, we met with ATF, CBP, ICE, and State officials working on law enforcement issues at the U.S. embassy. We interviewed Mexican government officials engaged in efforts to combat firearms trafficking from the Attorney General's Office (Procuraduría General de la República), the Federal Police (Policía Federal); the Ministry of Public Safety (Secretaría de Seguridad Pública); the Ministry of Defense (Secretaría de la Defensa Nacional); the Mexican National Intelligence Agency (Centro de Investigación y Seguridad Nacional, or CISEN); the Mexican Navy (Secretaría de Marina or Armada de Mexico); Customs (Servicio de Administración Tributaria); the Forensic Science Institute of Jalisco (Instituto Jalisciense de Ciencias Forenses); Attorney General Regional Offices, Federal Police, and State Police in Tijuana and Ciudad Juarez; and the State Attorney General in Guadalajara. Because our fieldwork was limited to selected locations along the Southwest border and in the

interior of Mexico, our observations in these locations are illustrative but are not generalizable and may not be representative of all efforts to address the issue.

To assess the extent to which the *National Southwest Border Counternarcotics Strategy* (*Strategy*) outlines U.S. goals and progress made in efforts to stem firearms trafficking to Mexico, we reviewed the 2011 and 2013 versions of the *Strategy*'s Weapons Chapter and the 2010 implementation guide. We also met with Office of National Drug Control Policy officials responsible for the implementation and monitoring the *Strategy*, as well as with ATF and ICE officials responsible for writing the Weapons Chapter and overseeing implementation and reporting on activities described within their respective agencies.

# Appendix II: Comments from the Department of Homeland Security



**U.S. Department of Homeland Security**
**Washington, DC 20528**

**Homeland Security**

December 9, 2015

Jessica Farb
Acting Director, International Affairs & Trade
U.S. Government Accountability Office
441 G Street, NW
Washington, DC 20548

Re:   Draft Report GAO-16-223, "FIREARMS TRAFFICKING:  U.S. Efforts to
      Combat Firearms Trafficking to Mexico Have Improved, but Some Collaboration
      Challenges Remain"

Dear Ms. Farb:

Thank you for the opportunity to review and comment on this draft report.  The U.S.
Department of Homeland Security (DHS) appreciates the U.S. Government
Accountability Office's (GAO) work in planning and conducting its review and issuing
this report.

The Department welcomes GAO's positive recognition that the U.S. Immigration and
Customs Enforcement (ICE) Homeland Security Investigations (HSI) efforts to combat
firearms trafficking to Mexico.  As the primary federal law enforcement agency
responsible for investigating international smuggling operations and enforcing U.S.
export laws, HSI is committed to combating illegal firearms, ammunition and explosives
smuggling activities that fuel violence both domestically and abroad.  HSI fulfills this
commitment by relying on its extensive legal authorities and unique expertise in
conducting illegal export and contraband smuggling investigations.

HSI firearms, ammunition, and explosives smuggling investigations have resulted in
unprecedented bi-lateral interdictions, investigations and information-sharing activities
that identify, disrupt, and dismantle transnational criminal networks operating within the
United States, Mexico, Canada, Central America, the Caribbean, and around the World.

HSI and its law enforcement partners target the illegal movement of U.S. origin firearms,
ammunition, and explosive weapons with the ultimate goal of preventing the procurement
of these items by drug cartels, terrorists, human rights violators, foreign adversaries, and
other transnational criminal organizations and individuals that utilize these weapons to
facilitate criminal activity and commit acts of violence.  HSI's investigative strategy
includes the identification and prosecution of criminal networks and individuals

responsible for the acquisition and movement of firearms and other dangerous weapons from the United States, as well as the seizure and forfeiture of money and valuable property derived from or used to facilitate this criminal activity.

The draft report contained one recommendation to DHS with which the Department concurs. Specifically, GAO recommended that the U.S. Attorney General and the Secretary of Homeland Security:

**Recommendation 1:** Convene cognizant officials from ATF [Bureau of Alcohol, Tobacco, Firearms and Explosives] and ICE to institute a mechanism to regularly monitor the implementation of the MOU [Memorandum of Understanding] and inform agency management of actions that may be needed to enhance collaboration and ensure effective information sharing.

**Response:** Concur. ICE and ATF will coordinate on efforts to institute an oversight mechanism to regularly monitor the implementation of the MOU between the two agencies. ICE HSI has already begun preliminary discussions with counterparts in ATF to create such a mechanism. The goal is to better inform agency management of actions that may be needed to enhance collaboration and ensure effective information sharing, as appropriate. Estimated Completion Date: December 31, 2016.

Again, thank you for the opportunity to review and comment on this draft report. Technical comments were previously provided under separate cover. Please feel free to contact me if you have any questions. We look forward to working with you in the future.

Sincerely,

Jim H. Crumpacker, CIA, CFE
Director
Departmental GAO-OIG Liaison Office

2

# Appendix III: GAO Contact and Staff Acknowledgments

| | |
|---|---|
| **GAO Contact** | Jessica Farb, (202) 202-512-6991 or farbj@gao.gov |
| **Staff Acknowledgments** | In addition to the contact named above, Charles Johnson (Director), Juan Gobel (Assistant Director), Francisco Enriquez (Analyst-in-Charge), Danny Baez, and Julia Jebo-Grant made key contributions to this report. Ashley Alley, Karen Deans, Justin Fisher, and Oziel Trevino provided additional assistance. |

| GAO's Mission | The Government Accountability Office, the audit, evaluation, and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
|---|---|
| Obtaining Copies of GAO Reports and Testimony | The fastest and easiest way to obtain copies of GAO documents at no cost is through GAO's website (http://www.gao.gov). Each weekday afternoon, GAO posts on its website newly released reports, testimony, and correspondence. To have GAO e-mail you a list of newly posted products, go to http://www.gao.gov and select "E-mail Updates." |
| Order by Phone | The price of each GAO publication reflects GAO's actual cost of production and distribution and depends on the number of pages in the publication and whether the publication is printed in color or black and white. Pricing and ordering information is posted on GAO's website, http://www.gao.gov/ordering.htm.<br><br>Place orders by calling (202) 512-6000, toll free (866) 801-7077, or TDD (202) 512-2537.<br><br>Orders may be paid for using American Express, Discover Card, MasterCard, Visa, check, or money order. Call for additional information. |
| Connect with GAO | Connect with GAO on Facebook, Flickr, Twitter, and YouTube.<br>Subscribe to our RSS Feeds or E-mail Updates.<br>Listen to our Podcasts and read The Watchblog.<br>Visit GAO on the web at www.gao.gov. |
| To Report Fraud, Waste, and Abuse in Federal Programs | Contact:<br><br>Website: http://www.gao.gov/fraudnet/fraudnet.htm<br>E-mail: fraudnet@gao.gov<br>Automated answering system: (800) 424-5454 or (202) 512-7470 |
| Congressional Relations | Katherine Siggerud, Managing Director, siggerudk@gao.gov, (202) 512-4400, U.S. Government Accountability Office, 441 G Street NW, Room 7125, Washington, DC 20548 |
| Public Affairs | Chuck Young, Managing Director, youngc1@gao.gov, (202) 512-4800 U.S. Government Accountability Office, 441 G Street NW, Room 7149 Washington, DC 20548 |



Please Print on Recycled Paper.

# EXHIBIT 10

U.S. Department of Justice
Office of Justice Programs



## Bureau of Justice Statistics
# Special Report

November 2001, NCJ 189369

*Survey of Inmates in State and Federal Correctional Facilities*

# Firearm Use by Offenders

By Caroline Wolf Harlow, Ph.D.
BJS Statistician

Approximately 203,300 prisoners serving a sentence in a State or Federal prison in 1997 were armed when they committed the crime for which they were serving time. An estimated 18% of State prison inmates and 15% of Federal inmates reported using, carrying, or possessing a firearm during the crime for which they were sentenced. In 1991, 16% of State inmates and 12% of Federal inmates said they were armed at the time of their offense.

Among all inmates in 1997, 9% of those in State prisons and 2% of those in Federal prisons said they fired a gun while committing their current offense. Of violent offenders, 18% of State inmates and 9% of Federal inmates discharged a firearm. Less than 2% of inmates serving time for a drug, property, or public-order offense fired a gun during the crime that resulted in their prison sentence.

Among prisoners who carried a firearm during the offense for which they were serving time in 1997, 14% had bought or traded for the gun from a store, pawnshop, flea market, or gun show. The 1997 percentage who had acquired their firearm at a retail outlet represented a significant drop from 21% in 1991. The percentage of inmates receiving their gun from family or friends rose from 34% in 1991 to 40% in 1997.

## Highlights

| Type of firearm | Percent of prison inmates | |
|---|---|---|
| | State | Federal |
| Total | 18.4% | 14.8% |
| Handgun | 15.3 | 12.8 |
| Rifle | 1.3 | 1.3 |
| Shotgun | 2.4 | 2.0 |

| Characteristic of inmates who carried firearms | Percent of prison Inmates possessing a firearm | |
|---|---|---|
| Offense | State | Federal |
| Violent | 30.2% | 35.4% |
| Property | 3.1 | 2.9 |
| Drug | 8.1 | 8.7 |
| Public-order | 19.1 | 27.3 |
| *Gender* | | |
| Male | 19.1% | 15.5% |
| Female | 7.3 | 6.2 |
| *Age* | | |
| 24 or younger | 29.4% | 19.1% |
| 25-34 | 16.5 | 15.5 |
| 35 or older | 14.8 | 13.6 |
| *Criminal history* | | |
| First-time offender | 22.3% | 9.5% |
| Recidivist | 17.2 | 18.4 |

| Source of gun | Percent of State inmates possessing a firearm | |
|---|---|---|
| | 1997 | 1991 |
| Total | 100.0% | 100.0% |
| Purchased from – | 13.9 | 20.8 |
| Retail store | 8.3 | 14.7 |
| Pawnshop | 3.8 | 4.2 |
| Flea market | 1.0 | 1.3 |
| Gun show | 0.7 | 0.6 |
| Friends or family | 39.6 | 33.8 |
| Street/illegal source | 39.2 | 40.8 |

| Use of firearm | Percent of prison inmates possessing a firearm | |
|---|---|---|
| | State | Federal |
| Total | 100.0% | 100.0% |
| Fired | 49.1 | 12.8 |
| Killed/injured victim | 22.8 | 5.0 |
| Other | 26.3 | 7.8 |
| Brandished to – | 73.2 | 46.2 |
| Scare someone | 48.6 | 29.3 |
| Defend self | 41.1 | 24.9 |

• During the offense that brought them to prison, 15% of State inmates and 13% of Federal inmates carried a handgun; about 2% had a military-style semiautomatic gun or machine gun.

• Among inmates in prison for homicide, a sexual assault, robbery, assault or other violent crime, 30% of State inmates and 35% of Federal offenders carried a firearm when committing the crime. Almost a fourth of State inmates and almost a third of Federal inmates serving a sentence for a violent crime had carried a handgun during the offense.

• 29% of State inmates under age 25 at the time of the survey were carrying a gun when they committed their current offense compared to 15% of those 35 or older.

• In 1997 among State inmates possessing a gun, fewer than 2% bought their firearm at a flea market or gun show, about 12% from a retail store or pawnshop, and 80% from family, friends, a street buy, or an illegal source.

• On average, State inmates possessing a firearm received sentences of 18 years, while those without a weapon had an average sentence of 12 years.

• Among prisoners carrying a firearm during their crime, 40% of State inmates and 56% of Federal inmates received a sentence enhancement because of the firearm.

0160

Data for this report are based primarily on personal interviews with large nationally representative samples of State and Federal prison inmates.  In the 1997 and 1991 Surveys of Inmates in State and Federal Correctional Facilities, inmates were questioned about any firearms they may have used when committing a crime and asked to specify the type of weapon, its source, and its use in committing crimes.  In addition, inmates were queried about the types of current and past offenses for which they were sentenced, including any weapons offenses.

**Almost a fifth of prison inmates carried a gun during their crime**

An estimated 18% of State prison inmates and 15% of Federal inmates reported that they used, carried, or possessed a firearm when they committed the crime for which they were serving a sentence to prison (table 1).[1]

When asked if they had ever been armed while committing a crime, about a quarter of State prison inmates and a fifth of Federal inmates reported that they had carried a gun while committing at least one crime.

Almost half of both State and Federal inmates said that they had owned or possessed a firearm at some time in their lives.  Equivalent measures for lifetime gun ownership among adults in the general population are difficult to find.  Personal or telephone interviews and polls provide estimates for persons in the general population owning a firearm at the time of the survey.  An estimated 25% to 29% of the adult population reported currently owning a firearm when surveyed.[2]  According to public opinion polls, members of 4 in every 10 U.S. households have access to a gun.

**Less than 2% of inmates reported carrying a fully automatic or military-style semiautomatic firearm**

Fewer than 1 in 50 State and Federal inmates used, carried, or possessed a military-style semiautomatic gun or a fully automatic gun during their current offense (table 2).  These guns, as used in the questions and definitions for the personal interviews with prison inmates, include the following:

• *military-style semiautomatic pistol* — similar to a conventional semiautomatic pistol except that the magazine or clip is visible[3]

• *military-style semiautomatic rifle* — a semiautomatic rifle with military features such as a pistol grip, folding stock, flash suppressor, or bayonet mount

• *military-style semiautomatic shotgun* — a semiautomatic shotgun with military features such as a pistol grip, folding stock, flash suppressor, or bayonet mount

• *machine gun* — a fully automatic gun which, if the trigger is held down, will fire rapidly and continuously.

[3]The survey interview included in the operational definition of a military-style semiautomatic pistol the phrase "can hold more than 19 bullets."

Some examples of these firearms are the UZI, TEC-9, and MAC10 for handguns; the AR-15 and AK-47 for rifles; and the "Street Sweeper" for shotguns.  Possession of these models meeting criteria specified in Federal statutes can be unlawful.

To be understood by inmate respondents who were asked about their gun use, the questions and definitions in the survey reflect terminology commonly used by prisoners to describe types of weapons.  If questioned by respondents, interviewers read to them the definitions included on pages 14 and 15 of this report.  Of necessity, this language is similar in concept but may differ in wording from technical descriptions in Federal statutes pertaining to firearms.

The Violent Crime Control and Law Enforcement Act of 1994 made it unlawful, with certain exceptions, to manufacture, transfer, or possess military-style semiautomatic weapons,

**Table 1.  Possession of firearms by State and Federal prison inmates, by type of firearm, 1997**

| | Percent of prison inmates — | | | | | |
| | Armed during current offense | | Ever armed while committing offense | | Ever used or possessed firearm | |
| Type of firearm | State | Federal | State | Federal | State | Federal |
|---|---|---|---|---|---|---|
| Total | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Firearm | 18.4% | 14.8% | 25.1% | 20.0% | 46.9% | 48.9% |
| Handgun | 15.3 | 12.8 | 21.3 | 17.2 | 36.0 | 38.6 |
| Rifle | 1.3 | 1.3 | 2.0 | 1.9 | 12.4 | 14.6 |
| Shotgun | 2.4 | 2.0 | 3.5 | 3.0 | 13.7 | 15.6 |
| Other | 0.5 | 0.6 | 1.1 | 0.9 | 2.7 | 2.3 |
| No firearm | 81.6% | 85.2% | 74.9% | 80.0% | 53.1% | 51.1% |

Note: Detail do not add to total because inmates may have had more than one firearm.

**Table 2.  Possession of firearms by State and Federal prison inmates, by whether the firearm was single shot, conventional semiautomatic, or military-style semiautomatic or fully automatic, 1997**

| | Percent of prison inmates — | | | | | |
| | Armed during current offense | | Ever armed while committing offense | | Ever used or possessed firearm | |
| Specific type of firearm | State | Federal | State | Federal | State | Federal |
|---|---|---|---|---|---|---|
| Single shot | 9.9% | 7.3% | 14.2% | 10.6% | 31.0% | 31.4% |
| Conventional semiautomatic | 7.9 | 7.7 | 10.9 | 9.8 | 22.6 | 26.0 |
| Military-style semiautomatic or fully automatic | 1.5 | 1.7 | 2.5 | 2.3 | 5.6 | 5.6 |

Note: Columns do not add to total percent with firearms because inmates may have possessed more than one firearm. See text above and pages 14 and 15 for definitions.

[1]For definitions of firearms, see *Methodology* on pages 14 and 15.
[2]Phillip J. Cook and Jens Ludwig, *Guns in America: Summary Report*, Washington, DC, Police Foundation, 1996, table 2.3.

2   *Firearm Use by Offenders*

if not lawfully possessed on September 13, 1994.[5]

**Of inmates who carried a firearm during their offense, 8 in 10 had a handgun**

Inmates reported that a handgun was their preferred firearm; of those carrying a firearm, 83% of State inmates and 87% of Federal inmates said that they carried a handgun during the offense for which they were serving their longest sentence.  About 8% of State inmates who had carried a firearm during the commission of their crime reported having a military-style semiautomatic (7%) or fully automatic (2%) firearm, with some carrying both.

| Type of firearm | Percent of prison inmates carrying a firearm during current offense | |
|---|---|---|
| | State | Federal |
| Handgun | 83.2% | 86.7% |
| Rifle | 7.3 | 8.9 |
| Shotgun | 13.1 | 13.7 |
| Single shot | 53.9% | 49.2% |
| Conventional semiautomatic | 43.2 | 51.8 |
| Military-style semiautomatic | 6.8 | 9.3 |
| Fully automatic | 2.4 | 3.8 |
| Number of inmates | 190,383 | 12,936 |

Note: Inmates could report carrying more than one type of firearm. For definitions of weapon categories, see pages 2, 14, and 15.

**Firearm use during crimes increased from 1991 to 1997**

Over the 6 years between surveys of inmates, 1991-97, possession of a firearm during a crime increased from 16% to 18% of State inmates and from 12% to 15% of Federal inmates (table 3).  Because of the growth in the prison population, the estimated number of inmates carrying a firearm increased dramatically — from 114,100 in 1991 to 190,400 in 1997 in State prisons and from 6,300 in 1991 to 12,900 in 1997 in Federal prisons.  These estimates were based on inmates who reported carrying a firearm during the offense for which they received their longest sentence.

[5]See P.L. 103-22 and *Commerce in Firearms in the United States*, Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, February 2000, page C-5.

### Table 3. Possession of firearms, by type of offense, by State and Federal prison inmates, 1997 and 1991

| | Prison inmates | | | |
|---|---|---|---|---|
| | 1997 | | 1991 | |
| Current offense | Number | Percent who possessed a firearm during current offense | Number | Percent who possessed a firearm during current offense |
| **State** | | | | |
| All inmates | 1,037,241 | 18.4% | 700,050 | 16.3% |
| Violent offense | 483,713 | 30.2 | 323,653 | 29.1 |
| Property offense | 227,726 | 3.1 | 171,749 | 3.2 |
| Drug offense | 213,974 | 8.1 | 148,743 | 4.1 |
| Public-order offense | 99,396 | 19.1 | 47,001 | 16.1 |
| **Federal** | | | | |
| All inmates | 87,466 | 14.8% | 53,348 | 11.8% |
| Violent offense | 12,604 | 35.4 | 9,113 | 38.0 |
| Property offense | 5,811 | 2.9 | 7,011 | 2.1 |
| Drug offense | 54,561 | 8.7 | 30,788 | 3.9 |
| Public-order offense | 12,708 | 27.3 | 4,964 | 28.5 |

### Table 4. Firearm possession during current offense, by type of offense, for State and Federal prison inmates, 1997

| | Prison inmates | | | |
|---|---|---|---|---|
| | State | | Federal | |
| Current offense | Number | Percent who possessed a firearm during current offense | Number | Percent who possessed a firearm during current offense |
| Violent offense | 483,713 | 30.2% | 12,604 | 35.4% |
| Homicide | 135,493 | 42.9 | 1,273 | 39.3 |
| Sexual assault | 87,687 | 2.9 | 679 | 0.0 |
| Robbery | 145,318 | 34.5 | 8,554 | 40.3 |
| Assault | 95,756 | 31.2 | 1,108 | 26.0 |
| Other violent | 19,459 | 27.1 | 989 | 22.4 |
| Property offense | 227,726 | 3.1% | 5,811 | 2.9% |
| Burglary | 111,198 | 4.0 | 279 | 10.1 |
| Other property | 116,528 | 2.3 | 5,531 | 2.5 |
| Drug offense | 213,974 | 8.1% | 54,561 | 8.7% |
| Possession | 91,511 | 7.8 | 9,959 | 7.0 |
| Trafficking | 116,578 | 8.6 | 39,769 | 9.1 |
| Other drug | 5,885 | 3.1 | 4,834 | 8.7 |
| Public-order offense | 99,396 | 19.1% | 12,708 | 27.3% |
| Weapons | 25,257 | 64.9 | 5,905 | 51.9 |
| Other public-order | 74,139 | 3.5 | 6,803 | 5.9 |

**8% of drug offenders and 3% of property offenders armed while committing their crimes**

Fewer than 1 in 10 offenders serving a sentence for selling or carrying illegal drugs and 1 in 30 inmates in prison for a property crime — burglary, larceny, fraud, or destruction of property — had a firearm with them while committing their current offense (table 4).

Inmates who had been sentenced for violent crimes used firearms more often than other prisoners.  They were more likely than property, drug, or public-order offenders to have used or possessed a gun during their crime. An estimated 30% of violent offenders in State prisons and 35% in Federal prisons had a firearm at the time of the offense.

Offenders sentenced for homicide or for robbery reported the most extensive use of firearms. Among inmates sentenced for homicide, about 43% in State prisons and 39% in Federal prisons said they were carrying a firearm when they committed the offense.  About 35% serving time for robbery in State prisons and 40% in Federal prison had a gun.

**Table 5.  Possession of a firearm during current offense, by selected characteristics for State and Federal prison inmates, 1997**

| Selected characteristic | Prison inmates | | | |
| | State | | Federal | |
| | Number | Percent who possessed a firearm during current offense | Number | Percent who possessed a firearm during current offense |
| --- | --- | --- | --- | --- |
| **Gender** | | | | |
| Male | 972,572 | 19.1% | 81,102 | 15.5% |
| Female | 64,669 | 7.3 | 6,364 | 6.2 |
| | | | | |
| **Race/Hispanic origin** | | | | |
| White | 346,188 | 14.8% | 25,977 | 16.7% |
| Black | 482,302 | 21.1 | 33,100 | 17.7 |
| Hispanic | 176,089 | 17.6 | 24,040 | 8.1 |
| Other | 32,662 | 19.3 | 4,349 | 17.9 |
| | | | | |
| **Age** | | | | |
| 20 or younger | 61,663 | 35.5% | 935 | 23.0% |
| 21-24 | 143,533 | 26.8 | 6,865 | 18.6 |
| 25-34 | 396,166 | 16.5 | 31,970 | 15.5 |
| 35-44 | 305,765 | 13.3 | 26,636 | 12.8 |
| 45-54 | 100,133 | 17.4 | 14,393 | 15.3 |
| 55 or older | 29,980 | 21.7 | 6,667 | 13.0 |
| | | | | |
| **Educational attainment** | | | | |
| Some high school or less | 445,479 | 16.8% | 25,642 | 13.9% |
| GED | 260,743 | 23.6 | 17,150 | 19.2 |
| High school diploma | 190,805 | 16.7 | 21,292 | 14.5 |
| Some college | 110,122 | 16.5 | 15,233 | 15.1 |
| College graduate | 27,649 | 12.1 | 7,963 | 8.3 |
| | | | | |
| **Citizenship** | | | | |
| United States | 983,876 | 18.5% | 71,307 | 16.9% |
| Latin America | 47,257 | 14.5 | 14,638 | 5.7 |
| Other | 4,609 | 22.0 | 1,376 | 2.4 |
| | | | | |
| **Military service** | | | | |
| Served | 129,913 | 16.4% | 12,746 | 17.2% |
| Did not serve | 907,142 | 18.6 | 74,676 | 14.4 |

## Male inmates and young inmates carried firearms

Male State and Federal offenders were more likely than their female counterparts to have carried a firearm when committing their offense.  About 19% of men in State prison and 16% in Federal prison reported using or possessing a firearm when committing their most serious offense, compared to 7% of women in State prison and 6% in Federal prison (table 5).

An estimated 21% of black non-Hispanic inmates in State prison, 18% of Hispanics, and 15% of white non-Hispanics said they had a gun with them while committing their most serious offense.  About 18% of black and white inmates in Federal facilities and 8% of Hispanics had carried a firearm.

Young State inmates were more likely than older inmates to use firearms.  About 29% of inmates under the age of 25 at the time of the survey were carrying a gun when they committed their current offense, compared to 15% of those 35 or older.  Among Federal inmates, about 19% under age 25 and 14% age 35 or older said they had a gun with them.

## Weapon offenses and offenders

Weapon offenses include unlawful distribution, sale, manufacture, alteration, transport, possession, or use of a deadly or dangerous weapon or accessory.  In 1998 an estimated 195,000 persons were arrested by State or local law enforcement or referred to a U.S. attorney for prosecution for a weapon offense — counting only the most important offense and no secondary offenses.  Over 35,000 persons were convicted of a weapon offense.  About 49,000 persons were in a local jail or State or Federal prison for a weapon offense in 1998.  An additional 100,000 were serving a sentence in the community on probation, parole, or supervised release.

An estimated 12% of State prison inmates and 19% of Federal inmates were either currently serving a sentence for a weapon offense or had been sentenced for a weapon offense in the past.

**Weapons as the most serious offense or charge in the criminal justice system, 1998**

| | Number | Percent of total |
| --- | --- | --- |
| **State/local jurisdictions** | | |
| Arrested | 190,600 | 1.3% |
| Defendants at initial filing | -- | 2.8 |
| Convicted of a felony | 31,904 | 3.4 |
| In local jails | 13,630 | 2.3 |
| In State prisons | 26,730 | 2.4 |
| On probation/parole | 100,440 | 2.3 |
| **Federal jurisdiction** | | |
| Received by U.S. attorneys as suspects | 4,907 | 4.3% |
| Prosecuted | 3,347 | 5.1 |
| Convicted | 3,413 | 5.6 |
| In Federal prison | 8,742 | 8.0 |
| On probation/supervised release/parole | 4,038 | 4.4 |

Note:  The weapon offense is the offenders' most serious offense.  Statistics on persons in Federal jurisdiction are for fiscal year 1998.
--Not available.

Sources:  Data on weapon offenders come from the FBI's *Crime in the United States, 1998,* table 29; from BJS' *Compendium of Federal Justice Statistics, 1998;* from BJS' Survey of Inmates in Local Jails, 1996, and Survey of Inmates in State and Federal Correctional Facilities, 1997, and from the following BJS reports available through <www.ojp.usdoj. gov/pubalp2.htm>: *Felony Defendants in Large Urban Counties, 1998; Felony Sentences in the United States, 1998; Prisoners in 1999;* and the press release for probation and parole surveys 2000.

**Current and past sentences for a weapon offense, for State and Federal prison inmates, 1997**

| Any current or past offense | Percent of prison inmates | |
| | State | Federal |
| --- | --- | --- |
| Total | 100.0% | 100.0% |
| | | |
| Current or past weapon offense | 12.2% | 18.6% |
| Current and past weapon offenses | 1.3 | 2.2 |
| Current weapon/past other offenses | 4.1 | 8.5 |
| Current weapon/no past offenses | 1.1 | 2.7 |
| Current other/past weapon offenses | 5.8 | 5.1 |
| | | |
| Other current and/or past offenses | 87.8% | 81.4% |

**Table 6. State and Federal prison inmates possessing a firearm during their most serious offense, by characteristics of their family and background, 1997**

| | Prison inmates | | | |
| | State | | Federal | |
| Inmates' family of origin and other background characteristics | Number | Percent who possessed a firearm during current offense | Number | Percent who possessed a firearm during current offense |
|---|---|---|---|---|
| Lived while growing up | | | | |
|   Both parents | 455,313 | 16.3% | 47,279 | 13.2% |
|   Single parent | 438,741 | 19.7 | 30,146 | 16.2 |
|   Other | 137,253 | 20.7 | 9,452 | 18.8 |
| | | | | |
| Parent ever incarcerated | 188,166 | 22.7% | 9,843 | 18.0% |
| Parent never incarcerated | 833,005 | 17.4 | 76,382 | 14.5 |
| | | | | |
| Parent received welfare | 374,340 | 20.8% | 20,328 | 20.0% |
| Parent did not receive welfare | 634,795 | 17.0 | 65,146 | 13.2 |
| | | | | |
| Inmate lived in public housing | 186,847 | 21.1% | 11,807 | 17.9% |
| Inmate did not live in public housing | 835,540 | 17.8 | 74,656 | 14.5 |
| | | | | |
| Parent abused alcohol or drugs | 327,404 | 18.5% | 18,041 | 17.6% |
|   Alcohol | 241,521 | 16.6 | 14,541 | 17.8 |
|   Drugs | 18,618 | 27.5 | 735 | 17.7 |
|   Both | 66,986 | 22.9 | 2,752 | 17.0 |
| Parent did not abuse alcohol or drugs | 698,716 | 18.3 | 68,424 | 14.1 |
| | | | | |
| Peers engaged in illegal activity while growing up | 780,234 | 19.6% | 49,941 | 19.0% |
|   Used drugs | 688,497 | 19.7 | 42,764 | 18.5 |
|   Damaged/stole/sold property* | 616,874 | 21.1 | 33,793 | 22.6 |
|   Drug trafficking | 395,042 | 24.3 | 20,731 | 22.4 |
|   Robbery | 203,745 | 30.4 | 8,400 | 32.5 |
| Peers did not engage in any illegal activity | 249,739 | 14.6 | 36,718 | 9.3 |

*Includes vandalism, shoplifting, stealing motor vehicles or parts, selling stolen property, and breaking and entering.

**Background characteristics account for relatively small differences in firearm use**

When inmates were interviewed for the 1997 Surveys, they were asked about their family background and experiences they had when growing up. Characteristics about which the inmates reported include parental upbringing, parental incarceration, welfare assistance to their family, parental use of alcohol and drugs, and peer participation in criminal behavior.

Inmates who grew up living with both parents were less likely to be using or carrying a firearm than those who grew up primarily living with one parent, grandparents, other relatives, friends, or a foster family. An estimated 16% of State inmates and 13% of Federal inmates living with both parents had a gun with them, compared to 20% of State inmates and 17% of Federal inmates living in some other arrangement while growing up (table 6).

A higher percentage of State inmates with a parent who had served a sentence to incarceration carried a gun (23%) than those whose parents had never been in prison or jail (17%). For Federal inmates, 18% of inmates who had incarcerated parents and 15% of those who did not carried a firearm.

Inmates who lived in families receiving welfare or living in publicly-subsidized housing while growing up were more likely than those who did not live under these types of government programs to be carrying a weapon. About 1 in 5 inmates whose family received welfare or who lived in publicly financed housing carried a firearm. About 1 in 6 State inmates and 1 in 7 Federal inmates whose parents were not receiving welfare benefits or living in publicly-financed housing had a gun.

A quarter of State inmates who said they had a parent who had abused drugs reported that they were carrying a gun while committing their current offense. In contrast, less than a fifth of those whose parents did not abuse substances had a firearm.

About 20% of State and Federal inmates whose friends while growing up used or traded drugs, stole, destroyed or damaged property, broke or entered private property, or robbed someone reported that they had a firearm with them when they committed their controlling offense. An estimated 15% of State inmates and 9% of Federal inmates who did not have friends involved in illegal activities

**Inmates who had ever been shot at**

As one measure of violence in inmates' lives, inmates were asked if they had ever been shot at. This experience could have been at any time in their lives, including when they were committing the crime for which they were in prison. About half of State prisoners reported that in the past they had been shot at by someone, and more than a fifth had actually been wounded by gunfire. A quarter of State and Federal inmates who had been shot at were carrying a firearm during their current offense, compared to a tenth of those who had never been shot at.

| | State prison inmates | | Federal prison inmates | |
| | Number | Percent carrying a firearm | Number | Percent carrying a firearm |
|---|---|---|---|---|
| Ever shot at with a gun | 516,194 | 24.6% | 30,064 | 24.0% |
|   Wounded | 213,429 | 26.7 | 12,933 | 24.4 |
|   Shot at but not wounded | 302,765 | 23.1 | 17,131 | 23.6 |
| Never shot at | 514,676 | 12.1 | 56,679 | 10.1 |

*Firearm Use by Offenders* 5

used or possessed a firearm during their current offense.

**Violent recidivists were as likely as first time violent offenders to have carried a gun**

Recidivism does not appear to be related to whether inmates were carrying guns when the type of current offense is taken into account. Violent offenders who had served a prior sentence and first time violent offenders were about equally likely to be carrying a firearm when committing their current offense — about 30% of violent offenders in State prisons carried a firearm (table 7). About a third of violent Federal offenders, whether recidivist or first time, carried a firearm.

Less than 10% of both first time and repeat State offenders serving time for property, drug, and public-order offenses carried a gun. Drug offenders who were recidivists were more likely to be carrying a firearm than first-time drug offenders (9% versus 6% of State inmates and 11% versus 5% of Federal inmates).

Inmates who had served prior sentences as a juvenile were more likely to have had a gun than those who did not have a juvenile record. For State offenders 22% who had a juvenile record and 13% with only an adult record had a firearm while committing their current offense; for Federal offenders 27% with a juvenile record and 14% with only an adult record possessed a firearm.

**Inmates' retail purchase of firearms fell between 1991 and 1997**

In 1997, 14% of State inmates who had used or possessed a firearm during their current offense bought or traded for it from a retail store, pawnshop, flea market, or gun show (table 8). Nearly 40% of State inmates carrying a firearm obtained the weapon from family or friends. About 3 in 10 received the weapon from drug dealers, off the street, or through the black market. Another 1 in 10 obtained their gun during a robbery, burglary, or other type of theft.

From 1991 to 1997 the percent of State inmates with guns who acquired them at a retail outlet fell from 21% to 14%. At the same time the percentage reporting that they used firearms furnished by family or friends increased from 34% to 40%. Between the two surveys the Brady Handgun Violence Prevention Act of 1993 was enacted. The act requires background checks for persons purchasing firearms from federally licensed firearm dealers. Changes in how inmates obtained firearms, when the two surveys are compared, may or may not reflect the requirements in the Brady Act. Inmates may have procured their firearm or entered prison before the Brady Act became effective in 1994.

**Table 8. Source of firearms possessed during the current offense of State prison inmates, 1997 and 1991**

| Source of firearms | Percent of State prison inmates who possessed a firearm during current offense | |
|---|---|---|
| | 1997 | 1991 |
| Total | 100.0% | 100.0% |
| | | |
| Purchased or traded from retail outlet | 13.9% | 20.8% |
| Retail store | 8.3 | 14.7 |
| Pawnshop | 3.8 | 4.2 |
| Flea market | 1.0 | 1.3 |
| Gun show | 0.7 | 0.6 |
| | | |
| Family or friend | 39.6% | 33.8% |
| Purchased or traded | 12.8 | 13.5 |
| Rented or borrowed | 18.5 | 10.1 |
| Other | 8.3 | 10.2 |
| | | |
| Street/illegal source | 39.2% | 40.8% |
| Theft or burglary | 9.9 | 10.5 |
| Drug dealer/off street | 20.8 | 22.5 |
| Fence/black market | 8.4 | 7.8 |
| | | |
| Other | 7.4% | 4.6% |

**Table 7. Possession of firearm during current offense, by criminal history, prior sentences, and criminal justice status at arrest, for State and Federal prison inmates, 1997**

| | Prison inmates | | | |
|---|---|---|---|---|
| | State | | Federal | |
| Criminal justice characteristic | Number | Percent who possessed a firearm during current offense | Number | Percent who possessed a firearm during current offense |
| **Criminal history** | | | | |
| No previous sentence | 247,287 | 22.3% | 33,731 | 9.5% |
| Current offense | | | | |
| Violent | 155,195 | 31.1 | 3,952 | 31.8 |
| Drug | 44,744 | 5.8 | 20,425 | 4.8 |
| Other | 47,347 | 9.1 | 9,354 | 10.2 |
| | | | | |
| Recidivists | 783,178 | 17.2 | 52,619 | 18.4 |
| Current offense | | | | |
| Violent | 360,564 | 28.4 | 9,866 | 38.4 |
| Drug | 177,922 | 9.0 | 32,706 | 11.2 |
| Other | 244,692 | 6.5 | 10,047 | 22.3 |
| | | | | |
| **Prior sentences** | | | | |
| Juvenile only | 66,742 | 34.4% | 2,835 | 25.8% |
| Adult only | 404,646 | 12.7 | 34,294 | 13.5 |
| Both juvenile and adult | 309,002 | 19.4 | 15,897 | 27.3 |
| | | | | |
| **Criminal justice status at arrest** | | | | |
| New court commitment | 543,238 | 21.8% | 63,320 | 13.7% |
| On status | 489,320 | 14.6 | 23,628 | 17.8 |
| Probation | 229,952 | 15.0 | 11,644 | 14.0 |
| Parole | 252,355 | 14.1 | 11,736 | 21.3 |
| Escape | 7,013 | 17.9 | 248 | 32.9 |

## Victims of violent offenders possessing firearms

About 30% of State inmates and 35% of Federal inmates sentenced for a violent offense — homicide, sexual assault, robbery, or assault — used or possessed a firearm when committing their current offense.   A quarter of violent State prisoners and almost a third of Federal prisoners carried a handgun.  Fewer than 1 in 10, however, carried a long gun — a rifle or shotgun — or a military-style semiautomatic or fully automatic weapon.

Inmates serving time for violent crimes were more likely to use a firearm when their victims were male rather than female, 18 or older rather than under age 18, and strangers, known by sight, or known casually rather than persons the inmates knew well.

• About 40% of violent State offenders who victimized a male had a gun compared to 17% of offenders when the victim was female.

• 39% of violent State inmates with a black victim and 33% of those with a Hispanic victim used a firearm, significantly more than the 25% with a white victim.

### Possession of a firearm, by type of firearm, for State and Federal prison inmates sentenced for a violent offense, 1997

| Type of firearm | Percent of prison inmates who possessed a firearm during current violent offense | |
| --- | --- | --- |
| | State | Federal |
| Total | 100% | 100% |
| **Any firearm** | 30.2% | 35.4% |
| Handgun | 24.7 | 30.4 |
| Rifle | 2.0 | 2.4 |
| Shotgun | 4.1 | 3.6 |
| Other | 0.7 | 1.2 |
| Type of firearm | | |
| Single shot | 17.0% | 18.0% |
| Conventional semiautomatic | 12.1 | 16.3 |
| Military-style semi-automatic or fully automatic | 2.1 | 4.0 |

• Less than 10% of those who victimized persons 17 or younger, compared to over 33% of those who victimized persons 18 or older, possessed a firearm.

• Over a third of violent offenders used guns when their victims were strangers and casual acquaintances, compared to a fifth who used guns against persons they knew.

• 27% of offenders who victimized a current or former spouse, boyfriend, or girlfriend were armed while committing the crime.  About 8% used guns against other relatives, including children, siblings, and other family members.

### Characteristics of victims of violent crime, by whether the State prison inmate possessed a firearm, 1997

| Characteristics of victim | Percent of violent State prison inmates who possessed a firearm during current offense |
| --- | --- |
| Gender | |
| Male | 39.8% |
| Female | 16.8 |
| Race/Hispanic origin | |
| White | 25.4% |
| Black | 38.6 |
| Hispanic | 32.8 |
| Other | 29.1 |
| Age | |
| 17 or younger | 8.2% |
| 18-24 | 40.9 |
| 25-34 | 37.0 |
| 35 or older | 33.8 |
| Relationship to offender | |
| Stranger | 35.6% |
| Known by sight or casually | 36.2 |
| Well known | 20.6 |
|    Intimate* | 27.0 |
|    Other relative | 8.2 |
|    Friend | 26.3 |
|    Other | 23.9 |

*Includes spouse, ex-spouse, boyfriend, girlfriend, ex-boyfriend, and ex-girlfriend.

**Recidivists less likely than first timers to buy their gun from a retail establishment**

Although existence of a prior record did not change inmates' likelihood of having carried a gun while committing their current crime, it did influence where they acquired their gun. Recidivists were less likely than those who were first time offenders to have purchased their gun from a retail store, pawnshop, flea market, or gun show. About a tenth of recidivists and a fifth of first timers purchased their gun from a retail establishment (table 9).

A larger percentage of recidivists than first time offenders obtained their weapon through illegal activities or from the street or a black market source — 42% of recidivists and 31% of first timers.

Recidivists with firearms were as likely as first time offenders to obtain their gun from a family member or friends in 1997— about 40% acquired their guns from either family or friends.

The percentage of inmates who purchased or traded from a retail outlet, such as a store or pawnshop, fell during this period for both those with prior sentences and those without them. For repeat offenders, purchasing from retail fell from 17% to 11%, and for first time offenders from 33% to 20%.

For recidivists the percentage of inmates with firearms who obtained them from family or friends rose from 1991 to 1997 — for recidivists from 33% in 1991 to 39% in 1997 and for first timers from 36% in 1991 to 41% in 1997.

**Table 9. Source of firearms possessed during current offense, by criminal history, for State prison inmates, 1997 and 1991**

| | Percent of State prison inmates possessing a firearm who were — | | | |
| | First timers | | Recidivists | |
| Source of firearms | 1997 | 1991 | 1997 | 1991 |
|---|---|---|---|---|
| Total | 100.0% | 100.0% | 100.0% | 100.0% |
| | | | | |
| Purchased or traded from a retail outlet | 20.1% | 32.9% | 11.4% | 16.8% |
|   Retail store | 14.2 | 25.5 | 6.0 | 11.0 |
|   Pawnshop | 4.2 | 5.4 | 3.7 | 3.9 |
|   Flea market | 0.9 | 1.0 | 1.1 | 1.4 |
|   Gun show | 0.8 | 1.0 | 0.7 | 0.4 |
| | | | | |
| Family or friend | 40.5% | 36.1% | 39.2% | 33.1% |
|   Purchased or traded | 11.0 | 11.5 | 13.5 | 14.0 |
|   Rented or borrowed | 20.0 | 12.9 | 17.9 | 9.3 |
|   Other | 9.5 | 11.6 | 7.8 | 9.9 |
| | | | | |
| Street/illegal source | 30.9% | 26.7% | 42.4% | 45.7% |
|   Theft or burglary | 7.6 | 4.7 | 10.9 | 12.4 |
|   Drug dealer/off street | 15.7 | 14.7 | 22.8 | 25.2 |
|   Fence/black market | 7.6 | 7.3 | 8.8 | 8.1 |
| | | | | |
| Other | 8.5% | 4.4% | 6.9% | 4.3% |
| | | | | |
|   Number of prison inmates | 51,152 | 22,444 | 127,664 | 70,728 |

---

**Victim, police, and inmate reports of gun use during violent crime**

The FBI reports that over two-thirds of homicide victims were killed with a firearm. About 4 in 10 inmates serving a sentence for murder or manslaughter in State and Federal correctional facilities said that they had used a gun in committing the crime.

About 23% of robbery victims and 28% of aggravated assault victims told the National Crime Victimization Survey that the offender used a gun.

**Possession of firearms during violent crime, as reported by victims, police, and prison inmates, 1997**

| Violent crime | Percent of victimizations in the National Crime Victimization Survey | Percent of offenses in the FBI's Supplemental Homicide Reports/ Uniform Crime Reports | Percent of offenders possessing a firearm during a violent crime | |
| | | | Survey of Inmates in State Correctional Facilities | Survey of Inmates in Federal Correctional Facilities |
|---|---|---|---|---|
| Homicide | | 67.8% | 42.9% | 39.3% |
| Sexual assault | 2.4% | | 2.9 | 0.0 |
| Robbery | 23.0 | 39.7 | 34.5 | 40.5 |
| Aggravated assault | 28.4 | 20.0 | 31.2 | 26.0 |

**Table 10. Source of firearms possessed during current offense, by whether the firearm was single shot, conventional semiautomatic, or military-style semiautomatic or fully automatic, for State prison inmates, 1997**

| Source of firearms | Percent of State prison inmates who possessed a firearm | | |
| --- | --- | --- | --- |
| | Military-style semiautomatic or fully automatic | Conventional semiautomatic | Single shot |
| Total | 100.0% | 100.0% | 100.0% |
| | | | |
| Purchased or traded from a retail outlet | 19.3% | 16.5% | 12.2% |
| Retail store | 10.6 | 9.2 | 7.5 |
| Pawnshop | 6.7 | 4.7 | 3.4 |
| Flea market | 0.0 | 1.2 | 0.9 |
| Gun show | 1.9 | 1.4 | 0.4 |
| | | | |
| Family or friend | 25.2% | 35.6% | 43.8% |
| Purchased or traded | 11.1 | 13.0 | 12.7 |
| Rented or borrowed | 10.6 | 15.7 | 21.5 |
| Other | 3.5 | 6.9 | 9.5 |
| | | | |
| Street/illegal sources | 48.5% | 42.1% | 36.4% |
| Theft or burglary | 9.8 | 8.0 | 11.4 |
| Drug dealer/off street | 23.4 | 23.6 | 18.4 |
| Fence/black market | 15.4 | 10.6 | 6.7 |
| | | | |
| Other | 7.0% | 5.8% | 7.6% |
| | | | |
| Number of prison inmates | 14,896 | 79,031 | 96,531 |

Note: See note on table 2 and definitions on page 14.

**Table 11. Source of firearms possessed during current offense, by gender and age, for State prison inmates, 1997**

| Source of firearms | Percent of State prison inmates who possessed a firearm during their current offense, by gender and age | | | | |
| --- | --- | --- | --- | --- | --- |
| | Male | Female | 24 or younger | 25-34 | 35 or older |
| Total | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| | | | | | |
| Purchased or traded from a retail outlet | 13.8% | 16.5% | 6.6% | 12.7% | 21.9% |
| Retail store | 8.3 | 10.6 | 2.6 | 7.0 | 15.0 |
| Pawnshop | 3.8 | 5.5 | 2.9 | 4.0 | 4.5 |
| Flea market | 1.0 | 0.4 | 0.1 | 0.9 | 1.9 |
| Gun show | 0.8 | 0.0 | 0.9 | 0.8 | 0.4 |
| | | | | | |
| Family or friend | 39.4% | 46.4% | 40.1% | 38.9% | 39.8% |
| Purchased or traded | 12.9 | 5.9 | 13.0 | 12.1 | 13.3 |
| Rented or borrowed | 18.3 | 28.4 | 20.3 | 18.8 | 16.6 |
| Other | 8.2 | 12.1 | 6.8 | 8.1 | 9.9 |
| | | | | | |
| Street/illegal sources | 39.4% | 30.5% | 46.8% | 41.2% | 29.9% |
| Theft or burglary | 9.9 | 13.1 | 10.0 | 9.8 | 10.1 |
| Drug dealer/off street | 21.0 | 13.0 | 27.8 | 22.9 | 12.1 |
| Fence/black market | 8.5 | 4.3 | 9.0 | 8.6 | 7.8 |
| | | | | | |
| Other | 7.4% | 6.6% | 6.5% | 7.1% | 8.5% |
| | | | | | |
| Number of prison inmates | 174,488 | 4,421 | 57,194 | 60,818 | 60,897 |

## 1 in 5 military-style semiautomatic or fully automatic guns bought from retail store

About a fifth of inmates with a military-style semiautomatic or fully automatic weapon bought it retail — at a store, flea market, or gun show (table 10). About a sixth of inmates with a conventional semiautomatic weapon and an eighth with a single-shot gun also had made a retail purchase.

While family and friends provided a quarter of military-style semiautomatic or fully automatic firearms, they gave inmates over a third of the conventional semiautomatic weapons and just under half of the single-shot guns.

Almost half of inmates possessing military-style semiautomatic or fully automatic weapons, about two-fifths of those with conventional semiautomatic firearms, and over a third of offenders having single-shot guns had got their firearm in a theft or burglary, or from a drug dealer, fence, or black market.

### Young offenders less likely than older ones to have bought a firearm from a retail source

Young offenders were less likely than older inmates to have bought their gun from a retail outlet (table 11). About 7% of inmates 24 or younger and 22% of those 35 or older obtained their gun from a retail outlet.

About half of inmates who were 24 or younger, compared to less than a third of those 35 or older, acquired their gun through illegal activities, a drug dealer, or a black market.

Among those possessing a firearm during their current offense, an estimated 17% of women and 14% of men purchased their guns from a retail establishment. About 3 in 10 women offenders and 4 in 10 male inmates acquired their firearms from a theft, burglary, drug dealer, fence, or black market. Family and friends provided guns to about 46% of female inmates with firearms and 39% of male inmates.

## Federal law may have disqualified over 8 in 10 inmates from buying a firearm

The Gun Control Act of 1968, as amended, and other Federal statutes list conditions which disqualify an individual from possessing a firearm or purchasing it from a licensed dealer. Some of these conditions include a prior felony conviction or indictment, current illegal drug use or addiction, dishonorable discharge from the Armed Forces, or being a fugitive from justice, a mental incompetent, or a nonresident alien. The Brady Act, effective in 1994, mandated that federally licensed firearm dealers obtain background checks of potential purchasers, based on the conditions of eligibility.

A slightly lower percentage of State prisoners who had a gun, compared to those who did not, reported having a characteristic which may have disqualified them, as defined by Federal law. About 84% of State inmates who had possessed a gun and 88% who did not have a gun may have met at least one of the conditions, as measured in the inmate survey (table 12).

Among State inmates, those with and without guns answered differently on only two conditions. About 50% of those with a firearm and 56% without had a prior sentence to incarceration; about 37% with a gun and 49% without were on probation or parole. On other factors, about the same percentages reported meeting a condition that could have made them ineligible to purchase a firearm. Almost 6 in 10 said they had used illegal drugs before their controlling offense, about 1 in 10 had stayed in a mental health facility overnight, and 1 in 20 was a noncitizen.

Higher percentages of Federal inmates with guns than without them reported meeting at least one of the conditions of the Federal laws. About 83% with a firearm and 78% without one may have been disqualified from purchasing a gun. Higher percentages of inmates using guns compared to those without a gun had a prior incarceration (55% versus 37%), were on probation or parole when arrested (32% versus 26%), or had used illegal drugs shortly before committing their current offense (56% versus 43%).

## 9% of all State prison inmates and 2% of all Federal inmates shot a gun while committing their current offense

In total, about 1 in 10 State inmates and 1 in 50 Federal inmates fired their gun while committing their current offense (table 13). Among inmates serving a sentence for a single violent crime incident, 18% of State inmates and 9% of Federal inmates said they fired the gun they were carrying.

**Table 12. Selected characteristics that may make a gun purchase illegal under Federal law, by possession of firearm during current offense, for State and Federal prison inmates, 1997**

| | Percent of inmates during current offense | | | |
| | State inmates | | Federal inmates | |
| Selected characteristic | Possessed firearm | Did not possess firearm | Possessed firearm | Did not possess firearm |
|---|---|---|---|---|
| Total meeting at least one condition which may have made inmates ineligible to purchase a firearm | 84.1% | 87.7% | 83.1% | 77.7% |
| Prior incarceration for serious offense | 49.8 | 55.9 | 55.1 | 36.9 |
| On probation or parole when arrested | 37.0 | 48.9 | 32.0 | 26.0 |
| On escape when arrested | 0.7 | 0.7 | 0.6 | 0.2 |
| Illegal drug use in month before or at time of offense | 58.8 | 56.3 | 56.0 | 43.0 |
| Ever treated overnight in mental health facility | 10.7 | 10.7 | 6.7 | 4.2 |
| Not a U.S. citizen | 5.2 | 6.0 | 7.8 | 22.6 |
| Dishonorable discharge from U.S. military | 0.3 | 0.3 | 0.7 | 0.2 |

**Table 13. Extent of weapon use during current offense, for State and Federal prison inmates, 1997**

| | Percent of prison inmates | | | | | |
| | All inmates | | Violent offenders | | Other offenders | |
| Firearm use | State | Federal | State | Federal | State | Federal |
|---|---|---|---|---|---|---|
| Total | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Used firearm | 20.4% | 8.9% | 38.5% | 35.1% | 4.3 | 3.5 |
| Discharged | 8.9 | 2.0 | 17.7 | 8.5 | 1.1 | 0.6 |
| Did not discharge | 11.5 | 6.9 | 20.7 | 26.6 | 3.2 | 2.9 |
| Possessed but did not use | 3.6 | 8.2 | 3.0 | 7.2 | 4.1 | 8.4 |
| Possessed other weapon | 1.0 | 0.5 | 1.4 | 2.7 | 0.6 | 0.1 |
| Did not possess weapon | 75.0 | 82.4 | 57.2 | 55.0 | 91.0 | 88.0 |
| Number | 993,305 | 71,325 | 468,757 | 12,249 | 515,532 | 58,266 |

Note: Table excludes prison inmates serving a sentence for multiple incidents.

**Table 14. Extent of firearm use during current offense for State and Federal prison inmates possessing a firearm, 1997**

| Firearm use | Percent of prison inmates possessing a firearm | |
| --- | --- | --- |
| | State | Federal |
| Total | 100.0% | 100.0% |
| Used firearm | 80.2% | 48.6% |
| Discharged | 49.1 | 12.8 |
| Killed victim | 14.6 | 3.0 |
| Injured victim | 15.4 | 3.5 |
| Neither killed nor injured | 26.3 | 7.8 |
| Brandished/displayed | 73.2 | 46.2 |
| To scare someone | 48.6 | 29.3 |
| To defend self | 41.1 | 24.9 |
| To "get away" | 18.9 | 11.6 |
| Did not actively use firearm | 19.8% | 51.4% |
| Number | 178,646 | 11,250 |

Note: Percents of subtotals do not add to totals because inmates may have used a firearm in more than one way. Table excludes prison inmates serving a sentence for multiple incidents.

**Table 15. Extent of firearm use during current offense, for State prison inmates possessing a firearm, 1997**

| Firearm use | Percent of State prison inmates possessing a firearm | | |
| --- | --- | --- | --- |
| | Military-style semiautomatic or fully automatic | Conventional semiautomatic | Single-shot |
| Total | 100.0% | 100.0% | 100.0% |
| Used firearm | 74.6% | 78.9% | 80.8% |
| Discharged | 42.9 | 46.3 | 50.6 |
| Killed victim | 11.2 | 13.5 | 15.7 |
| Injured victim | 14.2 | 15.1 | 15.3 |
| Neither killed nor injured | 23.4 | 24.0 | 27.3 |
| Brandished/displayed | 70.5 | 72.1 | 73.2 |
| To scare someone | 45.3 | 48.0 | 49.6 |
| To defend self | 39.7 | 42.4 | 39.9 |
| To "get away" | 20.4 | 18.5 | 18.7 |
| Did not actively use firearm | 25.4% | 21.1% | 19.2% |
| Number | 14,280 | 76,010 | 96,810 |

Note: Percents of subtotals do not add to totals because inmates may have used a firearm in more than one way. Table excludes prison inmates serving a sentence for multiple incidents. See pages 2, 14, and 15 for definitions of firearms.

About 1% of inmates serving a sentence for a single property, drug, or public-order incident discharged a gun.

Fewer than 1 in 20 State inmates and 1 in 10 Federal inmates, regardless of type of offense, said they possessed a firearm but did not use it. Another 2% reported they had another weapon, including a knife, scissors, ax, rock, club or other sharp or blunt object.

**About half of inmates carrying a gun during their offense fired it and half of those injured or killed someone**

If inmates carried a firearm, they tended to use it. Among inmates possessing a firearm and committing only one incident, four-fifths of State inmates and half of Federal inmates either fired the weapon or brandished or displayed it while committing the crime (table 14).

An estimated 23% of State inmates and 5% of Federal inmates with a gun either killed or injured their victim. Another 26% of State inmates and 8% of Federal inmates with a gun discharged the gun but did not injure or kill anyone with it.

Besides firing their weapon, inmates used their guns for other purposes. About half of State inmates said they used it to scare someone, about two-fifths to defend themselves, and a fifth to "get away."

About 81% of State inmates with a single-shot gun, 79% with a conventional semiautomatic, and 75% with a military-style semiautomatic weapon or a fully automatic weapon either fired or brandished it (table 15). About 51% with a single-shot gun, 46% with a conventional semiautomatic firearm, and 43% with a military-style semiautomatic weapon or a fully automatic weapon discharged their firearm. About a fifth either injured or killed their victim, regardless of the type of firearm.

About a quarter of inmates carrying military-style semiautomatic weapon or a fully automatic weapon and a fifth of those with a conventional semiautomatic or single-shot weapon did not actively use the gun in any way, discharging it or displaying it to scare someone, defend oneself, or "get away."

**Table 16.  Sentence length and time to be served, by possession of a firearm and type of offense, for State prison inmates, 1997**

| | Sentence length in months | | | | Time expected to be served | | | |
| | Possessed firearm | | Did not possess firearm | | Possessed firearm | | Did not possess firearm | |
| Current offense | Mean | Median | Mean | Median | Mean | Median | Mean | Median |
|---|---|---|---|---|---|---|---|---|
| Total | 220 mo | 180 mo | 150 mo | 96 mo | 126 mo | 91 mo | 83 mo | 52 mo |
| | | | | | | | | |
| Violent offense | 252 | 240 | 216 | 180 | 147 | 115 | 126 | 87 |
| Homicide | 330 | 480 | 352 | 600 | 196 | 172 | 209 | 182 |
| Sexual assault | 444 | 480 | 232 | 180 | 212 | 206 | 131 | 97 |
| Robbery | 232 | 180 | 192 | 120 | 125 | 94 | 102 | 72 |
| Assault | 177 | 120 | 133 | 96 | 101 | 75 | 83 | 59 |
| | | | | | | | | |
| Property offense | 177 | 120 | 123 | 72 | 87 | 72 | 64 | 44 |
| | | | | | | | | |
| Drug offense | 143 | 108 | 107 | 60 | 60 | 48 | 49 | 36 |
| | | | | | | | | |
| Public-order offense | 98 | 60 | 78 | 48 | 55 | 40 | 46 | 28 |

**Possession of a firearm during an offense increased sentences and expected time served of inmates**

On average, inmates possessing a firearm had longer sentences and expected to serve a longer time than those who had not used or possessed a firearm while committing their offense.  Sentences for State inmates with firearms had an average of about 18 years, while those for inmates without a firearm were about 12 years (table 16).  Those who had carried a firearm expected to serve about 10 years on their sentence, and those without a firearm, 7 years.

Violent offenders with firearms had on average a sentence of over 20 years and those without firearms, about 18 years.  Violent offenders who had carried a gun also expected to serve 12 years on average and those who did not carry them, 10 years.

Significantly higher percentages of inmates who possessed firearms, compared to those who did not, received a sentence enhancement, generally for possessing a firearm.  About 40% of State inmates who carried a firearm during their current offense and 6% who were not carrying a firearm were given an enhancement to their sentence because of a firearm offense (table 17).  About 56% of Federal inmates who carried a firearm and 14% who did not carry one received a weapons offense enhancement.

**Methodology**

The U.S. Census Bureau conducted the 1997 Survey of Inmates in State Correctional Facilities (SISCF) for the Bureau of Justice Statistics (BJS) and the 1997 Survey of Inmates in Federal Correctional Facilities (SIFCF) for BJS and the Bureau of Prisons.  From June through October, 1997, inmates were interviewed about their current offense and sentences, criminal histories, family and personal backgrounds, gun possession and use, prior drug and alcohol use and treatment, educational programs, and other services provided while in prison.  Similar surveys of State prison inmates were conducted in 1974, 1979, 1986, and 1991.  Federal inmates were surveyed for the first time in 1991.

*Sample design*

The samples for the SISCF and SIFCF were taken from a universe of 1,409 State prisons and 127 Federal prisons enumerated in the 1995 Census of State and Federal Adult Correctional Facilities or opened between comple- tion of the census and June 30, 1996.  The sample design for both surveys was a stratified two-stage selection; first, selecting prisons, and second, selecting inmates in those prisons.

In the first stage correctional facilities were separated into two sampling frames:  one for prisons with male inmates and one for prisons with female inmates.  Prisons holding both genders were included on both lists.

**Table 17.  Sentence enhancements, by possession of a firearm during current offense, for State and Federal prison inmates, 1997**

| | Percent of inmates during current offense | | | |
| | State inmates | | Federal inmates | |
| Enhancements to sentence | Possessed firearm | Did not possess firearm | Possessed firearm | Did not possess firearm |
|---|---|---|---|---|
| Total | 100.0% | 100.0% | 100.0% | 100.0% |
| | | | | |
| No enhancement | 49.6% | 70.3% | 31.1% | 57.7% |
| | | | | |
| Any enhancement | 50.4% | 29.7% | 68.9% | 42.3% |
| Firearm offense | 39.9 | 5.5 | 55.7 | 13.7 |
| 2nd or 3rd strike | 16.4 | 20.0 | 26.0 | 18.5 |
| Type of drug offense* | 7.0 | 9.8 | 23.3 | 25.7 |

*Type of drug offense includes type of drug, quantity of drug, or activity involved with the drug offense.

In the sampling of State facilities, the 13 largest male prisons and 17 largest female prisons were selected with certainty.  The remaining 1,265 male facilities and 261 female facilities were stratified into 14 strata defined by census region (Northeast except New York, New York, Midwest, South except Texas, Texas, West except California, and California).  Within each stratum facilities were ordered by facility type (confinement and community-based), security level (maximum, medium, minimum, and none), and size of population.  A systematic sample of prisons was then selected within strata with probabilities proportionate to the size of each prison.

For the sample of Federal prisons, one male prison and two female prisons were selected with certainty.  The remaining 112 male facilities were classified into 5 strata defined by security level (administrative, high, medium, low, and minimum).  The 20 remaining female facilities were stratified into 2 strata by security level (minimum and not minimum).  Within security level, facilities were ordered by size of population and then selected with probability proportionate to size.

For the State survey 280 prisons were selected, 220 male facilities and 60 female facilities.  Of the 280 facilities 3 refused to allow interviewing and 2 closed before the survey could be conducted.  Overall, 32 male facilities and 8 female facilities were selected for the Federal survey, and all participated.

In the second stage, inmates were selected for interviewing.  For State facilities interviewers selected the sample systematically using a random start and a total number of interviews based on the gender of the inmates and the size of the facility.  For Federal facilities, a sample of inmates was selected for each facility from the Bureau of Prisons central list, using a random start and predetermined sampling interval.

All selected drug offenders were then subsampled so that only a third were eligible for interview.  As a result, approximately 1 in every 75 men and 1 in 17 women were selected for the State survey, and 1 in every 13 men and 1 in every 3 women were selected for the Federal survey.

A total of 14,285 interviews were completed for the State survey and 4,041 for the Federal survey, for overall response rates of 92.5% in the State survey and 90.2% in the Federal survey.

The interviews, about an hour in length, used computer-assisted personal interviewing (CAPI).  With CAPI, computers provide questions for the interviewer, including follow-up questions tailored to preceding answers.  Before the interview, inmates were told verbally and in writing that participation was voluntary and that all information provided would be held in confidence.  Participants were assured that the survey was solely for statistical purposes and that no individual who participated could be identified through use of survey results.

*Estimates of prisoner counts*

Based on the completed interviews, estimates for the entire population were developed using weighting factors derived from the original probability of selection in the sample.  These factors were adjusted for variable rates of nonresponse across strata and inmates' characteristics and offenses.  The sample for the State survey was adjusted to midyear custody counts for June 30, 1997, from data obtained in the National Prisoner Statistics series (NPS-1A).  The sample from the Federal facilities was weighted to the total known sentenced custody population at midyear 1997.

Excluded from the estimate of Federal inmates were unsentenced inmates and those prisoners under Federal jurisdiction but housed in State and private contract facilities.  Those prisoners who were under State jurisdiction, yet held in local jails or private-facilities, were excluded from the estimated number of State prisoners.  As a result, the estimated prisoner counts do not match those in other BJS data series.  The estimated prisoner counts vary according to the particular data items analyzed.  Estimates are based on the number of prisoners who provided information on selected items.

*Accuracy of the estimates*

The accuracy of the estimates presented in this report depends on two types of error:  sampling and nonsampling.  Sampling error is the variation that may occur by chance because a sample rather than a complete enumeration of the population was conducted.  Nonsampling error can be attributed to many sources, such as nonresponses, differences in the interpretation of questions among inmates, recall difficulties, and processing errors.  In any survey the full extent of the nonsampling error is never known.  The sampling error, as measured by an estimated standard error, varies by the size of the estimate and the size of the base population.

Estimates of the standard errors have been calculated for the 1997 surveys. (See appendix tables 1 and 2.)  For example, the 95-percent confidence interval around the percentage of State inmates who carried a firearm during current offense is approximately 18.4% plus or minus 1.96 times 0.42% (or 17.6% to 19.2%).

These standard errors may also be used to test the significance of the difference between two sample statistics by pooling the standard errors of the two sample estimates.  For example, the standard error of the difference between violent and drug offenders carrying firearms when committing their current offense would be 1.0% (or the square root of the sum of the squared standard errors for each group).  The 95%-confidence interval around the difference would be 1.96 times 1.0% or 1.9%.  Since the difference, 22.1% (30.2% - 8.1%) is greater than 1.9%, the difference would be considered statistically significant.

The same procedure can be used to test the significance of the difference between estimates from the two surveys.  For example, the standard error of the difference between Federal and State prison inmates carrying a firearm would be 0.9%.  The 95-percent confidence interval around the difference would be 1.96 times .9% (or 1.7%).  Since the difference of 3.6% (18.4% minus 14.8%) is greater than 1.6%, the difference would be considered statistically significant.

All comparisons discussed in this report were statistically significant at the 95-percent confidence level.

*Definitions*

The survey questionnaire used the following definitions in language and terms familiar to the respondents. Interviewers read the definitions to the inmates when needed.

**Handguns** include both pistols and revolvers.  They are firearms held and fired with one hand and include the following:

— *Revolver* is a handgun with a revolving cylinder with several cartridge chambers.  The chambers are successively lined up with the barrel and then discharged. (Classified as *single shot* for analysis.)

— *Derringer* is a short-barreled, single shot pocket pistol.  A pistol has a chamber integral with the barrel. (Classified as *single shot* for analysis.)

— A *conventional semiautomatic pistol* uses a shell which is ejected and the next round of ammunition is loaded automatically from a magazine or clip internal to the pistol grip or handle. The trigger must be pulled for each shot.[5] (Classified as *conventional semiautomatic* for analysis.)

— *Military-style semiautomatic pistol* is similar to a conventional semiautomatic pistol except that the magazine or clip is visible.[5]  Primary examples are the UZI, TEC-9, and MAC-10.

[5]The survey interview included in the operational definition of a conventional semiautomatic pistol "can hold a maximum of 19 bullets" and of a military-style semiautomatic pistol "can hold more than 19 bullets."

(Classified as *military-style semiautomatic* for analysis.)

A **rifle** is a firearm intended to be shot from the shoulder.  It has a long barrel which shoots bullets.  Types include:

— *Bolt-action, pump-action, lever-action, or single-shot rifles* require physical movement by the operator of some part of the rifle — a bolt, lever, or pump — to reload.  A single shot rifle must be loaded after each shot. (Classified as *single shot* for analysis.)

— *Semiautomatic hunting-style rifle* is a rifle in which a shell is ejected and the next round of ammunition is loaded automatically from a magazine or clip. The trigger must be pulled for each shot. (Classified as *conventional semiautomatic* for analysis.)

— *Semiautomatic military-style rifle* has the characteristics of a semiautomatic hunting-style rifle.  It also has military features such as a pistol grip, folding stock, flash suppressor, and bayonet mount.  (Classified as *military-style semiautomatic* for analysis.)

A **shotgun** is a firearm intended to be shot from the shoulder with either a single- or double-barrel for firing shot

**Appendix table 1.  Standard errors for type of firearm during current offense, for State and Federal prison inmates, 1997**

| Type of firearm | Standard error for estimated percent armed during current offense | |
|---|---|---|
| | State | Federal |
| Any firearm | 0.42% | 0.75% |
| Handgun | 0.39 | 0.70 |
| Rifle | 0.12 | 0.24 |
| Shotgun | 0.17 | 0.29 |
| Single shot | 0.33 | 0.55 |
| Semiautomatic | | |
| Conventional | 0.30 | 0.56 |
| Military-style | 0.13 | 0.27 |

Note:  See tables 1 and 2 for survey estimates.

**Appendix table 2.  Standard errors for firearm possession during current offense, for State and Federal prison inmates, 1997**

| Current offense | Standard error for estimated percent armed during current offense | |
|---|---|---|
| | State | Federal |
| Violent offense | 0.74% | 2.66% |
| Homicide | 1.50 | 8.52 |
| Sexual assault | 0.63 | 0.00 |
| Robbery | 1.39 | 3.31 |
| Assault | 1.67 | 8.21 |
| Other violent | 3.55 | 8.26 |
| | | |
| Property offense | 0.41% | 1.37% |
| Burglary | 0.66 | 11.23 |
| Other property | 0.49 | 1.31 |
| | | |
| Drug offenses | 0.65% | 0.73% |
| Possession | 0.98 | 1.59 |
| Trafficking | 0.90 | 0.86 |
| Other drug | 2.52 | 2.52 |
| | | |
| Public-order offenses | 1.39% | 2.46% |
| Weapons | 3.35 | 4.05 |
| Other public-order | 0.75 | 1.78 |

Note:  See table 4 for survey estimates.

(a concentration of small pellets) at short ranges.  Types include:

— *Bolt-action, pump-action, lever-action, or single shot shotgun* requires physical movement by the operator of some part of the shotgun — a bolt, lever, or pump — to reload.  A single shot shotgun must be loaded after each shot.  (Classified as *single-shot* for analysis.)

— *Semiautomatic hunting-style shotgun* is a shotgun in which a shell is ejected and the next round of ammunition is loaded automatically from a magazine or clip. The trigger must be pulled for each shot. (Classified as *conventional semiautomatic* for analysis.)

— *Semiautomatic military-style shotgun* has the characteristics of a semiautomatic hunting-style shotgun.

In addition, the shotgun has military features, such as a pistol grip, folding-stock, and detachable magazine or clip.  It looks like a semiautomatic military-style rifle. (Classified as *military-style semiautomatic* for analysis.)

A **semiautomatic gun** is a firearm in which a shell is ejected and the next round of ammunition is loaded automatically from a magazine or clip. The trigger must be pulled for each shot.  Semiautomatic guns may be classified as handguns, rifles, or shotguns.

A **machine gun** is an automatic gun which, if the trigger is held down, will fire rapidly and continuously.  It is not a semi-automatic gun for which the trigger must be pulled for each shot. (Classified as *fully automatic* for analysis.)

A **BB gun** shoots a single pellet, using air rather than an explosive to propel the pellet. (Excluded from analysis, as were toy guns.)

This report in portable document format and in ASCII, its tables, and related statistical data are available at the BJS World Wide Web Internet site:

**http://www.ojp.usdoj.gov/bjs/**

The data for this report may be obtained from the National Archive of Criminal Justice Data at the University of Michigan.  The archive may be accessed through the BJS website.

The Bureau of Justice Statistics is the statistical agency of the U.S. Department of Justice.  Lawrence A. Greenfeld is the acting director.

BJS Special Reports address a specific topic in depth from one or more datasets that cover many topics.  Caroline Wolf Harlow wrote this report.

Tom Bonczar and Lara Reynolds provided statistical assistance and verification.  Terry Austin, Chief, National Tracing Center Division of the Bureau of Alcohol, Tobacco and Firearms, provided comments.  Tom Hester and Tina Dorsey edited the report.  Jayne Robinson administered final production.

November 2001, NCJ 189369

# EXHIBIT 11

Date of Hearing:  April 3, 2019

<div align="center">

ASSEMBLY COMMITTEE ON APPROPRIATIONS
Lorena Gonzalez, Chair
AB 893 (Gloria)  – As Introduced February 20, 2019

</div>

Policy Committee:    Public Safety                                    Vote:    5 - 2

Urgency:  No            State Mandated Local Program:  Yes            Reimbursable:  Yes

**SUMMARY**:

This bill prohibits, as of January 1, 2021, the sale of firearms and ammunition at the Del Mar Fairgrounds in the 22nd District Agricultural Association.

**FISCAL EFFECT**:

1) Minor costs (GF) for the Department of Justice to update its records to reflect the criminal penalty for sales of firearms and ammunition at the Del Mar Fairgrounds, since it is a violation of the Food and Agricultural Code.

2) No direct cost to the California Department of Food and Agriculture (CDFA).

**COMMENTS**:

1) **Purpose.** According to the author:

   There is an ever apparent link between the gun violence we see virtually every week and the number of guns in our communities. Additionally, the State of California should not be profiting or benefitting from the sale of firearms. This bill demonstrates that we value people over guns and public safety above all. Fundamentally, I believe it is wrong for the State of California to profit or to benefit from the sale of firearms and ammunition. I acknowledge that gun ownership is a Constitutional right in the United States, and I know that there are plenty of responsible gun owners out there. However, the fact remains that widespread accessibility to these deadly weapons produces a public safety threat that we must address.

2) **Background.** According to a 2018 press release, the 22nd District Agricultural Association's Board of Directors voted 8-to-1 to not consider any contracts with producers of gun shows beyond December 31, 2018, until it has adopted a more thorough policy regarding the conduct of gun shows. More recently, the operator of the Del Mar Fairgrounds gun show has filed a lawsuit challenging the board of directors' decision on the grounds that it violates the U.S. Constitution's First Amendment guarantee to free expression. This bill would add a section to the Food and Agricultural Code that prohibits the sale of firearms and ammunitions at the Del Mar Fairgrounds. By default, a violation of any provision of the Food and Agricultural code is a misdemeanor, unless otherwise specified. Therefore, this bill would effectively terminate the possibility for future gun shows at the Del Mar Fairgrounds. On

three prior occasions, former Governors Brown and Schwarzenegger vetoed similar legislation to ban gun shows at the Cow Palace in San Francisco.

3) **Support.** According to NeverAgainCA:

NeverAgainCA organized large, peaceful protests at every gun show at the Del Mar Fairgrounds, attended and spoke at every meeting of the 22nd District Agricultural Association Board, and joined students protesting gun violence and gun shows at many area schools. NeverAgainCA presented resolutions calling for the elimination of the gun shows at the Del Mar Fairgrounds to the City Councils of the adjacent cities of Del Mar, Solana Beach and Encinitas; these resolutions were adopted and are part of the record of this hearing. Candidate and now Congressman Mike Levin addressed several of our rallies against the gun shows. At the request of NeverAgainCA, then Lt. Governor, now Governor, Gavin Newsom, called on the Fair Board to end gun shows and put an end to valuing the sale of firearms above the value of lives. NeverAgainCA is proud to support AB 893. The residents of the 78th AD and adjacent districts, and their elected representatives, have demonstrated the broad public support for ending gun shows at the Del Mar Fair Grounds on a permanent basis.

4) **Opposition.** According to the California Rifle and Pistol Association, Inc.:

Promoters and operators of gun shows in California must comply with no less than twenty-six sections of the penal code. Gun sales are highly-regulated in California and the rules are no less stringent for those vendors at gun shows (Refer Exhibit #2 attached). Vendors that participate in gun shows may not do so unless all their licenses have been submitted to the California Department of Justice before the event for the purposes of determining whether the vendors possess the proper valid licenses. If they do not pass the review of the California DOJ, they are prohibited from participating. Gun shows are very much a family event. Many of them have training and education, guest speakers, lifestyle vendors, safety training, and more. Ever hear of a shooting spree at a gun show? No, because people that attend gun shows are the law-abiding citizens that attend for the educational value and to stay up on new products that are available. It is no different than any other trade show that occurs in other industries across the state. Criminals would never subject themselves to this much scrutiny and regulation in the hopes of getting their hands on a firearm. These types of false and scare-tactic narratives have no place in modern discourse.

5) **Related Legislation.** SB 281 (Wiener), among other things, prohibits the sale of firearms and ammunitions at the Cow Palace located in San Mateo County and San Francisco County. SB 281 is pending in the Senate Committee on Public Safety.

6) **Prior Legislation.**

a) SB 221 (Wiener), of the 2017-18 Legislative Session, would have prohibited the sale of firearms and ammunitions at the Cow Palace located in San Mateo County and San Francisco County. SB 221 was vetoed by Governor Brown.

b) SB 475 (Leno), of the 2013-14 Legislative Session, would have required gun shows at the Cow Palace to have prior approval of both the Board of Supervisors of the

County of San Mateo and the City and County of San Francisco. SB 475 was vetoed by Governor Brown.

c) SB 585 (Leno), of the 2009-10 Legislative Session, would have prohibited events at which any firearm or ammunition is sold at the Cow Palace. SB 585 was vetoed by Governor Schwarzenegger.

**Analysis Prepared by**:   Kimberly Horiuchi / APPR. / (916) 319-2081

# EXHIBIT 12



### California State Senate

**SENATOR**
**DAVE MIN**
**THIRTY-SEVENTH SENATE DISTRICT**

STATE CAPITOL
SACRAMENTO, CA 95814
(916) 651-4037

Natalie Rubalcava-Garcia, Board Chair
32nd District Agricultural Association
OC Fair and Event Center
88 Fair Drive
Costa Mesa, CA 92626

Dear Chair Rubalcava-Garcia,

I write to you today in regards to Senate Bill 264, which I have authored and which has been sent to Governor Gavin Newsom's desk for his signature. As you know, SB 264 would prohibit the sale of firearms, firearm precursor parts, or ammunition at the OC Fair and Event Center. I understand that you are meeting today to discuss two agenda items related to SB 264. Under Item 6A, the Board will "discuss the status of SB264 and whether or not to send a letter to the Governor respectfully requesting he veto SB264 because it exclusively targets the 32nd DAA." Under Item 6B, the Board will consider a request from the Crossroads of the West Gun Shows to "pre-approv[e]" gun shows for the 2022 year, prior to SB 264's effective date of January 1, 2022. As I explain below, I believe both of these items are inappropriate for the Board to pursue and that if approved, they would represent bad faith action on the part of the Board and its members.

Item 6A: "Discuss and Vote on Communication to the Governor's Office Regarding Amendment to SB 264 Banning Gun Shows Solely at OC Fair & Event Center"

I admit I am surprised that the Board is considering taking a position on SB 264 and lobbying the Governor's office. During the formative stages of SB 264, when my office and I were researching and developing this bill, I was repeatedly advised by staff and Board members from the 32nd DAA that the Board was not a political entity and therefore could not respond to the preferences of the local community, no matter how strong those sentiments might be. I was told that the Board's role was simply that of a fiscal steward and that as long as gun shows were legal, no matter how much they might lead to harm in our community and no matter how strong the local opposition, the Board had a fiduciary duty to enter into contracts with the operators of these gun shows. For the Board to take what is in effect a political position on this issue is not only contrary to these assertions, but would also seem clearly ultra vires of its stated mission and

0180

duties, as expressed in the California Code and in the California Department of Food and Agriculture's Board of Directors Handbook.

As you know, CDFA has its own Legislative Coordinator responsible for developing technical analysis and recommended positions on legislative activity affecting the 54 DAAs across the state of California. My understanding is that an individual DAA developing its own political position on a bill and lobbying the Governor to this effect is highly unusual and arguably prohibited. Indeed, in its 2008 Handbook for Board Directors, CDFA specifically states that "DAAs are not authorized to take independent positions on legislation or to provide testimony at legislative hearing regarding bills on which the Governor's Office has not issued an approved position."

Furthermore, the substantive merits of any such communication to the Governor are dubious. While Item 6A expresses a concern that SB 264 "exclusively targets the 32nd DAA," such action to ban gun shows at a single fairground site has recent precedent. In 2019, Gov. Newsom signed Assembly Bill 893 (Gloria) into law, ending the sale of firearms and ammunition at the Del Mar Fairgrounds, operated by the 22nd District Agricultural Association. In 2020, Sen. Scott Wiener authored SB 281, which would have ended the sale of firearms and ammunition at the Cow Palace. SB 281 passed out of the Senate with a large supermajority of votes, but was pulled by Sen. Wiener after the Cow Palace Board enacted a ban on all future gun shows.

Given the clear linkage between firearms sales and gun violence, and also given that Orange County has been the site of several recent high-profile shootings, including the mass shooting in Orange and the murder of young Aidan Leos on the 55 Freeway earlier this year, there is ample reason to support a ban on gun shows at the OC Fair and Event Center.

Finally, it is worth noting that there is strong local support for SB 264. In addition to the many Orange County residents and groups who have contacted you in support of this bill, it has also enjoyed strong support from local legislators. SB 264 passed out of the Senate and Assembly with overwhelming majorities, including support from myself and Assemblymember Cottie Petrie-Norris (AD-74). As you know, Asm. Petrie-Norris and I are the two legislators who represent the OC Fair and Event Center. Most of the other legislators who represent Orange County also supported this bill, including Senators Bob Archuleta (SD-32), Josh Newman (SD-29), and Tom Umberg (SD-34), and Assemblymembers Tasha Boerner Horvath (AD-76), Tom Daly (AD-69), and Sharon Quirk-Silva (AD-65).

Item 6B: Discuss and Vote on Whether or Not to Approve 2022 Rental Agreements with Crossroads of the West Gun Show to Exclude Sale of Firearm Precursor Parts

I also understand that the Board is considering whether or not to "pre-approve" contracts with the Crossroads of the West Gun Show for 2022 and possibly beyond. Item 6B is predicated on SB 264's exclusion of firearms, firearm precursor parts, or ammunition sold pursuant to a contract entered into before January 1, 2022. For a number of reasons, I believe that any such "pre-approvals" of contracts, undertaken immediately after the passage of SB 264 from the Legislature, would be void for opposing public policy.

Some context here might be appropriate. In drafting SB 264, we considered whether or not to simply make the effective date January 1, 2022, with no exceptions. But to try to be fair to those who might have entered into contracts in good faith that extended beyond January 1, 2022, we crafted a narrow exception to this rule, allowing for contracts entered into before January 1, 2022 to also be excluded from the scope of SB 264.

However, with the bill now at the Governor's desk ready for his signature, I believe that any such contracts entered into by the Board at this point would prima facie appear to be made in bad faith, with the specific intent of evading and opposing the purpose of SB 264. Moreover, the context of this meeting—a special meeting, described by one local news publication as an attempt to "rush to pre-approve the contracts for its annual gun shows," in contravention of past established practices and procedures by this Board—gives further credence to the idea that the Board would be acting with the specific intent to thwart public policy if it pre-approved these contracts.

Let me be clear. Should the Board vote to approve Item 6B and "pre-approve" a long-term contract with Crossroads of the West or any other gun show operator, I would explore litigation and legislation seeking to void these contracts. I also believe that any such action by the Board would potentially expose its members to personal liability, since they would be acting specifically with clear intent to subvert and evade the purpose of a statute they believed was likely to take effect, in opposition to clearly established public policy.

I am grateful for your public service, and appreciate your close consideration of these matters. I am hopeful that you will fulfill your statutory and fiduciary duties and reject both of these Items presented to you today. My staff and I are available for further questions, and I encourage you to reach out to us for further dialogue on this and other matters.

Very truly yours,

Senator Dave Min (SD-37)

0182

cc:    Michele Richards, CEO
Doug La Belle, Board Vice Chair
Ashleigh Aitken, Board Member
Barbara Bagneris, Board Member
Sandra Cervantes, Board Member
Nick Kovacevich, Board Member
Newton Pham, Board Member
Robert Ruiz, Board Member

# EXHIBIT 13

STATE OF CALIFORNIA
**GOVERNMENT CLAIM**
DGS ORIM 006 (Rev. 08/19)

DEPARTMENT OF GENERAL SERVICES
OFFICE OF RISK AND INSURANCE MANAGEMENT

### CLAIMANT INFORMATION

| LAST NAME | FIRST NAME | MIDDLE INITIAL |
|---|---|---|
| Olcott | Tracy | |

INMATE OR PATIENT IDENTIFICATION NUMBER (if applicable)
N/A

BUSINESS NAME(if applicable)
B & L Productions, Inc. d/b/a Crossroads of the West Gunshows

TELEPHONE NUMBER
(801) 546-2886

EMAIL ADDRESS
gunshows@crossroadsgunshows.com

| MAILING ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|
| 280 N. 900 W. | Kaysville | UT | 84037 |

IS THE CLAIMANT UNDER 18 YEARS OF AGE?
☐ Yes   ☑ No

INSURED NAME(Insurance Company Subrogation)
N/A

IS THIS AN AMENDMENT TO A PREVIOUSLY EXISTING CLAIM?
☐ Yes   ☑ No

EXISTING CLAIM NUMBER (if applicable)
N/A

EXISTING CLAIMANT NAME(if applicable)
N/A

### ATTORNEY OR REPRESENTATIVE INFORMATION

| LAST NAME | FIRST NAME | MIDDLE INITIAL |
|---|---|---|
| Barvir | Anna | M. |

TELEPHONE NUMBER
(562) 216-4444

EMAIL ADDRESS
abarvir@michellawyers.com

| MAILING ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|
| 180 E. Ocean Blvd., Ste. 200 | Long Beach | CA | 90802 |

### CLAIM INFORMATION

STATE AGENCIES OR EMPLOYEES AGAINST WHOM THE CLAIM IS FILED
Gavin Newsom, as Governor; Rob Bonta, as Attorney General; Karen Ross, as Secretary of Dept. of Food & Agriculture; 22nd District Agricultural Assn.

DATE OF INCIDENT
Ongoing

LATE CLAIM EXPLANATION (Required, if incident was more than six months ago)

N/A

DOLLAR AMOUNT OF CLAIM
Exceeds $10,000 (Gov't Code § 910(f).)

CIVIL CASE TYPE(Required, if amount is more than $10,000)
☐ Limited ($25,000 or less)   ☑ Non-Limited (over $25,000)

DOLLAR AMOUNT EXPLANATION
See Exhibit 1, section II.B.

INCIDENT LOCATION
Del Mar Fairgrounds, 2260 Jimmy Durante Blvd., Del Mar, CA 92014

SPECIFIC DAMAGE OR INJURY DESCRIPTION

See Exhibit A, section II.B.

CIRCUMSTANCES THAT LED TO DAMAGE OR INJURY

See Exhibit A, section II.C.

EXPLAIN WHY YOU BELIEVE THE STATE IS RESPONSIBLE FOR THE DAMAGE OR INJURY

See Exhibit A, section II.D.

0185

STATE OF CALIFORNIA
**GOVERNMENT CLAIM**
DGS ORIM 006 (Rev. 08/19)

DEPARTMENT OF GENERAL SERVICES
OFFICE OF RISK AND INSURANCE MANAGEMENT

| AUTOMOBILE CLAIM INFORMATION | | |
|---|---|---|
| DOES THE CLAIM INVOLVE A STATE VEHICLE? ☐ Yes ☑ No | VEHICLE LICENSE NUMBER (if known) | STATE DRIVER NAME (if known) |
| HAS A CLAIM BEEN FILED WITH YOUR INSURANCE CARRIER? ☐ Yes ☐ No | INSURANCE CARRIER NAME | INSURANCE CLAIM NUMBER |
| HAVE YOU RECEIVED AN INSURANCE PAYMENT FOR THIS DAMAGE OR INJURY? ☐ Yes ☑ No | AMOUNT RECEIVED (if any) | AMOUNT OF DEDUCTIBLE (if any) |

| NOTICE AND SIGNATURE |
|---|

I declare under penalty of perjury under the laws of the State of California that all the information I have provided is true and correct to the best of my information and belief. I further understand that if I have provided information that is false, intentionally incomplete, or misleading I may be charged with a felony punishable by up to four years in state prison and/or a fine of up to $10,000 (Penal Code section 72).

| SIGNATURE *Anna Barvir* | PRINTED NAME Anna M. Barvir | DATE August 2, 2021 |
|---|---|---|

| INSTRUCTIONS |
|---|

- Include a check or money order for $25, payable to the State of California.
  - $25 filing fee is not required for amendments to existing claims.
- Confirm all sections relating to this claim are complete and the form is signed.
- Attach copies of any documentation that supports your claim. Do not submit originals.

Mail the claim form and all attachments to:
Office of Risk and Insurance Management
Government Claims Program
P.O. Box 989052, MS414
West Sacramento, CA 95798-9052

Claim forms can also be delivered to:
Office of Risk and Insurance Management
Government Claims Program
707 3rd Street, 1st Floor
West Sacramento, CA 95605
1-800-955-0045

| Department of General Services Privacy Notice on Information Collection |
|---|

This notice is provided pursuant to the Information Practices Act of 1977, California Civil Code Sections 1798.17 & 1798.24 and the Federal Privacy Act (Public Law 93-579).

The Department of General Services (DGS), Office of Risk and Insurance Management (ORIM), is requesting the information specified on this form pursuant to Government Code Section 905.2(c).

The principal purpose for requesting this data is to process claims against the state The information provided will/may be disclosed to a person, or to another agency where the transfer is necessary for the transferee-agency to perform its constitutional or statutory duties, and the use is compatible with a purpose for which the information was collected and the use or transfer is accounted for in accordance with California Civil Code Section 1798.25.

Individuals should not provide personal information that is not requested.

The submission of all information requested is mandatory unless otherwise noted. If you fail to provide the information requested to DGS, or if the information provided is deemed incomplete or unreadable, this may result in a delay in processing.

**Department Privacy Policy**
The information collected by DGS Is subject to the limitations in the Information Practices Act of 1977 and state policy (see State Administrative Manual 5310-5310.7). For more information on how we care for your personal information, please read the DGS Privacy Policy.

**Access to Your Information**
ORIM is responsible for maintaining collected records and retaining them for 5 years. You have a right to access records containing personal information maintained by the state entity. To request access, contact:

**DGS ORIM**
**Public Records Officer**
**707 3rd St., West Sacramento, CA 95605**
**(916) 376-5300**

# EXHIBIT A

C.D. Michel (SBN 144258)
Anna M. Barvir (SBN 268728)
Tiffany D. Cheuvront (SBN 317144)
MICHEL & ASSOCIATES, P.C.
180 E. Ocean Blvd., Ste. 200
Long Beach, CA 90802
Telephone: (562) 216-4444
Fax: (562) 216-4445
Email: abarvir@michellawyers.com
  *Attorneys for Claimants B & L Productions, Inc., Lawrence M. Walsh, Miwall Corporation, L.A.X. Firing Range Inc., and California Rifle & Pistol Association, Incorporated*

Donald Kilmer (SBN 179986)
Law Offices of Donald Kilmer, APC
1645 Willow Street Suite 150
San Jose, CA 95125
Telephone: (408) 264-8489
Fax: (408) 264-8487
Email: Don@DKLawOffice.com
  *Attorney for Claimant Second Amendment Foundation*

| | |
|---|---|
| B & L PRODUCTIONS, INC., d/b/a CROSSROADS OF THE WEST, LAWRENCE M. WALSH, MIWALL CORPORATION, d/b/a WHOLESALE AMMUNITION, L.A.X. FIRING RANGE INC., d/b/a LAX AMMO LLC, CALIFORNIA RIFLE & PISTOL ASSOCIATION, INCORPORATED, and THE SECOND AMENDMENT FOUNDATION,<br><br>                Plaintiffs,<br><br>v.<br><br>GAVIN NEWSOM, in his official capacity as Governor of the State of California, ROB BONTA, in his official capacity as Attorney General of the State of California; KAREN ROSS, in her official capacity as Secretary of California Department of Food & Agriculture; and 22nd DISTRICT AGRICULTURAL ASSOCIATION,<br><br>                Defendants. | **GOVERNMENT TORT CLAIM**<br><br>[Gov't Code § 910] |

<div align="center">1</div>

## I.   INTRODUCTION

The 1963 California Tort Claims Act established uniform procedures for claims against public entities and public employees. The California Tort Claims Act establishes certain conditions before filing a lawsuit against a public entity. Specifically, the California Government Code provides that "no suit for money or damages may be brought against a public entity on a cause of action for which a claim is required to be presented . . . until a written claim therefor has been presented to the public entity and has been acted upon." Gov't Code § 945.4. The Government Code requires that the claimant set forth:

> (a) The name and post office address of the claimant.
>
> (b) The post office address to which the person presenting the claim desires notices to be sent.
>
> (c) The date, place and other circumstances of the occurrence or transaction which gave rise to the claim asserted.
>
> (d) A general description of the indebtedness, obligation, injury, damage or loss incurred so far as it may be known at the time of presentation of the claim.
>
> (e) The name or names of the public employee or employees causing the injury, damage, or loss, if known.
>
> (f) The amount claimed if it totals less than ten thousand dollars ($10,000) as of the date of presentation of the claim . . . together with the basis of computation of the amount claimed. *If the amount claimed exceeds ten thousand dollars ($10,000), no dollar amount shall be included in the claim*. However, it shall indicate whether the claim would be a limited civil case.

*Id.* at § 910(a)-(f).

The purpose of this claim is to present sufficient detail "to reasonably enable the public entity to make an adequate investigation of the merits of the claim and to settle it without the expense of a lawsuit." *Blair v. Super. Ct.* 218 Cal.App.3d 221, 225 (1990); *City of San Jose v. Super Ct.*, 12 Cal.3d 447, 456 (1974); *Turner v. State of California*, 232 Cal.App.3d 883 (1991).

## II.   FORM AND SUBSTANCE

### A.   Name and Addresses of Claimant and Person to Be Sent Notices

The addresses of the claimant and of the person to whom notices are to be sent

2

1   are particularly important to the presentation of a government tort claim. A statement

2   of the address of claimant's counsel substantially complies with the requirement that

3   the claimant's address must be given. *Cameron v. City of* Gilroy, 104 Cal.App.2d 76

4   (1951). Here, claimants are an event promoter, vendors, and nonprofit member

5   associations that promote or participate in gun shows at the Del Mar Fairgrounds and

6   sell lawful products, including firearms and/or ammunition, and/or organization

7   memberships. The following claimants' addresses are provided for information

8   purposes. All notices regarding this claim should be sent to counsel for each claimant

9   identified below.

1.   B & L Productions, Inc. d/b/a Crossroads of the West Gunshows
     *Event Promoter*
     Address: 280 N. 900 W., Kaysville, UT 84037
     Phone: (801) 546-2886
     Email: gunshows@crossroadsgunshows.com

     c/o Anna M. Barvir
     Michel & Associates, P.C.
     Address: 180 E. Ocean Blvd., Ste. 200, Long Beach, CA 90802
     Phone: (562) 216-4444
     Email: abarvir@michellawyers.com

2.   California Rifle & Pistol Association, Incorporated ("CRPA")
     *Nonprofit Association Vendor*
     Address: 271 E. Imperial Hwy., Ste. 620, Fullerton, CA 92835
     Phone: (714) 992-2772
     Email: contact@crpa.org

     c/o Anna M. Barvir
     Michel & Associates, P.C.
     Address: 180 E. Ocean Blvd., Ste. 200, Long Beach, CA 90802
     Phone: (562) 216-4444
     Email: abarvir@michellawyers.com

3.   Lawrence Michael Walsh and Miwall Corporation d/b/a Wholesale
     Ammunition ("Miwall")_
     *Vendor*
     Address: 13235 Grass Valley Ave., Grass Valley, CA 95945
     Mailing Address: P.O. Box 2809, Grass Valley, CA 95945
     Phone: (480) 530-3838
     Email: info@miwallcorp.com ; connie@miwallcorp.com

     c/o Anna M. Barvir
     Michel & Associates, P.C.
     Address: 180 E. Ocean Blvd., Ste. 200, Long Beach, CA 90802
     Phone: (562) 216-4444

3

Email: abarvir@michellawyers.com

4. L.A.X. Firing Range Inc., d/b/a LAX Ammo LLC
*Vendor*
Address: 927 W. Manchester Blvd., Inglewood CA, 90301
Phone: 424-750-9666
Email: laxrange@yahoo.com

c/o Anna M. Barvir
Michel & Associates, P.C.
Address: 180 E. Ocean Blvd., Ste. 200, Long Beach, CA 90802
Phone: (562) 216-4444

5. The Second Amendment Foundation ("SAF")
*Nonprofit Association Vendor*
Address: 12500 NE 10th Pl., Bellevue, WA, 98005
Phone: (425) 454-7012
Email: info@saf.org

c/o Donald Kilmer
Law Offices of Donald Kilmer, APC
Address: 14085 Silver Ridge Road, Caldwell, ID  83607
Phone: (408) 264-8489
Email: don@dklawoffice.com

**B.    Description of Specific Damage or Injury**

The above-listed Claimants, and each of them, claim that Respondents Gavin Newsom, Robert Bonta, Karen Ross, and the 22nd District Agricultural Association (collectively, "the State") have caused them harm by violating their constitutional rights under the First, Second, and Fourteenth Amendments, giving rise to claims under 42 U.S.C. § 1983. Such claims are not subject to the administrative requirements of California's Government Tort Claims Act, but are nonetheless included here so the State has notice of all potential claims for damages and equitable relief.

As described below, the above-listed Claimants, and each of them, claim that the State has caused them harm by intentionally and/or negligently interfering with their prospective economic advantage.

As described below, Claimant B&L Productions further claims that the State has caused it harm by intentionally interfering with B&L's contracts with Respondent 22nd District Agricultural Association and the Vendor Claimants, as well as

4

countless other gun show vendor participants.

### 1.    Intentional Interference with Prospective Economic Advantage (All Claimants)

Intentional Interference with Prospective Economic Advantage occurs where there is: (1) an economic relationship between the claimant and some third person with a probability of economic benefit to the claimant; (2) knowledge by the defendant of the existence of these relationships; (3) an intentional act by the defendant designed to disrupt that relationship; (4) actual disruption of relationship; and (5) damages to claimants caused by those actions. The interference can be with an existing contract or one that would, with certainty, have been consummated but for the actions of the defendant and regardless of the type of economic relationship.[1]

Through the adoption and enforcement of Assembly Bill 893 ("AB 893") (codified at Food and Agricultural Code section 4158), which effectively bans the sale or offer for sale of all firearms and ammunition at the Del Mar Fairgrounds ("the Fairgrounds"), the State Respondents have actually and intentionally interfered with ongoing and future economic relationships between Claimant B&L Productions and its vendors, including Claimants L. Michael Walsh and Miwall, LAX Ammo, CRPA, and SAF, and between Claimant B&L Productions and Respondent 22nd District Agricultural Association ("the Fair Board"). And the State's intentional interference with those economic relationships has caused damage to Claimants.

For more than 30 years, **Claimant B&L Productions** has maintained contracts with the Fair Board, under which B&L annually hosts about five gun-show events at the Fairgrounds. Thus, an economic relationship has been in effect between B&L and the Fair Board to operate gun shows on state fairground property for over 30 years with no significant safety issues. In turn, B&L maintains countless economic

---

[1] *Builders Corps. of Am. v. United States*, 148 F. Supp. 482, 484, n.1 (N.D. Cal. 1957), *rev'd on other grounds*, 259 F.2d 766 (9th Cir. 1958); *see also Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal.3d 1118, 1126 (1990).

1   relationships with for-profit and nonprofit vendors, including but not limited to,

2   Claimants L. Michael Walsh and Miwall, LAX Ammo, CRPA, and SAF. These

3   vendors pay B&L for space at B&L's Del Mar gun shows in order to sell

4   merchandise and organization memberships.

5       Each year, B&L presents their show dates to the Fairgrounds staff to secure

6   dates in a good-faith effort to schedule events and get them on the venue's calendar

7   before the written contracts can be approved.[2] Because of its status as a long-term

8   promoter of events at the Fairgrounds, B&L has long had a right of first refusal to

9   secure its dates with the Fairgrounds. This longstanding practice was highlighted in

10  the complaint and other filings in *B&L Productions v. 22nd District Agricultural*

11  *Association*. Ex. 3 at ¶¶ 68-7. Additionally, B&L entered into a settlement agreement

12  with the Fair Board in 2019 in *B&L Productions v. 22nd District Agricultural*

13  *Association*, permanently terminating the 2019 gun show moratorium, reinstating

14  B&L's right to promote gun show events at the Fairgrounds, and barring the Fair

15  Board from unilaterally halting B&L's gun show events at the Fairgrounds.

16      The State knew about these ongoing economic relationships when it adopted

17  AB 893. Indeed, the Del Mar Fairgrounds is a state-owned facility, and the Fair

18  Board must regularly report its activities to the California Department of Agriculture.

19  The text of AB 893 expressly identified the ongoing presence at the Fairgrounds of

20  "marketplaces popularly known as 'gun shows,' at which firearms and ammunition

21  and other items are sold to the public approximately five times a year." Assem. Bill

22  893, § 1(a) (2019-2020 Reg. Sess.). And the bill clearly recognized that ***"[p]romoters***

23  ***maintain relationships with a core group of vendors, some selling guns and some***

24  ***selling other merchandise,*** who travel as the schedule dictates from city to city and

25

26  _____

27  [2] This process is necessary because the Fair Board approves contracts as they
    come up throughout the year. If event promoters do not secure dates in advance
    through an oral or email commitment with Fairgrounds staff, they will not have the

28  time to secure plan the event, secure vendors, or market the event before the final
    written agreement is approved.

1  state to state and in the West, for example, many of the same vendors can be seen at

2  Crossroads of the West Gun Shows from San Francisco, California, to Tucson,

3  Arizona." *Id.*, § 1(g).

4        What's more, Assembly member Todd Gloria, the sponsor of AB 893, clearly

5  followed the Fair Board's attempts in 2018 to ban the gun show and the resulting

6  federal litigation, injunction order, and settlement. In fact, in a letter dated September

7  10, 2018, Gloria encouraged the Fair Board not to approve any new contracts with

8  producers of gun shows and further threatened that if the Fair Board did not ban the

9  events at the facility, he was "prepared to act by way of legislation." Ex. 1. Finally,

10  attorneys for the California DOJ represented the Fair Board in *B&L Productions v.*

11  *22nd District Agricultural Association* and actively negotiated the terms of the

12  written settlement agreement described above. It could hardly be clearer that the State

13  was well aware of the existence of these business relationships when AB 893 was

14  adopted.

15        The sale of firearms and ammunition is an essential function of gun shows, and

16  it is one of the main reasons people attend these events. If gun shows are not

17  economically viable because they have been stripped of an essential function, they

18  will cease to exist. The State was well-aware when it passed AB 893 that a "gunless"

19  gun show would not survive financially. Indeed, the intended purpose of AB 893 was

20  to end gun shows at the Fairgrounds, thus ending a 30-year business relationship for

21  B&L. Indeed, Assembly member Lorena Gonzalez, co-sponsor of AB 893,

22  hypocritically lamented that "[t]he State of California shouldn't be in the business of

23  using our land to join with the firearm industry to profit off the sale of guns and

24  ammo." She seems to take no issue, however, with the State profiting off the millions

25  of dollars in taxes and fees levied on the very same firearms and ammunition when

26  they are sold in gun stores. Her clear goal was not just to end the sales of firearms

27  and ammunition at Del Mar but to end gun shows entirely. Ex. 2.

28        B&L has been unable to secure dates and enter into new contracts for its events

in 2021 due to the State's intentional act of adopting AB 893. In line with the new law, the Fair Board cannot and will not enter into contracts for gun shows at the Fairgrounds if firearms and ammunition will be sold. And even though B&L has expressly stated that it would attempt to hold events without such sales, the Fair Board has dragged its feet and has not provided dates for events in 2021. B&L has reached out to secure event dates for 2021 but has received no appropriate response. Now, many of those dates have passed or have become unavailable.

Due to AB 893, B&L has suffered and will continue to suffer significant economic damages. B&L has lost revenue for all Del Mar gun shows in 2021 because the Fair Board will not finalize event dates, citing AB 893 as the reason. But even if B&L could secure dates to host gun shows in the second half of the year, AB 893 stands in the way of B&L generating the profits they typically generate because the ban on firearm and ammunition sales will significantly impact paid event attendance and the types and numbers of paid vendors who will do business with B&L at the Del Mar gun show. What's more, the harms and injuries to B&L are of a continuing nature; they continue to compound everyday AB 893 remains the law. Finally, B&L seeks recovery for the loss of business goodwill resulting from the State's adoption of AB 893 under the (unsupported) pretense that gun shows, generally, and B&L's shows, in particular, threaten public safety. The message that act sends to other venues, attendees, and vendors that do business with B&L will no doubt affect B&L for years.

In this matter, the claim exceeds $10,000, and any lawsuit would not be a limited civil case.

**Claimants L. Michael Walsh ("Walsh") and Miwall Corporation d/b/a Wholesale Ammunition ("Miwall"),  L.A.X. Firing Range Inc. d/b/a LAX Ammo LLC ("LAX Ammo"), California Rifle & Pistol Association, Incorporated ("CRPA"), and The Second Amendment Foundation, Inc. ("SAF") (collectively, "the Vendor Claimants")** are all gun-show vendors that rely on a portion of their

annual income from the multiple gun shows held at the Fairgrounds each year. They pay Claimant B&L to secure space at B&L's Del Mar gun show events. Many of these vendors have participated in B&L's events for years.

The State was also aware of the relationships between Claimant B&L and the Vendor Claimants when it adopted AB 893, barring the sale of firearms and ammunition at the Fairgrounds. Indeed, under state law, the Vendor Claimants must be approved by the California Department of Justice ("DOJ") in order to participate and sell legal products at B&L's gun shows. The DOJ must also approve all gun show security plans with a layout of all vendor booths. What's more, several of the bill's sponsors attended B&L's gun shows before adopting AB 893. And the bill clearly recognized that ***"[p]romoters maintain relationships with a core group of vendors, some selling guns and some selling other merchandise,*** who travel as the schedule dictates from city to city and state to state and in the West, for example, many of the same vendors can be seen at Crossroads of the West Gun Shows from San Francisco, California, to Tucson, Arizona." *Id.*, § 1(g).

The Vendor Claimants sell firearms, ammunition, or memberships to Second Amendment organizations at B&L's gun shows. The sale of firearms and ammunition is an essential function of gun shows, and it is one of the main reasons people attend these events. If gun shows are not economically viable because they have been stripped of an essential function, they will cease to exist. The State was well-aware when it passed AB 893 that a "gunless" gun show would not survive financially. Indeed, the intended purpose of AB 893 was to end gun shows at the Fairgrounds, thus ending a 30-year business relationship for B&L. If B&L can no longer produce the Del Mar gun show, its economic relationships with the Vendor Claimants will come to an end, and the Vendor Claimants will lose all profits generated at the Del Mar gun show from the sale of lawful products, merchandise, and organization memberships.

Even if B&L can continue to produce a gun show event at Del Mar without

9

1   sales of firearms and ammunition, gun owners are less likely to attend in as large of

2   numbers, significantly impacting the Vendor Claimants' profits from the event.

3   Lower attendance, if any at all, damages the expectation of economic advantage the

4   Vendor Claimants have when deciding to purchase space at a gun show. With

5   consumers not attending a "gunless" gun show, Vendors will not continue to

6   purchase space at the gun shows if it is no longer profitable. The economic advantage

7   is gone.

8       What's more, the Vendor Claimants can no longer discuss various firearms or

9   ammunition or what items consumers may be in the market for out of fear that they

10   will violate the restriction on offering firearms or ammunition for sale and

11   threatening the ability to hold gun shows at Del Mar in the future.

12       Due to AB 893, the Vendor Claimants have suffered and will continue to

13   suffer significant economic damages. They have lost all revenue from Del Mar gun

14   shows in 2021 because the Fair Board will not finalize event dates, citing AB 893 as

15   the reason. But even if B&L could secure dates to host gun shows in the second half

16   of the year, AB 893 stands in the way of the Vendor Claimants generating the profits

17   they typically generate because the ban on firearm and ammunition sales will

18   significantly impact paid event attendance and their ability to sell the lawful products

19   they sell. What's more, the harms and injuries to the Vendor Claimants are of a

20   continuing nature; they continue to compound everyday AB 893 remains the law.

21       In this matter, each Vendor Claimant's claim likely exceeds $10,000, and any

22   lawsuit would not be a limited civil case. That said, at this time, each Vendor

23   Claimant's potential individual claim is likely speculative, as the amount of

24   merchandise sales, membership sales, money donations, and other types of income a

25   vendor realizes at any given gun show depend largely on outside factors, including

26   but not limited to the current political and social climate.

27       Vendor Claimant SAF, however, also incurred more than $10,000 in damages

28   in the form of attorneys' fees and other costs associated with and not recovered after

successfully challenging Respondent 22nd District Agricultural Association's 2018 ban on gun shows and securing the settlement in that case, which is largely invalidated by the conduct complained of herein.

### 2. Negligent Interference with Prospective Economic Advantage (All Claimants)

Negligent interference with prospective economic advantage occurs where the defendant unreasonably, albeit not intentionally, and foreseeably disrupts a business advantage of another where an economic relationship exists. Claimants must show (1) the existence of an economic relationship between claimants and a third party with the probability of future economic benefit to the claimants; (2) that defendant knew of this relationship; (3) that defendant knew the relationship would be disrupted if defendant did not act with reasonable care; (4) that defendant failed to act with reasonable care; (5) actual disruption of the relationship; and (6) economic harm proximately caused by the defendant's negligence.

Through the adoption and enforcement of AB 893 (codified at Food and Agricultural Code section 4158), which effectively bans the sale or offer for sale of all firearms and ammunition at the Fairgrounds, the State has actually and negligently interfered with ongoing and future economic relationships between Claimant B&L and its vendors, including the Vendor Claimants, and between Claimant B&L and the Fair Board. And the State's negligent interference with those economic relationships has caused damage to Claimants.

For more than 30 years, **Claimant B&L Productions** has maintained contracts with the Fair Board, under which B&L annually hosts about five gun-show events at the Fairgrounds. Thus, an economic relationship has been in effect between B&L and the Fair Board to operate gun shows on state fairground property for over 30 years with no significant safety issues. In turn, B&L maintains countless economic relationships with for-profit and nonprofit vendors, including the Vendor Claimants. These vendors pay B&L for space at B&L's Del Mar gun shows in order to sell

1    merchandise and organization memberships.

2        Each year, B&L presents their show dates to the Fairgrounds staff to secure

3    dates in a good-faith effort to schedule events and get them on the venue's calendar

4    before the written contracts can be approved. Because of its status as a long-term

5    promoter of events at the Fairgrounds, B&L has long had a right of first refusal to

6    secure its dates with the Fairgrounds. This longstanding practice was highlighted in

7    the complaint and other filings in *B&L Productions*. Ex. 3 at ¶¶ 68-77. Additionally,

8    B&L entered into a settlement agreement with the Fair Board in 2019 in *B&L*

9    *Productions*, permanently terminating the 2019 gun show moratorium, reinstating

10   B&L's right to promote gun show events at the Fairgrounds, and barring the Fair

11   Board from unilaterally halting B&L's gun show events at the Fairgrounds.

12       The State knew about these ongoing economic relationships when it adopted

13   AB 893. Indeed, the Del Mar Fairgrounds is a state-owned facility, and the Fair

14   Board must regularly report its activities to the California Department of Agriculture.

15   The text of AB 893 expressly identified the ongoing presence at the Fairgrounds of

16   "marketplaces popularly known as 'gun shows,' at which firearms and ammunition

17   and other items are sold to the public approximately five times a year." Assem. Bill

18   893, § 1(a). And the bill clearly recognized that ***"[p]romoters maintain relationships***

19   ***with a core group of vendors, some selling guns and some selling other***

20   ***merchandise,*** who travel as the schedule dictates from city to city and state to state

21   and in the West, for example, many of the same vendors can be seen at Crossroads of

22   the West Gun Shows from San Francisco, California, to Tucson, Arizona." *Id.*, §

23   1(g).

24       What's more, Assembly member Todd Gloria, the sponsor of AB 893, clearly

25   followed the Fair Board's attempts in 2018 to ban the gun show and the resulting

26   federal litigation, injunction order, and settlement. In fact, in a letter dated September

27   10, 2018, Gloria encouraged the Fair Board not to approve any new contracts with

28   producers of gun shows and further threatened that if the Fair Board did not ban the

12

1  events at the facility, he was "prepared to act by way of legislation." Ex. 1. Finally,

2  attorneys for the DOJ represented the Fair Board in *B&L Productions* and actively

3  negotiated the terms of the written settlement agreement described above. It could

4  hardly be clearer that the State was well aware of the existence of these business

5  relationships when AB 893 was adopted. And it was thus entirely foreseeable that the

6  State's adoption of AB 893 would interfere with agreements between B&L and the

7  Fair Board and between B&L and its vendors, including the Vendor Claimants.

8      The sale of firearms and ammunition is an essential function of gun shows, and

9  it is one of the main reasons people attend these events. If gun shows are not

10  economically viable because they have been stripped of an essential function, they

11  will cease to exist. The State was well-aware when it passed AB 893 that a "gunless"

12  gun show would not survive financially. Indeed, the intended purpose of AB 893 was

13  to end gun shows at the Fairgrounds, thus ending a 30-year business relationship for

14  B&L. Indeed, Assembly member Lorena Gonzalez, co-sponsor of AB 893,

15  hypocritically lamented that "[t]he State of California shouldn't be in the business of

16  using our land to join with the firearm industry to profit off the sale of guns and

17  ammo." She seems to take no issue, however, with the State profiting off the millions

18  of dollars in taxes and fees levied on the very same firearms and ammunition when

19  they are sold in gun stores. Her clear goal was not just to end the sales of firearms

20  and ammunition at Del Mar but to end gun shows entirely. Ex. 2.

21      B&L has been unable to secure dates and enter into new contracts for its events

22  in 2021 due to the State's intentional act of adopting AB 893. In line with the new

23  law, the Fair Board cannot and will not enter into contracts for gun shows at the

24  Fairgrounds if firearms and ammunition will be sold. And even though B&L has

25  expressly stated that it would attempt to hold events without such sales, the Fair

26  Board has dragged its feet and has not provided dates for events in 2021. B&L has

27  reached out to secure event dates for 2021 but has received no appropriate response.

28  Now, many of those dates have passed or have become unavailable.

The State has a duty to act in the best interests of others and their property. In ending much needed contracts for a facility that is so far in debt, the State failed in their duty to consider the economic impacts of their decisions and the failed contracts that came from their actions. The State did not use reasonable care in its decision ban firearm and ammunition sales at the Fairgrounds (effectively shuttering the gun show) but instead relied upon the rhetoric of minority groups calling for the end of gun shows. Many more supporters of the gun show spoke out at public meetings than did the minority groups, but those citizens were ignored in favor of the anti-gun agenda State has bought into.

The State's actions have caused confusion with the operations of the Fairgrounds that directly impacts the ability of the gun shows to hold shows at the venue. Indeed, due to AB 893, B&L has suffered and will continue to suffer significant economic damages. B&L has lost revenue for all Del Mar gun shows in 2021 because the Fair Board will not finalize event dates, citing AB 893 as the reason. But even if B&L could secure dates to host gun shows in the second half of the year, AB 893 stands in the way of B&L generating the profits they typically generate because the ban on firearm and ammunition sales will significantly impact paid event attendance and the types and numbers of paid vendors who will do business with B&L at the Del Mar gun show. What's more, the harms and injuries to B&L are of a continuing nature; they continue to compound everyday AB 893 remains the law. Finally, B&L seeks recovery for the loss of business goodwill resulting from the State's adoption of AB 893 under the (unsupported) pretense that gun shows, generally, and B&L's shows, in particular, threaten public safety. The message that act sends to other venues, attendees, and vendors that do business with B&L will no doubt affect B&L for years. The State's ban on the sale of firearms and ammunition (lawful products already heavily regulated by state law) at the Fairgrounds is the proximate cause of these harms.

In this matter, Claimant B&L's claim exceeds $10,000, and any lawsuit would

14

1   not be a limited civil case.

2       **The Vendor Claimants** are all gun show vendors that rely on a portion of

3   their annual income from the multiple gun shows held at the Fairgrounds each year.

4   They pay Claimant B&L to secure space at B&L's Del Mar gun show events. Many

5   of these vendors have participated in B&L's events for years.

6       The State was also aware of the relationships between Claimant B&L and the

7   Vendor Claimants when it adopted AB 893, barring the sale of firearms and

8   ammunition at the Fairgrounds. Indeed, under state law, the Vendor Claimants must

9   be approved by the DOJ in order to participate and sell legal products at B&L's gun

10   shows. The DOJ must also approve all gun show security plans with a layout of all

11   vendor booths. What's more, several of the bill's sponsors attended B&L's gun

12   shows before adopting AB 893. And the bill clearly recognized that ***"[p]romoters***

13   ***maintain relationships with a core group of vendors, some selling guns and some***

14   ***selling other merchandise,*** who travel as the schedule dictates from city to city and

15   state to state and in the West, for example, many of the same vendors can be seen at

16   Crossroads of the West Gun Shows from San Francisco, California, to Tucson,

17   Arizona." *Id.*, § 1(g). It was thus entirely foreseeable that the State's adoption of AB

18   893 would interfere with agreements between B&L and its vendors, including the

19   Vendor Claimants.

20       The Vendor Claimants sell firearms, ammunition, or memberships to Second

21   Amendment organizations at B&L's gun shows. The sale of firearms and ammunition

22   is an essential function of gun shows, and it is one of the main reasons people attend

23   these events. If gun shows are not economically viable because they have been

24   stripped of an essential function, they will cease to exist. The State was well-aware

25   when it passed AB 893 that a "gunless" gun show would not survive financially.

26   Indeed, the intended purpose of AB 893 was to end gun shows at the Fairgrounds. If

27   B&L can no longer produce the Del Mar gun show, its economic relationships with

28   the Vendor Claimants will come to an end, and the Vendor Claimants will lose all

1    profits generated at the Del Mar gun show from the sale of lawful products,

2    merchandise, and organization memberships.

3        Even if B&L can continue to produce a gun show event at Del Mar without

4    sales of firearms and ammunition, gun owners are less likely to attend in as large of

5    numbers, significantly impacting the Vendor Claimants' profits from the event.

6    Lower attendance, if any at all, damages the expectation of economic advantage the

7    Vendor Claimants have when deciding to purchase space at a gun show. With

8    consumers not attending a "gunless" gun show, Vendors will not continue to

9    purchase space at the gun shows if it is no longer profitable. The economic advantage

10   is gone.

11       What's more, the Vendor Claimants can no longer discuss various firearms or

12   ammunition or what items consumers may be in the market for out of fear that they

13   will violate the restriction on offering firearms or ammunition for sale and

14   threatening the ability to hold gun shows at Del Mar in the future.

15       The State knew its actions would interfere with the Vendor Claimants

16   economic relationship with B&L. It did not exercise reasonable care in passing a law

17   that would damage so many and acted recklessly in pushing their agenda. The State

18   likes to say that Californians support more gun control in the state, but this negates

19   those thousands that attend gun shows each year and the over 1 million new gun

20   owners in California in 2020. The state did not act in the best interest of the people of

21   California in implementing AB 893.

22       Due to AB 893, the Vendor Claimants have suffered and will continue to

23   suffer significant economic damages. They have lost all revenue from Del Mar gun

24   shows in 2021 because the Fair Board will not finalize event dates, citing AB 893 as

25   the reason. But even if B&L could secure dates to host gun shows in the second half

26   of the year, AB 893 stands in the way of the Vendor Claimants generating the profits

27   they typically generate because the ban on firearm and ammunition sales will

28   significantly impact paid event attendance and their ability to sell the lawful products

GOVERNMENT TORT CLAIM

1  they sell. What's more, the harms and injuries to the Vendor Claimants are of a
2  continuing nature; they continue to compound everyday AB 893 remains the law. It
3  was foreseeable that the inability to sell firearms and ammunition at a gun show at
4  the Fairgrounds would impact the Vendors Claimants' profits, and the State's
5  adoption and enforcement of AB 893 is the proximate cause of the ongoing injury to
6  the Vendor Claimants.

7       In this matter, each Vendor Claimant's claim likely exceeds $10,000, and any
8  lawsuit would not be a limited civil case. That said, at this time, each Vendor
9  Claimant's potential individual claim is likely speculative, as the amount of
10  merchandise sales, membership sales, money donations, and other types of income a
11  vendor realizes at any given gun show depend largely on outside factors, including
12  but not limited to the current political and social climate.

13       Vendor Claimant SAF, however, also incurred more than $10,000 in damages
14  in the form of attorneys' fees and other costs associated with and not recovered after
15  successfully challenging Respondent 22nd District Agricultural Association's 2018
16  ban on gun shows and securing the settlement in that case, which is largely
17  invalidated by the conduct complained of herein.

18
19
### 3.    Intentional Interference with a Contact (Claimant B&L Productions)

20       The claim for intentional interference with a contract allows the parties of the
21  contract to hold a third person accountable for causing damage due to interference
22  with the contract where claimants (1) had a valid contract (written or verbal); (2)
23  where the third part defendant knew about the contract; (3) and the third-party
24  defendant acted improperly or intentionally to disrupt that contract; (4) causing
25  damage to the parties of the contract. This claim may be brought where the third-
26  party defendant knew about the contract and still acted in a way that caused a breach
27  or in a way that makes it impossible for the parties to meet their obligations of the
28  contract.

17

1    Through the adoption and enforcement of AB 893 (codified at Food and

2 Agricultural Code section 4158), which effectively bans the sale or offer for sale of

3 all firearms and ammunition at the Fairgrounds, the State has actually and

4 intentionally interfered with contractual relationships between Claimant B&L

5 Productions and its vendors, including the Vendor Claimants, and between Claimant

6 B&L and the Fair Board. And the State's intentional interference with those

7 contractual relationships has caused damage to Claimant B&L.

8    For more than 30 years, **Claimant B&L Productions** has maintained contracts

9 with the Fair Board, under which B&L annually hosts about five gun-show events at

10 the Fairgrounds. Thus, an economic relationship has been in effect between B&L and

11 the Fair Board to operate gun shows on state fairground property for over 30 years

12 with no significant safety issues.

13    Each year, B&L presents their show dates to the Fairgrounds staff to secure

14 dates in a good-faith effort to schedule events and get them on the venue's calendar

15 before the written contracts can be approved. Because of its status as a long-term

16 promoter of events at the Fairgrounds, B&L has long had a right of first refusal to

17 secure its dates with the Fairgrounds. This longstanding practice and agreement was

18 highlighted in the complaint and other filings in *B&L Productions*. Ex. 3 at ¶¶ 68-77.

19 Additionally, B&L entered into a settlement agreement with the Fair Board in 2019

20 in *B&L Productions*, permanently terminating the 2019 gun show moratorium,

21 reinstating B&L's right to promote gun show events at the Fairgrounds, and barring

22 the Fair Board from unilaterally halting B&L's gun show events at the Fairgrounds.

23    The State knew about the contractual relationship between B&L and the Fair

24 Board when it adopted AB 893. Indeed, the Fairgrounds is a state-owned facility, and

25 the Fair Board must regularly report its activities to the California Department of

26 Agriculture. In 2018, both Governor Newsom (who signed AB 893) and Assembly

27 member Gloria (who sponsored AB 893) wrote letters to the Fair Board encouraging

28 it to end the 30-year relationship with B&L. And the text of AB 893 expressly

1    identified the ongoing presence at the Fairgrounds of "marketplaces popularly known

2    as 'gun shows,' at which firearms and ammunition and other items are sold to the

3    public approximately five times a year." Assem. Bill 893, § 1(a). What's more,

4    attorneys for the California DOJ represented the Fair Board in *B&L Productions* and

5    actively negotiated the terms of the written settlement agreement described above.

6         The sale of firearms and ammunition is an essential function of gun shows, and

7    it is one of the main reasons people attend these events. If gun shows are not

8    economically viable because they have been stripped of an essential function, they

9    will cease to exist. The State was well-aware when it passed AB 893 that a "gunless"

10   gun show would not survive financially. Indeed, the intended purpose of AB 893 was

11   to end gun shows at the Fairgrounds, thus ending a 30-year business relationship for

12   B&L. Indeed, Assembly member Lorena Gonzalez, co-sponsor of AB 893,

13   hypocritically lamented that "[t]he State of California shouldn't be in the business of

14   using our land to join with the firearm industry to profit off the sale of guns and

15   ammo." She seems to take no issue, however, with the State profiting off the millions

16   of dollars in taxes and fees levied on the very same firearms and ammunition when

17   they are sold in gun stores. Her clear goal was not just to end the sales of firearms

18   and ammunition at Del Mar but to end gun shows entirely. Ex. 2.

19        Due to the State's intentional act of adopting AB 893, B&L has been unable to

20   secure dates and finalize contracts for events in 2021 in accordance with its long-

21   standing right to do so and the terms of the 2020 settlement agreement. In line with

22   the new law, the Fair Board cannot and will not enter into contracts for gun shows at

23   the Fairgrounds if firearms and ammunition will be sold. And even though B&L has

24   expressly stated that it would attempt to hold events without such sales, the Fair

25   Board has dragged its feet and has not provided dates for events in 2021. B&L has

26   reached out to secure event dates for 2021 but has received no appropriate response.

27   Now, many of those dates have passed or have become unavailable.

28        Due to AB 893, B&L has suffered and will continue to suffer significant

19

economic damages. B&L has lost revenue for all Del Mar gun shows in 2021 because the Fair Board will not finalize event dates, citing AB 893 as the reason. But even if B&L could secure dates to host gun shows in the second half of the year, AB 893 stands in the way of B&L generating the profits they typically generate because the ban on firearm and ammunition sales will significantly impact paid event attendance and the types and numbers of paid vendors who will do business with B&L at the Del Mar gun show. What's more, the harms and injuries to B&L are of a continuing nature; they continue to compound everyday AB 893 remains the law. Finally, B&L seeks recovery for the loss of business goodwill resulting from the State's adoption of AB 893 under the (unsupported) pretense that gun shows, generally, and B&L's shows, in particular, threaten public safety. The message that act sends to other venues, attendees, and vendors that do business with B&L will no doubt affect B&L for years.

In this matter, Claimant B&L's claim exceeds $10,000, and any lawsuit would not be a limited civil case.

### C.    Circumstances That Led to Damage or Injury

On September 11, 2018, the Fair Board voted to halt gun shows at the Del Mar Fairgrounds, a state-owned facility, while it "studied" the impact of gun shows to consider whether further regulation of the events was needed. In discriminating against the gun show promoters, vendors, and law-abiding citizens who have promoted or attended these gun shows for over 30 years, the Fair Board's actions violated the constitutional rights of those promoters, vendor, and attendees.

The Claimants, together with individual event attendees, sued the Fair Board in the United States District Court for the Southern District of California, challenging the gun show moratorium on First Amendment grounds. Ex. 3. The plaintiffs secured a decisive and well-reasoned opinion, holding that the plaintiffs were likely to succeed on the merits of their First Amendment claim and preliminarily enjoining the Fair Board from blocking gun shows during the course of litigation. Ex. 4. Shortly

thereafter, the Fair Board proposed that the parties attempt to settle the plaintiffs' claims. Negotiations were ultimately successful, and the plaintiffs dismissed their claims in exchange for the return of gun shows to the Del Mar Fairgrounds and the payment of damages and attorney fees exceeding $500,000.

After the settlement of *B&L Productions v. 22nd District Agricultural Association*, Assembly member Todd Gloria (D) vowed to pass legislation that would permanently "prohibit the sale of firearms and ammunition at the Del Mar Fairgrounds… and would thereby make a violation of that prohibition a misdemeanor" beginning January 1, 2021. Gloria made no attempts to show specific concerns of public safety occurring at gun shows at the Del Mar Fairgrounds. He instead tried to tie the prohibition of firearm and ammunition sales on state property to overly general incidents of gun violence happening throughout the country. These general concerns have no connection to gun show events at Del Mar (or in California, for that matter). To the contrary, as the head of security for the Del Mar Fairgrounds testified, there has been no legitimate security or public safety issues at the Del Mar gun show for the past 30 years.

Gloria's attempt to link gun violence and public safety concerns to a lawful and safe gun show fails. He was well aware of the safety record of the gun shows and that by moving to ban the sale of firearms and ammunition, the state would not only be interfering with the business relationships between the promoter and vendors and the promoter and fairgrounds but would also violate the First Amendment constitutional rights of the promoter, vendors, and attendees of the gun shows. This is especially true considering that Gloria's move to destroy the economic viability of gun shows at Del Mar was prompted by the settlement of *B&L Productions v. 22nd District Agricultural Association* and the federal district court's pro-First Amendment decision in that case.

Governor Newsom, who signed AB 893 into law and is ultimately responsible for the enforcement of state law, has long harbored animus towards gun show

<div align="center">21</div>

promotion as a whole. He has supported the closure of gun shows at other state venues and specifically wrote a letter to the Del Mar Fair Board in 2018 in support of the Fair Board acting against lawful commerce and contracts. Indeed, he wrote that "[p]ermitting the sale of firearms and ammunition on state owned property only perpetuates America's gun culture at a time when 73 percent of Californians support gun reform measures." His support was later thwarted by the federal district court as unconstitutional action by the Del Mar Fair Board. In fact, after one of the Del Mar Fair Board Directors voted to keep gun shows in 2019 (the only "yes" vote), Governor Newsom removed the Board Member from the Fair Board because he would not conform to the Governor's desire to end gun shows on state property. *See* Ex. 5.

For further discussion of the circumstances that led to Claimants' damage or injury, see Section II.B. above.

**D.   Why the State Is Responsible for the Damages and Injuries Described**

Respondents Newsom, Bonta, Ross, and the Fair Board, by way of intentional, negligent, or reckless disregard of claimants' constitutional rights, are responsible for the ongoing injuries to the promoter, vendors, and associations that promote and attend gun shows by continually prohibiting their right to lawfully engage in a business relationship that has been profitable for both the fairground, the promoters, vendors, and associations for over 30 years.

The State was readily aware of these business relationships when it acted. Indeed, the event and its history has been widely publicized. What's more, Assembly member Gloria clearly followed the Fair Board's attempts in 2018 to ban the gun show and the resulting federal litigation, injunction order, and settlement. In fact, in a letter dated September 10, 2018, Gloria encouraged the Fair Board not to approve any new contracts with producers of gun shows and further threatened that if the Fair Board did not ban the events at the facility, he was "prepared to act by way of

1 legislation." Ex. 2.

2      What's more, the text of AB 893 expressly identified the ongoing presence at

3 the Del Mar Fairgrounds of "marketplaces popularly known as 'gun shows,' at which

4 firearms and ammunition and other items are sold to the public approximately five

5 times a year." Assem. Bill 893, § 1(a). And the bill clearly recognized that

6 *"[p]romoters maintain relationships with a core group of vendors, some selling guns*

7 *and some selling other merchandise,* who travel as the schedule dictates from city to

8 city and state to state and in the West, for example, many of the same vendors can be

9 seen at Crossroads of the West Gun Shows from San Francisco, California, to

10 Tucson, Arizona." *Id.*, § 1(g). It could hardly be clearer that the State was well aware

11 of the existence of these business relationships when AB 893 was adopted.

12      When Governor Newsom signed AB 893 into law, his Communications

13 Director stated that "the whole premise behind our state's system of District

14 Agricultural Associations is for a group of local officials to determine what events

15 best match the values of the community." The problem here is that the Fair Board

16 already attempted to unconstitutionally ban gun shows at their venue and lost that

17 case in federal court. Then, the Fair Board decided that it was in its community's best

18 interest to settle that case and bring gun shows back to Del Mar. If the purpose of the

19 DAAs is to have local decisions determine their course of action, the State should not

20 be inserting itself into that process to attempt additional gun show bans, violating the

21 constitutional rights and impairing the business relationships of promoters, vendors,

22 associations, and fair boards. This is exactly what it has done, and now the State is

23 responsible for the ongoing economic injuries.

24

25 / / /

26 / / /

27 / / /

28 / / /

For further discussion of why the State is responsible for Claimants' damage or injury, see Section II.B. above.

Dated: August 2, 2021                    **MICHEL & ASSOCIATES, P.C.**

Anna M. Barvir
Attorneys for Claimants Attorneys for
Claimants B & L Productions, Inc., Lawrence
M. Walsh and Miwall Corporation, L.A.X.
Firing Range Inc., and California Rifle & Pistol
Association, Incorporated
abarvir@michellawyers.com

Dated: August 2, 2021                    **LAW OFFICES OF DONALD KILMER, APC**

*/s/ Donald Kilmer*

Donald Kilmer
Attorney for Claimant Second Amendment
Foundation
Don@DKLawOffice.com

# EXHIBIT 1

**STATE CAPITOL**
P.O. BOX 942849
SACRAMENTO, CA 94249-0078
(916) 319-2078
FAX (916) 319-2178

**DISTRICT OFFICE**
1350 FRONT STREET, SUITE 6054
SAN DIEGO, CA 92101
(619) 645-3090
FAX (619) 645-3094

**E-MAIL**
Assemblymember.Gloria@assembly.ca.gov

*Assembly*
*California Legislature*

**TODD GLORIA**
**MAJORITY WHIP**
ASSEMBLYMEMBER, SEVENTY-EIGHTH DISTRICT

**COMMITTEES**
AGING AND LONG-TERM CARE
GOVERNMENTAL ORGANIZATION
HOUSING AND COMMUNITY
DEVELOPMENT
VETERANS AFFAIRS
WATER, PARKS, AND WILDLIFE

September 10, 2018

22nd District Agricultural Association
Attn: Board of Directors
2260 Jimmy Durante Blvd.
Del Mar, CA 92014

Dear Members of the Board,

As the Assemblymember representing the 78th District, which includes the Del Mar Fairgrounds, I am writing in support of the Contracts Committee recommendation that no new contracts with producers of gun shows be approved.  As stated in my letter of March 12, 2018, it is my firm belief that the State of California should in no way help to facilitate the sale of firearms.

I applaud the 22nd District Agricultural Association (22nd DAA)'s willingness to consider options for limiting or eliminating these gun shows, and believe that this recommendation reflects the desires of the surrounding community. It is my firm belief that the Board itself should carry out this directive, however, I am prepared to act by way of legislation should the 22nd DAA Board be unable to take meaningful action.  I have prepared language for introduction in the next legislative session should that become necessary.

With the continued prevalence of gun violence in our nation, it is impossible to ignore the link to the number of guns in our communities. That is why I believe it is imperative to remove the State, to the extent possible, from complicity in these tragedies by restricting gun shows at the Del Mar Fairgrounds.

I appreciate the Board's time and consideration of this matter.

Sincerely,

*Todd Gloria*

TODD GLORIA
Assemblymember, 78th District

CC: Tim Fennell, Del Mar Fairgrounds CEO/General Manager

# EXHIBIT 2



### POLITICS

# Assembly Passes Todd Gloria's Bill to Thwart Gun Shows at Del Mar Fairgrounds



by **Chris Jennewein**
April 25, 2019



A gun show similar to Crossroads of the West in Del Mar. Photo via Wikimedia Commons

In what sponsor Todd Gloria called a "rebuke to the NRA," the state Assembly voted 48 to 16 Thursday to pass a bill prohibiting gun and ammunition sales at the Del Mar Fairgrounds.

"Today marks a major step forward for this bill and a major step toward making our communities safer by reducing the number of guns in our neighborhoods," said Gloria, a Democrat who represents coastal San Diego county.

0215

Case 3:21-cv-01718-AJB-KSC Document 1 Filed 10/04/21 PageID.275 Page 275 of 366

Assembly Bill 893 would prohibit the sale of guns or firearms anywhere on the Del Mar Fairgrounds property starting 2021. Violation would be punishable by a misdemeanor.

If it's ultimately passed by the state Senate, and signed by the governor, Gloria's bill would effectively shut down gun shows like Crossroads of the West at the fairgrounds.

"The communities around the Del Mar Fairgrounds have been clear: they do not want these gun shows taking place on this state-owned land. With this bill, we are demonstrating that we value people over guns and are putting public safety first," added Gloria, who is a candidate for San Diego Mayor in 2020.

←



Ads by Google

Stop seeing this ad　　Why this ad? ▷

Assemblymembers Lorena Gonzalez of San Diego and Tasha Boerner Horvath of Encinitas were co-authors of the bill.

"The State of California shouldn't be in the business of using our public land to join with the firearms industry to profit off the sale of guns and ammo," said Gonzalez.

The board of the 22nd District Agricultural Association, which oversees the fairgrounds, voted 8-1 last September to suspend gun shows until loopholes and concerns regarding the sale of guns and ammunition could be assuaged.

The NRA, Gun Owners of California and the California Rifle and Pistol Association have all opposed the bill through committee hearings and Thursday's vote.

0216

Assembly Passes Todd Gloria's Bill to Thwart Gun Shows at Del Mar Fairgrounds - Times of San Diego

▷

0217

0218



## CHRIS JENNEWEIN

Chris Jennewein is Editor & Publisher of Times of San Diego. More by Chris Jennewein

© 2021 Times of San Diego LLC.

Proudly powered by Newspack by Automattic

0219

# EXHIBIT 3

1  C.D. Michel-SBN 144258
   Anna M. Barvir-SBN 268728
2  Tiffany D. Cheuvront-SBN 317144
   MICHEL & ASSOCIATES, P.C.
3  180 East Ocean Blvd., Suite 200
   Long Beach, CA 90802
4  Telephone: (562) 216-4444
   Fax: (562) 216-4445
5  Email: cmichel@michellawyers.com

6  Attorneys for Plaintiffs B & L Productions, Inc., Barry Bardack, Ronald J. Diaz, Sr.,
7  John Dupree, Christopher Irick, Lawrence Walsh, Maximum Wholesale, Inc.,
   California Rifle & Pistol Association, Incorporated, South Bay Rod and Gun Club,
   Inc.
8
9  Donald Kilmer-SBN 179986
   Law Offices of Donald Kilmer, APC
10 1645 Willow Street Suite 150
   San Jose, CA 95125
11 Telephone: (408) 264-8489
   Fax: (408) 264-8487
   Email: Don@DKLawOffice.com
12
13 Attorney for Plaintiff Second Amendment Foundation

14              IN THE UNITED STATES DISTRICT COURT

15          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

16 | B & L PRODUCTIONS, INC., d/b/a | CASE NO: '19CV0134 CAB NLS
   | CROSSROADS OF THE WEST;
17 | BARRY BARDACK; RONALD J. | **COMPLAINT FOR MONETARY,**
   | DIAZ, SR.; JOHN DUPREE; | **DECLARATORY & INJUNCTIVE**
   | CHRISTOPHER IRICK; LAWRENCE | **RELIEF; DEMAND FOR JURY**
18 | WALSH; MAXIMUM WHOLESALE, | **TRIAL**
   | INC., d/b/a AMMO BROS.;
19 | CALIFORNIA RIFLE & PISTOL | **(1) VIOLATION OF 42 U.S.C. § 1983**
   | ASSOCIATION, INCORPORATED; | **[FREE SPEECH-POLITICAL];**
20 | SOUTH BAY ROD AND GUN
   | CLUB, INC.; and SECOND | **(2) VIOLATION OF 42 U.S.C. § 1983**
21 | AMENDMENT FOUNDATION, | **[FREE SPEECH-MIXED POLITICAL/**
   | | **COMMERCIAL];**
22 |        Plaintiffs,
   | | **(3) VIOLATION OF 42 U.S.C. § 1983**
23 |        v. | **[FREE SPEECH-COMMERCIAL];**

24 | 22nd DISTRICT AGRICULTURAL | **(4) VIOLATION OF 42 U.S.C. § 1983**
   | ASSOCIATION; STEVE | **[PRIOR RESTRAINT ON SPEECH];**
25 | SHEWMAKER, PRESIDENT OF
   | 22ND DISTRICT AGRICULTURAL | **(5) VIOLATION OF 42 U.S.C. § 1983**
26 | ASSOCIATION, in his official and | **[RIGHT TO ASSEMBLY];**
   | individual capacity; RICHARD
27 | VALDEZ, VICE PRESIDENT OF | **(6) VIOLATION OF 42 U.S.C. § 1983**
   | 22ND DISTRICT AGRICULTURAL | **[EQUAL PROTECTION];**
28 | ASSOCIATION, in his official and

                              1
          COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
                                                              0221

individual capacity; KAREN HILL SECRETARY OF CALIFORNIA DEPARTMENT OF FOOD & AGRICULTURE, in her official capacity; DOES 1-50;

Defendants.

**(7) VIOLATION OF 42 U.S.C. § 1985 [CONSPIRACY TO VIOLATE CIVIL RIGHTS].**

## INTRODUCTION

1.     Plaintiff B & L PRODUCTIONS, INC., d/b/a CROSSROADS OF THE WEST ("Crossroads") has operated popular, safe, heavily regulated, legal and family-friendly gun show events as a business in California for over 30 years, including at the Del Mar Fairgrounds ("Venue").

2.     Crossroads produces gun show events at the Venue where like-minded individuals gather to engage in commerce related to, and necessary for, the lawfully and regulated exercise of Second Amendment rights for themselves, their exhibitors, their patrons, their customers, and the general public. This safe and regulated marketplace promotes public safety, even for people who do not attend gun shows; because it will have a tendency to reduce the unregulated transfer of firearms within San Diego County. Furthermore, by providing a convenient forum for Californians to exercise their right to acquire firearms locally, gun shows at the Venue will have the tendency to discourage the sale and importation of firearms from other states with less strict gun laws than California.

3.     Crossroads and their co-plaintiffs also use the Venue to engage in First Amendment activities that are both necessary and essential to the open, robust, and lawful exercise of their Second Amendment rights. Discussions include (but are not limited to): firearms, firearm technology, firearm safety, gun-politics, and gun-law (both pending legislation and proper compliance with existing law.) Other topics include: where to shoot, where and from whom to receive training, gun-lore, gun-repair, gunsmithing, gun-art, and many other topics, that arise from the right to acquire, own, possess, enjoy, and celebrate arms as a quintessentially American

1  artifact with Constitutional significance. Crossroads, its co-plaintiffs, attendees, and

2  vendor/exhibitors have the same right, privileges and immunities as any other lawful

3  activity/event that now uses the Venue.

4      4.    Defendants are government actors who have discriminated against and

5  intend to discriminate in the future against Plaintiffs by denying them the same

6  access to this public space as other lawful businesses. This discrimination is based

7  on irrational public policies that are based on flawed reasoning and dubious

8  conclusions relating to gun show operations and gun shows' impact on public safety.

9  The fantasy that Defendants must impose a moratorium while they "conduct a

10  study" is an admission that they currently have no reliable, valid, admissible

11  evidence that gun shows are a source of any public safety concerns.

12      5.    This discrimination by Defendants is also based on viewpoint animus,

13  because Defendants do not agree with, and actively oppose the cultural values and

14  the messages conveyed by and promoted by Plaintiffs at gun shows.

15      6.    This action seeks declaratory and injunctive relief against Defendants

16  for violations of the U.S. Constitution. This action also seeks damages against

17  Defendants for lost profits, lost opportunities, diminished marketing value, and

18  added expense of advertising to the general public. This action also seeks

19  reimbursement for the attorney fees, costs and other expenses in bringing this action.

20  The U.S. Constitutional rights abridged/infringed include but are not limited to: the

21  rights to free speech and assembly, the right to equal protection, the right to due

22  process, and privileges immunities enjoyed by all. Further, because Defendants

23  voted to ban Plaintiffs' gun show events, by imposing a moratorium, at the Venue

24  (which they own or manage) pending an inchoate and pretextual "study" of gun

25  show events—the Defendants actions constitute prior restraint.

26      7.    Plaintiffs California Rifle & Pistol Association, Inc., South Bay Rod

27  and Gun Club, Inc., Second Amendment Foundation, Inc., Barry Bardack, Ronald J.

28  Diaz, Sr., John Dupree, Christopher Irick, Lawrence Michael Walsh, and Maximum

0223

1    Wholesale, Inc., attend and participate in the Crossroads gun show. They associate

2    with like-minded people, participate in public discussions, attend informational

3    forums, distribute and collect information, make offers for sale, make offers to buy,

4    and engage in the legal and political discussions related to the Second Amendment

5    which are all protected forms of speech protected by the First Amendment.

6         8.    Defendants refuse to continue the longstanding relationship and annual

7    contracts or holding or securing dates that Crossroads has maintained for over 30

8    years.

9         9.    Plaintiffs seek declaratory judgment from this Court to clarify that

10   Defendants' actions against Plaintiffs are unconstitutional.

11        10.    Plaintiffs seek an injunction to stop the moratorium against gun shows

12   at the Venue.

13        11.    Plaintiffs Crossroads, California Rifle & Pistol Association,

14   Incorporated, South Bay Rod & Gun Club, Inc., Second Amendment Foundation,

15   Inc., Lawrence Walsh, and Maximum Wholesale seek damages from Defendants

16   Shewmaker and Valdez, in their individual capacity. Plaintiffs also seek recovery of

17   fees and costs.

18        12.    In sum, Plaintiffs ask that the Court maintain the status quo and allow

19   Plaintiffs to continue their 30-year tradition of contracting for and holding gun

20   shows at this public Venue—until such time as Defendants can produce admissible,

21   clear and convincing evidence, to a jury, that a ban on gun shows at the Venue will

22   narrowly address a compelling government interest.

23                              **THE PARTIES**

24   **I.    Plaintiffs**

25        13.    Plaintiff B & L PRODUCTIONS, INC., d/b/a CROSSROADS OF THE

26   WEST, is a for-profit event promoter operating in several western states. Crossroads

27   is in the business of promoting and organizing trade shows throughout the state of

28   California and other western states, including their long-running gun show events

held at the Del Mar Fairgrounds ("Venue") operated under the d/b/a Crossroads of the West ("Crossroads"). Crossroads currently is the largest vendor of gun show events in California and at the Del Mar Fairgrounds. The gun shows occupy thousands of square feet of the Venue. Typically, thousands of people attend the gun show on each of the weekends they are held. They have successfully produced and operated multiple safe, legal, and family friendly gun show events in California and at the Venue every year for over 30 years.

14.    Plaintiff BARRY BARDACK is a resident of El Cajon, California, and a part-time flight instructor. He regularly attends the gun shows at the Del Mar Fairgrounds where he purchases ammunition for his target shooting hobby and volunteers at the CRPA booth to talk to others about their rights, the importance of membership in the CRPA, and the Second Amendment. If the gun show is banned from the Del Mar fairgrounds, he believes that his closest vendor for being able to purchase his bulk ammunition would be two hours from his home.

15.    Plaintiffs RONALD J. DIAZ, SR., is a resident of Alpine, California, and is a retired federal contractor. He regularly attends gun shows at the Del Mar Fairgrounds to purchase reloading supplies. If the gun show is banned from the Del Mar Fairgrounds, he believes he would have to drive several hours to get to a vendor that could offer him the expertise and variety available at the Crossroads gun shows. Plaintiff Diaz also attends the Crossroads gun show events at the Del Mar Fairgrounds to engage in expressive activities with like-minded people, including discussions related to firearms, ammunition, and accessories, the shooting sports, politics, and the Second Amendment.

16.    Plaintiff JOHN DUPREE is a resident of Alpine, California, and works for the federal government. He regularly attends the Crossroads gun shows at the Del Mar Fairgrounds. He is a competitive shooter and has the need to purchase bulk ammunition in order to compete. If the gun show is banned from the Del Mar Fairgrounds, he would have to drive several hours in order to find a vendor that he

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

could purchase bulk ammunition from as there is not a resource like this near his home. Plaintiff Dupree also attends the Crossroads gun-show events at the Del Mar Fairgrounds to engage in expressive activities with like-minded people, including discussions related to firearms, ammunition, and accessories, the shooting sports, politics, and the Second Amendment.

17. Plaintiff CHRISTOPHER PAUL IRICK is a resident of Carlsbad, California, and attends the Crossroads guns shows at the Del Mar Fairgrounds. He is self-employed and enjoys going to the shows for good prices on firearms and accessories, as well as the variety of merchandise available at the events. Plaintiff Irick also attends the Crossroads gun-show events at the Del Mar Fairgrounds to engage in expressive activities with like-minded people, who hunt and support the Second Amendment while learning about new and innovative products available to firearms owners and sportsmen.

18. Plaintiff LAWRENCE MICHAEL WALSH is the owner of Wholesale Ammunition and is a regular vendor at the Crossroads gun shows at the Del Mar Fairgrounds. His business currently does not have a physical store as they only sell their product at gun shows across the state. Mr. Walsh's business also supplies ammunition to many of the law enforcement agencies and officers in the state, some of which purchase their ammunition from him at the gun shows because of the amount available, the cost, and the variety they can find. Mr. Walsh enjoys being able to talk with other Second Amendment supporters with like interests and views. If the gun shows at the Del Mar Fairgrounds, or any of the other state venues, were to be shut down, it would be devastating to Mr. Walsh's business and his ability to reach a large number of people would be greatly diminished.

19. Plaintiff MAXIMUM WHOLESALE, INC., d/b/a AMMO BROS., is a for-profit corporation that was founded in 2002 in Cerritos, California. In 2009, their second location opened in Ontario, California. And in 2015, the company opened two more locations in southern California. Ammo Bros. is known for selling

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

0226

1   firearms and ammunition to individuals and police departments. In 2016, they

2   opened a San Diego location, serving those stationed at Miramar Air Base and the

3   surrounding communities. Ammo Bros. regularly attends the Crossroads gun shows

4   at the Del Mar Fairgrounds as a vendor, selling firearms, ammunition, and related

5   merchandise.

6        20.     Plaintiff CALIFORNIA RIFLE & PISTOL ASSOCIATION,

7   INCORPORATED ("CRPA") is a nonprofit membership organization incorporated

8   under the laws of California, with headquarters in Fullerton, California. Among its

9   other activities, CRPA works to preserve and expand constitutional and statutory

10   rights of gun ownership, including the right to self-defense and the right to keep and

11   bear arms. CRPA accomplishes this through their many educational offerings,

12   publications, member engagement events, support of legislation, and legislative

13   initiatives. CRPA has tens of thousands of members and supporters, many of whom

14   (including Plaintiff Bardack) reside in San Diego County. Their members are

15   firearm retailers, sportsmen, hunters, junior and youth competitors, Olympians,

16   police officers, professionals, and loving parents. CRPA represents all its members

17   both in their general interest as citizens and in their particular interests as supporters

18   of those who choose to engage other like-minded people in their endeavors to

19   lawfully own and possess firearms. CRPA also stands as an individual organization

20   plaintiff because CRPA is a regular vendor (where they engage the public about

21   constitutional rights, political issues, safety, and many other topics) and participant

22   at the gun shows and stands to have injury to the organization itself as well as to its

23   members.

24        21.     Plaintiff SOUTH BAY ROD AND GUN CLUB, INC. ("South Bay") is

25   a private nonprofit corporation formed in 1955 with a mission to operate a properly

26   managed nonprofit shooting club that is efficiently designed, contracted and safely

27   operated with diligently maintained shooting ranges, support structures, and

28   facilities so that all authorized members and guests may use the facility with pride,

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1   confidence, and satisfaction. South Bay endeavors to promote and encourage the

2   safe handling and use of firearms. South Bay also stands as an individual

3   organization plaintiff because it is a regular vendor and participant at the gun shows

4   and stands to have injury to the organization itself as well as to its more than 4,000

5   members.

6       22.    Plaintiff SECOND AMENDMENT FOUNDATION, INC. ("SAF") is

7   incorporated under the laws of the state of Washington and was founded in 1974. It

8   is dedicated to promoting a better understanding about our Constitutional heritage to

9   privately own and possess firearms through educational and legal action programs

10  designed to better inform the public about gun control issues. Second Amendment

11  Foundation has been a pioneer in innovative defense of the right to keep and bear

12  arms, through its publications and public education programs like the Gun Rights

13  Policy Conference. Those publications and other SAF materials and information are

14  offered at gun show events. Second Amendment Foundation also expends

15  significant sums of money sponsoring public interest litigation like this lawsuit.

16  **II.   Defendants**

17      23.    Defendant 22nd DISTRICT AGRICULTURAL ASSOCIATION

18  ("District") is a Governor-appointed Board of Directors that manages the state-

19  owned Del Mar Fairgrounds public venue. The District is governed by a nine-

20  member board, each member serving a four-year term. The District Board of

21  Directors appoints a CEO charged with the daily operations of the facilities but

22  maintains control over activities not delegated to the CEO, including contracting

23  with those seeking to host gun-show events at the Venue. It voted to ban all gun

24  shows at the Venue through December 2019, while a non-public, ad hoc committee

25  studies alleged safety and other concerns regarding the operation of such events at

26  the Venue.

27      24.    Defendant KAREN ROSS is the Secretary of the California Department

28  of Food & Agriculture—the entity responsible for the policy oversight of the

8

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1    network of California fair venues. Through the Department, Defendant Ross issues

2    guidance for governance and contracting to all agricultural districts throughout

3    California (including Defendant District) and requires reporting from the districts on

4    operational issues. The Department maintains an office of legal counsel for any

5    actions brought against Agricultural Association Districts in the state.

6        25.    Defendant STEVE SHEWMAKER, who is sued in his individual and

7    official capacities, is the President of the 22nd District Agricultural Board of

8    Directors. He assigned himself (and just one other Board Member) to serve on the

9    ad hoc committee responsible for developing the plan, in closed session, to

10   effectively ban gun shows from the Del Mar Fairgrounds. Defendant Shewmaker

11   expressed at a board meeting that he sought to ban gun shows because of personal

12   experience with gun violence. He did not consider his duty to manage public

13   property for all when he was looking to ban the gun shows at the Venue.

14       26.    Defendant RICHARD VALDEZ, who is sued in his individual and

15   official capacities, is the Vice President of the 22nd District Agricultural Board of

16   Directors. He, along with Defendant Shewmaker, served on the ad hoc committee

17   responsible for developing the plan, in closed session, to effectively ban gun shows

18   from the Del Mar Fairgrounds. He did not consider his duty to manage public

19   property for all when he was looking to ban the gun shows at the Venue.

20       27.    The true names and capacities of Defendants named as DOES 1

21   through 50, inclusive, are individual, corporate, associate or otherwise, and are

22   unknown to Plaintiffs. They are, however, believed to be responsible in some way

23   for Plaintiffs' loss and damages. Each Doe Defendant is, and at all times mentioned

24   here was, a partner, agent, principal, co-conspirator, or are otherwise vicariously or

25   directly responsible for the acts or omissions of the other defendants or themselves.

26   They are each sued individually and are joined as party defendants. Plaintiffs thus

27   sue each Doe Defendant under rules 15 and 21 of the Federal Rules of Civil

28   Procedure. Plaintiffs are informed and believed that the Doe Defendants are all

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

California residents. Plaintiffs will amend this complaint to show such true names and capacities of Doe Defendants when they have been ascertained.

## JURISDICTION AND VENUE

28.     This action arises under 42 U.S.C. § 1983 to redress the deprivation of rights secured by the United States Constitution. This Court has original jurisdiction over these civil claims under 28 U.S.C. § 1331 because the matters in controversy arise under the Constitution and laws of the United States, thus raising federal questions. The Court also has jurisdiction under 28 U.S.C.§ 1343 (a)(3) because this action is brought to redress the deprivation, under color of state law, of federally secured rights, privileges, and immunities.

29.     The Court has authority to render declaratory judgments and to issue permanent injunctive relief under 28 U.S.C. §§ 2201 and 2202 and Rule 65 of the Federal Rules of Civil Procedure.

30.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because the 22nd District Agricultural Association is located in San Diego County and all of the acts giving rise to this action occurred in this District.

## FACTUAL ALLEGATIONS

### I.     Regulation of Gun Show Events in California

31.     The state of California has the most rigorous regulatory regime for commerce in firearms and ammunition in the United States. That regulatory regime applies to the operation of gun show events throughout California. The laws related to the acquisition and sale of firearms is arguably stricter at a gun show, than at brick-and-mortar stores or internet sales.

32.     The state of California has already determined the manner in which lawful gun shows must be operated under the California Penal Code. Requiring more of gun show event promoters than state law dictates is an ultra vires action that exceeds the scope of state law.

33.     Only state approved, licensed gun show "producers" may operate a gun

10

0230

show events in California. All gun show producers, including Plaintiff Crossroads, must have an individual (the "promoter") who holds a valid "Certificate of Eligibility" issued by the California Department of Justice.

34. Gun show producers must also, among other things:

    a. Certify that they are familiar with all California laws regarding gun shows, Cal. Penal Code § 27200;

    b. Possess a minimum of $1,000,000 liability insurance, *id.*;

    c. Provide an annual list of shows or events to be held to the California Department of Justice, *id.*; and

    d. Notify the California Department of Justice no later than 30 days prior to the gun show or event of any changes to the above, *id.*

    e. Make available to law enforcement a complete and accurate list of all vendors that will participate in the show to sell, lease, or transfer firearms. Cal. Penal Code § 27205.

35. Gun show promoters must submit an annual event and security plan and schedule to the California Department of Justice and any local law enforcement agency. The plan must include:

    a. Type of show or event;

    b. Estimated number of vendors offering for sale or display firearms;

    c. Estimated number of attendees;

    d. Number of entrances and exits at the event;

    e. Location, dates, and times of the event;

    f. Contact person and telephone number for both promoter and facility;

    g. Number of sworn peace officers employed by the producer or facility who will be present at the event;

    h. Number of non-sworn security personnel employed by the

11

producer or the facility who will be present at the event; and

    i.    Promoters must inform all prospective vendors of all California laws regarding gun shows. Cal. Penal Code §§ 27210, 27215.

36.    Promoters of gun shows must also provide a list of all prospective vendors and designated firearm transfer agents who are licensed firearm dealers to the California Department of Justice no later than seven days prior to the event for the purpose of determining whether the vendor possess a valid license and are thus eligible to participate in the event. Cal. Penal Code § 27220.

37.    If a vendor is not approved by the California Department of Justice or fails to comply with all applicable California law, they cannot participate. Cal. Penal Code § 27220.

38.    If a promoter fails to inform all prospective vendors of California's state laws or fails to submit a list of all prospective vendors to the California Department of Justice, the event cannot commence. Cal. Penal Code § 27230.

39.    A promoter must have written contracts with each vendor selling firearms at the event. Cal. Penal Code § 27235.

40.    Promoters must post signs in a readily visible location at each public entrance to the event that includes all of the following notices:

- **"This gun show follows all federal, state, and local firearms and weapons laws, without exception."**
- **"Any firearm carried onto the premises by any member of the public will be checked, cleared of any ammunition, and secured in a manner that prevents it from being operated, and an identification tag or sticker will be attached to the firearm before the person is allowed admittance to the show."**
- **"No member of the public under the age of 18 years shall be admitted to the show unless accompanied by a parent, grandparent, or legal guardian."**

12

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

- **"All firearm transfers between private parties at the show shall be conducted through a licensed dealer in accordance with applicable state and federal laws."**
- **"Persons possessing firearms in this facility must have in their immediate possession government-issued photo identification and display it upon the request to any security officer or any peace officer, as defined in Section 830."** Cal. Penal Code § 27240(a).

41.     Producers must also post signs in a readily visible location at each entrance to the parking lot stating: "The transfer of firearms on the parking lot of this facility is a crime." Cal. Penal Code § 27240(b).

42.     A willful failure of a producer to comply with any of California's applicable laws is a misdemeanor punishable with a fine of up to $2,000 dollars and would render the producer ineligible for a gun show producer license for up to one year, which could cost a producer hundreds of thousands of dollars in lost revenue for a willful infraction. Cal. Penal Code § 272459(c).

43.     Actual firearm transfers are prohibited from taking place at any gun show in California absent very limited exceptions applicable only to law enforcement.[1] The firearm purchase process can be started through an onsite licensed "transfer dealer," but the sale cannot be completed on site. Purchasers must pick up their purchase after a 10-day waiting period and background check at a licensed firearm retailer at a different licensed location. There is no "Gun Show Loophole" at gun shows operated in accordance with California Law. Plaintiffs

---

[1] Cal. Penal Code § 27310 (requiring all firearm transfers at gun shows to comply with state and federal law); *id.* § 26805 (prohibiting the sale and transfer of a firearm by a licensed dealer at any location other than the dealer's premises as listed on their license but allowing dealer to prepare documents at a gun show in preparation for completion of the sale at the dealer's premises); *id.* § 27545 (requiring all firearm transactions to be processed through a licensed dealer when neither party is a licensed dealer).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

diligently operate all of their gun shows in accordance with state law, and take immediate remedial measures if irregularities are discovered.

44. The Gun Show Act of 2000, California Penal Code sections 27200-27245, places even more restrictions on the operation of a gun show in California by requiring that:

a. Vendors not display, possess, or offer for sale any firearms, knives, or weapons for which possession or sale is prohibited;

b. Vendors acknowledge that they are responsible for knowing and complying with all applicable federal, state, and local laws dealing with the possession and transfer of firearms;

c. Vendors will not engage in activities that incite or encourage hate crimes;

d. Vendors will process all transfers of firearms through licensed firearms dealers as required by state law;

e. Vendors will verify that all firearms in their possession will be unloaded and that the firearms will be secured in a manner that prevents them from being operated except for brief periods, when the mechanical condition of the firearm is being demonstrated to prospective buyer;

f. Vendors provide all required information under Penal Code § 27320;

g. Vendors not display or possess black powder or offer it for sale;

h. Ammunition only be displayed in closed original factory boxes or other closed containers, with the only exception for showing the ammunition to a prospective buyer. On July 1, 2019, additional state-law restrictions on the sale of ammunition will become effective and gun shows must comply;

i. No member of the public under 18 years old may enter a gun

14

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

show unless accompanied by a parent or legal guardian;

    j.    No person other than security personnel or law enforcement possess both a firearm and ammunition for that firearm at the same time, with the exception of vendors who are selling both.

45.    Even with all of the state and federal regulations that promoters and vendors must comply with, Defendants continually attempt to place further restrictions on Plaintiffs by requiring excessive security—more than is reasonably necessary—and by requiring metal detectors for each door.

46.    Under information and belief, all of this was done in an attempt to make producing the shows at the Venue so cost prohibitive that Plaintiffs would just decide to go elsewhere—when this tactic did not discourage Plaintiffs, Defendants sought to ban the gun show events all together.

**II.    The Gun Show Cultural Experience**

47.    Gun show events are a modern bazaar—a convention of like-minded individuals who meet in this unique public forum that has been set aside by state and local governments for all manner of commerce. Gun shows just happen to include the exchange of products and ideas, knowledge, services, education, entertainment, and recreation, related to the lawful uses of firearms. Those lawful uses include (but are not limited to):

    a.    Firearm safety training;

    b.    Self-defense;

    c.    Defense of others;

    d.    Defense of community;

    e.    Defense of state;

    f.    Defense of nation;

    g.    Hunting;

    h.    Target shooting;

    i.    Gunsmithing;

15

j.     Admiration of guns as art;

k.     Appreciation of guns as technological artifacts; and

l.     Study of guns as historical objects.

48.    Only a small percentage (usually less than 40%) of the vendors actually offer firearms or ammunition for sale. The remaining vendors offer accessories, collectibles, home goods, lifestyle products, food and other refreshments.

49.    Gun shows in general, and the Del Mar show in particular, are a celebration of America's "gun culture" that is a natural and essential outgrowth of the constitutional rights that flow from the Second Amendment to the United States Constitution. Participating in that culture is one of the primary reasons people attend Crossroads gun shows as vendors, exhibitors, customers, and guests (even if particular vendors/attendees are not in the firearm business or in the market to buy a gun at a particular event.)

50.    Another reason that people attend gun show events is to learn about the technology and use of various firearms and ammunition when they are considering whether to buy or sell a firearm (or ammunition) and to exchange knowledge with experienced dealers and firearm enthusiasts that they cannot get anywhere else. *Teixeira v. County of Alameda*, No. 13-17132 (9th Cir. 2017).[2]

51.    Vendors at Crossroads gun shows are some of the same licensed vendors that have brick & mortar stores in the community, operate legally over the internet, and are registered with the state as lawful businesses. They sell legal products and enjoy being able to attend gun shows so they can better interact with customers in a more meaningful and intimate way. This convention-like setting is of incalculable benefit to the gun-buying consumer and promotes public safety.

---

[2] The *Teixeira* court did not answer whether the Second Amendment includes a right to purchase a firearm. Plaintiffs allege, in good faith, that the right to keep and bear arms *necessarily* includes the rights to purchase and sell them. Indeed, those rights are paramount to the exercise of the Second Amendment.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

52.     Gun shows are a First Amendment forum where literature and information are shared, speakers provide valuable live lectures, classes are conducted, political forums are held where gun rights discussions take place, and candidates for political office can meet to discuss political issues, the government, and the Constitution with constituents who are part of the California gun culture. This forum is vitally important especially in California where government actors at all levels of government (federal, state & local) are openly hostile to the cultural values of the Second Amendment and where supporters of those cultural values are not considered "mainstream."

53.     Gun shows, are cultural marketplaces for those members of the "gun culture" who attend for the purpose of proselytizing their constitutional rights and to transmit those beliefs in patriotism and the rights of the individual on to the next generation. It is a place where parents take their children and grandparents take their grandchildren to share with them, among other things, the love of historic firearms, stories of American war heroes, and their love of hunting.

54.     The Crossroads show in Del Mar is a place where parents can learn how to protect their families and homes, as well as how to stay in compliance with the ever-changing California gun laws. It is a place where people can discuss the positions of political candidates and whether those values line up with their own beliefs in protecting the Second Amendment.

55.     The Crossroads shows are held and promoted, and considerable investment is made, precisely for the purpose of promoting and "normalizing" the gun culture and the constitutional principles that gun show participants hold dear.

56.     Anti-gun activist groups use false data and scare tactics to try to influence the decisions of politicians. The District wishes to end this celebration of "gun culture" and Second Amendment rights because they do not understand the culture or the people, and therefore will not condone it.

57.     Promoting and facilitating the exercise of fundamental constitutional

17

rights, even controversial ones, is conduct that is worthy of and entitled to protection by the United States Constitution.

**III. The Del Mar Fairgrounds Venue**

58. The Venue is owned by the state of California and managed by the Board of Directors of Defendant 22nd District Agricultural Association. (Ex. 1.) Defendant District is charged with maintaining the Venue and ensuring that is used for public purposes.

59. Defendant Ross, as the Secretary of the California Department of Food & Agriculture, oversees the operation of the various agricultural districts in the state, including Defendant District. The Department, under Secretary Ross, provides policies and guidance for the operation of all agricultural districts in the state, including the use of facilities as directed by Department policy.

60. The Department of Food & Agriculture maintains a *CDFA Contracts Manual for Agricultural Districts* ("Manual"). Section 6.25 of the Manual states that "[w]hether or not a fair rents out their facilities for gun shows is a policy decision to be made by the fair board and their community."

61. Due to its large size and unique urban location, the Del Mar Fairground is a unique, publicly owned venue. There is no other public or private venue of similar size in the area. Effectively, the government has a monopoly on venues of this size and type in the area.

62. The Venue is a state-owned property maintained and opened for use by the public. By virtue of being opened by the state for use by the public, it is a "public forum," from which the government may not generally exclude expressive activity. *Cinevision Corp. v. City of Burbank*, 745 F.2d 560, 569 (9th Cir. 1984) (*quoting Perry Educ. Ass'n v. Perry Local Educators' Assn*, 460 U.S. 37, 45-46 (1983)).

63. The Venue is used by many different public groups and is a major event venue for large gatherings of people to engage in expressive activities, including

18

1 concerts, festivals, and industry shows.

2      64.    The Venue actively promotes the use of the property by the public
3 through contracting for available space at the Venue.

4      65.    Defendants claim that the Venue complies with the Americans with
5 Disability Act, implying that Defendants themselves consider it to be a "public
6 venue" since private facilities need not comply with ADA requirements.

7      66.    The Venue's website states its mission is "[t]o manage and promote a
8 world-class, multi-use, *public assembly facility* with an emphasis on agriculture,
9 education, entertainment, and recreation in a fiscally sound and environmentally
10 conscientious manner *for the benefit of all.*" http://www.delmarfairgrounds.com/
11 index.php?fuseaction=facilities.ada_info (emphasis added).

12      67.    The Venue has held other non-gun-show events in which criminal
13 activity has taken place—including theft and a shooting. These criminal incidents
14 are no more likely to happen at a gun show event that the non-gun-show event. The
15 District has taken no actions to ban or impose a moratorium on these promoters or
16 events. (Ex. 2.)

17 **IV.**    **Contracting to Rent the Del Mar Venue**

18      68.    The District has a process for securing returning contractors who would
19 like to secure specific dates into future years before the contracts can be drafted and
20 executed.

21      69.    Each year, returning and regular contractors, including Crossroads,
22 submit preferred dates for the next calendar year, so the District can confirm
23 availability and so Crossroads can begin to reserve vendors and materials for the
24 show weekends.

25      70.    Due to the size and extensive planning that goes into producing gun
26 show events, the District has for the past 30 years provided and held preferred dates
27 for contractors until the contracts can fully be executed. The "hold" system
28 essentially operates as a right of first refusal to the benefit of returning contractors.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

For example, if another contractor wanted the same preferred dates as Crossroads, the District would not allow another vendor to come in and take those dates from Crossroads even though there is no official contract in place yet.

71. The "hold" system also provides the District with the security of knowing its venue is booked with experienced and knowledgeable repeat contractors that have a demonstrated record of running safe and profitable events at the Venue.

72. This reservation system also permits the promoter to spend advertising dollars to promote the show. When governments announce plans to ban gun shows at particular venues, vendors and patrons rationally make plans to attend at other venues or seek other states to conduct their commerce. If/when the bans/moratorium is set aside, promoters must then spend additional resources to attract business to correct the false trial impression that shows have been cancelled.

73. The District also considers the "hold" dates and shows during Venue budget discussions which are typically held in the year before the contracts are commenced.

74. Upon information and belief, the "hold" system is widely used by similar state fair board venues and is standard industry practice. (Ex. 3.)

75. On or about July 5, 2018, Venue staff sent e-mails to Crossroads confirming "holds" on Crossroads' preferred dates for gun show events at the Venue in 2019. (Ex. 4.)

76. Crossroads, after doing business in this customary manner for 30 years, had no reason to doubt the District would honor the preferred "hold" dates or the staff emails confirming future dates which would lead to the eventual executed contract for the event space on the dates indicated.

77. On information and belief, all parties understood that the 2019 "hold" dates were binding and would allow for Crossroads and Venue staff to plan for future events at the Venue.

///

## V.     Defendants Ban Gun Show Events at the Venue

78.     Even though Crossroads had secured "hold" dates for 2019, and despite the long history that Crossroads has with the Venue in operating safe and legal events, the political environment has become hostile toward gun show events and, more generally toward the "gun culture."

79.     Indeed, gun-show-banning activists are at work throughout the state and the country to ban *all* gun shows *everywhere*, not because they are "dangerous for the community," but because they do not subscribe to the same values as gun show promoters, vendors, and participants. (Ex. 5.)

80.     In 2017, gun-show-banning activists began pressuring Defendant District to prohibit gun show events at the Venue.

81.     These activists rely on unfounded fears about the security of gun show events, false claims that gun shows are inherently dangerous because they normalize the "gun culture," and stereotypes about the people that attend gun shows. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985) (striking an ordinance requiring a special permit for a group home for the intellectually disabled, the Court cited direct evidence of negative attitudes toward persons with disabilities expressed by community members and recorded in the legislative history).

82.     In response, the District began a series of meetings and public-comment periods to determine whether Defendants would continue to contract with Crossroads or other promoters for the use of the Venue for gun show events.

83.     The District also engaged in communications with other government agencies and with Crossroads to determine whether gun shows at the Venue were operated in full compliance with state and federal law, and if the events pose any real danger to the community.

84.     Defendant Shewmaker also appointed a non-public, ad hoc committee of two members of the District (comprised of just himself and Defendant Valdez) to investigate the gun show operation at the Venue and report back to the District with

21

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1    recommendations for the continued use of the Venue for gun show events. The ad

2    hoc "Contracts Committee" had no set timeframe for its activities.

3        85.    On April 23, 2018, then-Governor-Elect Gavin Newsom sent a letter to

4    the District expressing his support for ending gun shows at the Venue.

5        86.    On August 24, 2018, Defendant Shewmaker responded to Newsom in a

6    letter stating that "the time has come for the 22nd DAA to take action and we plan to

7    do something on September 11th." This strong inference that the District intended to

8    "take action" to put an end to gun show events suggests that Defendant Shewmaker

9    intentionally and unlawfully discriminated against Plaintiffs, having already made a

10   decision before the public hearing such that Plaintiffs could not receive a fair and

11   unbiased hearing. *See Cinevision*, 745 F.2d at 571-77.

12       87.    In advance of the September 11, 2018 meeting, Plaintiffs' counsel

13   wrote to all members of the District, informing them that prohibiting gun show

14   events on public property would violate the rights of Crossroads, as well as vendors

15   and individual participants of gun show events. (Ex. 6.) What's more, at least two

16   licensed attorneys serve on the District—surely, they understand that viewpoint-

17   based discrimination in the rental of public property violates the First Amendment

18   unless supported by a compelling governmental interest.

19       88.    At the public hearing on September 11, 2018, the ad hoc "Contracts

20   Committee" recommended that the District "not consider any contracts with the

21   producers of gun shows beyond December 31st 2018 until such time as the District

22   has put into place a more thorough policy regarding the conduct of gun shows that:

23            a.    Considers the feasibility of conducting gun shows for only

24                  educational and safety training purposes and bans the possession

25                  of guns and ammunition on state property[;]

26            b.    Aligns gun show contract language with recent changes to state

27                  and federal law[;]

28            c.    Details an enhanced security plan for the conduct of future

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

shows[;]

    d.    Proposes a safety plan[;]

    e.    Considers the age appropriateness of the event[;]

    f.    Grants rights for the DAA to perform an audit to ensure full compliance with California Penal Code Sections 171b and 12071.1 and 1207.4." (Ex. 7.)

89.    The ad hoc "Contracts Committee" recommended that the District require the presentation of the proposed policy at the December 2019 meeting of the District.

90.    At the September 11, 2018 hearing, Defendant Shewmaker stated that he was done "drinking the Kool-Aid" regarding gun shows at the Venue. And he offered a story of a personal experience with gun violence unrelated to gun show events—appearing to rely on improper personal motives instead of what is best for the Venue or the constitutional rights of Plaintiffs. *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000).

91.    On the other hand, in testimony before the District, the Del Mar Fairgrounds Chief Marketing Officer stated that "[w]e feel 100% comfortable with the security measures we take," while discussing the implementation of the security measures used for events at the Venue, including those implemented at gun shows. Matt Boone, *Security Concerns Linger Ahead of KAABOO After Shooting at Del Mar Fairgrounds*, ABC News 10 San Diego (Sept. 12, 2018), *available at* https://www.10news.com/news/security-concerns-linger-ahead-of-kaaboo-after-shooting-at-del-mar-fairgrounds. He did not suggest that the security measures taken at gun show events at the Venue were lacking in any way.

92.    Ultimately, the lengthy process of meetings, public comment, and communications with stakeholders resulted in no finding that allowing the (already heavily regulated) gun show events to continue at the Venue posed a definite or unique risk to public safety. Indeed, the District presented no evidence of any safety

23

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1    concerns within the community that could be linked to the 30-year-old gun show-

2    event at the Venue.

3        93.    To the contrary, banning highly regulated gun shows in California

4    communities, like Del Mar, serves to distort the gun market, potentially pushing

5    California gun buyers into less restrictive gun-buying environments.[3]

6        94.    Nonetheless, relying on contrived possibilities of unknown dangers and

7    unfounded claims that prohibiting gun shows might prevent suicide and violent

8    crime because the "gun culture" would be censored,[4] on September 11, 2018,

9    Defendant District voted (8-to-1) to impose a one-year moratorium (for the year

10   2019) on gun show events at the Venue while they study potential safety concerns.

11       95.    Lacking any evidence that continuing to contract with Crossroads to

12   host gun shows at the Venue raised any real public safety concerns, it is clear that

13   the District ultimately gave into populist pressure from gun-show-banning activist

14   groups.

15       96.    In so doing, Defendants ignored their mission to maintain a "public

16

17       [3] Joyce Lupiani, *Nevada Gun Shows Tied to California Gun Violence*, KTNV
18   (2017), https://www.ktnv.com/news/crime/study-nevada-gun-shows-tied-to-
     california-gun-violence (last visited Jan. 21, 2019); Brett Israel, Study*: Gun Deaths,
19   Injuries in California Spike Following Nevada Gun Shows*, Berkeley News (2017),
     https://news.berkeley.edu/2017/10/23/embargoed-until-1023-2pm-pdt-study-gun-
20   deaths-injuries-in-california-spike-following-nevada-gun-shows/ (last visited Jan.
21   21, 2019). *But see* Mariel Alper, Ph.D., & Lauren Glaze, Bureau of Justice Statistics,
     *Source and Use of Firearms Involved in Crimes: Survey of Prison Inmates, 2016*
22   (2019), *available at* https://www.bjs.gov/content/pub/pdf/suficspi16.pdf (last visited
23   Jan. 21, 2019); Garen J. Wintemute, et al., *Gun Shows and Gun Violence: Fatally
     Flawed Study Yields Misleading Results*, 100 Am. J. Pub. Health 1856-60 (2010),
24   *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2936974/ (last visited
25   Jan. 21, 2019).
         [4] *But see* Alvaro Castillo-Caniglia, Ph.D., et al., *California's Comprehensive
26   Background Check and Misdemeanor Violence Prohibition Policies and Firearm
27   Mortality*, Annals of Epidemiology (Oct. 11, 2018) (noting that, in California
     communities with the most stringent gun restrictions, there has been a marked
28   increase in both property and violent crime).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1   assembly facility… *for the benefit of all*" to the detriment of the civil rights of

2   Plaintiffs and others who attend and participate in gun shows. As a result, Plaintiffs

3   are being denied access to the public Venue because the District disagrees with the

4   content and viewpoint of their speech.

5   **VI.    Effect of the Gun Show Ban on Plaintiffs**

6           97.    Because of the time and resources needed to implement a gun show

7   event, Crossroads must plan its shows at least one year in advance. Because of the

8   late cancellation of the 2019 show schedule by Defendants, Crossroads has been

9   unable to find a suitable alternate location that offers the comparable space and

10  resources as the Venue.

11          98.    What's more, the government prohibits the building of similar venues

12  within their districts as a way of preventing competition for available space. As a

13  result, there are no venues within the same area that offer comparable space and

14  parking needed for gun show events.

15          99.    The use of a smaller private venue by Crossroads would result in

16  substantial loss of revenue and having to turn away many of the vendors and

17  attendees due to space constraints. It is not economically or practically feasible.

18          100.   Defendants' refusal to rent the Venue for lawful activity causes

19  economic damage to Crossroads in loss of event revenue, vendors, future show

20  dates, companies used as suppliers for gun show events, and business reputation and

21  goodwill that has been built by Plaintiff for more than 30 years.

22          101.   Defendants' refusal to contract with Crossroads for gun show events at

23  the Venue causes economic damage to the organizational plaintiffs, CRPA, SAF,

24  and South Bay, which use their vendor space, in part, to sell organization

25  memberships, advertise their educational courses, request donations, and sell

26  organization merchandise, like hats and stickers.

27          102.   Defendants' refusal to contract with Crossroads for gun show events at

28  the Venue causes economic damage to the vendor plaintiff, Mike Walsh, who uses

1    his vendor space, in part, to sell ammunition.

2         103.   Defendants' refusal to rent its publicly-owned "public assembly

3    facility" to Crossroads for gun show events, a lawful business, violates each

4    Plaintiffs' rights to engage in free speech and peaceful assembly, and their rights to

5    equal protection and due process.

6         104.   Specifically, Defendants' conduct strips Plaintiffs Bardack, Diaz,

7    Dupree, Irick, and Walsh, as well as the organizational plaintiffs, CRPA, SAF, and

8    South Bay, of a vital opportunity to assemble and engage in pure speech about the

9    rights and responsibilities of gun owners, the Second Amendment, patriotism, and

10   political activism with like-minded individuals.

11        105.   Defendants' conduct complained of here also strips Crossroads of the

12   right to promote gun show events, acting as a "clearinghouse" for both political

13   speech and commercial speech.

14        106.   Defendants' conduct complained of here also strips Plaintiff Walsh of a

15   vital opportunity to assemble and engage in lawful commercial speech, including the

16   offer and acceptance of sales of ammunition and other firearm-related goods.

17        107.   Furthermore, even if the Court grant injunctive relief, Crossroads will

18   have incurred damages in having to devote extraordinary advertising dollars to

19   inform the public that the gun show has not been banned in San Diego County.

20                          **FIRST CAUSE OF ACTION**

21        **Violation of Right to Free Speech Under U.S. Const., amend. I**

22                              **42 U.S.C. § 1983**

23    (By Plaintiffs CRPA, South Bay, SAF and All Individuals Against All Defendants)

24        108.   Plaintiffs incorporate by reference paragraphs 1 through 107 of this

25   Complaint as though fully set forth herein in their entirety.

26        109.   The First Amendment provides that "Congress shall make no law . . .

27   abridging the freedom of speech. . .."

28        110.   The First Amendment's Freedom of Speech Clause is incorporated and

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1  made applicable to the states and their political subdivisions by the Fourteenth

2  Amendment to the United States Constitution and by 42 U.S.C. § 1983.

3      111.   The First Amendment does not tolerate the suppression of speech based

4  on the viewpoint of the speaker. Public property made available for lease by

5  community groups to engage in expressive activity must thus be available without

6  regard to the viewpoint sought to be expressed. *Cinevision*, 745 F.2d 560. Such

7  venues cannot be opened to some and closed to others, suppressing protected

8  expression, absent a compelling government interest. *Id.* at 571.

9      112.   The state of California owns the Venue, a fair venue. It is rented to the

10  public, including community-based organizations and businesses, for its use and

11  enjoyment, including for concerts, festivals, and industry shows.

12      113.   Defendant Ross, as the Secretary of the California Department of Food

13  & Agriculture, is responsible for the oversight of California fair venues. She has

14  authorized Defendants District, Shewmaker, and Valdez, to interpret, enforce, and

15  implement its policies for the operation and management of the Venue, including

16  CDFA Contract Manual section 6.25 (discretion to contract with gun show events).

17      114.   Defendants District, Shewmaker, and Valdez do, in fact, interpret,

18  implement, and enforce the policies of the Department of Food & Agriculture as

19  regards the Venue, including those policies and practices regarding rental of the

20  Venue for public use. As described herein, Defendants District, Shewmaker, and

21  Valdez have imposed a content-based restriction on Plaintiffs' speech in violation of

22  the First Amendment.

23      115.   Plaintiffs CRPA, SAF, South Bay, and Individuals Bardack, Diaz,

24  Dupree, Irick, and Walsh have attended in the past and wish to again attend

25  Crossroads of the West Gun Show at the Venue so they may exchange ideas,

26  information, and knowledge, as well discuss political issues and the importance of

27  protecting and defending the Second Amendment.

28      116.   Plaintiffs CRPA, SAF, South Bay, and Individuals Bardack, Diaz,

27

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1    Dupree, Irick, and Walsh have a right under the First Amendment to use the Venue

2    for their expressive activity on the same basis as other members of the public

3    without regard to the viewpoints they seek to express.

4        117.   Defendants, however, placed a moratorium on all gun shows at the

5    Venue in 2019 with the intention of permanently banning them—based on their

6    opposition to Plaintiffs' "pro-gun rights" viewpoint—thereby denying Plaintiffs

7    their rights under the First Amendment.

8        118.   There is no compelling governmental interest to support the shuttering

9    of all gun show events at the Venue, which in turn destroys a vital outlet for the

10   expression and exchange of ideas related to promoting and preserving the "gun

11   culture" in California and elsewhere.

12       119.   Defendants acted with malice, oppression, and wanton and intentional

13   disregard of the rights of Plaintiffs when it eliminated the promised dates for 2019

14   for the gun shows and refused to allow contracts with the Venue like other lawful

15   businesses based upon a viewpoint held by Plaintiffs with which Defendants do not

16   agree.

17       120.    As a direct and proximate result of Defendants' conduct, Plaintiffs

18   CRPA, South Bay, SAF and Individuals Bardack, Diaz, Dupree, Irick, and Walsh

19   have suffered irreparable harm, including the violation of their constitutional right to

20   freedom of expression, entitling them to declaratory and injunctive relief and

21   nominal damages.

**SECOND CAUSE OF ACTION**

**Violation of Right to Free Speech Under U.S. Const., amend. I**

**42 U.S.C. § 1983**

(By Plaintiff Crossroads Against All Defendants)

26       121.   Plaintiffs incorporate by reference paragraphs 1 through 120 of this

27   Complaint as though fully set forth herein in their entirety.

28       122.   The First Amendment provides that "Congress shall make no law . . .

28

abridging the freedom of speech. . ..”

123.   The First Amendment's Freedom of Speech Clause is incorporated and made applicable to the states and their political subdivisions by the Fourteenth Amendment to the United States Constitution and by 42 U.S.C. § 1983.

124.   The First Amendment does not tolerate the suppression of speech based on the viewpoint of the speaker. Public property made available for lease by community groups to engage in expressive activity must thus be available without regard to the viewpoint sought to be expressed. *Cinevision*, 745 F.2d 560. Such venues cannot be opened to some and closed to others, suppressing protected expression, absent a compelling government interest. *Id.* at 571.

125.   Event promoters, though they generally promote events for profit, "still enjoy the protections of the First Amendment." *Id.* at 567. For "[t]he role of a promoter in ensuring access to the public is at least as critical as the role of a bookseller or theater owner and . . . is in a far better position than a concert goer or individual performers to vindicate First Amendment rights and ensure public access." *Id*. at 568. The conduct they engage in is protected expression.

126.   The state of California owns the Venue, a fair venue. It is rented to the public, including community-based organizations and businesses, for its use and enjoyment, including for concerts, festivals, and industry shows.

127.   Defendant Ross, as Secretary of the California Department of Food & Agriculture, is responsible for the oversight of California fair venues. She has authorized Defendants District, Shewmaker, and Valdez to interpret, enforce, and implement its policies for the operation and management of the Venue, including CDFA Contract Manual section 6.25 (discretion to contract with gun show events).

128.   Defendants District, Shewmaker, and Valdez do, in fact, interpret, implement, and enforce the policies of the Department of Food & Agriculture as regards the Venue, including those policies and practices regarding rental of the Venue for public use. As described herein, Defendants District, Shewmaker, and

1   Valdez have imposed a content-based restriction on Crossroads' speech in violation

2   of the First Amendment.

3       129.   Plaintiff Crossroads seeks to engage in protected speech at the Venue, a

4   noted "public assembly facility," through the promotion and productions of events

5   for lawful expressive activity, including events that bring together like-minded

6   individuals to engage in pure political and educational speech, as well as

7   commercial speech of vendor and individual participants to communicate offer and

8   acceptance for the sale of goods and services.

9       130.   Plaintiff Crossroads has a right under the First Amendment to use the

10   Venue for its expressive activity on the same basis as other members of the public

11   without regard to the content or viewpoint it seeks to express and promote.

12       131.   Defendants, however, placed a moratorium on all gun shows at the

13   Venue in 2019 with the intention of permanently banning them—based on their

14   opposition to Crossroads' "pro-gun rights" viewpoint—thereby denying Plaintiff of

15   its rights under the First Amendment.

16       132.   Defendants' policy and practice of permitting organizers of non-gun-

17   show events to use the Venue for their events, while denying Crossroads and all gun

18   show promotors access, bars Plaintiff from engaging in expression based on the

19   content and viewpoint of its speech.

20       133.   There is no compelling governmental interest to support the shuttering

21   of all gun show events at the Venue, which in turn destroys a vital outlet for the

22   expression and exchange of ideas related to promoting and preserving the "gun

23   culture" in California and elsewhere.

24       134.   Indeed, Defendants' refusal to rent the publicly owned facility to a

25   lawful business (that has, for 30 years, conducted safe and successful events at the

26   Venue) does not advance any public interest and subjects Plaintiff Crossroads to the

27   deprivation of free speech rights secured by the First Amendment.

28       135.   Defendants acted with malice, oppression, and wanton and intentional

1  disregard of the rights of Crossroads when it eliminated the promised dates for 2019

2  and refused contract with Crossroads for use of the public Venue for expressive

3  activity based the content and viewpoint of Plaintiff Crossroads' speech.

4      136.    As a direct and proximate result of Defendants' conduct, Plaintiff

5  Crossroads has suffered irreparable harm, including the violation of its constitutional

6  right to freedom of expression, entitling Plaintiff to declaratory and injunctive relief

7  and nominal damages.

8                           **THIRD CAUSE OF ACTION**

9       **Violation of Right to Free Speech Under U.S. Const., amend. I**

10                              **42 U.S.C. § 1983**

11          (By Plaintiffs Walsh and Ammo Bros. Against All Defendants)

12     137.   Plaintiffs incorporate by reference paragraphs 1 through 136 of this

13  Complaint as though fully set forth herein in their entirety.

14     138.   The First Amendment provides that "Congress shall make no law . . .

15  abridging the freedom of speech. . .."

16     139.   The First Amendment's Freedom of Speech Clause is incorporated and

17  made applicable to the states and their political subdivisions by the Fourteenth

18  Amendment to the United States Constitution and by 42 U.S.C. § 1983.

19     140.   The First Amendment does not tolerate the suppression of speech based

20  on the viewpoint of the speaker. Public property made available for lease by

21  community groups to engage in expressive activity must thus be available without

22  regard to the viewpoint sought to be expressed. *Cinevision*, 745 F.2d 560. Such

23  venues cannot be opened to some and closed to others, suppressing protected

24  expression, absent a compelling government interest. *Id.* at 571.

25     141.   The state of California owns the Venue, a fair venue. It is rented to the

26  public, including community-based organizations and businesses, for its use and

27  enjoyment, including for concerts, festivals, and industry shows.

28     142.   Defendant Ross, as Secretary of the California Department of Food &

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Agriculture, is responsible for the oversight of California fair venues. She has authorized Defendants District, Shewmaker, and Valdez to interpret, enforce, and implement its policies for the operation and management of the Venue, including CDFA Contract Manual section 6.25 (discretion to contract with gun show events).

143.   Defendants District, Shewmaker, and Valdez do, in fact, interpret, implement, and enforce the policies of the Department of Food & Agriculture as regards the Venue, including those policies and practices regarding rental of the Venue for public use. As described herein, Defendants District, Shewmaker, and Valdez have imposed a content-based restriction on Plaintiff Walsh's speech in violation of the First Amendment.

144.   Plaintiffs Walsh and Ammo Bros. have attended in the past and wish to again attend Crossroads gun shows at the Venue to engage in lawful commercial speech with individual attendees.

145.   Plaintiffs Walsh and Ammo Bros. have a right under the First Amendment to use the Venue for expressive activity on the same basis as other members of the public without regard to the viewpoints they seek to express and promote.

146.   Defendants, however, placed a moratorium on all gun shows at the Venue in 2019 with the intention of permanently banning them—based on their opposition to Plaintiff Walsh's "pro-gun rights" viewpoint—thereby denying Plaintiff Walsh of his rights under the First Amendment.

147.   Defendants' policy and practice of permitting organizers of non-gun-show vendors to use the Venue, while denying Plaintiffs Walsh and Ammo Bros., as well as all gun show vendors the same access, bars Plaintiffs from engaging in expression based on the content and viewpoint of his speech.

148.   There is no substantial governmental interest to support the shuttering of all gun show events at the Venue, which in turn destroys a vital outlet for commercial speech related to the sale of firearms, ammunition, and firearms

1    accessories.

2         149.   Even if there were a substantial governmental interest in restricting gun

3    shows and the commercial speech that occurs at such events, banning gun show

4    events at the Venue altogether is more extensive than necessary to serve any such

5    interest.[5]

6         150.   As a direct and proximate result of Defendants' conduct, Plaintiffs

7    Walsh and Ammo Bros. have suffered irreparable harm, including the violation of

8    their constitutional right to freedom of expression, entitling them to declaratory and

9    injunctive relief and nominal damages.

10                          **FOURTH CAUSE OF ACTION**

11   **Prior Restraint on Right to Free Speech Under U.S. Const., amend. I**

12                              **42 U.S.C. § 1983**

13                     (By All Plaintiffs Against All Defendants)

14        151.   Plaintiffs incorporate by reference paragraphs 1 through 150 of this

15   Complaint as though fully set forth herein in their entirety.

16        152.   The First Amendment provides that "Congress shall make no law . . .

17   abridging the freedom of speech. . .."

18        153.   The First Amendment's Freedom of Speech Clause is incorporated and

19   made applicable to the states and their political subdivisions by the Fourteenth

20   Amendment to the United States Constitution and by 42 U.S.C. § 1983.

21        154.   The First Amendment affords special protection against policies or

22   orders that impose a previous or prior restraint on speech. "[P]rior restraints on

23   speech and publication are the most serious and least tolerable infringement on First

24   Amendment Rights." *Ass'n for L.A. Deputy Sheriffs v. L.A. Times Commc'ns LLC*,

25   239 Cal. App. 4th 808, 811 (2015), citing *Neb. Press Ass'n v. Stuart*, 427 U.S. 539,

26

27        [5] *See Nordyke v. Santa Clara County*, 110 F.3d 707 (9th Cir. 1997) (holding
28   that a ban on the sale of firearms on county-owned land was overbroad as abridging
     commercial speech associated with the sale of lawful products).

                                          33

559 (1976). A prior restraint is particularly egregious when it falls upon the communication of news, commentary, current events, political speech, and association. *N.Y. Times Co. v. United States*, 403 U.S. 713, 715 (1971).

155. Prior restraint also involves the "unbridled discretion doctrine" where a policy, or lack thereof, allows for a single person or body to act at their sole discretion, without regard for any constitutional rights possessed by the person upon which the action is taken, and where there is no remedy for challenging the discretion of the decision makers. *Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 (1988).

156. Further, denying or cancelling a government contract in anticipation that an event or its attendees will violate the law, where there is no more chance of criminal elements surfacing at such event than at any other event, is an unlawful prior restraint on expression. *See Se. Promos., Ltd., v. Conrad*, 420 U.S. 546 (1975).

157. Defendant Ross, as the Secretary of the California Department of Food & Agriculture, is responsible for the oversight of California fair venues. Through the Department, she issues guidance giving local agricultural district boards full discretion to determine who they issue contracts to for the use of their facilities. This recommendation does not currently take into account the potential for a violation of constitutional rights, like free speech and assembly.

158. Defendant Ross, as Secretary of the California Department of Food & Agriculture, has authorized Defendants District, Shewmaker, and Valdez to interpret, enforce, and implement its policies for the operation and management of the Venue, including CDFA Contract Manual section 6.25 (discretion to contract with gun show events).

159. Defendants District, Shewmaker, and Valdez do, in fact, interpret, implement, and enforce the policies and guidance of the Department of Food & Agriculture as regards the Venue, including those policies and practices regarding rental of the Venue for public use.

34

160.   Defendant District does not have any policy for determining who will win a contract from the District and who will not, except that the District is the sole and final decision maker on all contracts. There is no policy outlining requirements for contracting or detailing who and what activities are allowed at the public venue—only that the District makes the decision on any contract brought before it.

161.   Defendants District, Shewmaker, and Valdez voted to prohibit promoters and vendors from contracting for use of the Venue to host gun show events, thus quashing their speech and the speech of vendors and attendees of the show.

162.   Defendants' policies and practices complained of here impose an unconstitutional prior restraint because they vest local agricultural district boards and board members, including Defendants District, Shewmaker, and Valdez, with unbridled discretion to permit or refuse protected expression by members of the public, including Plaintiffs.

163.   Defendants' policies and practices complained of here give unbridled discretion to local agricultural district boards and board members to decide what forms of expression members of the public may engage in on at the Venue and to ban any other expression at the whim of those boards and board members in violation of the First Amendment.

164.   As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered irreparable harm, including the violation of their constitutional right to freedom of expression, entitling them to declaratory and injunctive relief and nominal damages.

## FIFTH CAUSE OF ACTION

**Violation of Right to Assembly and Association Under U.S. Const., amend. I**

**42 U.S.C. § 1983**

(By All Plaintiffs Against All Defendants)

165.   Plaintiffs incorporate by reference paragraphs 1 through 164 of this

1    Complaint as though fully set forth herein in their entirety.

2      166.  The First Amendment provides recognizes and protects the rights to

3    association and assembly. Indeed, "[e]ffective advocacy of both public and private

4    points of view, particularly controversial ones, is undeniably enhanced by group

5    association." *NAACP v. Alabama*, 377 U.S. 288, 462 (1958).

6      167.  Plaintiffs are attempting to engage in their protected right to free

7    assembly and association lawful activities that bring together like-minded

8    individuals to engage in lawful commerce, expressive activities, including political

9    and educational speech, and fellowship.

10     168.  Defendants violate Plaintiffs' right to freedom of assembly by denying

11   them the right to use the Venue, a "public assembly facility", to assemble and

12   engage in political and other types of expression—a right Defendants extend to other

13   members of the public so long as they are not meeting for the purposes of holding a

14   gun show event.

15     169.  Defendants have no legitimate and substantial interest in prohibiting

16   gun show events and, by extension, the rights of Plaintiffs to associate and assemble

17   at the Venue.

18     170.  But even if Defendants had a "legitimate and substantial" interest in

19   barring Plaintiffs from assembling at the Venue, they have imposed an

20   unconstitutional and overly broad restriction on Plaintiffs' rights to assembly. *See id.*

21   at 307.

22                          **SIXTH CAUSE OF ACTION**

23   **Violation of the Right to Equal Protection Under U.S. Const., amend. XIV**

24                               **42 U.S.C. § 1983**

25                   (By All Plaintiffs Against All Defendants)

26     171.  Plaintiffs incorporate by reference paragraphs 1 through 170 of this

27   Complaint as if fully set forth herein in their entirety.

28     172.  The Fourteenth Amendment to the United States Constitution,

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1    enforceable under 42 U.S.C. § 1983, provides that no state shall deny to any person
2    within its jurisdiction the equal protection of the laws.

3        173.   Generally, equal protection is based upon protected classes of person
4    who are similarly situated; however, individuals who suffer irrational and intentional
5    discrimination or animus can bring claims of equal protection where the government
6    is subjecting only the Plaintiffs to differing and unique treatment compared to others
7    who are similarly situated, *Engquist v. Ore. Dept. of Agric.*, 553 U.S. 591 (2008),
8    even if not based on group characteristics, *Village of Willowbrook v. Olech*, 528
9    U.S. 562 (2000).

10       174.   Disparate treatment under the law, when one is engaged in activities
11   that are fundamental rights, is actionable under the Equal Protection Clause of the
12   Fourteenth Amendment. *Police Dep't of Chic. v. Mosley*, 408 U.S. 92 (1972); *Carey*
13   *v. Brown*, 447 U.S. 455 (1980).

14       175.   Although Plaintiff Crossroads operates a legal and legitimate business
15   and the Venue is suitable for the purposes of hosting a gun show at its public
16   facility, the District refuses to allow Crossroads to use the Venue for its gun shows,
17   preventing Plaintiffs from equally participating in the use of the public venue.

18       176.   Defendants' refusal to permit Plaintiffs equal access to the Venue for its
19   promotion of gun shows does not further any compelling governmental interest.

20       177.   Defendants' refusal to allow Plaintiffs equal use of the public facility
21   while continuing to allow contracts for the use of the facility with other similarly
22   situated legal and legitimate businesses is a violation of Plaintiffs' right to equal
23   protection under the law because it is based on a "bare desire to harm a politically
24   unpopular group." *U.S. Dep't of Agric v. Moreno*, 413 U.S. 528, 534 (1973).

25       178.   As a direct and proximate result of Defendants' conduct, Plaintiffs have
26   suffered irreparable harm, including the violation of their constitutional right to
27   equal protection under the law, entitling them to declaratory and injunctive relief
28   and nominal damages.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

# SEVENTH CAUSE OF ACTION

## Conspiracy to Violate Civil Rights

### 42 U.S.C. § 1985

(By All Plaintiffs Against All Defendants)

179. Plaintiffs incorporate by reference paragraphs 1 through 178 of this Complaint as if fully set forth herein in their entirety.

180. Defendants Shewmaker and Valdez, together with Defendant District and unnamed third parties, concocted and implemented a plan to prohibit gun show events at the publicly owned Venue based on animus toward Plaintiffs and in light of the viewpoint Plaintiffs sought to express at gun show events by creating a non-public committee what limited the public input into the process and where only Defendants Shewmaker and Valdez could participate, thus showing that the two Defendants has a "meeting of the minds" as to the proposed ban of the gun shows at the Venue.

181. Defendants Shewmaker, Valdez, and District did not provide a fair and unbiased hearing for Plaintiffs—indeed, they failed to use consistent, content-neutral standards to evaluate Plaintiffs' activities, rejected favorable reports from their own Del Mar Fairgrounds Directors of Security and local law enforcement, allowed politically charged groups to sway their decisions, relied on their personal biases against guns, and publicly stated that something must be done about the gun shows.

182. The conduct of Defendants Shewmaker, Valdez, and District was made possible because Defendant Ross, as the Secretary of the California Department of Food & Agriculture, vested Defendant District with unfettered power to discriminate against members of the public in the rental of state-owned fairgrounds property (the Venue). The lack of policies that protect constitutional rights of groups and individuals and a lack of parameters of authority within which Defendants Shewmaker, Valdez, and District are required to work, served as a direct avenue for Defendants to willfully, wantonly, and maliciously act against Plaintiffs.

183.   Defendants Shewmaker, Valdez, and District considered arbitrary and unlawful factors in disapproving of Plaintiffs' activities stating repeatedly that gun shows are not "family friendly" and not the type of event that should be hosted at the Venue, this making arbitrary judgements about what should be "family friendly" and "good" for all people. The term "family friendly" does not set a standard sufficient to make a determination as it is vague and undefined.

184.   By taking this action, Defendants Shewmaker, Valdez, District, and unnamed third parties conspired to deny civil liberties guaranteed by the First and Fourteenth Amendments in violation of 42 U.S.C. § 1985.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for:

1.     A declaration that Defendants' conduct complained of herein violates the free speech rights of Plaintiffs CRPA, South Bay, SAF, and Individual Plaintiffs Bardack, Diaz, Dupree, Irick, and Walsh under the First Amendment to the United States Constitution;

2.     A declaration that Defendants' conduct complained of herein violates the free speech rights of Plaintiff Crossroads under the First Amendment to the United States Constitution;

3.     A declaration that Defendants' conduct complained of herein violates the free speech rights of Plaintiffs Walsh and Ammo Bros. under the First Amendment to the United States Constitution;

4.     A declaration that Defendants' conduct complained of herein violates the free speech rights of all Plaintiffs under the First Amendment to the United States Constitution because it imposes a prior restraint on their speech;

5.     A declaration that Defendants' conduct complained of herein violates the rights of assembly and association of all Plaintiffs under the First Amendment to the United States Constitution;

6.     A declaration that Defendants' conduct complained of herein violates

39

0259

1   the rights of all Plaintiffs to equal protection under the law per the Fourteenth

2   Amendment to the United States Constitution;

3          7.     A declaration that Defendants' conduct complained of herein

4   constitutes a conspiracy to violate the civil rights of Plaintiffs under 42 U.S.C. §

5   1985.

6          8.     An injunction prohibiting Defendant Ross, as Secretary of the

7   California Department of Food & Agriculture, from allowing the Defendants

8   District, Shewmaker, and Valdez to decide who may hold events at the Venue, a

9   public assembly facility, based on the viewpoint of or animus towards the event

10  promoter, vendors, or participants.

11         9.     An injunction prohibiting Defendants District, Shewmaker, and Valdez,

12  or any of their agents, from discriminating against members of the public in the use

13  of state-owned, District-managed facilities based on the viewpoint of or animus

14  towards the event promoter, vendors, or participants.

15         10.    An injunction compelling Defendants to allow Plaintiff Crossroads to

16  contract for, promote, and hold its gun shows at the Venue on the 2019 dates

17  promised via email from Defendants to Plaintiff Crossroads on or about July 5,

18  2018;

19         11.    An order for damages according to proof;

20         12.    An order for punitive damages against Defendants District,

21  Shewmaker, and Valdez, for action taken with malice, oppression, and wanton

22  disregard for the law in engaging in political viewpoint discrimination;

23         13.    An award of costs and expenses, including attorney's fees, pursuant to

24  42 U.S.C. § 1988 or other appropriate state or federal law; and

25         14.    Any such other relief the Court deems just and equitable.

26  / / /

27  / / /

28  / / /

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

# DEMAND FOR JURY TRIAL

Pursuant to rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury in the above-captioned action of all issues triable by jury.

Dated: January 21, 2019       **MICHEL & ASSOCIATES, P.C.**

                                  *s/ C. D. Michel*

                                  C. D. Michel
Counsel for Plaintiffs B & L Productions, Inc., Barry Bardack, Ronald J. Diaz, Sr., John Dupree, Christopher Irick, Lawrence Walsh, Maximum Wholesale, Inc., California Rifle & Pistol Association, Incorporated, South Bay Rod and Gun Club, Inc.

Dated: January 21, 2019       LAW OFFICES OF DON KILMER

                                  *s/ Don Kilmer*

                                  Don Kilmer
Counsel for Plaintiff Second Amendment Foundation

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

0261

# EXHIBIT 4

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| B & L PRODUCTIONS, INC. d/b/a CROSSROADS OF THE WEST et al., | Case No.:  3:19-CV-134-CAB-NLS |
| Plaintiffs, | **MEMORANDUM OPINION RE JUNE 18, 2019 ORDER** |
| v. | |
| 22ND DISTRICT AGRICULTURAL ASSOCIATION et al., | |
| Defendants. | |

At a hearing on June 17, 2019, and in an order dated June 18, 2019, the Court granted in part and denied in part a motion to dismiss filed by Defendants, denied Plaintiffs' request for entry of summary judgment, and issued a preliminary injunction against Defendant 22nd District Agricultural District (the "District").  The purpose of this opinion is to provide the reasoning for the Court's order.

## I.    Background

Plaintiff B&L Productions, Inc. d/b/a Crossroads of the West ("Crossroads") operates gun show events in California, including at the Del Mar Fairgrounds (the "Fairgrounds").  [Doc. No. 1 at ¶ 1.]  Plaintiffs California Rifle & Pistol Association, Inc. ("CRPA"); South Bay Rod and Gun Club, Inc. ("SBRGC"); Second Amendment

0263

Foundation, Inc. ("SAF"); Barry Bardack; Ronald J. Diaz, Sr.; John Dupree; Christopher Irick; Lawrence Michael Walsh; and Maximum Wholesale, Inc. d/b/a Ammo Bros ("MW"), attend and participate in the Crossroads gun show at the Fairgrounds. [*Id.* at ¶ 7.] The Complaint describes gun shows as:

> a modern bazaar—a convention of like-minded individuals who meet in this unique public forum that has been set aside by state local governments for all manner of commerce. Gun shows just happen to include the exchange of products and ideas, knowledge, services, education, entertainment, and recreation, related to the lawful uses of firearms. Those lawful uses include (but are not limited to):
>
>    a. Firearm safety training;
>    b. Self-defense;
>    c. Defense of others;
>    d. Defense of community;
>    e. Defense of state;
>    f. Defense of nation;
>    g. Hunting;
>    h. Target shooting;
>    i. Gunsmithing;
>    j. Admiration of guns as art;
>    k. Appreciation of guns as technological artifacts; and
>    l. Study of guns as historical objects.

[*Id.* at ¶ 47.] The complaint further alleges that:

> Gun shows in general, and the Del Mar show in particular, are a celebration of America's "gun culture" that is a natural and essential outgrowth of the constitutional rights that flow from the Second Amendment to the United States Constitution. Participating in that culture is one of the primary reasons people attend Crossroads gun shows as vendors, exhibitors, customers, and guests (even if particular vendors/attendees are not in the firearm business or in the market to buy a gun at a particular event.)

[*Id.* at ¶ 49.]

According to the complaint, individuals attending and participating in these gun shows engage in commercial activities [*id.* at ¶ 3], but "[a]ctual firearm transfers are prohibited from taking place at any gun show in California absent very limited exceptions applicable only to law enforcement" [*id.* at ¶ 43]. "Only a small percentage (usually less

0264
3:19-CV-134-CAB-NLS

than 40%) of the vendors actually offer firearms or ammunition for sale. The remaining vendors offer accessories, collectibles, home goods, lifestyle products, food and other refreshments." [*Id.* at ¶ 48.]

In addition, according to the complaint, these gun show events include activities and discussions related to: "firearms, firearm technology, firearm safety, gun-politics, and gun-law (both pending legislation and proper compliance with existing law.) Other topics include: where to shoot, where and from whom to receive training, gun-lore, gun-repair, gunsmithing, gun-art, and many other topics, that arise from the right to acquire, own, possess, enjoy, and celebrate arms as a quintessentially American artifact with Constitutional significance." [*Id.* at ¶ 3.] The complaint also alleges that at gun shows, "literature and information are shared, speakers provide valuable live lectures, classes are conducted, political forums are held where gun rights discussions take place, and candidates for political office can meet to discuss political issues, the government, and the Constitution with constituents who are part of the California gun culture." [*Id.* at ¶ 52.]

The Fairgrounds is owned by the state of California and managed by the board of directors of Defendant 22nd District Agricultural Association (the "District"). [*Id.* at ¶¶ 23, 58, 112.] According to the complaint, the Fairgrounds "is used by many different public groups and is a major event venue for large gatherings of people to engage in expressive activities, including concerts, festivals, and industry shows." [*Id.* at ¶ 63.] The Fairgrounds' website allegedly describes its mission as "'[t]o manage and promote a world-class, multi-use, *public assembly facility* with an emphasis on agriculture, education, entertainment, and recreation in a fiscally sound and environmentally conscientious manner *for the benefit of all.*'" [*Id.* at ¶ 66 (*emphasis* originally in complaint); Doc. No. 1-2 at 2-33; Doc. No. 14-5 at 206.][1]

---

[1] *See also* http://www.delmarfairgrounds.com/index.php?fuseaction=about.home

Defendant Karen Ross is the Secretary of the California Department of Food & Agriculture (the "CDFA"), the entity responsible for policy oversight of the Fairgrounds. [Doc. No. 1 at ¶ 24.] According to the complaint, she oversees the operation of the District, and authorized the other Defendants "to interpret, enforce, and implement [the CDFA's] policies for the operation and management of the [Fairgrounds]." [*Id.* at ¶¶ 59, 113.]

Defendants Steve Shewmaker and Richard Valdez are president and vice-president of the District Board of Directors, respectively. [*Id.* at ¶¶ 25, 26.] Shewmaker and Valdez were also the members of an "ad hoc committee responsible for developing the plan, in closed session, to effectively ban gun shows from the [Fairgrounds]." [*Id.*; *see also* ¶ 84] At a public hearing on September 11, 2018, this committee:

> recommended that the District not consider any contracts with the producers of gun shows beyond December 31, 2018 until such time as the District has put into place a more thorough policy regarding the conduct of gun shows that:
>
> > a. Considers the feasibility of conducting gun shows for only educational and safety training purposes and bans the possession of guns and ammunition on state property[;]
> >
> > b. Aligns gun show contract language with recent changes to state and federal law[;]
> >
> > c. Details enhanced security plan for the conduct of future shows[;]
> >
> > d. Proposes a safety plan[;]
> >
> > e. Considers the age appropriateness of the event[;]
> >
> > f. Grants rights for the [District] to perform an audit to ensure full compliance with California Penal Code Sections 171b and 12071.1 and 12071.4.

[*Id.* at ¶ 88.]  The District then "voted (8-to-1) to impose a one-year moratorium (for the year 2019) on gun show events at the Venue while they study potential safety concerns." [*Id.* at ¶ 94.]  According to the complaint, there was "no finding that allowing the (already heavily regulated) gun show events to continue at the [Fairgrounds] posed a definite or unique risk to public safety."  [*Id.* at ¶ 92.]  The complaint also alleges that the Fairgrounds "has held other non-gun-show events in which criminal activity has taken place—including

1   theft and a shooting.  These criminal incidents are no more likely to happen at a gun show
2   event [than at] the non-gun-show event.  The District has taken no actions to ban or impose
3   a moratorium on these promoters or events."  [*Id.* at ¶ 67.]

## II.   Procedural History

5   On January 21, 2019, Plaintiffs filed the complaint in this action.  The complaint
6   asserts several claims for violation of the right to free speech under the First Amendment
7   to the Constitution by various combinations of Plaintiffs, as well as claims by all Plaintiffs
8   for violation of the right to assembly and association under the First Amendment, violation
9   of the right to equal protection under the Fourteenth Amendment to the Constitution, and
10   conspiracy to violate civil rights under 42 U.S.C. § 1985.  The complaint prays for
11   declaratory relief that Defendants' actions in enacting the moratorium on gun shows
12   violated Plaintiffs' First Amendment Rights, injunctive relief compelling Defendants to
13   allow Crossroads to hold gun shows at the Fairgrounds in 2019, compensatory damages,
14   and punitive damages.

15   On March 27, 2019, Defendants moved to dismiss the complaint in its entirety.  In
16   their opposition to the motion, Plaintiffs asked the Court to convert the motion to dismiss
17   into cross-motions for summary judgment.  Upon review of the briefing, and because in a
18   First Amendment case, "plaintiffs have a special interest in obtaining a prompt adjudication
19   of their rights," *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 563 (2011), the Court was inclined
20   to adopt Plaintiffs' proposal.  The Court then ordered further briefing to give Defendants
21   the opportunity to fully oppose summary judgment in favor of Plaintiffs.  After that
22   supplemental briefing was complete, the Court held a hearing on June 17, 2019.  As
23   memorialized by a written order the following day, at that hearing the Court informed the
24   parties that it was granting in part and denying in part Defendants' motion to dismiss,
25   denying without prejudice Plaintiffs' motion for summary judgment based on Defendants'
26   claim that they need discovery to adequately oppose the motion, and set a discovery
27   schedule and briefing schedule for motions for summary judgment. The Court also granted
28   a preliminary injunction to Plaintiffs that enjoined Defendants from enforcing the

1  moratorium on gun shows adopted at the September 11, 2018 meeting (the "Moratorium").

2  This opinion provides the Court's reasoning for the rulings it issued at the June 17, 2019

3  hearing and memorialized in the June 18, 2019 order.

### III.   Defendants' Motion to Dismiss

5       Although one might think otherwise based on the quantity of outside evidence

6  submitted by Defendants with their motion to dismiss, "evidence outside the pleadings . . .

7  cannot normally be considered in deciding a 12(b)(6) motion." *Cervantes v. City of San

8  *Diego*, 5 F.3d 1273, 1274 (9th Cir. 1993) (quoting *Farr v. United States*, 990 F.2d 451,

9  454 (9th Cir. 1993)).[2]  "The question presented . . . is not whether the plaintiff will

10  ultimately prevail, but whether the plaintiff has alleged sufficient factual grounds to support

11  a plausible claim to relief, thereby entitling the plaintiff to offer evidence in support of its

12  claim." *Mazal Grp., LLC v. Espana*, No. 217CV05856RSWLKS, 2017 WL 6001721, at

13  *2 (C.D. Cal. Dec. 4, 2017).

14       Thus, when considering a motion to dismiss the Court "accept[s] factual allegations

15  in the complaint as true and construe[s] the pleadings in the light most favorable to the

16  nonmoving party."  *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031

17  (9th Cir. 2008).  To survive the motion, the "complaint must contain sufficient factual

18  matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v.*

---

[2] Defendants ask for judicial notice of various policies, manuals, reports, meeting minutes and transcripts from the District, on the grounds that they are public records.  [Doc. 12-2.]  "Judicial notice under Rule 201 permits a court to notice an adjudicative fact if it is 'not subject to reasonable dispute.'" *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) (quoting Fed. R. Evid. 201(b)).  Although "a court may take judicial notice of matters of public record without converting a motion to dismiss into a motion for summary judgment, . . . [it] cannot take judicial notice of disputed facts contained in such public records." *Id.* (internal citation and quotation marks omitted).  Here, it is not clear from the request for judicial notice which facts from these documents Defendants are asking the Court to notice because the request asks the Court only to take notice of the documents themselves.  The accuracy of the documents may not reasonably be questioned, "but accuracy is only part of the inquiry under Rule 201(b)." *Id.*  "Just because the document itself is susceptible to judicial notice does not mean that every assertion of fact within that document is judicially noticeable for its truth."  *Id.*  Regardless, even after considering the documents attached to Defendants' request, the Court finds that the complaint states a claim against the District.  Accordingly, the need not address the merits of Defendants' request for judicial notice.

0268

*Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). On the other hand, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). Nor is the Court "required to accept as true allegations that contradict exhibits attached to the Complaint or matters properly subject to judicial notice, or allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). "In sum, for a complaint to survive a motion to dismiss, the non-conclusory factual content, and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (internal quotation marks omitted).

## A. Claims Against the District

In the motion to dismiss, Defendants argue that the free speech claims should be dismissed because the Moratorium does not regulate speech or expressive conduct, is viewpoint and content-neutral, and survives either rational basis review or intermediate scrutiny. As discussed in detail below, the Court disagrees with Defendants and finds that the Moratorium is a content-based restriction of speech on its face. As a result, the Court is satisfied that the complaint states plausible claims against the District for violation of Plaintiffs' First Amendment rights and for violation of Plaintiffs' rights under the Equal Protection Clause of the Fourteenth Amendment. It is for this reason that the Court denied the motion to dismiss with respect to the District.[3]

---

[3] Defendants make a host of objections to evidence submitted by Plaintiffs with their opposition to the motion to dismiss and request for summary judgment. [Doc. No. 15-1.] Because the language of the Moratorium and allegations in the complaint were sufficient for this ruling, the Court did not need to consider any of this evidence to determine that the complaint states a claim against the District and to deny the motion to dismiss as to the District. Nor was this evidence material to the Court's decision to deny Plaintiffs' motion for summary judgment based on Defendants' claimed need for discovery. Regardless, Defendants' formulaic objections to the relevance of Plaintiffs' evidence are generally inappropriate in the context of a motion for summary judgment. Instead of objecting to the relevance of the evidence, Defendants would be better served by *arguing* that the facts are not material. *See Burch v.*

## B. Qualified Immunity as to Shewmaker and Valdez

The motion to dismiss also argues that Defendants Shewmaker and Valdez are entitled to qualified immunity. "Qualified immunity shields government actors from civil liability under 42 U.S.C. § 1983 if 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1066 (9th Cir. 2016) (en banc) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). It "protects 'all but the plainly incompetent or those who knowingly violate the law,'" *Mueller v. Auker*, 576 F.3d 979, 992 (9th Cir. 2009) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)), and it assumes that government actors "do not knowingly violate the law," *Gasho v. United States*, 39 F.3d 1420, 1438 (9th Cir. 1994). Because "[i]t is 'an *immunity from suit* rather than a mere defense to liability . . . it is effectively lost if a case is erroneously permitted to go to trial.'" *Mueller*, 576 F.3d at 992 (*emphasis* in original) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). To that end, the Supreme Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

To determine whether Shewmaker and Valdez are immune from suit, the court must "evaluate two independent questions: (1) whether [their] conduct violated a constitutional right, and (2) whether that right was clearly established at the time of the incident." *Castro*,

---

*Regents of Univ. of California*, 433 F.Supp. 2d 1110, 1119 (E.D. Cal. 2006). As to objections as to the foundation for the evidence, many of the objections are targeted to the exact sort of evidence Defendants submitted in their request for judicial notice. Defendants even object to Plaintiff's submission of some of the exact same documents it included with its motion as also being irrelevant. Compare Exhibit D to Defendants' Request for Judicial Notice [Doc. No. 12-3 at 30] with Exhibit 18 to the Barvir Declaration [Doc. No. 14-6 at 304]. It is unclear what Defendants intend to accomplish with such objections, considering that Defendants believe the evidence is admissible and relevant in some form. Ultimately, the District bears the burden of proof that the gun show moratorium satisfies the requisite level of scrutiny, *see United States v. Playboy Entmt. Grp., Inc.*, 529 U.S. 803, 816 (2000), and it is the District's complete lack of evidence, rather than Plaintiffs' evidence, that causes the Court to conclude that Plaintiffs have a likelihood of success on the merits and otherwise satisfy the requirements for a preliminary injunction. Accordingly, Defendants' objections to Plaintiffs' evidence [Doc. No. 15-1] are **OVERRULED**.

833 F.3d at 1066. "[A] right is clearly established when the 'contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Id.* at 1067 (quoting *Serrano v. Francis*, 345 F.3d 1071, 1077 (9th Cir. 2003)). "This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." *Mueller*, 576 F.3d at 994 (internal quotation marks and citation omitted). "[T]he clearly established law must be 'particularized' to the facts of the case." *White v. Pauly*, 137 S.Ct. 548, 552 (2017) (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "The standard is an objective one that leaves 'ample room for mistaken judgments.'" *Mueller*, 576 F.3d at 992 (quoting *Malley*, 475 U.S. at 343).

Here, the Court need not resolve whether Plaintiffs' Shewmaker and Valdez violated Plaintiffs' constitutional rights, because even assuming they did, those rights were not clearly established. Plaintiffs' constitutional rights "would be 'clearly established' if 'controlling authority or a robust consensus of cases of persuasive authority' had previously held that" it is a violation of the First Amendment right to free speech or Fourteenth Amendment right to equal protection to propose or vote for a rule banning gun shows from a public fairground. *Hines v. Youseff*, 914 F.3d 1218, 1229–30 (9th Cir. 2019) (quoting *Dist. of Columbia v. Wesby*, ––– U.S. ––––, 138 S.Ct. 577, 589–90, 199 L.Ed.2d 453 (2018)). Plaintiffs point to no such precedent, and the Court has not located any on its own. The absence of such authority means that the rights in question here were not clearly established when Shewmaker and Valdez took actions related to the Moratorium. Accordingly, they are entitled to qualified immunity.

### C. Sovereign Immunity as to Ross

The motion to dismiss argues that the claims against Ross should be dismissed because she has sovereign immunity under the Eleventh Amendment to the Constitution. The Eleventh Amendment states:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

It "enacts a sovereign immunity from suit." *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 267 (1997). The Supreme Court has "extended a State's protection from suit to suits brought by the State's own citizens . . . [and] suits invoking the federal-question jurisdiction of Article III courts may also be barred by the Amendment." *Id.* at 268. Thus, "Eleventh Amendment immunity represents a real limitation on a federal court's federal-question jurisdiction." *Id.* at 270. Sovereign immunity is an affirmative defense, and therefore, "[l]ike any other such defense . . . must be proved by the party that asserts it and would benefit from its acceptance." *ITSI T.V. Prods., Inc. v. Agric. Associations*, 3 F.3d 1289, 1291 (9th Cir. 1993).

"Naming state officials as defendants rather than the state itself will not avoid the eleventh amendment when the state is the real party in interest. The state is the real party in interest when the judgment would tap the state's treasury or restrain or compel government action." *Almond Hill Sch. v. U.S. Dep't of Agric.*, 768 F.2d 1030, 1033 (9th Cir. 1985). Under the exception created by *Ex Parte Young*, 209 U.S. 123 (1908), however, "individuals who, as officers of the state, are clothed with some duty in regard to the enforcement of the laws of the state, and who threaten and are about to commence proceedings, either of a civil or criminal nature, to enforce against parties affected an unconstitutional act, violating the Federal Constitution, may be enjoined by a Federal court of equity from such action." *Ex parte Young*, 209 U.S. at 155–56. Pursuant to this exception, "the eleventh amendment does not bar an injunctive action against a state official that is based on a theory that the officer acted unconstitutionally." *Almond Hill Sch.*, 768 F.2d at 1034. This exception does not allow suit against officers of the state simply "to enjoin the enforcement of an act alleged to be unconstitutional" unless the officer has "some connection with the enforcement of the act." *Ex parte Young*, 209 U.S. at 157. Otherwise, the suit "is merely making [the officer] a party as a representative of the state, and thereby attempting to make the state a party." *Id.*

1  Ross does not have a connection with the enforcement of the Moratorium.[4]  The only

2  allegations about Ross in the complaint are that she delegated operation and management

3  of the Fairgrounds to the District and left it within the District's discretion to have gun

4  show events at the Fairgrounds.  [*See, e.g.,* Doc. No. 1 at ¶ 127.]  There are no allegations

5  that Ross was tasked with enforcing the Moratorium by preventing gun shows at the

6  Fairgrounds.  Instead, Ross' alleged wrongdoing amounts to supervision over the District,

7  Shewmaker, and Valdez, who are alleged to have been responsible for the Moratorium.

8  This "general supervisory power over the persons responsible for enforcing" the

9  Moratorium does not subject Ross to suit.  *Los Angeles Cty. Bar Ass'n v. Eu*, 979 F.2d 697,

10  704 (9th Cir. 1992).  Accordingly, Ross is entitled to sovereign immunity.

## IV.  Plaintiffs' Motion for Summary Judgment and Defendants' Rule 56(d) Declaration

13  Under Federal Rule of Civil Procedure 56, the court shall grant summary judgment

14  "if the movant shows that there is no genuine dispute as to any material fact and the movant

15  is entitled to judgment as a matter of law."  Fed. R. Civ. P 56(a).  To avoid summary

16  judgment, disputes must be both 1) material, meaning concerning facts that are relevant

17  and necessary and that might affect the outcome of the action under governing law, and 2)

18  genuine, meaning the evidence must be such that a reasonable judge or jury could return a

19  verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

20  (1986).  When ruling on a summary judgment motion, the court must view all inferences

21  drawn from the underlying facts in the light most favorable to the nonmoving party.

---

[4] Plaintiffs argue in their opposition that Ross does not have sovereign immunity regardless of *Ex Parte Young* because "when Ross acts as supervisor of and delegates authority to the local District, she is not acting in her capacity as a state actor."  [Doc. No. 14 at 24.]  Yet, on the previous page of their brief, Plaintiffs state that they are suing Ross "in her official capacity as a state actor only."  [*Id.* at 23.] Moreover, the complaint itself identifies Ross as "Secretary of the California Department of Food & Agriculture—the entity responsible for the policy oversight of the network of California fair venues" [Doc. No. 1 at ¶ 24], indicating that she is a party simply because of her title and not because of any specific actions she took with respect to the Moratorium.  By suing her in her official capacity as a state actor, the suit can stand only if an exception to sovereign immunity applies.  *Almond Hill Sch.*, 768 F.2d at 1033.

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

In opposition to summary judgment here, however, the District's primary argument is that it is entitled to discovery needed to oppose the motion.  Federal Rule of Civil Procedure 56(d)[5] "provides that if a party opposing summary judgment demonstrates a need for further discovery in order to obtain facts essential to justify the party's opposition, the trial court may deny the motion for summary judgment or continue the hearing to allow for such discovery." *Margolis v. Ryan*, 140 F.3d 850, 853 (9th Cir. 1998).  In making a Rule 56(d) motion, "a party opposing summary judgment 'must make clear what information is sought and how it would preclude summary judgment.'" *Id*. (quoting *Garrett v. City and County of San Francisco*, 818 F.2d 1515, 1518 (9th Cir. 1987)).  "The facts sought must be 'essential' to the party's opposition to summary judgment . . . and it must be 'likely' that those facts will be discovered during further discovery." *Sec. & Exch. Comm'n v. Stein*, 906 F.3d 823, 833 (9th Cir. 2018).  "In other words, there must be a 'basis or factual support for [the] assertions that further discovery would lead to the facts and testimony' described in an affidavit submitted pursuant to Rule 56(d)." *Haines v. Home Depot U.S.A., Inc.*, No. 1:10-CV-01763-SKO, 2012 WL 217767, at *2 (E.D. Cal. Jan. 24, 2012) (quoting *Margolis*, 140 F.3d at 854)).  Evidence that is "the object of mere speculation . . . is insufficient to satisfy the rule." *Stein*, 906 F.3d at 833 (citing *Ohno v. Yasuma*, 723 F.3d 984, 1013 n.29 (9th Cir. 2013)).

Although this rule "facially gives judges the discretion to disallow discovery when the non-moving party cannot yet submit evidence supporting its opposition, the Supreme Court has restated the rule as requiring, rather than merely permitting, discovery 'where

---

[5] Federal Rule of Civil Procedure 56(d) states: "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order."

the nonmoving party has not had the opportunity to discover information that is essential to its opposition.'" *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 846 (9th Cir. 2001) (quoting *Anderson*, 477 U.S. at 250 n.5). Thus, when "a summary judgment motion is filed so early in the litigation, before a party has had any realistic opportunity to pursue discovery relating to its theory of the case, district courts should grant any [Rule 56(d)] motion fairly freely." *Burlington N. Santa Fe R. Co. v. Assiniboine & Sioux Tribes of Fort Peck Reservation*, 323 F.3d 767, 773 (9th Cir. 2003).

This right to discovery does not fit well with litigation like this one involving prior restraints on speech. Content-based restrictions on speech, of which the District's moratorium on gun shows is one, "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2226 (2015). In other words, as discussed in the next section, the Moratorium is subject to strict scrutiny. This finding is compelled by the language of the Moratorium itself. No discovery is needed from either side to arrive at this conclusion, and no additional discovery would result in a different standard of scrutiny being applied by the Court. *See id.* at 2228 ("A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained'"). Thus, the only question on which discovery could be useful is whether the Moratorium satisfies strict scrutiny.

The District, however, has never taken the position that the Moratorium satisfies strict scrutiny. To the contrary, the District's position is that the Moratorium does not regulate speech at all and that it is subject only to rational basis review. [Doc. No. 12-1 at 20-22.] In the alternative, the District argues that the Moratorium satisfies intermediate scrutiny. It was only when faced with summary judgment in favor of Plaintiffs that the District asserts that it needs discovery to satisfy its burden. Yet, considering that the District has never argued that the Moratorium satisfies strict scrutiny, the discovery it now purports to need necessarily is based merely on speculation that the District will uncover

evidence supporting a finding that the Moratorium satisfies strict scrutiny.  The Court is not persuaded that the government can enact a facially content-based speech restriction based on a misguided belief that the regulation would have to satisfy only rational basis review, and then when told strict scrutiny applies, be allowed to delay summary judgment in favor of the party whose speech has been restricted in the hopes of finding support for the new position that the restriction satisfies strict scrutiny.  Surely, the District's right to discovery to justify a facially content-based speech restriction does not take precedence over the First Amendment rights of Plaintiffs that would be restricted while such discovery takes place.

Moreover, the Court is not convinced that any of the discovery sought by the District will help it overcome summary judgment in favor of Plaintiffs.  First, the District contends it needs discovery on whether the Moratorium regulates non-commercial speech that is inextricably intertwined with commercial speech.  Yet, if both commercial and non-commercial speech occur at gun shows, the Moratorium restricts both commercial and non-commercial speech.  If these types of speech at guns shows are inextricably intertwined, strict scrutiny applies to them both.  *Cf. Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 795-96 (1988) (holding that strict scrutiny applies where the commercial and non-commercial "component parts of a single speech are inextricably intertwined").  On the other hand, even if the non-commercial and commercial speech at gun shows are not inextricably intertwined, the Moratorium remains subject to strict scrutiny based on its restriction of non-commercial speech.  Either way, the discovery the District contends it needs will not result in an easing of the District's burden.

Next, the District claims it needs discovery on whether the Moratorium "targets gun culture."  Yet, even if the Moratorium does not target gun culture, it is still subject to strict scrutiny.  *See Reed*, 135 S.Ct. at 2230 (noting that although "discrimination among viewpoints—or the regulation of speech based on the specific motivating ideology or the opinion or perspective of the speaker—is a more blatant and egregious form of content discrimination . . . the First Amendment's hostility to content-based regulation extends not

only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic.") (internal quotation marks and citations omitted).  Thus, it is unclear how such discovery would preclude summary judgment here.

Finally, the District contends that it requires discovery on "how the [Moratorium] serves the compelling government interest of protecting public safety."  [Doc. No. 20 at 20.]  Yet, despite its arguments to the contrary, an amorphous concern for "public safety" is not the public interest that the District stated was the interest served by the Moratorium. Instead, the interest purportedly served by the Moratorium, based on the language of the Moratorium itself, is the District's ability to "put into place a more thorough policy regarding the conduct of gun shows."  In other words, the District does not seek discovery to support its stated interest for the Moratorium; it seeks discovery in the hopes of supporting a new state interest.  This speculative discovery does not satisfy Rule 56(d). *Stein*, 906 F.3d at 833.

Notwithstanding the foregoing, there is a middle ground here that would protect both any entitlement to discovery that the District may have before ruling on summary judgment, as well as Plaintiffs' constitutional rights—a preliminary injunction.  As discussed below, Plaintiffs satisfy the requirements for a preliminary injunction on enforcement of the Moratorium.  Accordingly, although the Court is skeptical that any of the discovery sought by the District would preclude summary judgment for Plaintiffs, Plaintiffs' motion for summary judgment is denied without prejudice based on Rule 56(d). The June 18, 2019 order provides a briefing schedule for a renewed motion for summary judgment by Plaintiffs (and the District if desired) after the discovery period.

## V.    Preliminary Injunction

Although Plaintiffs did not expressly move for a preliminary injunction, the briefing demonstrates that such an injunction is warranted while the District pursues the discovery it contends it needs to oppose summary judgment.  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his

15

favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Each of these four requirements is satisfied here.

### A.   Likelihood of Success Against the District

### 1.   First Amendment Claims

"The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits laws that abridge the freedom of speech." *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S.Ct. 2361, 2371 (2018). Under the First Amendment, "a government, including a municipal government vested with state authority, 'has no power to restrict expression because of its message, its ideas, its subject matter, or its content.'" *Reed*, 135 S.Ct. at 2226 (quoting *Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 95 (1972)); *see also Texas v. Johnson*, 491 U.S. 397, 414 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."). "Content-based regulations 'target speech based on its communicative content.'" *Nat'l Inst. of Family & Life Advocates*, 138 S.Ct. at 2371 (quoting *Reed*, 135 S.Ct. at 2226). "[T]he First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic." *Reed*, 135 S.Ct. at 2230.

Content-based regulations "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed*, 135 S.Ct. at 2226; *see also R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 382 (1992) ("Content-based regulations are presumptively invalid."). "It is rare that a regulation restricting speech because of its content will ever be permissible." *Playboy Entm't Grp., Inc.*, 529 U.S. at 818; *see also Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 230 (1987) ("Regulations which permit the Government to discriminate on the basis of the content of the message cannot be tolerated under the First Amendment.") (quoting *Regan v. Time, Inc.*, 468 U.S. 641, 648-649 (1984)). On the other hand, "[a] regulation that serves purposes unrelated to the content of expression is deemed neutral,

even if it has an incidental effect on some speakers or messages but not others." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). "A content-neutral regulation will be sustained under the First Amendment if it advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests." *Turner Broad. Sys., Inc. v. F.C.C.*, 520 U.S. 180, 189 (1997). Accordingly, the Court first must decide whether the Moratorium is content neutral because resolution of that question determines the appropriate level of scrutiny. *See McCullen v. Coakley*, 573 U.S. 464, 478 (2014) ("The content-neutrality prong of the *Ward* test is logically antecedent to the narrow-tailoring prong, because it determines the appropriate level of scrutiny.").

### a. Is the Moratorium Content-Based or Content-Neutral?

"Although it is common to place the burden upon the Government to justify impingements on First Amendment interests, it is the obligation of the person desiring to engage in assertedly expressive conduct to demonstrate that the First Amendment even applies." *Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 293 n.5 (1984). Here, there is little question that speech and conduct protected by the First Amendment occurs at Crossroads' gun shows. Moreover, the speech in question is not merely commercial speech, as Defendants attempt to frame it in their motion. Rather, the types of speech alleged to occur at gun shows includes pure speech that warrants full First Amendment protection.

Further, the Moratorium is a restriction on speech based on the "communicative content" of that speech, *Reed*, 135 S.Ct. at 2226, with the communicative content being guns, gun rights, and gun-related issues. By its plain terms, the Moratorium applies only to gun shows. Put differently, on its face, the Moratorium accords preferential treatment to shows featuring speech on all issues aside from these gun-related subjects. The Moratorium "thus slips from the neutrality of time, place, and circumstance into a concern about content. This is never permitted." *Mosley*, 408 U.S. at 99 (internal quotation marks and citation omitted). Notwithstanding this seemingly obvious conclusion, Defendants

argue that "the fact that the [Moratorium] applies only to gun shows, and not all other types of events, does not transform it into a content-based regulation; otherwise, any legislative or regulatory action taken with respect to a particular type of activity or subject matter would be deemed to be content-based and subject to strict scrutiny." [Doc. No. 12-1 at 25.] Defendants' reliance on *McCullen v. Coakley*, 573 U.S. 464 (2014), for this argument is misplaced.

In *McCullen*, the regulation in question was a Massachusetts statute making "it a crime to knowingly stand on a 'public way or sidewalk' within 35 feet of an entrance to any place, other than a hospital, where abortions are performed." *McCullen*, 573 U.S. at 469. In holding that the statute was content-neutral, the Supreme Court noted that the statute "does not draw content-based distinctions on its face," and stated that the statute "would be content based if it required 'enforcement authorities 'to examine the content of the message that is conveyed to determine whether' a violation has occurred." *Id.* at 479 (quoting *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 383 (1984)). Here, in contrast, the content of a show or event, i.e., whether it is a gun show or is not a gun show, is determinative of whether it is eligible to hold an event at the Fairgrounds in 2019. Thus, whereas the buffer zone in *McCullen* may have had the "'*inevitable* effect' of restricting abortion-related speech more than speech on other subjects," *id.* at 480 (*emphasis* added), the Moratorium here has the *intended* effect of restricting gun-related speech more than speech on other subjects.

Defendants conflate the government interests purportedly served by the Moratorium with the determination of whether the Moratorium is content-based or content-neutral. A court, however, must consider "whether a law is content neutral on its face *before* turning to the law's justification or purpose." *Reed*, 135 S.Ct at 2228 (*emphasis* in original). Ignoring *Reed*, Defendants argue that because, according to Defendants, the Moratorium is focused on public safety issues, it "'serves purposes unrelated to the content of expression,' and so should be 'deemed neutral.'" [Doc. No. 12-1 at 26 (quoting *McCullen*, 468 U.S. at 480).]

Defendants' justifications for the Moratorium may be relevant to the determination of whether it satisfies the requisite level of scrutiny, but they do not render a content-based law content neutral. *Reed*, 135 S.Ct. at 2228 ("[A]n innocuous justification cannot transform a facially content-based law into one that is content-neutral."). In *McCullen,* because the statute was facially neutral, the Court needed to go beyond the face of the statute to determine whether its purposes were intended to be content-based. *See Reed*, 135 S.Ct. at 2228 ("Because strict scrutiny applies either when a law is content based on its face or when the purpose and justification for the law are content based, a court must evaluate each question before it concludes that the law is content neutral and thus subject to a lower level of scrutiny."). Here, on the other hand, the Moratorium is content-based on its face, the content being gun shows, which include speech related to guns and gun issues. "A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." *Id.* at 2228. Defendants' proffered content-neutral justification does not render the Moratorium, a facially content-based policy, content-neutral.

Indeed, because the speech at gun shows is likely to be predominantly, if not exclusively, favorable to guns and gun rights, "[i]n its practical operation," the Moratorium "goes even beyond mere content discrimination, to actual viewpoint discrimination." *R.A.V.*, 505 U.S. at 391. "A regulation engages in viewpoint discrimination when it regulates speech based on the specific motivating ideology or perspective of the speaker." *Interpipe Contracting, Inc. v. Becerra*, 898 F.3d 879, 899 (9th Cir. 2018) (internal quotation marks and citation omitted). "The government may not regulate use based on hostility—or favoritism—towards the underlying message expressed." *R.A.V.*, 505 U.S. at 386. "Discrimination against speech because of its message is presumed to be unconstitutional." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 828 (1995). "When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Id.*

at 829.  "Viewpoint discrimination is the most noxious form of speech suppression." *R.A.V.*, 505 U.S. at 386.  Here, it is difficult to conceive of the Moratorium on gun shows as anything other than a restriction of speech with a *pro-gun* or *pro-second amendment* viewpoint.  Normally, this conclusion is all but dispositive.  *Sorrell*, 564 U.S. at 571 ("In the ordinary case it is all but dispositive to conclude that a law is content-based and, in practice, viewpoint-discriminatory.").

In this context, whether the Fairgrounds is a public forum, as Plaintiffs argue, or a "limited public forum" or nonpublic forum, as Defendants argue, has no impact on the result here.  The Supreme Court has "identified three types of fora: the traditional public forum, the public forum created by government designation, and the nonpublic forum." *Cornelius v. NAACP Legal Defense & Ed. Fund, Inc.*, 473 U.S. 788, 802 (1985). Regardless of the type of forum, however, "the fundamental principle that underlies [the Court's] concern about 'content-based' speech regulations [is] that 'government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views.'"  *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 48–49 (1986) (quoting *Mosley*, 408 U.S. at 95-96).  "Although a speaker may be excluded from a nonpublic forum if he wishes to address a topic not encompassed within the purpose of the forum, or if he is not a member of the class of speakers for whose special benefit the forum was created, the government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject."  *Cornelius*, 473 U.S. at 806 (internal citations omitted); *see also Christian Legal Soc. Chapter of the Univ. of California, Hastings Coll. of the Law v. Martinez*, 561 U.S. 661, 679 (2010) (holding that any restrictions based on the limited or nonpublic nature of the forum are subject to a "key caveat: Any access barrier must be reasonable and viewpoint neutral.").

"The Constitution forbids a state to enforce certain exclusions from a forum generally open to the public even if it was not required to create the forum in the first place."  *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983); *see*

*also Cinevision Corp. v. City of Burbank*, 745 F.2d 560, 571 (9th Cir. 1984) ("Although the City was not required to open the Starlight Bowl and is not required to leave it open indefinitely, it cannot, absent a compelling governmental interest, open the forum to some and close it to others solely in order to suppress the content of protected expression."). "Once a forum is opened up to assembly or speaking by some groups, government may not prohibit others from assembling or speaking on the basis of what they intend to say. Selective exclusions from a public forum may not be based on content alone, and may not be justified by reference to content alone." *Mosley*, 408 U.S. at 96 (internal footnote omitted). "Reasonable time, place and manner regulations are permissible, [but] a content-based prohibition must be narrowly drawn to effectuate a compelling state interest." *Perry Educ. Ass'n*, 460 U.S. at 46. Here, having opened up the Fairgrounds to shows of all types that are put on by all members of the public, the District cannot restrict use of the Fairgrounds based on the content, let alone viewpoint, expressed by the show and its participants. *See Martinez*, 561 U.S. at 685 ("Once it has opened a limited public forum, . . . the State must respect the lawful boundaries it has itself set.") (internal quotation marks and brackets omitted).

In sum, "[i]t is well established that '[t]he First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to a public discussion of an entire topic.'" *Reed*, 135 S.Ct. at 2230 (quoting *Consol. Edison Co. v. Pub. Serv. Comm'n of New York*, 447 U.S. 530, 537 (1980)); *cf. Rosenberger*, 515 U.S. at 831 ("If the topic of debate is, for example, racism, then exclusion of several views on that problem is just as offensive to the First Amendment as exclusion of only one. It is as objectionable to exclude both a theistic and an atheistic perspective on the debate as it is to exclude one, the other, or yet another political, economic, or social viewpoint."). At a minimum, based on the allegations in the complaint, the Moratorium is a "content-based" regulation of speech. Because the Moratorium regulates speech based on its content, it is subject to strict scrutiny, meaning "it must be narrowly tailored to promote a compelling Government interest." *Playboy Entm't Grp., Inc.*, 529 U.S. at 813. Further, because the

District is a political body, its decision on the Moratorium "must be scrutinized most carefully—if only because such a body is at all times, by its very nature, the object of political pressures." *Cinevision Corp.*, 745 F.2d at 575.

### b.  Compelling State Interest

Having determined that the Moratorium is a content-based restriction of speech, it is presumptively unconstitutional. *Reed*, 135 S.Ct. at 2226; *R.A.V.*, 505 U.S. at 382.  Content based restrictions are rarely upheld.  "When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 210 (2014) (quoting *Playboy Entm't Grp., Inc.*, 529 U.S. at 816).  Thus, the District bears the burden of proving that the Moratorium is narrowly tailored to promote a compelling government interest.

In its briefs (and again at the hearing), the District relies vague claims that the Moratorium is based on an interest in "public safety."  Both the language of the Moratorium itself and the District's briefs, however, are largely silent as what members of the public are endangered by gun shows or the speech therein.  Nor does the District point to any evidence that attendees of gun shows at the Fairgrounds have suffered injuries in the past or are in greater danger than attendees of other events at the Fairgrounds.[6]  Indeed, at the hearing, counsel for the District could not answer why, after years of gun shows at the Fairgrounds, the District decided to enact the Moratorium when it did.  The District's "[m]ere speculation of harm does not constitute a compelling state interest." *Consol. Edison Co. of New York*, 447 U.S. at 543.  A general fear that people attending gun shows will violate state and local laws about gun possession or even commit acts of gun violence in the community upon leaving the show cannot justify the Moratorium.  *See Cinevision Corp.*, 745 F.2d at 572 ("[A] general fear that state or local narcotics or other laws will be

---

[6] Plaintiffs, on the other hand, submitted records from the San Diego County Sherriff's office indicating that recent gun shows at the Fairgrounds did not result in any major safety incidents.  [Doc. No. 14-2 at 13-46.]

broken by people attending the concerts cannot justify a content-based restriction on expression."); *see also Sorrell*, 564 U.S. at 577 ("Those who seek to censor or burden free expression often assert that disfavored speech has adverse effects.  But the fear that people would make bad decisions if given truthful information cannot justify content-based burdens on speech.") (internal quotation marks and citation omitted); *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 773 (1976) (holding that a State may not "completely suppress the dissemination of concededly truthful information about entirely lawful activity, fearful of that information's effect upon its disseminators and its recipients"); *Bay Area Peace Navy v. United States*, 914 F.2d 1224, 1228 (9th Cir. 1990) ("[The government] is not free to foreclose expressive activity in public areas on mere speculation about danger.").

Although "[t]here is no doubt that the City has a substantial interest in safeguarding its citizens against violence," *Edwards v. City of Coeur d'Alene*, 262 F.3d 856, 863 (9th Cir. 2001), "even the most legitimate goal may not be advanced in a constitutionally impermissible manner," *Carey v. Brown*, 447 U.S. 455, 464–65 (1980).  "[M]erely invoking interests . . . is insufficient. The government must also show that the proposed communicative activity endangers those interests." *Kuba v. 1-A Agr. Ass'n*, 387 F.3d 850, 859 (9th Cir. 2004) (citation omitted). Thus, "the First Amendment demands that municipalities provide tangible evidence that speech-restrictive regulations are necessary to advance the proffered interest in public safety." *Edwards*, 262 F.3d at 863 (internal quotation marks and citation omitted).  That the District enacted the Moratorium without *any* evidence of actual public safety concerns caused by the speech that takes place at gun shows (as opposed to general gun violence in the community) makes it exceedingly likely that the District will not be able to satisfy its burden of demonstrating the existence of a compelling state interest for the Moratorium.

### c.  Narrowly Tailored

Regardless, even if the Moratorium serves a compelling governmental interest in "public safety", the Moratorium is not narrowly tailored to serve that interest.  "To meet

the requirement of narrow tailoring, the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." *McCullen*, 573 U.S. at 495. Indeed, the complete ban on gun shows effected by the Moratorium would not even survive lesser scrutiny because it unquestionably burdens substantially more speech than necessary to accomplish the District's alleged goal of ensuring public safety. *Cf. id.* at 496-97 (applying lesser scrutiny applicable to content neutral speech restrictions to statute creating buffer zones around abortion clinics and holding that it was not narrowly tailored to the government's claimed interests, one of which was public safety); *Turner Broad. Sys., Inc.*, 520 U.S. at 213–14 ("Under intermediate scrutiny, the Government may employ the means of its choosing so long as the regulation promotes a substantial governmental interest that would be achieved less effectively absent the regulation, and does not burden substantially more speech than is necessary to further that interest.") (internal quotation marks and ellipses omitted). In reality, the District appears to have taken "the path of least resistance," because of a belief that the gun-related speech that takes place at gun shows "is associated with particular problems," namely gun violence in the community. *See McCullen*, 573 U.S. at 485. Such a path is not narrowly tailored to the District's stated interest in public safety and therefore does not survive scrutiny.

Accordingly, for the foregoing reasons, Plaintiffs have a likelihood of success on their First Amendment free speech claims.

## 2. Equal Protection Claim Against the District

Because the Moratorium treats some events (and therefore event promotors, vendors, and attendees) differently from others, it implicates the Equal Protection Clause of the Fourteenth Amendment as well. *Mosley*, 408 U.S. at 94–95 ("Because Chicago treats some picketing differently from others, we analyze this ordinance in terms of the Equal Protection Clause of the Fourteenth Amendment."); *see also Dariano v. Morgan Hill Unif. Sch. Dist.*, 767 F.3d 764, 779-780 (9th Cir. 2014) ("Government action that suppresses protected speech in a discriminatory manner may violate both the First Amendment and

1   the Equal Protection Clause.")  The analysis of this claim is "essentially the same" as under
2   the First Amendment.  *Dariano*, 767 F.3d at 780.

3       "The Equal Protection Clause requires that statutes affecting First Amendment
4   interests be narrowly tailored to their legitimate objectives." *Mosely*, 408 U.S. at 101.
5   "When government regulation discriminates among speech-related activities in a public
6   forum, the Equal Protection Clause mandates that the legislation be finely tailored to serve
7   substantial state interests, and the justifications offered for any distinctions it draws must
8   be carefully scrutinized." *Carey*, 447 U.S. at 461–62.  "Necessarily, then, under the Equal
9   Protection Clause, not to mention the First Amendment itself, government may not grant
10  the use of a forum to people whose views it finds acceptable, but deny use to those wishing
11  to express less favored or more controversial views." *Mosely*, 408 U.S. at 96.

12      As with the First Amendment, "under the Equal Protection Clause, . . . [o]nce a
13  forum is opened up to assembly or speaking by some groups, government may not prohibit
14  others from assembling or speaking on the basis of what they intend to say.  Selective
15  exclusions from a public forum may not be based on content alone, and may not be justified
16  by reference to content alone." *Id.* at 96 (internal footnote omitted).  Thus, the District may
17  not maintain that gun shows pose a safety risk unless those shows are clearly more
18  dangerous than the shows and events the District permits at the Fairgrounds.  *Id.* at 100
19  ("[U]nder the Equal Protection Clause, Chicago may not maintain that other picketing
20  disrupts the school unless that picketing is clearly more disruptive than the picketing
21  Chicago already permits.").  As discussed above, the District, who has the burden of proof,
22  offers no evidence that gun shows pose a greater safety risk to the public than any other
23  shows at the Fairgrounds.  General statements about gun violence or dislike of gun culture
24  do not justify the unequal treatment resulting from the Moratorium.  "'(I)n our system,
25  undifferentiated fear or apprehension of disturbance is not enough to overcome the right to
26  freedom of expression.'" *Id.* at 101 (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
27  393 U.S. 503, 508 (1969)).  Accordingly, Plaintiffs also have a likelihood of success on
28  their claims under the Equal Protection Clause of the Fourteenth Amendment.

### B.  Irreparable Harm

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("It is well established that the deprivation of constitutional rights unquestionably constitutes irreparable injury.") (internal quotation marks omitted).  "Under the law of this circuit, a party seeking preliminary injunctive relief in a First Amendment context can establish irreparable injury sufficient to merit the grant of relief by demonstrating the existence of a colorable First Amendment claim." *Warsoldier v. Woodford*, 418 F.3d 989, 1001 (9th Cir. 2005) (internal brackets and citation omitted).  Here, the harm suffered by Plaintiffs is the violation of their First Amendment rights.  By demonstrating a likelihood of success on the merits of their First Amendment claims, Plaintiffs have demonstrated that irreparable harm will result from the continued restriction of their protected speech.

### C.  Balance of Equities

Balanced against the irreparable injury faced by Plaintiffs as a result of the continued enforcement of the Moratorium is the District's interest in evaluating the feasibility of gun shows at the Fairgrounds and in determining whether gun shows impact public safety.  Considering the complete lack of evidence of any public safety concerns resulting from gun shows at the Fairgrounds (or at least any greater concerns than those resulting from any show at the Fairgrounds), the scales tilt decidedly in favor of Plaintiffs.  The District is fully able to revise its policies and procedures for gun shows while gun shows continue to occur at the Fairgrounds.  Indeed, the District even allowed a gun show to occur in 2018 after it passed the Moratorium banning gun shows in 2019.

### D.  Public Interest

For similar reasons, the public interest favors Plaintiffs' exercise of their First Amendment rights.  The Ninth Circuit has "consistently recognized the significant public interest in upholding First Amendment principles." *Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014).  Neither the District's speculative general interest in "public safety" nor its

26

specific interest in re-evaluating its gun show policies and procedures outweigh the public interest in ensuring that First Amendment free speech rights are upheld.

## VI.   Conclusion

For the foregoing reasons, Plaintiffs claims against the individual defendants are dismissed, the motion to dismiss claims against the District is denied, and the District is enjoined from enforcing the Moratorium, as stated in the Court's June 18, 2019 order.

Dated:  June 25, 2019

_____
Hon. Cathy Ann Bencivengo
United States District Judge

# EXHIBIT 5

- Voice of San Diego - https://www.voiceofsandiego.org -

## Newsom Has Offered Hints He'll Treat Del Mar Gun Show Bill Differently Than Brown

Posted By *Jesse Marx* On March 28, 2019 @ 7:11 pm



The Crossroads of the West gun show at the Del Mar Fairgrounds / Image courtesy of NBC San Diego

San Diego progressives have long wanted to abolish gun shows on public property. With a new governor, their years of activism may finally pay off.

Assembly members Todd Gloria and Tasha Boerner Horvath are carrying a bill that would prohibit gun sales at the Del Mar Fairground beginning in 2021. Gloria told the Assembly Public Safety Committee, which advanced the bill this week, that he wanted "to offer more than thoughts and prayers. We are here for action."

He and others made the case that California shouldn't be in the business of promoting firearms for profit — gun buyers have plenty of other options.

"A gun show on a state-owned property is overkill — literally," said Rose Ann Sharp, founder of Never Again CA, a gun control group based in Del Mar. "The presence of gun shows at the fairgrounds normalizes their use. It says guns are OK here."

Gloria also underlined pointed to studies [1] showing that gun shows are a source of illegally trafficked firearms.

Naturally, the folks who run Crossroads of the West on the Del Mar Fairgrounds dispute the implication that they're making the world a more violent place or breaking any laws.

At this week's public safety hearing, Kathy Lynch, a representative for the National Shooting Sports Foundation and other pro-gun groups, argued that gun shows like the one in Del Mar help keep firearm transactions from

0291

going underground. The shows also comply with state and federal firearm regulations, including wait times, she said.

Still, some local officials have long considered the gun show to be an inappropriate use of public property and they've pressured the state board overseeing the fairgrounds.

Del Mar City Councilman Dwight Worden described the gun show as "a festering sore in our community for decades, driven by the irony that the Del Mar Fairgrounds is in our city, but it's state-owned property run by a state agency, so we don't have much regulatory control."

The cities of Del Mar, Solana Beach and Encinitas are all supporters of AB 893 [2].

The tide changed when Never Again CA, according to the Union-Tribune, uncovered evidence that the patriarch of the family that operates the gun show had a past felony firearms conviction [3] and avoided legal conflicts by ceding responsibility for the event to his daughter.

After protesters began gathering outside Crossroads of the West last year, California's 22nd District Agricultural Association, which manages the Del Mar Fairgrounds, voted 8-1 to suspend the contract with the event show for 2019. That decision led to a constitutional challenge that is still pending in the courts.

Similar attempts to ban gun sales on state-owned property in the Bay Area have been vetoed by previous governors, including Jerry Brown, as recently as October. His successor, Gavin Newsom, is not likely to do the same.

"Permitting the sale of firearms and ammunition on state-owned property only perpetuates America's gun culture at a time when 73 percent of Californians support gun reform measures," Newsom wrote [4] to the fairgrounds while he was lieutenant governor.

As the state's top executive, Newsom appoints the members of the agricultural association board to four-year terms and has been using that power to reshape government in his image [5], according to the Los Angeles Times. In October, several weeks after he cast the lone no-vote on the gun show contract, Russ Penniman, a retired rear admiral [6], lost his spot. Newsom replaced Penniman but kept two other board members alone.

Several board members, according to the U-T, cited concerns about large quantities of ammunition being sold by the wagon [7] and about kits allowing people to make their own potentially illegal weapons. Penniman acknowledged that the Crossroads of the West had "some issues," but told his colleagues that the show should be allowed to continue while addressing the problems.

Penniman didn't respond to a request for comment, nor did the governor's office.

Still, some local officials saw Penniman's departure as punishment for his gun show vote.

"You don't take a shot at the king and miss," Worden said.

---

Article printed from Voice of San Diego: **https://www.voiceofsandiego.org**

0292

URL to article: https://www.voiceofsandiego.org/topics/news/newsom-has-offered-hints-hell-treat-del-mar-gun-show-bill-differently-than-brown/

URLs in this post:

[1] pointed to studies: https://www.voiceofsandiego.org/wp-content/uploads/2019/03/201920200AB893_Assembly-Public-Safety_.pdf

[2] AB 893: http://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=201920200AB893

[3] a past felony firearms conviction: https://www.sandiegouniontribune.com/communities/north-county/sd-no-crossroads-daughter-20180523-story.html

[4] Newsom wrote: https://timesofsandiego.com/politics/2018/04/24/initial-results-are-expected-in-the-next-few-days-on-previously-untested-rape-evidence-kits-that-will-help-identify-offenders-who-may-potentially-be-linked-to-other-sexual-assaults-san-diego-county-d/

[5] reshape government in his image: https://www.latimes.com/politics/la-pol-ca-gavin-newsom-appointments-california-agencies-20190227-story.html

[6] a retired rear admiral: https://www.navy.mil/navydata/bios/navybio_ret.asp?bioID=444

[7] cited concerns about large quantities of ammunition being sold by the wagon: https://www.sandiegouniontribune.com/communities/north-county/sd-no-gunshow-suspended-20180911-story.html

Copyright © Voice of San Diego. All rights reserved.

STATE OF CALIFORNIA
DEPARTMENT OF GENERAL SERVICES
**GOVERNMENT CLAIM**
OFFICE OF RISK AND INSURANCE MANAGEMENT

DGS ORIM 006 (Rev. 08/19)

| CLAIMANT INFORMATION | | |
|---|---|---|
| **LAST NAME** Minnich | **FIRST NAME** Richard | **MIDDLE INITIAL** |
| **INMATE OR PATIENT IDENTIFICATION NUMBER (if applicable)** N/A | **BUSINESS NAME(if applicable)** California Rifle & Pistol Association, Incorporated | |
| **TELEPHONE NUMBER** (714) 992-2772 | **EMAIL ADDRESS** contact@crpa.org | |
| **MAILING ADDRESS** 271 E. Imperial Hwy., Ste. 620 | **CITY** Fullerton | **STATE** CA | **ZIP** 92835 |
| **IS THE CLAIMANT UNDER 18 YEARS OF AGE?** ☐ Yes ☑ No | **INSURED NAME(Insurance Company Subrogation)** N/A | |
| **IS THIS AN AMENDMENT TO A PREVIOUSLY EXISTING CLAIM?** ☐ Yes ☑ No | **EXISTING CLAIM NUMBER (if applicable)** N/A | **EXISTING CLAIMANT NAME(if applicable)** N/A |

| ATTORNEY OR REPRESENTATIVE INFORMATION | | |
|---|---|---|
| **LAST NAME** Barvir | **FIRST NAME** Anna | **MIDDLE INITIAL** M. |
| **TELEPHONE NUMBER** (562) 216-4444 | **EMAIL ADDRESS** abarvir@michellawyers.com | |
| **MAILING ADDRESS** 180 E. Ocean Blvd., Ste. 200 | **CITY** Long Beach | **STATE** CA | **ZIP** 90802 |

| CLAIM INFORMATION | |
|---|---|
| **STATE AGENCIES OR EMPLOYEES AGAINST WHOM THE CLAIM IS FILED** Gavin Newsom, as Governor; Rob Bonta, as Attorney General; Karen Ross, as Secretary of Dept. of Food & Agriculture; 22nd District Agricultural Assn. | **DATE OF INCIDENT** Ongoing |

**LATE CLAIM EXPLANATION (Required, if incident was more than six months ago)**

N/A

| **DOLLAR AMOUNT OF CLAIM** Exceeds $10,000 (Gov't Code § 910(f).) | **CIVIL CASE TYPE(Required, if amount is more than $10,000)** ☐ Limited ($25,000 or less) ☑ Non-Limited (over $25,000) |
|---|---|

**DOLLAR AMOUNT EXPLANATION**
See Exhibit 1, section II.B.

**INCIDENT LOCATION**
Del Mar Fairgrounds, 2260 Jimmy Durante Blvd., Del Mar, CA 92014

**SPECIFIC DAMAGE OR INJURY DESCRIPTION**

See Exhibit A, section II.B.

**CIRCUMSTANCES THAT LED TO DAMAGE OR INJURY**

See Exhibit A, section II.C.

**EXPLAIN WHY YOU BELIEVE THE STATE IS RESPONSIBLE FOR THE DAMAGE OR INJURY**

See Exhibit A, section II.D.

STATE OF CALIFORNIA

# GOVERNMENT CLAIM

DGS ORIM 006 (Rev. 08/19)

DEPARTMENT OF GENERAL SERVICES
OFFICE OF RISK AND INSURANCE MANAGEMENT

## AUTOMOBILE CLAIM INFORMATION

| DOES THE CLAIM INVOLVE A STATE VEHICLE?<br>☐ Yes  ☑ No | VEHICLE LICENSE NUMBER (if known) | STATE DRIVER NAME (if known) |
| --- | --- | --- |
| HAS A CLAIM BEEN FILED WITH YOUR INSURANCE CARRIER?<br>☐ Yes  ☑ No | INSURANCE CARRIER NAME | INSURANCE CLAIM NUMBER |
| HAVE YOU RECEIVED AN INSURANCE PAYMENT FOR THIS DAMAGE OR INJURY?<br>☐ Yes  ☑ No | AMOUNT RECEIVED (if any) | AMOUNT OF DEDUCTIBLE (if any) |

## NOTICE AND SIGNATURE

I declare under penalty of perjury under the laws of the State of California that all the information I have provided is true and correct to the best of my information and belief. I further understand that if I have provided information that is false, intentionally incomplete, or misleading I may be charged with a felony punishable by up to four years in state prison and/or a fine of up to $10,000 (Penal Code section 72).

| SIGNATURE | PRINTED NAME | DATE |
| --- | --- | --- |
| *Anna Barvir* | Anna M. Barvir | August 2, 2021 |

## INSTRUCTIONS

- Include a check or money order for $25, payable to the State of California.
  - $25 filing fee is not required for amendments to existing claims.
- Confirm all sections relating to this claim are complete and the form is signed.
- Attach copies of any documentation that supports your claim. Do not submit originals.

Mail the claim form and all attachments to:
Office of Risk and Insurance Management
Government Claims Program
P.O. Box 989052, MS414
West Sacramento, CA 95798-9052

Claim forms can also be delivered to:
Office of Risk and Insurance Management
Government Claims Program
707 3rd Street, 1st Floor
West Sacramento, CA 95605
1-800-955-0045

### Department of General Services Privacy Notice on Information Collection

This notice is provided pursuant to the Information Practices Act of 1977, California Civil Code Sections 1798.17 & 1798.24 and the Federal Privacy Act (Public Law 93-579).

The Department of General Services (DGS), Office of Risk and Insurance Management (ORIM), is requesting the information specified on this form pursuant to Government Code Section 905.2(c).

The principal purpose for requesting this data is to process claims against the state The information provided will/may be disclosed to a person, or to another agency where the transfer is necessary for the transferee-agency to perform its constitutional or statutory duties, and the use is compatible with a purpose for which the information was collected and the use or transfer is accounted for in accordance with California Civil Code Section 1798.25.

Individuals should not provide personal information that is not requested.

The submission of all information requested is mandatory unless otherwise noted. If you fail to provide the information requested to DGS, or if the information provided is deemed incomplete or unreadable, this may result in a delay in processing.

**Department Privacy Policy**
The information collected by DGS Is subject to the limitations in the Information Practices Act of 1977 and state policy (see State Administrative Manual 5310-5310.7). For more information on how we care for your personal information, please read the DGS Privacy Policy.

**Access to Your Information**
ORIM is responsible for maintaining collected records and retaining them for 5 years. You have a right to access records containing personal information maintained by the state entity. To request access, contact:

**DGS ORIM**
**Public Records Officer**
**707 3rd St., West Sacramento, CA 95605**

**(916) 376-5300**

STATE OF CALIFORNIA
**GOVERNMENT CLAIM**
DGS ORIM 006 (Rev. 08/19)

DEPARTMENT OF GENERAL SERVICES
OFFICE OF RISK AND INSURANCE MANAGEMENT

### CLAIMANT INFORMATION

| LAST NAME | FIRST NAME | MIDDLE INITIAL |
|---|---|---|
| Kash | Daniel | |

| INMATE OR PATIENT IDENTIFICATION NUMBER (if applicable) | BUSINESS NAME(if applicable) |
|---|---|
| N/A | L.A.X. Firing Range, Inc., d/b/a LAX Ammo LLC |

| TELEPHONE NUMBER | EMAIL ADDRESS |
|---|---|
| (424) 750-9666 | laxrange@yahoo.com |

| MAILING ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|
| 927 W. Manchester Blvd. | Inglewood | CA | 90301 |

| IS THE CLAIMANT UNDER 18 YEARS OF AGE? | INSURED NAME(Insurance Company Subrogation) |
|---|---|
| ☐ Yes ☑ No | N/A |

| IS THIS AN AMENDMENT TO A PREVIOUSLY EXISTING CLAIM? | EXISTING CLAIM NUMBER (if applicable) | EXISTING CLAIMANT NAME(if applicable) |
|---|---|---|
| ☐ Yes ☑ No | N/A | N/A |

### ATTORNEY OR REPRESENTATIVE INFORMATION

| LAST NAME | FIRST NAME | MIDDLE INITIAL |
|---|---|---|
| Barvir | Anna | M. |

| TELEPHONE NUMBER | EMAIL ADDRESS |
|---|---|
| (562) 216-4444 | abarvir@michellawyers.com |

| MAILING ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|
| 180 E. Ocean Blvd., Ste. 200 | Long Beach | CA | 90802 |

### CLAIM INFORMATION

| STATE AGENCIES OR EMPLOYEES AGAINST WHOM THE CLAIM IS FILED | DATE OF INCIDENT |
|---|---|
| Gavin Newsom, as Governor; Rob Bonta, as Attorney General; Karen Ross, as Secretary of Dept. of Food & Agriculture; 22nd District Agricultural Assn. | Ongoing |

LATE CLAIM EXPLANATION (Required, if incident was more than six months ago)

N/A

| DOLLAR AMOUNT OF CLAIM | CIVIL CASE TYPE(Required, if amount is more than $10,000) |
|---|---|
| Exceeds $10,000 (Gov't Code § 910(f).) | ☐ Limited ($25,000 or less)  ☑ Non-Limited (over $25,000) |

DOLLAR AMOUNT EXPLANATION
See Exhibit 1, section II.B.

INCIDENT LOCATION
Del Mar Fairgrounds, 2260 Jimmy Durante Blvd., Del Mar, CA 92014

SPECIFIC DAMAGE OR INJURY DESCRIPTION

See Exhibit A, section II.B.

CIRCUMSTANCES THAT LED TO DAMAGE OR INJURY

See Exhibit A, section II.C.

EXPLAIN WHY YOU BELIEVE THE STATE IS RESPONSIBLE FOR THE DAMAGE OR INJURY

See Exhibit A, section II.D.

0296

STATE OF CALIFORNIA
## GOVERNMENT CLAIM
DGS ORIM 006 (Rev. 08/19)

DEPARTMENT OF GENERAL SERVICES
OFFICE OF RISK AND INSURANCE MANAGEMENT

### AUTOMOBILE CLAIM INFORMATION

| DOES THE CLAIM INVOLVE A STATE VEHICLE? ☐ Yes ☒ No | VEHICLE LICENSE NUMBER (if known) | STATE DRIVER NAME (if known) |
|---|---|---|
| HAS A CLAIM BEEN FILED WITH YOUR INSURANCE CARRIER? ☐ Yes ☐ No | INSURANCE CARRIER NAME | INSURANCE CLAIM NUMBER |
| HAVE YOU RECEIVED AN INSURANCE PAYMENT FOR THIS DAMAGE OR INJURY? ☐ Yes ☒ No | AMOUNT RECEIVED (if any) | AMOUNT OF DEDUCTIBLE (if any) |

### NOTICE AND SIGNATURE

I declare under penalty of perjury under the laws of the State of California that all the information I have provided is true and correct to the best of my information and belief. I further understand that if I have provided information that is false, intentionally incomplete, or misleading I may be charged with a felony punishable by up to four years in state prison and/or a fine of up to $10,000 (Penal Code section 72).

| SIGNATURE | PRINTED NAME | DATE |
|---|---|---|
| *Anna Barvir* | Anna M. Barvir | August 2, 2021 |

### INSTRUCTIONS

- Include a check or money order for $25, payable to the State of California.
  - $25 filing fee is not required for amendments to existing claims.
- Confirm all sections relating to this claim are complete and the form is signed.
- Attach copies of any documentation that supports your claim. Do not submit originals.

Mail the claim form and all attachments to:
Office of Risk and Insurance Management
Government Claims Program
P.O. Box 989052, MS414
West Sacramento, CA 95798-9052

Claim forms can also be delivered to:
Office of Risk and Insurance Management
Government Claims Program
707 3rd Street, 1st Floor
West Sacramento, CA 95605
1-800-955-0045

### Department of General Services Privacy Notice on Information Collection

This notice is provided pursuant to the Information Practices Act of 1977, California Civil Code Sections 1798.17 & 1798.24 and the Federal Privacy Act (Public Law 93-579).

The Department of General Services (DGS), Office of Risk and Insurance Management (ORIM), is requesting the information specified on this form pursuant to Government Code Section 905.2(c).

The principal purpose for requesting this data is to process claims against the state The information provided will/may be disclosed to a person, or to another agency where the transfer is necessary for the transferee-agency to perform its constitutional or statutory duties, and the use is compatible with a purpose for which the information was collected and the use or transfer is accounted for in accordance with California Civil Code Section 1798.25.

Individuals should not provide personal information that is not requested.

The submission of all information requested is mandatory unless otherwise noted. If you fail to provide the information requested to DGS, or if the information provided is deemed incomplete or unreadable, this may result in a delay in processing.

**Department Privacy Policy**
The information collected by DGS Is subject to the limitations in the Information Practices Act of 1977 and state policy (see State Administrative Manual 5310-5310.7). For more information on how we care for your personal information, please read the DGS Privacy Policy.

**Access to Your Information**
ORIM is responsible for maintaining collected records and retaining them for 5 years. You have a right to access records containing personal information maintained by the state entity. To request access, contact:

**DGS ORIM**
**Public Records Officer**
**707 3rd St., West Sacramento, CA 95605**
**(916) 376-5300**

STATE OF CALIFORNIA
**GOVERNMENT CLAIM**
DGS ORIM 006 (Rev. 08/19)

DEPARTMENT OF GENERAL SERVICES
OFFICE OF RISK AND INSURANCE MANAGEMENT

### CLAIMANT INFORMATION

| LAST NAME | FIRST NAME | MIDDLE INITIAL |
|---|---|---|
| Walsh | Lawrence | M. |

| INMATE OR PATIENT IDENTIFICATION NUMBER (if applicable) | BUSINESS NAME (if applicable) |
|---|---|
| N/A | Miwall Corporation d/b/a Wholesale Ammunition |

| TELEPHONE NUMBER | EMAIL ADDRESS |
|---|---|
| (480) 530-3838 | info@miwallcorp.com |

| MAILING ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|
| P.O. Box 2809 | Grass Valley | CA | 95945 |

| IS THE CLAIMANT UNDER 18 YEARS OF AGE? | INSURED NAME (Insurance Company Subrogation) |
|---|---|
| ☐ Yes   ☑ No | N/A |

| IS THIS AN AMENDMENT TO A PREVIOUSLY EXISTING CLAIM? | EXISTING CLAIM NUMBER (if applicable) | EXISTING CLAIMANT NAME (if applicable) |
|---|---|---|
| ☐ Yes   ☑ No | N/A | N/A |

### ATTORNEY OR REPRESENTATIVE INFORMATION

| LAST NAME | FIRST NAME | MIDDLE INITIAL |
|---|---|---|
| Barvir | Anna | M. |

| TELEPHONE NUMBER | EMAIL ADDRESS |
|---|---|
| (562) 216-4444 | abarvir@michellawyers.com |

| MAILING ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|
| 180 E. Ocean Blvd., Ste. 200 | Long Beach | CA | 90802 |

### CLAIM INFORMATION

| STATE AGENCIES OR EMPLOYEES AGAINST WHOM THE CLAIM IS FILED | DATE OF INCIDENT |
|---|---|
| Gavin Newsom, as Governor; Rob Bonta, as Attorney General; Karen Ross, as Secretary of Dept. of Food & Agriculture; 22nd District Agricultural Assn. | Ongoing |

LATE CLAIM EXPLANATION (Required, if incident was more than six months ago)

N/A

| DOLLAR AMOUNT OF CLAIM | CIVIL CASE TYPE (Required, if amount is more than $10,000) |
|---|---|
| Exceeds $10,000 (Gov't Code § 910(f).) | ☐ Limited ($25,000 or less)   ☑ Non-Limited (over $25,000) |

DOLLAR AMOUNT EXPLANATION
See Exhibit 1, section II.B.

INCIDENT LOCATION
Del Mar Fairgrounds, 2260 Jimmy Durante Blvd., Del Mar, CA 92014

SPECIFIC DAMAGE OR INJURY DESCRIPTION

See Exhibit A, section II.B.

CIRCUMSTANCES THAT LED TO DAMAGE OR INJURY

See Exhibit A, section II.C.

EXPLAIN WHY YOU BELIEVE THE STATE IS RESPONSIBLE FOR THE DAMAGE OR INJURY

See Exhibit A, section II.D.

0298

STATE OF CALIFORNIA
**GOVERNMENT CLAIM**
DGS ORIM 006 (Rev. 08/19)

DEPARTMENT OF GENERAL SERVICES
OFFICE OF RISK AND INSURANCE MANAGEMENT

---

### AUTOMOBILE CLAIM INFORMATION

| DOES THE CLAIM INVOLVE A STATE VEHICLE? | VEHICLE LICENSE NUMBER (if known) | STATE DRIVER NAME (if known) |
|---|---|---|
| ☐ Yes   ☒ No | | |
| HAS A CLAIM BEEN FILED WITH YOUR INSURANCE CARRIER? | INSURANCE CARRIER NAME | INSURANCE CLAIM NUMBER |
| ☐ Yes   ☐ No | | |
| HAVE YOU RECEIVED AN INSURANCE PAYMENT FOR THIS DAMAGE OR INJURY? | AMOUNT RECEIVED (if any) | AMOUNT OF DEDUCTIBLE (if any) |
| ☐ Yes   ☒ No | | |

### NOTICE AND SIGNATURE

I declare under penalty of perjury under the laws of the State of California that all the information I have provided is true and correct to the best of my information and belief. I further understand that if I have provided information that is false, intentionally incomplete, or misleading I may be charged with a felony punishable by up to four years in state prison and/or a fine of up to $10,000 (Penal Code section 72).

| SIGNATURE | PRINTED NAME | DATE |
|---|---|---|
| *Anna Barvir* | Anna M. Barvir | August 2, 2021 |

### INSTRUCTIONS

- Include a check or money order for $25, payable to the State of California.
  - $25 filing fee is not required for amendments to existing claims.
- Confirm all sections relating to this claim are complete and the form is signed.
- Attach copies of any documentation that supports your claim. Do not submit originals.

Mail the claim form and all attachments to:
    Office of Risk and Insurance Management
    Government Claims Program
    P.O. Box 989052, MS414
    West Sacramento, CA 95798-9052

Claim forms can also be delivered to:
    Office of Risk and Insurance Management
    Government Claims Program
    707 3rd Street, 1st Floor
    West Sacramento, CA 95605
    1-800-955-0045

### Department of General Services Privacy Notice on Information Collection

This notice is provided pursuant to the Information Practices Act of 1977, California Civil Code Sections 1798.17 & 1798.24 and the Federal Privacy Act (Public Law 93-579).

The Department of General Services (DGS), Office of Risk and Insurance Management (ORIM), is requesting the information specified on this form pursuant to Government Code Section 905.2(c).

The principal purpose for requesting this data is to process claims against the state The information provided will/may be disclosed to a person, or to another agency where the transfer is necessary for the transferee-agency to perform its constitutional or statutory duties, and the use is compatible with a purpose for which the information was collected and the use or transfer is accounted for in accordance with California Civil Code Section 1798.25.

Individuals should not provide personal information that is not requested.

The submission of all information requested is mandatory unless otherwise noted. If you fail to provide the information requested to DGS, or if the information provided is deemed incomplete or unreadable, this may result in a delay in processing.

**Department Privacy Policy**
The information collected by DGS Is subject to the limitations in the Information Practices Act of 1977 and state policy (see State Administrative Manual 5310-5310.7). For more information on how we care for your personal information, please read the DGS Privacy Policy.

**Access to Your Information**
ORIM is responsible for maintaining collected records and retaining them for 5 years. You have a right to access records containing personal information maintained by the state entity. To request access, contact:

**DGS ORIM**
**Public Records Officer**
**707 3rd St., West Sacramento, CA 95605**

**(916) 376-5300**

STATE OF CALIFORNIA
**GOVERNMENT CLAIM**
DGS ORIM 006 (Rev. 08/19)

DEPARTMENT OF GENERAL SERVICES
OFFICE OF RISK AND INSURANCE MANAGEMENT

| CLAIMANT INFORMATION | | |
|---|---|---|
| LAST NAME | FIRST NAME | MIDDLE INITIAL |
| INMATE OR PATIENT IDENTIFICATION NUMBER (if applicable)<br>N/A | BUSINESS NAME(if applicable)<br>The Second Amendment Foundation | |
| TELEPHONE NUMBER<br>(425) 454-7012 | EMAIL ADDRESS<br>info@saf.org | |
| MAILING ADDRESS<br>12500 NE 10th PL | CITY<br>Bellevue | STATE<br>WA | ZIP<br>98005 |
| IS THE CLAIMANT UNDER 18 YEARS OF AGE?<br>☐ Yes  ☑ No | INSURED NAME(Insurance Company Subrogation)<br>N/A | |
| IS THIS AN AMENDMENT TO A PREVIOUSLY EXISTING CLAIM?<br>☐ Yes  ☑ No | EXISTING CLAIM NUMBER (if applicable)<br>N/A | EXISTING CLAIMANT NAME(if applicable)<br>N/A |

| ATTORNEY OR REPRESENTATIVE INFORMATION | | |
|---|---|---|
| LAST NAME<br>Kilmer | FIRST NAME<br>Donald | MIDDLE INITIAL |
| TELEPHONE NUMBER<br>(408) 264-8489 | EMAIL ADDRESS<br>Don@DKLawOffice.com | |
| MAILING ADDRESS<br>14085 Silver Ridge Road | CITY<br>Caldwell | STATE<br>ID | ZIP<br>83607 |

| CLAIM INFORMATION |
|---|

STATE AGENCIES OR EMPLOYEES AGAINST WHOM THE CLAIM IS FILED
Gavin Newsom, as Governor; Rob Bonta, as Attorney General; Karen Ross, as Secretary of Dept. of Food & Agriculture; 22nd District Agricultural Assn.

DATE OF INCIDENT
Ongoing

LATE CLAIM EXPLANATION (Required, if incident was more than six months ago)

N/A

DOLLAR AMOUNT OF CLAIM
Exceeds $10,000 (Gov't Code § 910(f).)

CIVIL CASE TYPE(Required, if amount is more than $10,000)
☐ Limited ($25,000 or less)  ☑ Non-Limited (over $25,000)

DOLLAR AMOUNT EXPLANATION
See Exhibit 1, section II.B.

INCIDENT LOCATION
Del Mar Fairgrounds, 2260 Jimmy Durante Blvd., Del Mar, CA 92014

SPECIFIC DAMAGE OR INJURY DESCRIPTION

See Exhibit A, section II.B.

CIRCUMSTANCES THAT LED TO DAMAGE OR INJURY

See Exhibit A, section II.B.

EXPLAIN WHY YOU BELIEVE THE STATE IS RESPONSIBLE FOR THE DAMAGE OR INJURY

See Exhibit A, section II.D.

0300

STATE OF CALIFORNIA

DEPARTMENT OF GENERAL SERVICES

# GOVERNMENT CLAIM

OFFICE OF RISK AND INSURANCE MANAGEMENT

DGS ORIM 006 (Rev. 08/19)

## AUTOMOBILE CLAIM INFORMATION

| DOES THE CLAIM INVOLVE A STATE VEHICLE? <br> ☐ Yes  ☒ No | VEHICLE LICENSE NUMBER(if known) | STATE DRIVER NAME (if known) |
|---|---|---|
| HAS A CLAIM BEEN FILED WITH YOUR INSURANCE CARRIER? <br> ☐ Yes  ☐ No | INSURANCE CARRIER NAME | INSURANCE CLAIM NUMBER |
| HAVE YOU RECEIVED AN INSURANCE PAYMENT FOR THIS DAMAGE OR INJURY? <br> ☐ Yes  ☒ No | AMOUNT RECEIVED (if any) | AMOUNT OF DEDUCTIBLE(if any) |

## NOTICE AND SIGNATURE

I declare under penalty of perjury under the laws of the State of California that all the information I have provided is true and correct to the best of my information and belief. I further understand that if I have provided information that is false, intentionally incomplete, or misleading I may be charged with a felony punishable by up to four years in state prison and/or a fine of up to $10,000 (Penal Code section 72).

| SIGNATURE <br> /s/ Donald Kilmer | PRINTED NAME <br> Donald Kilmer | DATE <br> August 2, 2021 |
|---|---|---|

## INSTRUCTIONS

- Include a check or money order for $25, payable to the State of California.
  - $25 filing fee is not required for amendments to existing claims.
- Confirm all sections relating to this claim are complete and the form is signed.
- Attach copies of any documentation that supports your claim. Do not submit originals.

Mail the claim form and all attachments to:
Office of Risk and Insurance Management
Government Claims Program
P.O. Box 989052, MS414
West Sacramento, CA 95798-9052

Claim forms can also be delivered to:
Office of Risk and Insurance Management
Government Claims Program
707 3rd Street, 1st Floor
West Sacramento, CA 95605
1-800-955-0045

### Department of General Services Privacy Notice on Information Collection

This notice is provided pursuant to the Information Practices Act of 1977, California Civil Code Sections 1798.17 & 1798.24 and the Federal Privacy Act (Public Law 93-579).

The Department of General Services (DGS), Office of Risk and Insurance Management (ORIM), is requesting the information specified on this form pursuant to Government Code Section 905.2(c).

The principal purpose for requesting this data is to process claims against the state. The information provided will/may be disclosed to a person, or to another agency where the transfer is necessary for the transferee agency to perform its constitutional or statutory duties, and the use is compatible with a purpose for which the information was collected and the use or transfer is accounted for in accordance with California Civil Code Section 1798.25.

Individuals should not provide personal information that is not requested.

The submission of all information requested is mandatory unless otherwise noted. If you fail to provide the information requested to DGS, or if the information provided is deemed incomplete or unreadable, this may result in a delay in processing.

**Department Privacy Policy**
The information collected by DGS Is subject to the limitations in the Information Practices Act of 1977 and state policy  (see State Administrative Manual 5310-5310.7). For more information on how we care for your personal information, please read the  DGS Privacy Policy.

**Access to Your Information**
ORIM is responsible for maintaining collected records and retaining them for 5 years. You have a right to access records containing personal information maintained by the state entity. To request access, contact:

**DGS ORIM**
**Public Records Officer**
**707 3rd St., West Sacramento, CA 95605**
**(916) 376-5300**

# EXHIBIT 14

**To:**     Board of Directors
         22nd District Agricultural Association       *206*

**From:**   Patrick J. Kerins, Public Safety Director
         22nd District Agricultural Association

**Via:**     Mr. Timothy Fennell, General Manager
         22nd District Agricultural Association

**Subject: Laws and Regulations pertaining to California Gun Shows**

In preparation for your Board meeting on November 15, 2016 reference the letter from Mr. Wayne Derntz relative to the Crossroads of the West Gun Show, I am providing you the following historical information relative to the Crossroads of the West Gun Show and the California rules, regulations and laws that govern gun shows. As you will note in the report, I communicated with law enforcement to see if any of the information had to be up-dated but according to the San Diego Sheriff's Department that regulates the gun show I was advised that all the applicable rules, regulations and laws are as applicable today as they were in 1999.

With that said, in 1999, then Director Louis Wolfsheimer requested that a staff report be prepared to answer two questions he had regarding the gun show held at the Fairgrounds.

Mr. Wolfsheimer's major concerns were:

- can a patron attending a gun show on District property purchase a firearm without any checks or waiting periods that are required by law when guns are purchased from retail dealers off fairground property?

- secondly, does the District have in place proper internal oversight and mechanisms requiring the promoter and the vendors to comply with all applicable laws that regulate the sale and transfer of firearms?

In order to address Director Wolfsheimer's concerns as to whether firearms being sold or transfer on District property are in compliance with applicable federal, state and local laws, I contacted the Commander of the Encinitas Sheriff's station who has primary law enforcement jurisdiction pertaining to any such matters on District property. I was subsequently directed to the San Diego County Sheriff's Department Licensing Division. The San Diego County Sheriff's Department has regulatory jurisdiction in licensing and enforcement of gun shows. At the time, I was directed to Detective Tom Morton who was a licensing specialist who had considerable expertise in the area of statutory regulations and compliance for gun shows.

After reviewing Director Wolfsheimer's letter at my request, Detective Morton made an unsolicited statement that the Crossroads of the West Gun Show is one of the best gun

shows for compliance with all state and federal regulatory statutes that apply to the sale and transfer of firearms. Detective Morton said, in his opinion, The Crossroads of the West Gun Show was more a sports show. He based that on the fact that the show appears to have just as many vendors selling hunting equipment, clothes and accessories as firearms. In fact, he said the promoter should call it the "CROSSROADS OF THE WEST SPORTS SHOW" instead of gun show.

Detective Morton said that any firearm sold or transferred at the Crossroads of the West Gun Show must meet the same requirements as if the firearm was purchased from an off-site licensed vendor. All sales and transfers are subject to compliance with Penal Code sections 12071 and 12072 that regulate Gun Shows. In essence, those particular statutes requires the purchaser and seller to:

- produce valid identification and a firearms safety certificate
- prepare a CA. Dept. of Justice dealer record of sale
- prepare a Bureau of Alcohol, Tobacco and Firearms form 4473 (federal record of sale form)
- wait the required ten day waiting period for both the state and federal authorities to do a background check to determine if the person is qualified to own a firearm. This applies to any transaction whether from a vendor or via private parties.

The only exception to the above requirements is for firearms made prior to 1898 and are classified as antiques.

As for the promoter of the Crossroads of the West Gun Show, Mr. Bob Templeton, Detective Morton said he was in full compliance with the requirements set-forth in Penal Code section 12071 which regulate gun shows. Those requirements are:

- that he possess a Certificate of Eligibility issued by the California Department of Justice. This certificate is issued after a thorough background check is completed on the applicant.
- that he produce a list of all vendors that sell firearms (35 of the 265 gun show vendors) 72 hours prior to the event. Detective Morton and the California Department of Justice validates that they are all licensed vendors.

As for actual vendors, Detective Morton said that all vendors that participate in the gun show are in compliance with all the state and federal regulations. They all possess the following documents:

- Federal Firearms License issued by the Bureau of Alcohol, Tobacco and Firearms.
- Certificate of Eligibility issued by the California Department of Justice.
- sellers permit issued by the State Board of Equalization.
- California Firearms Dealer (CFD) number issued by the California Department of Justice. This certificate validates that the vendor is a fully licensed California gun dealer. Participating in a gun show is an extension of the dealer's retail business. In

essence, selling and transfer of a firearm must meet the same legal requirements as if the firearm was purchased at a licensed retail shop.

- any firearm purchased must be retained by the dealer for ten days before being transferred to the purchaser. This allows the state and federal government to do a thorough background check. In the case of private party transactions, a licensed vendor must facilitate the transaction and retain possession of the firearm for the ten days. A fee is charge to the purchaser to off-set any administrative overhead incurred by the vendor.

In order to ensure compliance with the aforementioned regulatory statutes and in accordance with section 12071.1(8) (i) Gun Show Security plan, Detective Morton, in cooperation and support with District Security, conducts both an overt and covert inspection of all our gun shows. Each gun show is policed by four uniformed San Diego County Deputy Sheriffs and a team of undercover Detectives from the Sheriff's Licensing and Explosive Ordnance Unit. Their mission is to:

- observe firearm transactions and compliance with all appropriate state and federal statutes.
- monitor private party transactions
- look for any illegal weapons
- monitor the crowd for any parole violators or any other person prohibited from owning a firearm

It should also be noted that Agents from the California Department of Justice and the Bureau of Alcohol, Tobacco and Firearms do site inspections as well.

Detective Morton, at the time, stated that the Crossroads of the West Gun Show was in full compliance with local, state and federal regulatory statutes. In his tenure of monitoring the Gun Show nominal violations had been recorded. In addition to Detective Morton's assessment of the Crossroads of the West Gun Show, the Criminal Justice Information Services Division of the State Attorney General's Office also stated that the Crossroads of the West Gun Show was in full compliance with all applicable laws of the state and federal government. Detective Morton said that most of the publicity in reference to gun show loopholes was associated with states that do not have regulatory statutes pertaining to the possession, sale and transfer of weapons at gun shows.

Detective Morton also addressed the issue of firearms that meet the definition of an assault weapon. Detective Morton said that the California Assault Weapons Control Act includes a list of semiautomatic firearms which are identified "assault weapons". Accordingly, those firearms which are specified in Penal Code section 12276 are assault weapons and are illegal to possess, sell or transfer by any means. Fully automatic weapons are illegal and CANNOT be obtained at gun shows.

As to the recent passage of Proposition 63, the sales of ammunition at the gun show will have to meet all the legal requirements of the State ballot measure. In regards to the sale of ammunition, purchasers will be required to obtain a permit from the California

Department of Justice. In reference to firearm safety, prior to purchasing and taking possession of a firearm, the purchaser must take a firearms safety course and upon successfully passing the test will be issued a Firearms Safety Certificate which is required to purchase a firearm.

As Chief of Security for the 22nd DAA, I routinely inspect the gun show and on a regular basis communicate with the San Diego Sheriff's Department re: compliance with all the applicable laws and regulations and the Security Plan required by the California Department of Justice Firearms Division. I recently spoke to Detective Jaime Rodriguez of the Sheriff's North Coastal Station who supervises the four Deputies assigned to the gun show security detail and Detective Stacey Smith who is assigned to the Sheriff's Licensing Division. Both Detectives said the Crossroads of the West Gun Show is in complete compliance with all the local, State and Federal laws that govern gun shows and that there have not been any violations of law. Both Detectives had high praise for the show promoters and the 22nd DAA staff.

In addition, the District is in full compliance with the Division of Fairs and Expositions rules and regulations that mandates that all District Agricultural Associations include specific language and terms into all contracts for shows and events where participants display, possess or sell firearms or other weapons.

The CROSSROADS OF THE WEST GUN SHOW has been affiliated with the District for approximately 30 years. Robert R. Templeton is the president of the show and produces fifty two (52) gun shows each year in California, Arizona, Utah, Colorado and Nevada. He is a chartered member of the National Association of Arms Shows, an organization of gun show producers whose rules include the strictest compliance with the law and safety requirements of any gun shows in America. Approximately thirteen (5%) percent of the 265 vendors that participate in the Crossroads of the West Gun show sell firearms. Currently, his daughter-in-law, Tracey Olcottt, manages the event and is the holder of the required Certificate of Eligibility issued by the California Department of Justice.

In my considered opinion, as Chief of Security for the 22nd DAA for the last 17 years, the CROSSROADS OF THE WEST GUN SHOWS (5 per year) are in compliance with all the local, state and federal regulatory statutes and have operated without any violations of those laws. Under the laws of the State of California you must comply with all the laws of purchasing, selling and/or transferring of firearms at a gun show as you would at licensed gun dealer's store. Due to the strict California gun show regulations there are no so called loop holes that you so often hear about in the media.

It should be further noted, that in 2016 California voters passed Proposition 63, which will comprehensively regulate ammunition sales in California. Per Proposition 63, beginning January 1, 2018 the following rules and laws governing the sale ammunition in the State of California will take effect:

- Beginning January 1, 2018, individuals who sell more than 500 rounds of ammunition in any month will be required to obtain an annual state issued license and will be required to conduct ammunition sales at specified business location or gun shows.
- State of California Department of Justice will issue ammunition vendor licenses to individuals who provide specified documentation, including a certificate of eligibility verifying that they passed a background check. Those dealers already licensed as firearm dealers are precluded.
- Dealers will be required to report loss or theft of ammunition from their inventory.
- Ammunition sales will have to be conducted by or processed through a licensed vendors.
- Beginning July 1, 2019, licensed ammunition vendors will be required to record, maintain and report to DOJ records of ammunition sales in a manner similar to dealer's records of sales for firearms purchases.
- Beginning July 1, 2019, licensed ammunition vendors will be prohibited from selling or transferring ammunition until first conducting a background check to verify that the person receiving the ammunition is legally eligible.
- Ammunition cannot be sold to anyone under the age of 18. Handgun ammunition can only be sold to those 21 years of age or older.
- All ammunition at Gun Shows must be displayed in closed containers. In addition, no person at a Gun Show in California, other than Security personnel or sworn peace officers, can possess at the same time both a firearm and ammunition that is designed to be fired in the firearm.

---

Patrick J. Kerins, Public Safety Director
22nd District Agricultural Association