C.D. Michel-SBN 144258
Anna M. Barvir-SBN 268728
Tiffany D. Cheuvront-SBN 317144
Alexander A. Frank-SBN 311718
MICHEL & ASSOCIATES, P.C.
180 East Ocean Blvd., Suite 200
Long Beach, CA 90802
Telephone: (562) 216-4444
Fax: (562) 216-4445
Email: cmichel@michellawyers.com

Attorneys for Plaintiffs B&L Productions, Inc., Barry Bardack, Ronald J. Diaz, Sr.,
John Dupree, Christopher Irick, Robert Solis, Lawrence Michael Walsh, Captain
Jon's Lockers, LLC, L.A.X. Firing Range, Inc., California Rifle & Pistol
Association, Incorporated, and South Bay Rod and Gun Club, Inc.

Donald Kilmer-SBN 179986
Law Offices of Donald Kilmer, APC
14085 Silver Ridge Road
Caldwell, Idaho 83607
Telephone: (408) 264-8489
Email: Don@DKLawOffice.com

Attorney for Plaintiff Second Amendment Foundation

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| B&L PRODUCTIONS, INC., d/b/a CROSSROADS OF THE WEST; et al., <br><br> Plaintiffs, <br><br> v. <br><br> GAVIN NEWSOM, in his official capacity as Governor of the State of California and in his personal capacity; et al., <br><br> Defendants. | CASE NO.: 21-cv-01718-AJB-KSC <br><br> **NOTICE OF ERRATA RE: FIRST AMENDED COMPLAINT** |

1

NOTICE OF ERRATA RE: FIRST AMENDED COMPLAINT

21CV1718

1  TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:

2      PLEASE TAKE NOTICE that Plaintiffs B&L Productions, Inc., Barry

3  Bardack, Ronald J. Diaz, Sr., John Dupree, Christopher Irick, Robert Solis,

4  Lawrence Michael Walsh, Captain Jon's Lockers, LLC, L.A.X. Firing Range, Inc.,

5  California Rifle & Pistol Association, Incorporated, South Bay Rod and Gun Club,

6  Inc., and Second Amendment Foundation inadvertently omitted a redlined version of

7  the amended complaint showing how the pleading differed from the previously

8  dismissed pleading when filing their First Amended Complaint on August 31, 2022,

9  as should have been included pursuant to Civil Rule 15.1 c.

10      The redlined version of the amended complaint is attached as **Exhibit A**.

11

12  Dated:  September 8, 2022          *s/ Anna M. Barvir*
                                       Anna M. Barvir
13                                     MICHEL & ASSOCIATES, P.C.
                                       Email: abarvir@michellawyers.com
14

15  Dated:  September 8, 2022          *s/ Donald Kilmer*
                                       Donald Kilmer
16                                     LAW OFFICES OF DONALD KILMER, APC
                                       Email: don@dklawoffice.com
17

18

19

20           **ATTESTATION OF E-FILED SIGNATURES**

21      I, Anna M. Barvir, am the ECF User whose ID and password are being used

22  to file this **NOTICE OF ERRATA RE: FIRST AMENDED COMPLAINT**. In

23  compliance with Southern District of California Electronic Case Filing

24  Administrative Policies and Procedures Section 2(f)(4), I attest that Plaintiff Second

25  Amendment Foundation's counsel, Donald Kilmer, has concurred in this filing.

26

27  Dated: September 8, 2022          *s/ Anna M. Barvir*
                                      Anna M. Barvir
28

2

NOTICE OF ERRATA RE: FIRST AMENDED COMPLAINT

21CV1718

# EXHIBIT A

1   C.D. Michel-SBN 144258
    Anna M. Barvir-SBN 268728
2   Tiffany D. Cheuvront-SBN 317144
    MICHEL & ASSOCIATES, P.C.
3   180 East Ocean Blvd., Suite 200
    Long Beach, CA 90802
4   Telephone: (562) 216-4444
    Fax: (562) 216-4445
5   Email: cmichel@michellawyers.com

6   Attorneys for Plaintiffs B&L Productions, Inc., Barry Bardack, Ronald J. Diaz, Sr.,
    John Dupree, Christopher Irick, Robert Solis, Lawrence Michael Walsh, Captain
7   Jon's Lockers, LLC, L.A.X. Firing Range, Inc., California Rifle & Pistol
    Association, Incorporated, and South Bay Rod and Gun Club, Inc.

8
    Donald Kilmer-SBN 179986
9   Law Offices of Donald Kilmer, APC
    14085 Silver Ridge Road
10  Caldwell, Idaho 83607
    Telephone: (408) 264-8489
11  Email: Don@DKLawOffice.com

12  Attorney for Plaintiff Second Amendment Foundation

13              IN THE UNITED STATES DISTRICT COURT

14             FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| 15 16 | B&L PRODUCTIONS, INC., d/b/a CROSSROADS OF THE WEST; | ~~CASE NO:~~Case No.: 21-cv-01718-AJB-KSC |
|---|---|---|
| 17 | BARRY BARDACK; RONALD J. DIAZ, SR.; JOHN DUPREE; CHRISTOPHER IRICK; ROBERT | **FIRST AMENDED COMPLAINT FOR MONETARY, DECLARATORY & INJUNCTIVE RELIEF; DEMAND FOR JURY TRIAL** |
| 18 19 | SOLIS; LAWRENCE MICHAEL WALSH; CAPTAIN JON'S LOCKERS, LLC; L.A.X. FIRING | |
| 20 | RANGE, INC., d/b/a LAX AMMO; CALIFORNIA RIFLE & PISTOL ASSOCIATION, INCORPORATED; | **(1) VIOLATION OF 42 U.S.C. § 1983 [FREE SPEECH - POLITICAL];** |
| 21 22 | SOUTH BAY ROD AND GUN CLUB, INC.; and SECOND AMENDMENT FOUNDATION, | **(2) VIOLATION OF 42 U.S.C. § 1983 [FREE SPEECH-MIXED POLITICAL/COMMERCIAL];** |
| 23 | Plaintiffs, | **(3) VIOLATION OF 42 U.S.C. § 1983 [FREE SPEECH-COMMERCIAL];** |
| 24 | v. | **(4) VIOLATION OF 42 U.S.C. § 1983 [PRIOR RESTRAINT ON SPEECH];** |
| 25 | GAVIN NEWSOM, in his official capacity as Governor of the State of | |
| 26 | California and in his personal capacity; ~~ROBERT~~ROB BONTA, in his official | **(5) VIOLATION OF 42 U.S.C. § 1983 [RIGHT TO ASSEMBLY];** |
| 27 28 | capacity as Attorney General of the State of California and in his personal capacity; KAREN ROSS, in her | ~~(6)~~**(6) VIOLATION OF 42 U.S.C. § 1983 [RIGHT TO KEEP & BEAR ARMS];** |

official capacity as Secretary of California Department of Food & Agriculture and in his personal capacity; SUMMER STEPHAN ~~SUMMER~~, in his official capacity as District Attorney ~~of San Diego County; THOMAS MONTGOMERY, in his official capacity as County Counsel~~ of San Diego County; 22nd DISTRICT AGRICULTURAL ASSOCIATION; DOES 1-50;

     Defendants.

**(7)  VIOLATION OF 42 U.S.C. § 1983 [EQUAL PROTECTION];**

**(7̶8)  INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE;**

**(8̶9)  NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE;**

**(9̶10)  INTENTIONAL INTERFERENCE WITH CONTRACT.**

**DEMAND FOR JURY TRIAL**

**NOTICE OF UNCONSTITUTIONALITY OF STATE STATUTE**

**NOTICE OF RELATED CASE**

FIRST AMENDED COMPLAINT
~~COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF~~

2

# INTRODUCTION

1.      Plaintiff B & L PRODUCTIONS, INC., d/b/a CROSSROADS OF THE WEST has operated popular, safe, heavily regulated, legal, and family-friendly gun shows as a business in California for over 30 years, including at the Del Mar Fairgrounds.

2.      Crossroads produces gun shows at the Fairgrounds where like-minded individuals gather to engage in commerce related to, and necessary for, the lawful and regulated exercise of Second Amendment rights for themselves, their exhibitors, their patrons, their customers, and the ~~general~~ public. This safe and regulated marketplace promotes public safety, even for people who do not attend gun shows because it will tend to reduce the unregulated transfer of firearms within San Diego County. Furthermore, by providing a convenient forum for Californians to exercise their right to acquire firearms locally, gun shows at the Fairgrounds will have the tendency to discourage the sale and importation of firearms from other states with less strict gun laws than California.

3.      Plaintiffs Barry Bardack, Ronald J. Diaz, Sr., John Dupree, Christopher Irick, Robert Solis, Lawrence Michael Walsh, Captain Jon's Lockers, LLC, L.A.X Firing Range, d/b/a LAX Ammo, California Rifle & Pistol Association, Incorporated, South Bay Rod and Gun Club, Inc., and Second Amendment Foundation, Inc., attend and participate in the Crossroads gun show to engage in First Amendment activities that are both necessary and essential to the open, robust, and lawful exercise of their Second Amendment rights.

4.      At the gun show, Plaintiffs associate with like-minded people, participate in public discussions, attend informational forums, distribute and collect information, make offers for sale, make offers to buy, and engage in legal and political discussions related to the Second Amendment, which are all forms of speech protected by the First Amendment. Discussions include, but are not limited to, firearms and ammunition, firearm technology, firearm safety, and firearm law

---

1    and politics. Participants also exchange information about where to hunt and where

2    to practice shooting, where and from whom to receive training, gunsmithing, gun

3    repair, gun art, and many other topics that arise from the right to acquire, own,

4    possess, enjoy, and celebrate arms as a quintessentially American artifact with

5    constitutional significance.

6        5.    Defendants are government actors who, through the adoption and

7    enforcement of Assembly Bill 893, codified at California Food & Agricultural Code

8    section 4158,[1] which prohibits the sale of firearms and ammunition at the

9    Fairgrounds with the intention and effect of shuttering gun show events altogether,

10   have engaged in and will continue to engage in action that violates Plaintiffs'

11   constitutional rights to free speech, assembly, and equal protection. Their actions

12   also constitute prior restraint.

13       6.    What's more, the conduct of Defendants Newsom, Bonta, Ross, and the

14   22nd District Agricultural Association also constitutes intentional and/or negligent

15   interference with the prospective economic advantage of Plaintiffs Crossroads,

16   Walsh, LAX Ammo, CRPA, and SAF, as well as intentional interference with

17   Plaintiff Crossroads' contracts.

18       7.    This action seeks declaratory and injunctive relief against Defendants

19   for violating the United States Constitution. It also seeks damages for lost profits,

20   lost opportunities, and diminished marketing value, and reimbursement for

21   reasonable attorney's fees, costs, and other expenses in bringing this action.

22                        **JURISDICTION AND VENUE**

23       8.    The Court has original jurisdiction of this civil action under 28 U.S.C. §

24   1331 because the action arises under the Constitution and laws of the United States,

25   thus raising federal questions. The Court also has jurisdiction under 28 U.S.C. §

26   1343(a)(3) and 42 U.S.C. § 1983 since this action seeks to redress the deprivation,

27
         [1] Plaintiffs refer to the challenged law, California Food & Agricultural Code

28   section 4158, as AB 893 throughout this complaint.

under color of the laws, statutes, ordinances, regulations, customs, and usages of the State of California and political subdivisions thereof, of rights, privileges, or immunities secured by the United States Constitution and by Acts of Congress.

9.     Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, respectively, and their claim for attorneys' fees is authorized by 42 U.S.C. § 1988.

10.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367 because those claims share common operative facts with Plaintiffs' federal law claims over which this Court has original jurisdiction. Adjudication of Plaintiffs' state law claims together with Plaintiffs' federal law claims furthers the interest of judicial economy.

10.11.Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because the 22nd District Agricultural Association is located in San Diego County and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district. Further, the state of California maintains an office for service of process in San Diego County at 600 West Broadway, Suite 1800, San Diego, California 92101.

**PARTIES**

**[Plaintiffs]**

11.12.Plaintiff B & L PRODUCTIONS, INC., d/b/a CROSSROADS OF THE WEST, is a for-profit event promoter operating in several western states. Crossroads is in the business of promotingpromotes and organizingorganizes trade shows throughout the state of California and other western states, including their long-running gun show events held at the Del Mar Fairgrounds ("the Fairgrounds") operated under the d/b/a Crossroads of the West ("Crossroads"). Crossroads currently is the largest vendor of gun show events in California and at the Del Mar Fairgrounds. The gun shows occupy thousands of square feet of the Fairgrounds. Typically, thousands of people attend the gun show on each of the weekends they are held. They have successfully

FIRST AMENDED COMPLAINT
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
5

1  produced and operated multiple safe, legal, and family-friendly gun show events in

2  California and at the Fairgrounds every year for over 30 years.

3  ~~12.~~13.  Plaintiff BARRY BARDACK is a resident of El Cajon, California, and

4  he is a part-time flight instructor. He regularly attends the gun shows at the

5  Fairgrounds where he purchases ammunition for his target shooting hobby and

6  volunteers at the CRPA booth to talk to others about their rights, the importance of

7  membership in the CRPA, and the Second Amendment. The ban on sales of

8  firearms and ammunition at the Fairgrounds burdens his right to engage in otherwise

9  lawful commercial speech in a public forum and restricts his ability to purchase

10  ammunition for lawful purposes—this is especially true for Plaintiff Bardack

11  because the nearest vendor that could serve his particular ammunition needs is some

12  two hours from his home. And because the ban is intended to make gun shows less

13  profitable and effectively shutter them, it also restricts his right to engage in the

14  unique types of political, educational, and commercial speech that takes place at the

15  gun show.

16  ~~13.~~14. Plaintiff RONALD J. DIAZ, SR., is a resident of Alpine, California,

17  and he is a retired federal contractor. He regularly attends gun shows at the

18  Fairgrounds to purchase ammunition reloading supplies. Plaintiff Diaz also attends

19  the Crossroads gun show events at the Del Mar Fairgrounds to engage in expressive

20  activities with like-minded people, including discussions related to firearms,

21  ammunition, and firearm accessories, the shooting sports, politics, and the Second

22  Amendment. The ban on sales of firearms and ammunition at the Fairgrounds,

23  which is intended to make gun shows less profitable and effectively shutter them,

24  burdens his right to engage in otherwise lawful commercial and educational speech

25  in a public forum with vendors that offer him the expertise and variety of reloading

26  supplies available at Crossroads gun shows. It also restricts his right to engage in the

27  unique types of political, educational, and commercial speech that takes place at the

28  gun show.

14.15. Plaintiff JOHN DUPREE is a resident of Alpine, California, and he works for the federal government. He regularly attends the Crossroads gun shows at the Fairgrounds. He is a competitive shooter and has the need to purchase bulk ammunition in order to compete. Plaintiff Dupree also attends the Crossroads gun show events at the Del Mar Fairgrounds to engage in expressive activities with like-minded people, including discussions related to firearms, ammunition, and firearm accessories, the shooting sports, politics, and the Second Amendment. The ban on sales of firearms and ammunition at the Fairgrounds burdens his right to engage in otherwise lawful commercial speech in a public forum and restricts his ability to purchase ammunition for lawful purposes—this is especially true for Plaintiff Dupree because the nearest vendor that could serve his particular ammunition needs is several hours from his home. And because the ban is intended to make gun shows less profitable and effectively shutter them, it also restricts his right to engage in the unique types of political, educational, and commercial speech that takes place at the gun show.

15.16. Plaintiff CHRISTOPHER PAUL IRICK is a resident of Carlsbad, California, and he regularly attends the Crossroads guns shows at the Fairgrounds. He is self-employed and enjoys going to the shows for good prices on firearms and accessories, as well as the variety ofvaried merchandise available at the events. Plaintiff Irick also attends the Crossroads gun show events at the Fairgrounds to engage in expressive activities with like-minded people who hunt and support the Second Amendment, while learning about new and innovative products available to firearms owners and sportsmen. The ban on sales of firearms and ammunition at the Fairgrounds burdens his right to engage in otherwise lawful commercial speech in a public forum and restricts his ability to purchase firearms and ammunition for lawful purposes. And because the ban is intended to make gun shows less profitable and effectively shutter them, it also restricts his right to engage in the unique types of political, educational, and commercial speech that takes place at the gun show.

16.17. Plaintiff ROBERT SOLIS is a resident of Oxnard, California, and he is a regular vendor at the Crossroads gun shows at the Fairgrounds. At the Crossroads gun show, he sells firearms-related accessories and, though not in the business of selling firearms, he occasionally sometimes engages in the lawful private sale of firearms and ammunition at the show. Plaintiff Solis also attends gun show events at the Del Mar Fairgrounds to engage in expressive activities with like-minded people, including discussions related to firearms, ammunition, and firearm accessories, the shooting sports, politics, and the Second Amendment. The ban on sales of firearms and ammunition at the Fairgrounds directly burdens Plaintiff Solis' right to engage in otherwise lawful commercial speech in a public forum and to access firearms and ammunition for lawful purposes. And because the ban on sales of firearms and ammunition at the Fairgrounds is intended to make gun shows less profitable and effectively shutter them, it restricts his right to engage in otherwise lawful commercial speech related to the sales of firearms accessories and his ability to engage in the unique types of political, educational, and commercial speech that takes place at the gun show.

17.18. Plaintiff LAWRENCE MICHAEL WALSH is a resident of Grass Valley, California, and is the owner of Miwall Corporation, d/b/a Wholesale Ammunition. Miwall is one of the major gun ammunition distributors on the west coast and has been in business for decades. He is a regular vendor at the Crossroads gun shows at the Fairgrounds. Plaintiff Walsh's business currently does not have a physical store, and it only sells its product at gun shows across the state and online. Wholesale Ammunition also supplies ammunition to many of the law enforcement agencies and officers in the state, some of which purchase their ammunition from him at the gun shows because of the amount available, the cost, and the variety they can find. Plaintiff Walsh enjoys being able to talk talking with other Second Amendment supporters with like interests and views. If the gun shows at the Fairgrounds, or any of the other state venues, were to be shut down, it would be devastating to Plaintiff

1   Walsh's business. The ban on sales of firearms and ammunition at the Fairgrounds

2   directly burdens Plaintiff Walsh's right to engage in otherwise lawful commercial

3   speech in a public forum and to access firearms and ammunition for lawful

4   purposes. And because the ban on sales of firearms and ammunition at the

5   Fairgrounds is intended to make gun shows less profitable and effectively shutter

6   them, it restricts his right to engage in the unique types of political, educational, and

7   commercial speech that takes place at the gun show.

8        18.19. Plaintiff CAPTAIN JON'S GREEN CAN LOCKERS, LLC, is a

9   limited liability corporation incorporated under the laws of California, with

10  headquarters in Alpine, California. It is wholly owned and operated by Jon J.

11  Winslow, a Retired Fire Captain, who invented and, through the Captain Jon's

12  business, sells a device that safely and effectively locks the widely popular green

13  metal surplus ammunition cans to prevent unauthorized access to their contents.

14  Captain Jon's has no physical store but has been a regular vendor at the Crossroads

15  gun shows at the Fairgrounds since 2015. The Fairgrounds is only 45 minutes from

16  Captain Jon's headquarters, and the next nearest gun show event is at least two

17  hours away. Captain Jon's thus depends on the Del Mar gun show for a significant

18  portion of its annual revenues. Indeed, Captain Jon's has built a loyal following of

19  repeat buyers at the Del Mar show, which make up approximatelyabout 50% of the

20  business' sales at the gun show. What's more, Mr. Winslow, Captain Jon's only

21  employee, also attends gun show events at the Fairgrounds to engage in expressive

22  activities with like-minded people, including discussions related to firearms,

23  ammunition, and firearm accessories, the shooting sports, politics, and the Second

24  Amendment. Because the ban on sales of firearms and ammunition at the

25  Fairgrounds is intended to make gun shows less profitable and effectively shutter

26  them, it restricts the lawful commercial speech that Captain Jon's and its sole owner,

27  operator, and employee, Mr. Winslow, engage in at the gun show. It also restricts

28  Mr. Winslow's ability to engage in the unique types of political, educational, and

1    commercial speech that takes place at the gun show.

2        19.20. Plaintiff L.A.X. FIRING RANGE, INC., d/b/a LAX AMMO LLC, is a

3    limited liability corporation incorporated under the laws of California, with

4    headquarters in Inglewood, California. LAX Ammo is a regular vendor at the

5    Crossroads gun shows at the Fairgrounds. At the Crossroads gun show, LAX Ammo

6    sells "high quality reloads and factory new ammunition in various calibers for rifles,

7    handguns, and shotguns at affordable prices." The ban on sales of firearms and

8    ammunition at the Fairgrounds directly burdens the right of LAX Ammo, its owners,

9    and employees, to engage in otherwise lawful commercial speech in a public forum

10   and to access firearms and ammunition for lawful purposes. And because the ban on

11   sales of firearms and ammunition at the Fairgrounds is intended to make gun shows

12   less profitable and effectively shutter them, it restricts the right of LAX Ammo, its

13   owners, and employees, to engage in the unique types of political, educational, and

14   commercial speech that takes place at the gun show.

15       20.21. Plaintiff CALIFORNIA RIFLE & PISTOL ASSOCIATION,

16   INCORPORATED ("CRPA") is a nonprofit membership organization incorporated

17   under the laws of California, with headquarters in Fullerton, California. Among its

18   other activities, CRPA works to preserve and expand constitutional and statutory

19   rights of gun ownership, including the right to self-defense and the right to keep and

20   bear arms. CRPA accomplishes this through its educational offerings, publications,

21   member engagement events, and legislative advocacy and initiatives. CRPA is also a

22   regular vendor at the Crossroads gun shows at the Fairgrounds, where it engages the

23   public in discussions about the organization and its purposes, the shooting sports,

24   firearms, and firearm safety, and the Second Amendment and other political issues.

25   It also attends gun shows at the Fairgrounds to sell organization memberships,

26   advertise its events, distribute its publications, and sell its merchandise, some of

27   which includes expressly pro-gun messaging. CRPA has also hosted political rallies,

28   educational seminars, and range safety officer training at gun shows throughout the

FIRST AMENDED COMPLAINT
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
10

1   state, including those at the Fairgrounds. What's more, CRPA has tens of thousands

2   of members and supporters, many of whom (including Plaintiffs Bardack, Diaz,

3   Dupree, Irick, Solis, and Winslow) attend the Crossroads gun shows at the

4   Fairgrounds to engage in expressive activities with like-minded people, including

5   discussions related to firearms, ammunition, and firearm accessories, the shooting

6   sports, politics, and the Second Amendment. Because the ban on sales of firearms

7   and ammunition at the Fairgrounds is intended to make gun shows less profitable

8   and effectively shutter them, it restricts the rights of CRPA, its employees,

9   volunteers, members, and supporters, to engage in the unique types of political,

10   educational, and commercial speech that takes place at the gun show. Through this

11   lawsuit, CRPA represents not only its own interests as a gun show vendor, but also

12   the interests of its members as gun show attendees and supporters of the right to

13   keep and bear arms for lawful purposes.

14       21.22. Plaintiff SOUTH BAY ROD AND GUN CLUB, INC. ("South Bay") is

15   a private nonprofit corporation incorporated under the laws of California, with

16   headquarters in San Diego County, California. It was formed in 1955 with a mission

17   to operate a properly managed nonprofit shooting club that is efficiently designed,

18   contracted, and safely operated with diligently maintained shooting ranges, support

19   structures, and facilities so that all authorized members and guests may use the

20   facility with pride, confidence, and satisfaction. South Bay endeavorsseeks to

21   promote and encourage the safe handling and use of firearms. South Bay is a regular

22   vendor at the Crossroads gun shows at the Fairgrounds, where it engages the public

23   in discussions about the organization and its purposes, the shooting sports, and

24   firearms and firearm safety. What's more, South Bay has some 4,000 members,

25   many of whom reside in San Diego County and attend the Crossroads gun shows at

26   the Fairgrounds to engage in expressive activities with like-minded people,

27   including discussions related to firearms, ammunition, and firearm accessories, the

28   shooting sports, politics, and the Second Amendment. Because the ban on sales of

1     firearms and ammunition at the Fairgrounds is intended to make gun shows less

2     profitable and effectively shutter them, it restricts the rights of South Bay, its

3     employees, volunteers, and members, to engage in the unique types of political,

4     educational, and commercial speech that takes place at the gun show. Through this

5     lawsuit, South Bay represents not only its own interests as a gun show vendor, but

6     also the interests of its members as gun show attendees and supporters of the right to

7     keep and bear arms for lawful purposes.

8         22.23. Plaintiff SECOND AMENDMENT FOUNDATION, INC. ("SAF") is a

9     non-profit nonprofit membership organization. It is incorporated under the laws of

10    the state of Washington and was founded in 1974. SAF has over 650,000 members

11    and supporters nationwide, include thousands of members in California. The

12    purposes of SAF include education, research, publishing, and litigation. It is critical

13    to the success of SAF that its promotional material, publications, and messages

14    about the "right to keep and bear arms" reach demographic groups that are saturated

15    with gun owners, gun buyers, and people of the "gun culture." Gun Shows like the

16    one threatened by the Defendants' actions interfere with this effort. SAF is dedicated

17    to promoting a better understanding about our constitutional heritage to privately

18    own and possess firearms through educational and legal action programs designed to

19    better inform the public about gun control issues. SAF has been a pioneer in

20    innovative defense of the right to keep and bear arms, through its publications and

21    public education programs like the Gun Rights Policy Conference. Those

22    publications and other SAF materials and information are offered at gun show

23    events. Second Amendment Foundation also expends significant sums of money

24    sponsoring public interest litigation to defend its own interests to disseminate

25    information to like-minded individuals, in and individualized setting, but SAF also

26    seeks to defend the interests of its member in lawsuits like this present effort.

27                              **[Defendants]**

28        23.24. Defendant GAVIN NEWSOM is the Governor of the State state of

California. As Governor, he is the chief executive officer or the state of California, vested with "the supreme executive power" of the state and ~~shall~~ obligated to "see that the law is faithfully executed." Cal. Const. art. 5, § 1. ~~The injunctive and declaratory relief portions of this suit are brought against Defendant~~ As for California's District Agricultural Associations, Governor Newsom oversees the operation and management of each district, and he wields the statutory power to appoint and remove district board members. Cal. ~~in his official capacity. Claims~~ Food & Agric. Code §§ 3959-3960. Governor Newsom has exerted that significant authority to direct district decision-making about the operation of gun shows at the Fairgrounds, as well as other state-owned fairgrounds. State-law claims for damages are brought against Defendant Newsom in his personal capacity. *Cf. Hafer v. Melo*, 502 U.S. 21, 31 (1991) (holding that state officers are not "immune from personal liability under § 1983 solely by virtue of the 'official' nature of their acts").

~~24.~~25. Defendant ~~ROBERT~~ROB BONTA is the Attorney General of the ~~State~~state of California. He is the "chief law officer" of the state and has the duty to 'see that the laws of the State are uniformly and adequately enforced." Cal. Const. art. 5, § 1. Additionally, Defendant Bonta has "direct supervision over every district attorney" within the State. *Id.* If, at any point a district attorney of the ~~State~~state fails to enforce adequately "any law of the State," Defendant Bonta must "prosecute any violations of the law." *Id.* Finally, Defendant Bonta, as Attorney General of the ~~State~~state of California, "shall assist any district attorney in the discharge" of duties when "required by the public interest or directed by the Governor. . . ." *Id.* The injunctive and declaratory relief portions of this suit are brought against Defendant Bonta in his official capacity. ~~Claims~~State-law claims for damages are brought against Defendant Bonta in his personal capacity. *Cf. Hafer*, 502 U.S. at 31 (holding that state officers are not "immune from personal liability under § 1983 solely by virtue of the 'official' nature of their acts").

~~25.~~26. Defendant SUMMER STEPHAN ~~SUMMER~~ is the District

FIRST AMENDED COMPLAINT
~~COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF~~
16

1  Attorney responsible for enforcing the law within the county of San Diego. Under

2  the California Government Code, the district attorney must prosecute "all actions for

3  the recovery" of fines and penalties. Cal. Gov't Code § 26521. More specifically,

4  District Attorney Stephan is charged with prosecuting any violation of the California

5  Food & Agricultural Code, including section 4158 (i.e., AB 893) within the county

6  of San Diego. Cal. Food & Agric. § 8. The injunctive and declaratory relief portions

7  of this suit are brought against District Attorney ~~Summer~~Stephan in ~~his~~her official

8  capacity.

9  ~~26.   Defendant THOMAS MONTGOMERY is the County Counsel~~

10  ~~responsible for enforcing the law within the County of San Diego. In that capacity,~~

11  ~~he must "discharge all the duties vested in the district attorney." Cal. Gov't Code §~~

12  ~~26529. The injunctive and declaratory relief portions of this suit are brought against~~

13  ~~County Counsel Montgomery in his official capacity.~~

14  27.   Defendant 22nd DISTRICT AGRICULTURAL ASSOCIATION

15  ("District") is a Governor-appointed Board of Directors that manages the state-

16  owned Del Mar Fairgrounds public venue. The District is governed by a nine-

17  member board, each member serving a four-year term. The District Board of

18  Directors appoints a CEO charged with the daily operations of the facilities but

19  ~~maintains control over~~controls activities not delegated to the CEO, including

20  contracting with those seeking to host events, including gun shows, at the

21  Fairgrounds. ~~It is responsible for ensuring~~It ensures that all state laws governing gun

22  shows at the Fairgrounds, including AB 893, are faithfully enforced. ~~In 2018,~~

23  ~~Defendant District adopted a moratorium on contracting with third parties to host~~

24  ~~gun show events at the Fairgrounds. That moratorium was enjoined by order of the~~

25  ~~court and later permanently repealed through settlement of a related lawsuit, *B&L*~~

26  ~~*Productions, Inc., et al. v. 22nd District Agricultural Association*, Case No. 3:19-cv-~~

27  ~~134-CAB.~~

28  28.   Defendant KAREN ROSS is the Secretary of the California Department

FIRST AMENDED COMPLAINT
~~COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF~~

10

of Food & Agriculture—the entity responsible for the policy oversight of the network of California fair venues, which includes the Del Mar Fairgrounds. Through the Department, ~~Defendant~~Secretary Ross issues guidance for governance and contracting to all agricultural districts throughout California ~~(,~~ including Defendant District~~),~~ and requires reporting from the districts on operational issues. The Department maintains an office of legal counsel ~~for any actions brought against Agricultural Association Districts in the state. The injunctive and declaratory relief portions of this suit are brought against Defendant Ross in her official capacity. Claims for damages are brought against Defendant Ross in her personal capacity.~~that issues policy recommendations for district boards, including recommendations about bans on gun show events at state-owned fairgrounds. The Department of Food & Agriculture also develops positions on legislative activity affecting the 54 districts, reserving to itself the sole authority to dictate legislative policy positions affecting the operations of the districts. Through the Department, Secretary Ross has exerted that significant authority to silence any opposition the districts might have to attempts to ban gun shows from the properties they manage. State-law claims for damages are brought against Defendant Ross in her personal capacity. *Cf. Hafer*, 502 U.S. at 31 (holding that state officers are not "immune from personal liability under § 1983 solely by virtue of the 'official' nature of their acts").

29.   The true names and capacities of Defendants named as DOES 1 through 50, inclusive, are individual, corporate, associate or otherwise, and are unknown to Plaintiffs. They are, however, believed to be responsible in some way for Plaintiffs' loss and damages. Each Doe Defendant is, and at all times mentioned here was, a partner, agent, principal, co-conspirator, or are otherwise vicariously or directly responsible for the acts or omissions of the other defendants or themselves. They are each sued individually and are joined as party defendants. Plaintiffs thus sue each Doe Defendant under rules 15 and 21 of the Federal Rules of Civil Procedure. Plaintiffs are informed and believed that the Doe Defendants are all

California residents. Plaintiffs will amend this complaint to show such true names and capacities of Doe Defendants when they have been ~~ascertained~~determined.

**FACTUAL ALLEGATIONS**

**[The First Amendment Rights to Free Speech, Association & Assembly]**

30.   The First Amendment provides, in part, that "Congress shall make no law . . . abridging the freedom of speech," U.S. Const. amend. I. It is incorporated and made applicable to the states by the Fourteenth Amendment to the United States Constitution and by 42 U.S.C. § 1983.

31.   Political and ideological speech—including speech about "politics, nationalism, religion, or other matters of opinion"—has long been considered the core of the First Amendment. *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

32.   Public property made available for lease by community groups to engage in expressive activity must thus be available without regard to the viewpoint sought to be expressed *Cinevision Corp. v. City of Burbank*, 745 F.2d 560 (9th Cir. 1984). Such venues cannot be opened to some and closed to others, suppressing protected expression, absent a compelling government interest. *Id.* at 571.

33.   The First Amendment does not tolerate the suppression of speech based on what some may label an unpopular viewpoint of the speaker. *John J. Hurley and S. Boston Allied War Vets. Council v. Irish-Am. Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557 (1995). Indeed, "*above all else*, the First Amendment means that the government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Mosley*, 408 U.S. at 95 (emphasis added); *see also Ashcroft*, 535 U.S. at 573.

34.   A content-based restriction that implicates political or ideological speech must generally survive "strict scrutiny," where the government must show that the law is narrowly tailored to achieve a compelling government interest. *See Reed v. Town of Gilbert*, 576 U.S. 155 (2015).

FIRST AMENDED COMPLAINT

~~COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF~~

35.   Even purely commercial speech—speech that "does no more than propose a commercial transaction" or relates solely to the economic interests of the speaker and audience—receives First Amendment protection if it is not misleading and concerns a lawful activity. *Cent. Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 U.S. 557 (1980). "An offer to sell firearms or ammunition is speech that 'does no more than propose a commercial transaction.' Such an offer is, therefore, commercial speech within the meaning of the First Amendment." *Nordyke v. Santa Clara*, 110 F.3d 707, 710 (9th Cir. 1997).

36.   Government restrictions on commercial speech are constitutional *only* if they directly advance a substantial government interest and are not broader than necessary to serve that interest. *Cent. Hudson*, 447 U.S. 557; *see also Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525 (2001) (holding that tobacco marketing restrictions must be the narrowest means of achieving an asserted state interest); *Tracy Rifle & Pistol LLC v. Harris*, 339 F. Supp. 3d 1007, 1018 (E.D. Cal. 2018) (holding that a California law prohibiting the display of a handgun or a placard advertising the sale of a handgun in a manner that is visible from the outside of a gun dealer's premises is unconstitutional).[2]

37.   The First Amendment protects not only the right of free speech, but also "the right of the people peaceably to assemble." U.S. Const., amend. I. The right to assemble often merges with the right to free expression. For "[e]ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association." *NAACP v. Patterson*, 357 U.S. 449,

---

[2] Though this is currently the controlling test for so-called "commercial speech," modern case law is trending toward extending **full** First Amendment protection to all speech, including "commercial speech." *See Sorrell v. IMS Health, Inc.*, 564 U.S. 552 (moving toward providing commercial speech the same level of heightened protection long accorded to political speech); *see also 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 523 (1996) (Thomas, J., concurring in part and concurring in judgment) ("I do not see a philosophical or historical basis for asserting that 'commercial' speech is of 'lower value' than 'noncommercial' speech. Indeed, some historical materials suggest to the contrary.").

462 (1958). "Governmental action which may have the effect of curtailing the freedom to associate is subject to the *closest* scrutiny." *Id.* at 461-62.

**[The Second Amendment Right to Keep & Bear Arms]**

38.   The Second Amendment to the United States Constitution declares that "the right of the people to keep and bear arms shall not be infringed." U.S. Const amend. II.

39.   The Second Amendment protects a fundamental, individual right that applies against both the federal government and the states. *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008); *McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010).

40.   The Supreme Court recently confirmed that Second Amendment questions are to be analyzed in light of "text, history, and tradition." "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, -- U.S. --, 142 S. Ct. 2111, 2126 (2022) (citing *Heller*, 554 U.S. at 634).

41.   The Second Amendment protects the right to possess and use arms that are "typically possessed by law-abiding citizens for lawful purposes." *See, e.g.*, *Heller*, 554 U.S. at 624-25; *see also Caetano v. Massachusetts*, 577 U.S. 411, 136 S. Ct. 1027, 1027-28 (2016). That protection "extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller*, 544 U.S. at 582. It also includes the ammunition necessary to use firearms for their core lawful purposes. *See Jackson v. City & Cnty. of San Francisco*, 746 F.3d at 967-68 (recognizing that "without bullets, the right to bear arms would be meaningless").

42.   Finally, the Second Amendment protects the corresponding right to obtain protected firearms and ammunition. *See id.* at 967 ("'[T]he right to possess

firearms for protection implies a corresponding right' to obtain the bullets necessary to use them."); *see also Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) (holding that the right to possess firearms implies a corresponding right to access to firing ranges to train to be proficient with such firearms)

**[The Fourteenth Amendment Right to Equal Protection Under the Law]**

43.    The Fourteenth Amendment to the United States Constitution, enforceable under 42 U.S.C. § 1983, provides that no state shall deny to any person within its jurisdiction the equal protection of the laws.

44.    Singling out speakers because of the content of their speech also violates their fundamental rights under the Equal Protection Clause. U.S. Const. amend. XIV.

45.    If unequal treatment occurs in the context of exercising a fundamental right, or the government is motivated by animus toward a disfavored group, courts apply heighted scrutiny. *See Loving v. Virginia*, 388 U.S. 1, 11 (1967); *see also Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432 (1985); *Romer v. Evans*, 517 U.S. 620 (1996). Indeed, "[b]ecause the right to engage in political expression is fundamental to our constitutional system, statutory classifications impinging upon that right must be narrowly tailored to serve a compelling governmental interest." *Austin v. Mich. Chamber of Com.*, 494 U.S. 652, 666 (1990), *rev'd on other grounds*, *Citzs. United v. Fed. Elec. Comm'n*, 558 U.S. 310, 130 S. Ct. 876 (2010).

46.    The Fourteenth Amendment case law extending equal protection beyond the immutable characteristics of race, color, religion, and national origin, has also subsumed exercising fundamental rights, including, but not limited to, the First Amendment. The Fourteenth Amendment's Equal Protection umbrella thus necessarily includes exercising rights to buy and sell Second Amendment artifacts (in accordance with state and local laws regulating such sales) at any public facility owned, operated, or managed by or on behalf of any state or subdivision thereof.

**[Regulation of Gun Show Events in California]**

FIRST AMENDED COMPLAINT
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
19

30.47. The state of California has the most rigorous regulatory regime for commerce in firearms and ammunition in the United States. That regulatory regime applies to the operation of gun show events throughout California. The laws related to the acquisition and sale of firearms is arguablyperhaps stricter at a gun show, than at brick-and-mortar stores or internet sales.

31.48. Only state approved, licensed gun show "producers" may operate gun shows in California. All gun show producers, including Plaintiff Crossroads, must have an individual (the "promoter") who holds a valid "Certificate of Eligibility" issued by the California Department of Justice.

32.49. Gun show producers must also, among other things:

    a.    Certify that they are familiar with all California laws regardingabout gun shows, Cal. Penal Code § 27200;

    b.    Possess a minimum of $1,000,000 liability insurance, *id.*;

    c.    Provide an annual list of shows or events to be held to the California Department of Justice, *id.*; and

    d.    Notify the California Department of Justice no later than 30 days prior tobefore the gun show or event of any changes to the above, *id.*

    e.    Make available to law enforcement a complete and accurate list of all vendors that will participate in the show to sell, lease, or transfer firearms. Cal. Penal Code § 27205.

33.50. Gun show promoters must submit an annual event and security plan and schedule to the California Department of Justice and any local law enforcement agency. The plan must include:

    a.    Type of show or event;

    b.    Estimated number of vendors offering for sale or display firearms;

    c.    Estimated number of attendees;

      d.      Number of entrances and exits at the event;

      e.      Location, dates, and times of the event;

      f.      Contact person and telephone number for both promoter and facility;

      g.      Number of sworn peace officers employed by the producer or facility who will be present at the event;

      h.      Number of non-sworn security personnel employed by the producer or the facility who will be present at the event; and

      i.      Promoters must inform all prospective vendors of all California laws ~~regarding~~about gun shows.

Cal. Penal Code §§ 27210, 27215.

~~34.~~51. Promoters must also provide a list of all prospective vendors and designated firearm transfer agents who are licensed firearm dealers to the California Department of Justice no later than seven days ~~prior to~~before the event ~~for the purpose of determining~~to determine whether the vendor possess a valid license and are thus eligible to participate in the event. Cal. Penal Code § 27220.

~~35.~~52. If a vendor is not approved by the California Department of Justice or fails to comply with all applicable California laws, they cannot participate. Cal. Penal Code § 27220.

~~36.~~53. If a promoter fails to inform all prospective vendors of California's state laws or fails to submit a list of all prospective vendors to the California Department of Justice, the event cannot ~~commence~~begin. Cal. Penal Code § 27230.

~~37.~~54. A promoter must have written contracts with each vendor selling firearms at the event. Cal. Penal Code § 27235.

~~38.~~55. Promoters must post signs in a readily visible location at each public entrance to the event that includes all of ~~the following~~these notices:

      • "This gun show follows all federal, state, and local firearms and weapons laws, without exception."

- "Any firearm carried onto the premises by any member of the public will be checked, cleared of any ammunition, and secured in a manner that prevents it from being operated, and an identification tag or sticker will be attached to the firearm before the person is allowed admittance to the show."

- "No member of the public under the age of 18 years shall be admitted to the show unless accompanied by a parent, grandparent, or legal guardian."

- "All firearm transfers between private parties at the show shall be conducted through a licensed dealer in accordance with applicable state and federal laws."

- "Persons possessing firearms in this facility must have in their immediate possession government-issued photo identification and display it upon the request to any security officer or any peace officer, as defined in Section 830."

Cal. Penal Code § 27240(a).

39.56. Producers must also post signs in a readily visible location at each entrance to the parking lot stating: "The transfer of firearms on the parking lot of this facility is a crime." Cal. Penal Code § 27240(b).

40.57. A willful failure of a producer to comply with any of California's applicable laws is a misdemeanor punishable with a fine of up to $2,000 dollars and would render the producer ineligible for a gun show producer license for up to one year, which could cost a producer hundreds of thousands of dollars in lost revenue for a willful infraction. Cal. Penal Code § 272459(c).

41.58. Except in very limited narrow exceptions applicable only to law enforcement, actual firearm transfers are already prohibited from taking place at any

gun show in California.[3] The firearm sale can be started through an on-site licensed "transfer dealer," but it cannot be completed on site. Instead, purchasers must pick up their purchase at a licensed firearm retailer at a different licensed location--but only after a 10-day waiting period and background check. There is no "Gun Show Loophole" at gun shows operated in accordance with California Law.

42.59. The Gun Show Act of 2000, California Penal Code sections 27200-27245, places even more restrictions on the operation of a gun show in California by requiring that:

   a.   Vendors not display, possess, or offer for sale any firearms, knives, or weapons for which possession or sale is prohibited;

   b.   Vendors acknowledge that they are responsible for knowing and complying must know and comply with all applicable federal, state, and local laws dealing with the possession and transfer of firearms;

   c.   Vendors will not engage in activities that incite or encourage hate crimes;

   d.   Vendors will process all transfers of firearms through licensed firearms dealers as required by state law;

   e.   Vendors will verify that all firearms in their possession will be unloaded and that the firearms will be secured in a manner that prevents them from being operated except for brief periods, when the mechanical condition of the firearm is being demonstrated to

---

[3] Cal. Penal Code § 27310 (requiring all firearm transfers at gun shows to comply with state and federal law); *id.* § 26805 (prohibiting the sale and transfer of a firearm by a licensed dealer at any location other than the dealer's premises as listed on their license but allowing dealer to prepare documents at a gun show in preparation for completion of the sale at the dealer's premises); *id.* § 27545 (requiring all firearm transactions to be processed through a licensed dealer when neither party is a licensed firearm dealer).

prospective buyer;

f.   Vendors provide all required information under Penal Code § 27320;

g.   Vendors will not display or possess black powder or offer it for sale;

h.   Ammunition ~~only~~ be displayed _only_ in closed original factory boxes or other closed containers, with the only exception for showing the ammunition to a prospective buyer. ~~On July 1, 2019, additional state-law restrictions on the sale of ammunition will become effective and gun shows must comply~~;

i.   No member of the public under 18 years old may enter a gun show unless accompanied by a parent or legal guardian;

j.   No person other than security personnel or law enforcement possess both a firearm and ammunition for that firearm at the same time, ~~with the exception of~~except for vendors who are selling both.

~~43.~~60. Plaintiff  Crossroads diligently operates all of its gun shows in accordance with state law, and it takes immediate remedial measures if irregularities are discovered.

~~44.~~61. Vendors at Crossroads gun shows, like Plaintiffs Walsh and LAX Ammo, are some of the same licensed vendors that have brick and mortar stores in the community or operate legally over the internet and are registered with the state as lawful businesses.

~~45.~~62. Vendors at Crossroads gun shows sell legal products and enjoy ~~being able to attend~~attending gun shows so they can better interact with customers in a more meaningful and intimate way.

~~46.~~63. Even with all of the state and federal regulations that promoters and vendors must abide, through the adoption and enforcement of AB 893, Defendants

1    now seek to ~~wholly~~ prohibit constitutionally protected, highly regulated, and

2    otherwise perfectly legal activity.

3                    **[The Gun Show Cultural Experience]**

4         ~~47.~~64. Gun shows are a modern bazaar—a convention of like-minded

5    individuals who meet in this unique public forum that has been set aside by state and

6    local governments for all manner of commerce. This convention-like setting is of

7    incalculable benefit to the gun-buying consumer and promotes public safety.

8         ~~48.~~65. Gun shows, in general, and the Del Mar show, in particular, are a

9    celebration of America's "gun culture" that is a natural and essential outgrowth of

10   the constitutional rights that flow from the Second Amendment to the United States

11   Constitution.

12        ~~49.~~66. Gun shows, in general, and the Del Mar show, in particular, are a First

13   Amendment forum where literature and information are shared, speakers provide

14   valuable lectures, classes are conducted, political forums are held where gun rights

15   discussions take place, and candidates for political office can meet to discuss

16   political issues, the government, and the constitution with constituents who are part

17   of the California gun culture.

18        ~~50.~~67. Gun shows just happen to include the exchange of products and ideas,

19   knowledge, services, education, entertainment, and recreation related to the lawful

20   uses of firearms. Those lawful uses include (but are not limited to):

21              a.    Firearm safety training

22              b.    Self-defense

23              c.    Defense of others

24              d.    Defense of community

25              e.    Defense of state

26              f.    Defense of nation

27              g.    Hunting

28              h.    Target shooting

---

i.       Gunsmithing

j.       Admiration of guns as art

k.       Appreciation of guns as technological artifacts

l.       Study of guns as historical objects.

51.68. Gun shows, in general, and the Del Mar show, in particular, are cultural marketplaces for those members of the "gun culture" who attend to celebrate their constitutional rights and to pass their beliefs in patriotism and the rights of the individual on to the next generation. It is a place where parents take their children and grandparents take their grandchildren to share with them, among other things, a love of historichistorical firearms, stories of American war heroes, and their love of hunting.

52.69. Gun shows, in general, and the Del Mar show, in particular, are places where parents can learn to protect their families and their homes, and how to stay in compliance with California's ever-changing gun laws.

53.70. Gun shows, in general, and the Del Mar show, in particular, are places where people can discuss the positions of political candidates and whether those values line up with their own beliefs in protecting the Second Amendment.

54.71. Gun shows, in general, and the Del Mar show, in particular, are held and promoted, and considerable investment is made, precisely to promote and "normalize" the "gun culture" and the constitutional principles that gun show participants hold dear.

55.72. This forum is vitally importantvital especially in California where government actors at all levels of government (federal, state, and local) are openly hostile to the cultural values of the Second Amendment and where supporters of those cultural values are not considered "mainstream."

56.73. Participating in "gun culture" is an important reason people attend Crossroads gun shows as vendors, exhibitors, customers, and guests (even if particular vendors or attendees are not in the firearm business or in the market to

buy a gun at a particular event).

57.74. While less than 40% of vendors at Crossroads' events offer firearms or ammunition for sale (the remaining vendors offer accessories, collectibles, home goods, lifestyle products, food, and other refreshments), the principle draw of gun shows is the availability of firearms and ammunition for sale.

58.75. Indeed, many people attend gun shows to learn about the technology and use of various firearms and ammunition when they are considering whether to buy or sell a firearm (or ammunition) and to exchange knowledge with experienced dealers and firearm enthusiasts that they cannot get anywhere else. *Teixeira v. County of Alameda*, No. 13-17132 (9th Cir. 2017).[4]

59.76. Without the ability to buy and sell firearms and ammunition at gun shows at the Fairgrounds, the events will no longer be able to draw many of its vendors and attendees, making the events unprofitable and economically infeasible.

60.77. Defendants wish to end this celebration of "gun culture" and Second Amendment rights because they do not understand the culture or the people. To that end, Defendants have attempted, first through an unconstitutional moratorium on gun show events, *see B&L Prods. v. 22nd Dist. Agric. Ass'n*, 394 F. Supp. 3d 1226 (S.D. Cal. 2019), and then through AB 893's ban on sales of firearms and ammunition at the Fairgrounds, to permanently deprive Plaintiffs of their right to engage in constitutionally protected conduct at the Fairgrounds.

**[The Del Mar Fairgrounds Venue]**

61.78. The Fairgrounds is owned by the state of California and managed by the Board of Directors of Defendant District, which must regularly report its activities to the California Department of Food & Agriculture. *See* Table of

---

[4] The *Teixeira* court did not answer whether the Second Amendment includes a right to purchase a firearm. Plaintiffs allege, in good faith, that the right to keep and bear arms *necessarily* includes the rights to purchase and sell them. Indeed, those rights are paramount to the exercise of the Second Amendment.

Fairground Information (Dec. 31. 2010) (attached as Exhibit 1.).

62.79. Among other things, Defendant District is charged with maintaining the Fairgrounds and ensuring that is used for public purposes.

63.80. Defendant Ross, as the Secretary of the California Department of Food & Agriculture, oversees the operation of the various agricultural districts in the state, including Defendant District.

64.81. The California Department of Food & Agriculture, under Secretary Ross, provides policies and guidance for the operation of operating all agricultural districts in the state, including the use of facilities as directed by Department policy.

65.82. The California Department of Food & Agriculture maintains a *CDFA Contracts Manual for Agricultural Districts* ("Manual"). Section 6.25 of the Manual states that "[w]hether or not a fair rents out their facilities for gun shows is a policy decision to be made by the fair board and their community."

66.83. Due to Because of its large size and unique urban location, the Fairgrounds is a unique, publicly owned venue. There is no other public or private venue of similar size in the area. Effectively, the government has a monopoly on venues of this size and type in the area.

67.84. The Fairgrounds is a state-owned property maintained and opened for use by the public. By virtue of being opened by the state for use by the public, it is a "public forum," from which the government may not generally exclude expressive activity. *Cinevision Corp. v. City of Burbank*, 745 F.2d 560, 569 (9th Cir. 1984) (quoting *Perry Educ. Ass'n v. Perry Local Loc. Educators' Assn*, 460 U.S. 37, 45-46 (1983)).

68.85. The Fairgrounds is used by many different public groups and is a major event venue for large gatherings of people to engage in expressive activities, including concerts, festivals, and industry shows.

69.86. The Fairgrounds actively promotes the use of the property by the public through contracting for available space at the Fairgrounds.

1   70.87.Indeed, the Fairgrounds plays host not only to events, like the San

2   Diego County Fair, produced by Defendant District, but to "events and activities

3   produced by third-party promoters, which range from concerts and festivals, trade

4   shows and consumer expos, equestrian competitions and animal shows, sporting

5   events, fundraisers and personal celebrations." Del Mar Fairgrounds, About Us,

6   https://delmarfairgrounds.com/about-us/ (last visited Sept. 29, 2021).

7   71.88.The Fairgrounds' 2008 Master Plan, which is still in use, states that

8   Defendant District's mission is "[t]o manage and promote a world-class, multi-use,

9   public assembly facility with an emphasis on agriculture, education, entertainment,

10  and recreation in a fiscally sound and environmentally conscientious manner *for the*

11  *benefit of all*." 22nd District Agricultural District, *2008 Master Plan: Del Mar*

12  *Fairgrounds and Horsepark* 13 (April 2011), *available at*

13  https://delmarfairgrounds.com/pdf/11EIR_000_2008_master_plan.pdf (last visited

14  Sept. 29, 2021) (emphasis added).

15  72.89.The Fairgrounds has held non-gun-show events in which criminal

16  activity has taken place—including theft and a shooting. These criminal incidents

17  are no more likely to happen at a gun show than at other types of events, but the

18  Defendants have not banned these promoters or their events.

19  **[Contracting for Use of the Fairgrounds]**

20  73.90.Defendant District has a process for securing returning contractors who

21  would like to secure specific dates into future years before the contracts can be

22  drafted and executed.

23  74.91.Each year, returning and regular contractors, including Plaintiff

24  Crossroads, submit preferred dates for the next calendar year, so Defendant District

25  can confirm availability and so that Plaintiff Crossroads can begin to reserve

26  vendors and materials for the show weekends.

27  75.92.Due toBecause of the size and extensive planning that goes into

28  producing gun show events, Defendant District has—for decades—provided and

1   held preferred dates for Plaintiff Crossroads, a long-time contractor, until the

2   contracts can fully be executed.

3       76.93.Defendant District's "hold" system essentially operates as a right of

4   first refusal to the benefit of returning contractors. For example, if another contractor

5   wanted the same preferred dates as Plaintiff Crossroads, Defendant District would

6   not allow another vendor to come in and take those dates from Plaintiff Crossroads

7   even though there is no official contract in place yet.

8       77.94.The "hold" system also provides Defendant District with the security of

9   knowing its venue is booked with experienced and knowledgeable repeat contractors

10  that have a demonstrated record of running safe and profitable events at the

11  Fairgrounds.

12      78.95.The "hold" system also permits the promoter to spend advertising

13  dollars to promote its events, but when governments announce plans to ban gun

14  shows at particular venues, vendors, and patrons rationally make plans to attend gun

15  show events at other venues or seek other states to conduct their commerce.

16      79.96.Defendant District also considers the "hold" dates and shows during

17  budget discussions which are typically held in the year before the contracts are

18  commenced.

19      80.97.Upon information and belief, Plaintiffs allege that the "hold" system is

20  widely used by similar state fair board venues and is standard industry practice.

21      81.98.Plaintiff Crossroads, after doing business in this customary manner for

22  more than 30 years, had no reason to doubt that Defendant District would continue

23  to honor such relationship with Plaintiff Crossroads.

24      **[Previous Ban on Gun Shows at the Fairgrounds & Resulting Litigation]**

25      82.99. Despite the long history that Plaintiff Crossroads has had with the

26  Fairgrounds in operating safe and legal events, the political environment has become

27  hostile toward gun show events and (more generally) toward the "gun culture" in

28  recent years.

83.100.    Indeed, gun-show-banning activists are at work throughout the state and the country to ban *all* gun shows *everywhere*, not because they are "dangerous for the community," but because they do not subscribe to the same values as gun show promoters, vendors, and participants.

84.101.    These activists rely on unfounded fears about the security of gun show events, false claims that gun shows are inherently dangerous because they normalize the "gun culture," and stereotypes about the people that attend gun shows. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985) (striking an ordinance requiring a special permit for a group home for the intellectually disabled and citing direct evidence of negative attitudes toward persons with disabilities expressed by community members and recorded in the legislative history).

85.102.    In 2017, gun-show-banning activists using the same tactics described above began pressuring Defendant District to prohibit gun show events at the Fairgrounds.

86.103.    In response, Defendant District began a series of meetings and public comment periods to determine whether it would continue to contract with Plaintiff Crossroads or other promoters for the use of the Fairgrounds for gun show events.

87.104.    Defendant District also engaged in communications with other government agencies and with Crossroads to determine whether gun shows at the Fairgrounds were operated in full compliance with state and federal law, and if the events pose any real danger to the community.

88.105.    Defendant District also appointed a non-public, ad hoc committee of two members of the District to investigate the gun show operation at the Fairgrounds and report back to the District with recommendations for the continued use of the Fairgrounds for gun show events.

89.106.    On April 23, 2018, Defendant Newsom sent a letter to the District urging the District to ban gun shows at the Fairgrounds, citing his concerns

that "[p]ermitting the sale of firearms and ammunition on state-owned property only perpetuates America's gun culture." Letter from Governor Gavin Newsom to Board Members of 22nd District Agricultural Association (April 23, 2018) (attached as Exhibit 2.).

90.107.    On September 10, 2018, Assembly member Todd Gloria (D) sent a letter to the District, stating his "firm belief that the State of California should in no way help to facilitate the sale of firearms." He also expressed his support forpraised the District's "willingness to consider options for limiting or eliminating these gun shows" and vowed to "act by way of legislation should the 22nd DAA Board be unable to take meaningful action." Letter from Assembly Member Todd Gloria to Board Members of 22nd District Agricultural Association (Sept. 10, 2018) (attached as Exhibit 3.).

91.108.    At a public hearing on September 11, 2018, the ad hoc "Contracts Committee" recommended that the District "not consider any contracts with the producers of gun shows beyond December 31st 2018 until such time as the District has put into place a more thorough policy regardingrelated to the conduct of gun shows that:.

    a.    Considers the feasibility of conducting gun shows for only educational and safety training purposes and bans the possession of guns and ammunition on state property

    b.    Aligns gun show contract language with recent changes to state and federal law

    c.    Details an enhanced security plan for the conduct of future shows

    d.    Proposes a safety plan

    e.    Considers the age appropriateness of the event

    f.    Grants rights for the DAA to perform an audit to ensure full compliance with California Penal Code Sections 171b and 12071.1 and 1207.4."

92.109.    In testimony before the District at the September 11, 2018, hearing, Patrick Kerins, who was then the Public Safety Director for the District, reported on the laws that apply to gun shows in California, as well as Plaintiff Crossroads history of events at the Fairgrounds.

93.110.    During his comments at the September 11, 2018, hearing, Mr. Kerins referenced a memorandum that he prepared for the District's Board of Directors in. In that memorandum, he reported that:

> As Chief of Security for the 22nd DAA, I routinely inspect the gun show and on a regular basis communicate with the San Diego Sheriff's Department re: compliance with all the applicable laws and regulations and the Security Plan required by the California Department of Justice Firearms Division. I recently spoke to Detective Jaime Rodriguez of the Sheriff's North Coastal Station who supervises the four Deputies assigned to the gun show security detail and Detective Stacey Smith who is assigned to the Sheriff's Licensing Division. Both Detectives said the Crossroads of the West Gun Show is in complete compliance with all the local, State and Federal laws that govern gun shows and that there have not been any violations of law. Both Detectives had high praise for the show promoters and the 22 DAA staff.

Memorandum of Patrick Kerins, Public Safety Director, 22nd District Agricultural Association, to Board of Directors, 22nd District Agricultural Association, at 17 (2016), ) (attached as Exhibit 14.).

94.111.    Mr. Kerins' 2016 memorandum continued:

> In my considered opinion, as Chief of Security for the 22 DAA for the last 17 years, the CROSSROADS OF THE WEST GUN SHOWS (5 per year) are m compliance with all the local, state and federal regulatory statutes and have operated without any violations of those laws Under the laws of the State of California you must comply with all the laws of purchasing, selling and/or transferring of firearms at a gun show as you would at licensed gun dealer's store Due to the strict California gun show regulations there are no so called loop holes that you so often hear about in the media.

Ex. 14 at 17.

95.112.    Ultimately, the lengthylong process of meetings, public comment, and communications with stakeholders resulted in no finding that

1  allowing the (already heavily regulated) gun show events to continue at the

2  Fairgrounds posed a definite or unique risk to public safety.

3      ~~96.~~113.      Indeed, Defendant District presented *no* evidence of any safety

4  concerns within the community that could be linked to the over-30-year-old gun

5  show at the Fairgrounds.

6      ~~97.~~114.      To the contrary, banning highly regulated gun shows in

7  California communities, like Del Mar, serves to distort the gun market, potentially

8  pushing California gun buyers into less restrictive gun-buying environments.[5]

9      ~~98.~~115.      ~~Nonetheless~~Even so, relying on contrived possibilities of

10  unknown dangers and unfounded claims that prohibiting gun shows might prevent

11  suicide and violent crime because the "gun culture" would be censored,[6] Defendant

12  District voted to impose a one-year moratorium (for the year 2019) on gun show

13  events at the Fairgrounds while they study potential safety concerns.

14      ~~99.~~116.      Plaintiffs Crossroads, Bardack, Diaz, Dupree, Irick, Walsh,

15  CRPA, South Bay, SAF, and others sued Defendants District, Ross, and others in

16

17      [5] Joyce Lupiani, *Nevada Gun Shows Tied to California Gun Violence*, KTNV
18  (2017), https://www.ktnv.com/news/crime/study-nevada-gun-shows-tied-to-
   california-gun-violence (last visited Jan. 21, 2019); Brett Israel, Study*: Gun Deaths,*
19  *Injuries in California Spike Following Nevada Gun Shows*, Berkeley News (2017),
   https://news.berkeley.edu/2017/10/23/embargoed-until-1023-2pm-pdt-study-gun-
20  deaths-injuries-in-california-spike-following-nevada-gun-shows/ (last visited Jan.
21  21, 2019). *But see* Mariel Alper, Ph.D., & Lauren Glaze, Bureau of Justice Statistics,
   *Source and Use of Firearms Involved in Crimes: Survey of Prison Inmates, 2016*
22  (2019), *available at* https://www.bjs.gov/content/pub/pdf/suficspi16.pdf (last visited
   Jan. 21, 2019); Garen J. Wintemute, et al., *Gun Shows and Gun Violence: Fatally*
23  *Flawed Study Yields Misleading Results*, 100 Am. J. Pub. Health 1856-60 (2010),
24  *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2936974/ (last visited
   Jan. 21, 2019).
25      [6] *But see* Alvaro Castillo-Caniglia, Ph.D., et al., *California's Comprehensive*
26  *Background Check and Misdemeanor Violence Prohibition Policies and Firearm*
   *Mortality*, Annals of Epidemiology (Oct. 11, 2018) (noting that, in California
27  communities with the most stringent gun restrictions, there has been a marked
28  increase in both property and violent crime).

1  federal court under to prevent enforcement of the moratorium, alleging violations of

2  various constitutional rights, including the rights to free speech, assembly, and equal

3  protection. *See B&L Prods. v. 22nd Dist. Agric. Ass'n*, 394 F. Supp. 3d 1226 (S.D.

4  Cal. 2019) ("*B&L I*") (attached as Exhibit 4.).

5  ~~100.~~117.  Denying Defendant District's motion to dismiss and granting

6  plaintiffs a preliminary injunction—sua sponte—on the ground that plaintiffs were

7  exceedingly likely to succeed on the merits of their constitutional claims, the court

8  in *B&L I* temporarily enjoined the enforcement of the District's gun show

9  moratorium and ordered the District to contract with Crossroads as it would any

10  other similar event promoter at the Fairgrounds. Ex. 4.

11  ~~101.~~118.  ~~Shortly thereafter~~Soon after, the *B&L I* plaintiffs negotiated a

12  settlement with the District, represented by attorneys for the California Department

13  of Justice, permanently terminating the 2019 gun show moratorium, reinstating

14  Crossroads' right to promote gun show events at the Fairgrounds, and permanently

15  barring the District from unilaterally halting B&L's gun show events at the

16  Fairgrounds. *See* Parties' Joint Notice of Settlement and Motion for Dismissal, *B&L*

17  *Prods. v. 22nd Dist. Agric. Ass'n*, 394 F. Supp. 3d 1226 (S.D. Cal. 2020) (attached

18  as Exhibit 5.).

19  **[California's Assembly Bill 893 (Gloria)]**

20  ~~102.~~119.  Making good on his threat, and fully aware of the court's

21  decision in *B&L I*, Assembly member Gloria introduced Assembly Bill 893 ("AB

22  893") on or about February 20, 2019. Assem. Bill 893, 2019-2020 Reg. Sess. (Cal.

23  2019) (attached as Exhibit 6.).

24  ~~103.~~120.  AB 893, which added ~~Section~~section 4158 to the California Food

25  & Agricultural Code, bars any "officer, employee, operator, lessee, or licensee of the

26  [District]" from "contract[ing] for, authoriz[ing], or allow[ing] the sale of any

27  firearm or ammunition on the property or in the buildings that comprise the Del Mar

28  Fairgrounds...." Violation of the law is a misdemeanor. ~~Ex. 6.~~ *Id.*; *see also* Cal. Food

& Agric. § 9.

104.121.    AB 893 does not bar the possession of firearms or ammunition on the property or in the buildings that comprise the Del Mar Fairgrounds. Ex. 6.

105.122.    The text of AB 893 expressly identifies the ongoing presence at the Fairgrounds of "marketplaces popularly known as 'gun shows,' at which firearms and ammunition and other items are sold to the public approximately five times a year." Ex. 6*Id*.

106.123.    AB 893 also clearly recognizes that "[p]romoters maintain relationships with a core group of vendors, some selling guns and some selling other merchandise, who travel as the schedule dictates from city to city and state to state and in the West, for example, many of the same vendors can be seen at Crossroads of the West Gun Shows from San Francisco, California, to Tucson, Arizona." Ex. 6*Id*.

107.124.    AB 893 failed to identify, however, any real public safety or security concern specifically related to the existence of gun show events at the Fairgrounds.

108.125.    To be sure, AB 893 claims, without support, that "[g]un shows bring grave danger to a community" and that "dangerous incidents" have taken place at guns shows at the Fairgrounds, including "an official vendor accused of trafficking illegal firearms, sales of firearms to individuals registered in the Department of Justice Bureau of Firearms Armed Prohibited Persons System, and illegal importation of large-capacity magazines." *Id.* But AB 893 makes no effort to show that these incidents are any more likely to occur at gun shows in California, which are regulated at least as heavily as retailers operating out of brick-and-mortar stores.

109.126.    AB 893 also claims that "between the years 2013 and 2017, the San Diego County Sheriff recorded 14 crimes" at gun shows at the Fairgrounds. Ex. 6*Id*. But even if the Legislature had proof of these crimes, AB 893 makes no attempt to compare this to the number of crimes recorded at other similarly sized events at

the Fairgrounds during that period. Nor does it distinguish between the type of crimes this bill purports to target (e.g., illegal firearm transfers, straw purchases, sales of illegal firearms or accessories) and run-of-the-mill crimes ~~that are~~ likely to occur whenever thousands of people descend on one venue for a trade show or fair (e.g., petty thefts, parking or traffic violations, public drunkenness, and simple assault).

~~110.~~127.    Instead, AB 893's legislative history reveals only general concerns about gun violence occurring all over the country and legislators' beliefs that the state should not profit from sales of firearms and ammunition. *See* Matthew Fleming, Assem. Comm. Pub. Safety, Bill Analysis Re: AB 819 (Gloria), 2019-2020 Reg. Sess., at 3 (Cal. 2019) (attached as Exhibit 7~~.~~).

~~111.~~128.    Indeed, AB 893 opens with a list of tragedies, including the horrific mass murders that took place at Columbine High School, Sandy Hook Elementary School, and Marjory Stoneman Douglas High School—none of which were carried out with firearms traced to gun show events at the Fairgrounds. Ex. 6.

~~112.~~129.    What's more, a March 26, 2019, analysis of AB 893 presented to the Assembly Committee on Public Safety quoted claims by Assembly member Gloria, the bill's sponsor, that "[t]here is an ever apparent link between the gun violence we see virtually every week and the number of guns in our communities." These statements, however, made no attempt to link gun violence to gun shows, generally, or to gun shows at the Fairgrounds, specifically. Ex. 7 at 2.

~~113.~~130.    The Public Safety Committee's March 26, 2019, analysis also quoted Gloria as lamenting that "the State of California should not be profiting or benefitting from the sale of firearms." He continued, "[f]undamentally, I believe it is wrong for the state of California to profit or to benefit from the sale of firearms and ammunition." Ex. 7 at 2.

~~114.~~131.    Assembly member Lorena Gonzalez, who co-sponsored AB 893, expressed a similar sentiment~~, arguing that "[t]he~~: "The State of California shouldn't be in

the business of using our public land to join with the firearms industry to profit off the sale of guns and ammo." Chris Jennewein, *Assembly Passes Todd Gloria's Bill to Thwart Gun Shows at Del Mar Fairgrounds*, timesofsandiego.com (April 25, 2019), https://timesofsandiego.com/politics/2019/04/25/assembly-passes-todd-glorias-bill-to-thwart-gun-shows-at-del-mar-fairgrounds/ (last visited Sept. 29, 2021).

132.   The Public Safety Committee's March 26, 2019, analysis also cited a decade-old report from the Violence Prevention Research Program at the UC Davis School of Medicine, identifying gun shows as a source of illegally trafficked firearms. Ex. 7 at 3.

~~115.~~133.   But neither the VPRP report nor AB 893's legislative history links any illegally trafficked firearm or gun used in crime to gun shows at the Fairgrounds (or even to gun shows in California). *See* Garen Wintemute, MD, *Inside Gun Shows: What Goes on When Everybody Thinks Nobody's Watching*, ch. 1 (2009~~, )~~ (attached as Exhibit 8~~.~~). This is unsurprising because, as the study states, "[m]uch of the concern about gun shows as a source of crime guns focuses on private party gun sales, *since no background checks are conducted and no records are kept.*" ~~Ex. 8~~*Id.* at 32. But such concerns are simply irrelevant in California where private party transfers—even those ~~initiated~~started at gun shows—must be processed by a licensed firearm dealer and are subject to background checks and registration under state law.

~~116.~~134.   The VPRP report cited by the Public Safety Committee's analysis of AB 893 also ~~attempts~~tries to implicate licensed firearm retailers operating at gun shows as sources of crime guns in America, claiming that "30% of dealers with gun show sales, but 22% of all dealers, had previously had a crime gun traced to them." But it expressly recognizes that "in California, where both gun shows themselves and gun commerce generally are regulated, *sales at gun shows are not a risk factor among licensed retailers for disproportionate sales of crime guns*." ~~Ex.~~

8*Id.* at 33 (emphasis added).

135.   The Public Safety Committee's March 26, 2019, analysis also cited a report from the Government Accountability Office, claiming that a GAO report "regarding gun trafficking to Mexico confirmed that many traffickers buy guns at gun shows." Ex. 7 at 3.

117.136.   But again, neither the BATFE report nor AB 893's legislative history links any illegally trafficked firearm to gun shows at the Fairgrounds (or even to gun shows in California). *See* U.S. Gov't Accountability Off., GAO-16-223, *Firearms Trafficking: U.S. Efforts to Combat Firearms Trafficking to Mexico Have Improved, but Some Collaboration Challenges Remain* (2016) (attached as Exhibit 9.). To be sure, the GAO report identifies U.S. Southwest border states, including Texas (41%), California (19%), and Arizona (15%), as the largest sources of firearms illegally trafficked into Mexico from the United States. Ex. 9*Id.* at 14. But it does not trace these illegally trafficked guns to licensed dealers, generally, or to those operating at gun shows, specifically. Rather, it says only that "there were about 10,134 licensed dealers and pawnbrokers in the four Southwest border states, many of them along the border," and that "these licensed dealers and pawnbrokers can operate in locations such as gun shops, pawn shops, their own homes, or gun shows." *Id.*

118.137.   The Public Safety Committee's March 26, 2019 analysis did concede that "less than one percent of inmates incarcerated in state prisons for gun crimes acquired their firearms at a gun show"—though it transparently tries to diminish that fact by citing only a website of the National Rifle Association as the source of the statistic, instead of the U.S. Department of Justice, Bureau of Justice Statistics reports from which the NRA drew it. Ex. 7 at 2-3 (citing NRA-ILA, *Background Checks|NICS*, https://www.nraila.org/get-the-facts/background-checks-nics (last visited Sept. 29, 2021)); *but see* Caroline Wolf Harlow, Ph.D., Bureau of Justice Statistics, *Firearm Use by Offenders* (Nov. 2001) (attached as Exhibit 10.).

119.138.    While the Public Safety Committee's March 26, 2019, analysis also concedes that "violent criminals do not appear to regularly purchase their guns directly from gun shows," the analysis immediately shifts to "criticism" (from the partisan Center for American Progress) that gun shows are somehow "the critical moment in the chain of custody for many guns, the point at which they move from the somewhat-regulated legal market to the shadowy, no-questions-asked illegal market." Ex. 7 at 3 (citing Arkadi Gerney, Center for American Progress, *The Gun Debate 1 Year After Newtown: Assessing Six Key Claims About Gun Background Checks* (Dec. 2013), *available at* https://www.americanprogress.org/issues/guns-crime/reports/2013/12/13/80795/the-gun-debate-1-year-after-newtown/ (last visited Sept. 29. 2021).)). Neither the Center for American Progress editorial nor AB 893's bill analysis show how, in California where sales at gun shows are regulated *at least* as heavily as sales at brick-and-mortar retailers, guns originating at gun shows are any more likely to enter the "shadowy, no-questions-asked illegal market" than those sold at gun stores.

120.139.    Councilman Dwight Worden from the city of Del Mar, which was "at the helm of city-level efforts to oppose the shows," spoke in strong support of AB 893. He made clear that hostility toward the pro-gun speech that occurs at gun shows has long driven the movement to put an end to the events: "Councilman Dwight Worden said Del Mar's City Council is 'unanimously on the same page with this [AB 893] and very much behind the effort to discontinue the sale of guns and ammo' at the Fairgrounds. 'For decades in Del Mar, we felt that the *promotion and glorification of guns at the gun show are not consistent with our community values.*' " Lexy Brodt, *Boerner Horvath, Gloria Introduce Bill to Ban Gun Shows at Fairgrounds*, Coast News Group (Feb. 28, 2019), https://thecoastnews.com/boerner-horvath-gloria-introduce-bill-to-ban-gun-shows-on-state-land-2/ (last visited Sept. 29, 2019) (emphasis added).

121.140.    On October 11, 2019, Governor Newsom signed AB 893 into

law.

122.141.   Defendant Newsom, who is ultimately responsible for enforcing the enforcement of the law AB 893, has long harbored animus towards gun show promotion.

123.142.   Indeed, Defendant Newsom has supported the closure of gun shows at other state venues and specifically wrote to Defendant District in 2018 in support of its unconstitutional gun show moratorium. He wrote: "[p]ermitting the sale of firearms and ammunition on state owned property only perpetuates America's gun culture at a time when 73 percent of Californians support gun reform measures."

143.   [The Impact of And just "weeks after he cast the lone no-vote on the [District's 2018] gun show [moratorium], Russ Penniman, a retired rear admiral, lost his spot. [Governor] Newsom replaced Penniman but kept two other board members alone."

**[AB 893 on the Directly Bans Speech Necessary to Sales of Firearm & Ammunition]**

144.   By banning the "sale of any firearm or ammunition on the property or in the buildings that comprise the Del Mar Fairgrounds," AB 893 acts as a direct ban on speech. While the mere "act of exchanging of money for" firearms or ammunition may not itself constitute speech, *see Nordyke*, 110 F.3d at 710, any real-world "sale" *necessarily* involves speech.

145.   On information and belief, Plaintiffs allege that AB 893's ban on "sales" of firearm and ammunition at the Fairgrounds includes the speech or expressive conduct necessary to initiate or engage in the sale of firearms or ammunition, including offering such products for sale, even if the act of transferring ownership and possession does not take place onsite. Recall, AB 893 notwithstanding, state law already bars actual firearm transfers from taking place at any gun show in California. *See supra* ¶ 58 & n. 3.

146. Speech that is necessary for any sale includes but is not limited to: communication of intent to sell or buy; offers to sell or buy; discussion of price, availability, and condition of the goods; discussion of any conditions on the sale; and acceptance of the terms of a sale.

147. Speech that generally accompanies any sale of firearms or ammunition includes, but is not limited to, conversations relating to the suitability of the firearm or ammunition for an intended use (e.g., suitability for self-defense or sport shooting, caliber, weight, size, fit).

148. State law also requires that certain speech take place during sales of firearms, including safety instruction, a safe loading and unloading demonstration, inquiries to ensure the sale is not a straw purchase, background check communications (e.g., age, criminal record status, and immigration status), and discussions related to possession of firearm safes or locking devices and locked-storage requirements.

149. At gun shows, specifically, firearm sales from the event attendee to a vendor require discussions about whether the firearm is stolen, whether is the firearm is legal for sale in California, and establishing proof of ownership.

150. And for San Jose residents who may be legally purchasing a firearm at a gun show at the Fairgrounds, a firearm sale requires showing proof of insurance and payment of annual fee.

**[AB 893 Indirectly (But Intentionally) Bans Gun ~~Show~~Shows at the Fairgrounds]**

~~124.~~151. The sale of firearms and ammunition is an essential function of gun shows, and it is one of the main reasons people attend these events; if gun shows are not economically viable because they have been stripped of an essential function, they will cease to exist.

~~125.~~152. AB 893 thus has the same practical effect as the District's unconstitutional gun show moratorium—that is, by permanently banning the

commercial sale of firearms and ammunition at the Fairgrounds, it has the effect of banning gun shows at the Fairgrounds *and all the educational, ideological, and commercial speech that takes place at such events*.

126.153.    The Legislature was well-aware when it passed AB 893 that a "gunless" gun show would notwithout the sale of firearms and ammunition cannot survive financially. Indeed, the intended purpose of AB 893 was to end gun shows at the Fairgrounds.

127.154.    Indeed, the March 26, 2019, Public Safety Committee's March 26, 2019 analysis of AB 893 expressly admitted that:

> This bill would add a section to the Food and Agricultural Code that prohibits the sale of firearms and ammunitions at the Del Mar Fairgrounds. By default, a violation of any provision of the Food and Agricultural code is a misdemeanor, unless otherwise specified. Therefore, this bill would effectively terminate the possibility for future gun shows at the Del Mar Fairgrounds.

Ex. 7 at 4.

128.155.    Similarly, the April 1, 2019, Assembly Appropriations Committee's  April 1, 2019, analysis of AB 893 acknowledged:

> This bill would add a section to the Food and Agricultural Code that prohibits the sale of firearms and ammunitions at the Del Mar Fairgrounds. By default, a violation of any provision of the Food and Agricultural code is a misdemeanor, unless otherwise specified. Therefore, this bill would effectively terminate the possibility for future gun shows at the Del Mar Fairgrounds. On three prior occasions, former Governors Brown and Schwarzenegger vetoed similar legislation to ban gun shows at the Cow Palace in San Francisco.

*See* Kimberly Horiuchi, Assem. Comm. Approps., Bill Analysis Re: AB 819 (Gloria), 2019-2020 Reg. Sess., at 1-2 (Cal. 2019) (attached as Exhibit 11.).

129.156.    Reporting that AB 893 "would effectively shut down gun shows like Crossroads of the West at the fairgrounds," the Times of San Diego quoted Gloria as saying that "[t]he communities around the Del Mar Fairgrounds have been clear: they do not want these gun shows taking place on this state-owned land." Chris Jennewein, *Assembly Passes Todd Gloria's Bill to Thwart Gun Shows at Del*

1   *Mar Fairgrounds*, timesofsandiego.com (April 25, 2019),

2   https://timesofsandiego.com/politics/2019/04/25/assembly-passes-todd-glorias-bill-

3   to-thwart-gun-shows-at-del-mar-fairgrounds/ (last visited Sept. 29, 2021).

4           130.157.     And further evidencing the Legislature's intended effect of AB

5   893, Senator Dave Min recently wrote to the Board of the 32nd District Agricultural

6   Association in Orange County, warning the Board Members not to stand in the way

7   ofhinder his bill that would ban sales of firearms, ammunition, and firearm precursor

8   parts, and ammunition at the Orange County Fairgrounds in Costa Mesa. In that letter, he

9   addressed members' concerns that their venue was being unfairly and exclusively

10  targeted, responding that AB 893 was a similar action banning gun shows at a single

11  fairground:

12          Furthermore, the substantive merits of any such communication to
13          the Governor are dubious. While Item 6A expresses a concern that
            SB 264 "exclusively targets the 32nd DAA," such action to **ban**
            **gun shows** at a single fairground site has recent precedent. In
14          2019, Gov. Newsom signed Assembly Bill 893 (Gloria) into law,
            ending the sale of firearms and ammunition at the Del Mar
15          Fairgrounds, operated by the 22nd District Agricultural
            Association.

16

17  Letter from Senator Dave Min to Board Members of 32nd District Agricultural

18  Association (on or about Sept. 13, 2021) (attached as Exhibit 12) (emphases added).

19          131.158.     NonethelessEven so, Plaintiff Crossroads has repeatedly reached out

20  to Defendant District to request dates for events at the Fairground in 2021.

21          132.159.     Plaintiff Crossroads has been unable to secure dates and enter

22  into new contracts for events at the Fairgrounds in 2021 or 2022 due to the

23  Defendants' intentional act of adopting and enforcing AB 893.

24          133.160.     Indeed, in compliance with AB 893, Defendant District cannot

25  and will not enter into contracts for gun shows at the Fairgrounds if firearms and

26  ammunition will be sold.

27          134.161.     Even though Plaintiff Crossroads has offered to attempt to hold

28  events without sales of firearms or ammunition to preserve its longstanding

1  relationship with the District, mitigate damages, and continue planning and

2  promoting its family-friendly events until its claims can be heard, Defendant District

3  ~~has~~ dragged its feet and ~~has not~~never provided dates for events in 2021 or 2022.

4      ~~135.~~162.    As a result of Defendant District's stalling, ~~most of~~Plaintiff

5  Crossroads' requested dates in 2021 have ~~either~~all passed ~~or have become unavailable.~~.

6      ~~136.~~163.    Because of the time and resources needed to plan and implement

7  its gun show events, Plaintiff Crossroads must plan its shows about one year in

8  advance, but Defendant District has not allowed Plaintiff Crossroads to secure dates

9  in 2022 either.

10      ~~137.~~164.    What's more, Defendant District seems to have stripped Plaintiff

11  Crossroads of its effective right of first refusal under the District's "hold" system

12  described above. Indeed, it has not only failed to give Crossroads first choice of its

13  dates for the coming year, but it has also prohibited Crossroads from securing dates

14  for gun show events at the Fairgrounds since 2020.

15      ~~138.~~165.    Because California prohibits the building of similar venues

16  within their districts as a way ~~of preventing~~to prevent competition for available space,

17  there are no venues in the area that offer comparable space and parking needed for

18  gun show events. Plaintiff Crossroads has thus been unable to find a suitable

19  alternate location to the Fairgrounds.

20      ~~139.~~166.    Defendants' adoption and enforcement of AB 893, which has the

21  intended and practical effect of banning gun shows at the Fairgrounds, has and will

22  continue to cause Plaintiff Crossroads significant economic damages, including loss

23  of event revenue, breakdown of relationships and agreements with long-time event

24  vendors and companies used as suppliers for gun show events, relinquishment of

25  future show dates, and loss of business reputation and goodwill that has been built

26  by Plaintiff Crossroads for more than 30 years.

27      ~~140.~~167.    Plaintiff Crossroads has already lost all revenue for gun show

28  events at the Fairgrounds in 2021 because the Fair Board will not finalize event

1    dates, citing AB 893 as the reason. If shows do not return to the Fairgrounds in

2    2022, Plaintiff Crossroads will lose all revenue for gun show events at the

3    Fairgrounds in 2022 as well.

4         141.168.    Even if Plaintiff Crossroads could secure dates, plan, promote,

5    and host gun shows in the remainderremaining months of 2021 and in 2022, AB 893 stands

6    in the way ofinterferes with Crossroads generating the profits theits events typically

7    generate because the ban on firearm and ammunition sales will significantly impact

8    paid event attendance and the types and numbers of paid vendors who will do

9    business with Crossroads at the Del Mar gun show.

10        142.169.    Plaintiff Crossroads has and will continue to suffer loss of

11   business goodwill resulting from Defendants' adoption and enforcement of AB 893

12   under the (unsupported) pretense that gun shows, generally, and Crossroads' shows,

13   in particular, threaten public safety. The message this sends to other venues,

14   attendees, and vendors that do business with Crossroads will no doubt affect

15   Crossroads for years.

16        143.170.    Defendants' adoption and enforcement of AB 893, which has the

17   intended and practical effect of banning gun shows at the Fairgrounds, also causes

18   economic damage to the organizational plaintiffs, CRPA, SAF, and South Bay,

19   which use their vendor spaces, in part, to sell organization memberships, advertise

20   their educational courses, request donations, and sell organization merchandise, like

21   hats and stickers.

22        144.171.    Defendants' adoption and enforcement of AB 893, which has the

23   intended and practical effect of banning gun shows at the Fairgrounds, also causes

24   economic damage to the vendor plaintiffs, Solis, Walsh, Captain Jon's, and LAX

25   Ammo, who uses their vendor spaces, in part, to sell firearms, ammunition, and/or

26   related accessories.

27        145.172.    Defendants' adoption and enforcement of AB 893, which has the

28   intended and practical effect of banning gun shows at the Fairgrounds, prohibits

Plaintiffs and all those similarly situate from making ~~sue~~use of a state-owned "public assembly facility" to host gun show events, a lawful business activity, in violation of Plaintiffs' rights to engage in free speech and peaceful assembly, and their right to equal protection under the law.

~~146.~~173.    ~~Specifically,~~Defendants' conduct complained of here strips Plaintiffs Bardack, Diaz, Dupree, Irick, Solis, and Walsh, as well as the organizational plaintiffs, CRPA, SAF, and South Bay, of a vital opportunity to assemble and engage in pure speech about, among other things, the rights and responsibilities of gun owners, the Second Amendment, patriotism, and political activism with like-minded individuals.

~~147.~~174.    Defendants' conduct complained of here also strips Plaintiff Crossroads of the right to promote gun show events, acting as a "clearinghouse" for both political speech and commercial speech.

~~148.~~175.    Defendants' conduct complained of here also strips Plaintiffs Solis, Walsh, Captain Jon's, and LAX Ammo of a vital opportunity to assemble and engage in lawful commercial speech, including the offer and acceptance of sales of firearms, ammunition, and related accessories.

~~149.~~176.    Furthermore, even if the Court grants injunctive relief, Plaintiff Crossroads will have incurred damages in having to devote extraordinary advertising dollars to inform the public that gun shows will continue to be held and have not been banned at the Fairgrounds.

~~150.~~177.    The economic and non-economic harms and injuries to Plaintiffs are of a continuing nature; they continue to compound everyday AB 893 remains the law.

**[Government Tort Claim]**

~~151.~~178.    On August 2, 2021, Plaintiffs Crossroads, Walsh, LAX Ammo, CRPA, and SAF notified Defendants Newsom, Bonta, Ross, and District of their claims for intentional and/or negligent interference with prospective advantage by

filing a timely Government Tort Claim ~~pursuant to~~under California's Tort Claims Act. B&L Productions, Inc., et al., Government Tort Claim (filed Aug. 2, 2021) (attached as Exhibit 13~~.~~).

152.179.   Defendants Newsom, Bonta, Ross, and District neither accepted nor rejected Plaintiffs' Government Tort Claim in writing within 45 days, so the claim was rejected by operation of law.

153.180.   On August 2, 2021, Plaintiff Crossroads of its claim for intentional interference with contract by filing a timely Government Tort Claim ~~pursuant to~~under California's Tort Claims Act. Ex. 7.

154.181.   Defendants Newsom, Bonta, Ross, and District neither accepted nor rejected Plaintiffs' Government Tort Claim in writing within 45 days, so the claim was rejected by operation of law.

**FIRST CAUSE OF ACTION**
**Violation of Right to Free Speech Under U.S. Const., amend. I**
**42 U.S.C. § 1983**
(By Plaintiffs CRPA, South Bay, SAF, and All Individuals Against ~~All~~ Defendants Bonta, Stephan, and District)

155.182.   Plaintiffs incorporate by reference paragraphs 1 through ~~154~~181 of this Complaint as though fully set forth herein in their entirety.

~~156.   The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech. . .."~~

~~157.~~1.~~The First Amendment's Freedom of Speech Clause is incorporated and made applicable to the states and their political subdivisions by the Fourteenth Amendment to the United States Constitution and by 42 U.S.C. § 1983.~~

~~158.~~1.~~The First Amendment does not tolerate the suppression of speech based on the viewpoint of the speaker. Public property made available for lease by community groups to engage in expressive activity must thus be available without regard to the viewpoint sought to be expressed. *Cinevision*, 745 F.2d 560. Such venues cannot be opened to some and closed to others, suppressing protected expression, absent a compelling government interest. *Id.* at 571.~~

159.183.   The state of California owns the Fairgrounds, a public venue. It is rented to the public, including community-based organizations and businesses, for its use and enjoyment, including for concerts, festivals, and industry shows.

160.   Defendants Newsom, Becerra, Summers, and Montgomery are the state and local actors responsible for ensuring that AB 893 is enforced and thus have the authority to prosecute violations of AB 893.

161.   Defendants Ross and District interpret, implement, and enforce state laws and policies as regards the Fairgrounds, including AB 893.

162.184.   Plaintiffs CRPA, South Bay, SAF, and Individuals Bardack, Diaz, Dupree, Irick, Solis, and Walsh have attended in the past and wish to again attend Crossroads of the West Gun Showgun shows at the Fairgrounds so they may exchange ideas, information, and knowledge, as well discuss political issues and the importance of protecting and defending the Second Amendment.

163.185.   Plaintiffs CRPA, South Bay, SAF, and Individuals Bardack, Diaz, Dupree, Irick, Solis, and Walsh have a right under the First Amendment to use the Fairgrounds for their expressive activity on the same basis as other members of the public without regard to the viewpoints they seek to express.

186.   Defendants' enforcementDefendants Bonta and Stephan, acting under color of state law, are the government actors responsible for enforcing and prosecuting violations of AB 893, which prohibits the sale of firearms and ammunition atdeprives Plaintiffs CRPA, South Bay, SAF, and Individuals Bardack, Diaz, Dupree, Irick, Solis, and Walsh of free speech rights secured by the First Amendment of the United States Constitution in violation of 42 U.S.C. § 1983.

187.   Defendant District interprets, implements, and enforces state laws and policies as regards the Fairgrounds with the purpose and intention (or at least the effect) of ending gun show events at, including AB 893, which deprives Plaintiffs of free speech rights secured by the First Amendment of the United States Constitution in violation of 42 U.S.C. § 1983.

164.188.    Defendants' enforcement of AB 893, which prohibits the sale of firearms and ammunition at the Fairgrounds with the purpose and intention (or at least the effect) of ending gun show events at the Fairgrounds, is an impermissible content-based restriction of speech. Fairgrounds, is an impermissible content-based restriction of speech. Such enforcement constitutes a direct violation of the First Amendment.free speech rights of Plaintiffs CRPA, South Bay, SAF, and Individuals Bardack, Diaz, Dupree, Irick, Solis, and Walsh.

189.   There is no compelling (or even legitimate) governmental interest to support the ban on the commercial sales of allSimilarly, by expressly banning the sale of firearms and ammunition at the Fairgrounds, effectively shutteringAB 893 strips gun shows of an essential function and one of the main reasons people attend these events, limiting the number and types of vendors at the gun shows and the number of individuals in attendance. Thus, AB 893 has a chilling effect on the First Amendment.

165.190.    Defendants have no compelling (or even legitimate) interest in banning the otherwise lawful (and constitutionally protected) sale of lawful firearms and ammunition at the Fairgrounds, or in banning gun show events at the Fairgrounds and destroying a vital outlet for theand the unique expression and exchange of ideas related to promoting and preserving the "gun culture" in California and elsewhere. that takes place at those events. Any purported interest in "public safety" is betrayed by the fact that AB 893 does not ban the possession of firearms or ammunition on Fairgrounds property and state law already governs sales at gun shows *at least* as strictly as it governs sales at "brick-and-mortar" stores.

191.   Further, AB 893 is neither narrowly tailored to nor the least restrictive means of achieving the state's dubious interests. Indeed, by intentionally and effectively banning gun shows at the Fairgrounds, it sweeps up *all* forms of speech and expressive conduct that occurs at such events and impermissibly banishes that speech from a public venue.

192.   Similarly, AB 893 is unconstitutionally overbroad because, in an effort to restrict the commercial sale of firearms and ammunition, the law intentionally and effectively bans gun shows events altogether, seriously and deliberately burdening a vast amount of speech that does not constitute such a communication and is fully protected by the First Amendment.

~~166.~~193.   As a direct and proximate result of Defendants' conduct, Plaintiffs ~~CRPA, South Bay, SAF and Individuals Bardack, Diaz, Dupree, Irick, Solis, and Walsh~~ Clark, Johnson, Littrell, Merson, CRPA, APAGOA, 2ALC, and SAF have suffered irreparable harm, including the violation of their constitutional right to ~~freedom of expression~~ free speech, entitling them to declaratory and injunctive relief. Without intervention by this Court, through declaratory and injunctive relief, Plaintiffs will continue to suffer this irreparable harm.

**SECOND CAUSE OF ACTION**
**Violation of Right to Free Speech Under U.S. Const., amend. I**
**42 U.S.C. § 1983**
(By Plaintiff Crossroads Against ~~All~~ Defendants Bonta, Stephan, and District)

~~167.~~194.   Plaintiffs incorporate by reference paragraphs 1 through ~~166~~193 of this Complaint as though fully set forth herein in their entirety.

195.   The state of California owns the Fairgrounds, a public venue. It is rented to the public, including community-based organizations and businesses, for its use and enjoyment, including for concerts, festivals, and industry shows.

196.   Plaintiff Crossroads seeks to engage in protected speech at the Fairgrounds, a noted "public assembly facility," through the promotion and production of events for lawful expressive activity, including events that bring together like-minded individuals to engage in pure political and educational speech, as well as commercial speech of vendor and individual participants to communicate offer and acceptance for the sale of legal goods and services.

~~168.   The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech. . .."~~

169.   The First Amendment's Freedom of Speech Clause is incorporated and made applicable to the states and their political subdivisions by the Fourteenth Amendment to the United States Constitution and by 42 U.S.C. § 1983.

170.   The First Amendment does not tolerate the suppression of speech based on the viewpoint of the speaker. Public property made available for lease by community groups to engage in expressive activity must thus be available without regard to the viewpoint sought to be expressed. *Cinevision*, 745 F.2d 560. Such venues cannot be opened to some and closed to others, suppressing protected expression, absent a compelling government interest. *Id.* at 571.

171.197.   Event promoters, though they generally promote events for profit, "still enjoy the protections of the First Amendment." *Id.* at 567. For "[t]he role of a promoter in ensuring access to the public is at least as critical as the role of a bookseller or theater owner and . . . is in a far better position than a concert goer or individual performers to vindicate First Amendment rights and ensure public access." *Id.* at 568. The conduct they engage in is protected expression.

172.1.The state of California owns the Fairgrounds, a public venue. It is rented to the public, including community-based organizations and businesses, for its use and enjoyment, including for concerts, festivals, and industry shows.

173.   Defendants Newsom, Becerra, Summers, and Montgomery are the state and local actors responsible for ensuring that AB 893 is enforced and thus have the authority to prosecute violations of AB 893.

174.   Defendants Ross and District interpret, implement, and enforce state laws and policies as regards the Fairgrounds, including AB 893.

175.1.Plaintiff Crossroads seeks to engage in protected speech at the Fairgrounds, a noted "public assembly facility," through the promotion and production of events for lawful expressive activity, including events that bring together like-minded individuals to engage in pure political and educational speech, as well as commercial speech of vendor and individual participants to communicate

offer and acceptance for the sale of legal goods and services.

176.198.    Plaintiff Crossroads has a right under the First Amendment to use the Fairgrounds for its expressive activity on the same basis as other members of the public without regard to the content or viewpoint it seeks to express and promote.

199.   Defendants' enforcement of AB 893, which prohibits the sale of firearms and ammunition at the Fairgrounds with the purpose and intention (or at least the effect) of ending gun show events at the Fairgrounds, is an impermissible content-based restriction of speech. Defendants Bonta and Stephan, acting under color of state law, are the government actors responsible for enforcing and prosecuting violations of AB 893, which deprives Plaintiff Crossroads of free speech rights secured by the First Amendment of the United States Constitution in violation of 42 U.S.C. § 1983.

200.   Defendant District interprets, implements, and enforces state laws and policies as regards the Fairgrounds, including AB 893, which deprives Plaintiff Crossroads of free speech rights secured by the First Amendment of the United States Constitution in violation of 42 U.S.C. § 1983.

177.201.    Defendants' enforcement of AB 893, which prohibits the sale of firearms and ammunition at the Fairgrounds with the purpose and intention (or at least the effect) of ending gun show events at the Fairgrounds, is an impermissible content-based restriction of speech. Such enforcement constitutes a direct violation of the First Amendmentfree speech rights of Plaintiff Crossroads.

202.   There is no compelling (or even legitimate) governmental interest to support the ban on the commercial sales of allSimilarly, by expressly banning the sale of firearms and ammunition at the Fairgrounds, effectively shutteringAB 893 strips gun shows of an essential function and one of the main reasons people attend these events, limiting the number and types of vendors at the gun shows and the number of individuals in attendance. Thus, AB 893 has a chilling effect on the First Amendment.

203.   Defendants have no compelling (or even legitimate) interest in banning the otherwise lawful (and constitutionally protected) sale of lawful firearms, ammunition, and firearm precursor parts at the Fairgrounds, or in banning gun show events at the Fairgrounds and destroying a vital outlet for the and the unique expression and exchange of ideas related to promoting and preserving the "gun culture" in California and elsewhere. that takes place at those events. Any purported interest in "public safety" is betrayed by the fact that AB 893 does not ban the possession of firearms or ammunition on Fairgrounds property and state law already governs sales at gun shows *at least* as strictly as it governs sales at "brick-and-mortar" stores.

204.   Further, AB 893 is neither narrowly tailored to nor the least restrictive means of achieving the state's dubious interests. Indeed, by intentionally and effectively banning gun shows at the Fairgrounds, it sweeps up *all* forms of speech and expressive conduct that occurs at such events and banishes from a public venue.

178.205.   Similarly, AB 893 is unconstitutionally overbroad because, in an effort to restrict the commercial sale of firearms, ammunition, and firearm precursor parts, the law effectively and intentionally bans gun shows events altogether, seriously and deliberately burdening a vast amount of speech that does not constitute such a communication and is fully protected by the First Amendment.

179.206.   As a direct and proximate result of Defendants' conduct, Plaintiff Crossroads has suffered and will continue to suffer irreparable harm, including the violation of its constitutional right to freedom of expression free speech, entitling Plaintiff Crossroads to declaratory and injunctive relief. Without intervention by this Court, through declaratory and injunctive relief, Plaintiffs will continue to suffer this irreparable harm.

**THIRD CAUSE OF ACTION**
**Violation of Right to Free Speech Under U.S. Const., amend. I**
**42 U.S.C. § 1983**

///

///

### THIRD CAUSE OF ACTION
### Violation of Right to Free Speech Under U.S. Const., amend. I
### 42 U.S.C. § 1983

(By Plaintiffs Solis, Walsh, Captain Jon's, ~~and~~ LAX Ammo, and CRPA Against ~~All~~ Defendants Bonta, Stephan, and District)

~~180.~~207.   Plaintiffs incorporate by reference paragraphs 1 through ~~179~~206 of this Complaint as though fully set forth herein in their entirety.

208.   The state of California owns the Fairgrounds, a public venue. It is rented to the public, including community-based organizations and businesses, for its use and enjoyment, including for concerts, festivals, and industry shows.

~~181.   The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech. . .."~~

~~182.   The First Amendment's Freedom of Speech Clause is incorporated and made applicable to the states and their political subdivisions by the Fourteenth Amendment to the United States Constitution and by 42 U.S.C. § 1983.~~

~~183.   The First Amendment does not tolerate the suppression of speech based on the viewpoint of the speaker. Public property made available for lease by community groups to engage in expressive activity must thus be available without regard to the viewpoint sought to be expressed. *Cinevision*, 745 F.2d 560. Such venues cannot be opened to some and closed to others, suppressing protected expression, absent a compelling government interest. *Id.* at 571.~~

~~184.   AB 893 violates the commercial free speech rights of the Plaintiffs, both on its face and as applied. This violation is especially egregious given the well-established law of this Circuit with regard to the commercial speech rights at gun shows that are protected by the First Amendment. *Nordyke v. Santa Clara Cty.*, 110 F.3d 707 (9th Cir. 1997).~~

~~185.~~1.The state of California owns the Fairgrounds, a public venue. It is rented to the public, including community-based organizations and businesses, for its use and enjoyment, including for concerts, festivals, and industry shows.

186.   Defendants Newsom, Becerra, Summers, and Montgomery are the state and local actors responsible for ensuring that AB 893 is adequately enforced and thus have the authority to prosecute violations of AB 893.

187.   Defendants Ross and District interprets, implements, and enforces state laws and policies as regards the Fairgrounds, including AB 893.

188.209.   Plaintiffs Solis, Walsh, Captain Jon's, and LAX Ammo, as well as business members of CRPA, have attended in the past and wish to again attend Crossroads gun shows at the Fairgrounds to engage in lawful commercial speech with individual attendees.

189.210.   Plaintiffs Solis, Walsh, Captain Jon's, and LAX Ammo, as well as business members of CRPA, have a right under the First Amendment to use the Fairgrounds for expressive activity on the same basis as other members of the public without regard to the viewpoints they seek to express and promote.

211.   Defendants Bonta and Stephan, acting under color of state law, are the government actors responsible for enforcing and prosecuting violations of AB 893, which deprives Plaintiffs Solis, Walsh, Captain Jon's, and LAX Ammo, as well as business members of CRPA, of free speech rights secured by the First Amendment of the United States Constitution in violation of 42 U.S.C. § 1983.

212.   Defendant District interprets, implements, and enforces state laws and policies as regards the Fairgrounds, including AB 893, which deprives Plaintiffs Solis, Walsh, Captain Jon's, and LAX Ammo, as well as business members of CRPA, of free speech rights secured by the First Amendment of the United States Constitution in violation of 42 U.S.C. § 1983.

190.213.   Defendants' enforcement of AB 893, which prohibits the sale of firearms and ammunition at the Fairgrounds with the purpose and intention (or at least the effect) of ending gun show events at the Fairgrounds, is an impermissible content-based restriction of speech. Such enforcement constitutes a direct violation of the First Amendment commercial speech rights of the Plaintiffs.

214.   Further, by directly barring the rights of vendors, like Plaintiffs Solis, Walsh, and LAX Ammo, to sell firearms and ammunition (*which necessarily involves commercial speech*), AB 893 defies existing case law in the Ninth Circuit protecting the commercial speech associated with firearm sales on public property. *See Nordyke, ~~v. Santa Clara Cty.,~~* 110 F. 3d 707 (~~9th Cir. 1997).There is no governmental interest—let alone~~holding that a ban on the sale of firearms on county-owned land was overbroad as abridging commercial speech associated with the sale of lawful products).

215.   Finally, by expressly banning the sale of firearms and ammunition at the Fairgrounds, AB 893 strips gun shows of an essential function and one of the main reasons people attend these events, limiting the number and types of vendors at the gun shows and the number of individuals in attendance. Thus, AB 893 has a chilling effect on the First Amendment.

~~191.~~216.   Defendants have no substantial ~~one—to support~~(or even legitimate) interest in banning the ~~ban on the commercial sales~~otherwise lawful (and constitutionally protected) sale of ~~all~~lawful firearms and ammunition at the Fairgrounds, ~~effectively shuttering~~or in banning gun show events ~~at the Fairgrounds and destroying a vital outlet for the~~and the unique expression and exchange of ideas related to promoting and preserving the "gun culture" ~~in California and elsewhere. This is especially true where the~~that takes place at those events. Any purported interest in "public safety" is betrayed by the fact that AB 893 does not ban the possession of firearms or ammunition on Fairgrounds property and state ~~maintains an interest in tax revenue from the lawful sale of firearms and ammunition at locations other than gun shows~~law already governs sales at gun shows *at least* as strictly as it governs sales at "brick-and-mortar" stores.

217.   Even if there were a substantial governmental interest in restricting gun shows and the commercial speech that occurs at such events, it would not be directly served by a ban on sales of firearms and ammunition (and the speech necessary to

such sales) at the Fairgrounds.

192.218.    Even if there were a substantial government interest in restricting gun shows and the commercial speech that occurs at such events, banning commercial speech about firearms and ammunition at the Fairgrounds altogether is more extensive than necessary to serve any such interest. *See Nordyke*, 110 F.3d 707 (holding that a ban on the sale of firearms on county-owned land was overbroad as abridging commercial speech associated with the sale of lawful products).

193.219.    As a direct and proximate result of Defendants' conduct, Plaintiffs Solis, Walsh, Captain Jon's, and LAX Ammo will suffer, as well as business members of CRPA,have suffered irreparable harm, including the violation of their constitutional right to freedom of expressionfree speech, entitling them to declaratory and injunctive relief. Without intervention by this Court, through declaratory and injunctive relief, Plaintiffs will continue to suffer this irreparable harm.

**FOURTH CAUSE OF ACTION**
**Prior Restraint on Right to Free Speech Under U.S. Const., amend. I**
**42 U.S.C. § 1983**
(By All Plaintiffs Against All Defendants Bonta, Stephan, and District)

194.220.    Plaintiffs incorporate by reference paragraphs 1 through 194219 of this Complaint as though fully set forth herein in their entirety.

195.   The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech. . . ."

196.   The First Amendment's Freedom of Speech Clause is incorporated and made applicable to the states and their political subdivisions by the Fourteenth Amendment to the United States Constitution and by 42 U.S.C. § 1983.

197.221.    The First Amendment affords special protection against policies or orders that impose a previous or prior restraint on speech. "[P]rior restraints on speech and publication are the most serious and least tolerable infringement on First Amendment Rights." *Ass'n for L.A. Deputy Sheriffs*, 239 Cal. App. 4th at 811 (citing

*Neb. Press Ass'n*, 427 U.S. at 559. A prior restraint is ~~particularly egregious~~especially bad when it falls upon the communication of news, commentary, current events, political speech, and association. *N.Y. Times Co.*, 403 U.S. at 715.

~~198.~~222.    Prior restraint also involves the "unbridled discretion doctrine" where a policy, or lack thereof, allows for a single person or body to act at their sole discretion, without regard for any constitutional rights possessed by the person ~~upon~~on which the action is taken, and where there is no remedy for challenging the discretion of the decision makers. *Lakewood~~,~~ v. Plain Dealer Publ'g Co.,* 486 U.S. ~~at~~750, 757~~.~~ (1988).

~~199.~~223.    ~~The~~ Defendants Bonta, Stephan, and District are the state and local actors responsible for enforcing and prosecuting violations of AB 893, which is a content-based restriction of speech that will have a chilling effect on Plaintiffs' First Amendment rights, thus acting as a de facto prior restraint on Plaintiffs' rights.

~~200.~~224.    Under AB 893, Defendant District has unfettered discretion to determine what constitutes a "sale" under the law and is thereby prohibited at the Fairgrounds.

~~201.~~225.    Defendants' policies and practices complained of here impose an unconstitutional prior restraint because they vest the District with unbridled discretion to permit or refuse protected expression by members of the public, including Plaintiffs.

~~202.~~226.    Defendants' policies and practices complained of here give unbridled discretion to local agricultural district boards and board members to decide what forms of expression members of the public may engage in on at the Fairgrounds and to ban any other expression at the whim of those boards and board members in violation of the First Amendment.

~~203.~~227.    As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered and will continue to suffer irreparable harm, including the

1   violation of their constitutional right to freedom of expression, entitling them to

2   declaratory and injunctive relief and nominal damages.

3

4   **FIFTH CAUSE OF ACTION**
    **Violation of Right to Assembly and Association Under U.S. Const., amend. I**
    **42 U.S.C. § 1983**

5   (By All Plaintiffs Against ~~All~~ Defendants Bonta, Stephan, and District)

6   ~~204.~~228.   Plaintiffs incorporate by reference paragraphs 1 through ~~204~~227

7   of this Complaint as though fully set forth herein in their entirety.

8   229.   The state of California owns the Fairgrounds, a public venue. It is

9   rented to the public, including community-based organizations and businesses, for

10   its use and enjoyment, including for concerts, festivals, and industry shows.

11   ~~205.   The First Amendment protects the rights to association and assembly.~~

12   ~~Indeed, "[e]ffective advocacy of both public and private points of view, particularly~~

13   ~~controversial ones, is undeniably enhanced by group association." *NAACP*, 377 U.S.~~

14   ~~at 462.~~

15   ~~206.~~230.   Plaintiffs ~~are attempting~~have promoted or attended in the past

16   and wish to ~~engage in their protected right to free assembly and association through~~

17   ~~lawful activities that bring together like-minded individuals~~again promote or attend

18   Crossroads gun shows at the Fairgrounds so they may assemble and associate with

19   one another to engage in lawful commerce, fellowship, and expressive activities,

20   including political and educational speech~~, and fellowship~~ about the lawful

21   ownership, possession, and use of firearms and related products.

22   231.   Plaintiffs have a right under the First Amendment to use the

23   Fairgrounds to assemble and associate on the same basis as other members of the

24   public without regard to the content or viewpoint it seeks to express and promote.

25   232.   Defendants ~~violate~~Bonta and Stephan, acting under color of state law,

26   are the government actors responsible for enforcing and prosecuting violations of

27   AB 893, which deprives Plaintiffs of their rights of assembly and association

28   secured by the First Amendment of the United States Constitution in violation of 42

U.S.C. § 1983.

233.   Defendant District interprets, implements, and enforces state laws and policies in regard to the Fairgrounds, including AB 893, which deprives Plaintiffs of their rights of assembly and association secured by the First Amendment of the United States Constitution in violation of 42 U.S.C. § 1983.

~~207.~~234.   Defendants' enforcement of AB 893, which prohibits the sale of firearms and ammunition at the Fairgrounds with the purpose and intention (or at least the effect) of banning gun show events at the Fairgrounds, violates Plaintiffs' ~~right~~rights to ~~freedom of~~ assembly and association by denying them the right to use the Fairgrounds, a "public assembly facility~~",~~," to assemble and engage in political and other types of expression—a right Defendants extend to other members of the public so long as they are not meeting ~~for the purposes of holding~~to hold a gun show event.

~~208.~~ Defendants have no compelling (or even legitimate ~~and substantial)~~ governmental interest in ~~prohibiting~~banning the otherwise lawful (and constitutionally protected) sale of lawful firearms and ammunition~~, effectively shuttering gun shows at~~ at the Fairgrounds, or in banning gun show events and~~,~~ by extension~~,~~ the rights of Plaintiffs to assemble and associate ~~and assemble~~ at such events at the Fairgrounds.

~~209.   Defendants have expressly banned the sale of firearms and ammunition at the Fairgrounds, which~~Any purported interest in "public safety" is ~~an essential function of gun show and one of the main reasons people attend these events. By eliminating the sale of firearms and ammunition, Defendants have stripped gun shows of an essential function, limiting the number and types of vendors at the gun shows and the number of individuals in attendance. Thus, having a chilling effect on the First Amendment.~~

~~210.~~235.   ~~Not only does~~betrayed by the fact that AB 893 ~~eliminate Plaintiffs' ability to engage in discussion with event attendees about the sale and~~

1  purchase of firearms and ammunition, but it does also so unnecessarily because of
2  California's already extensive regulation of gun show events. For instance,
3  California's mandatory 10-day waiting period prevents any attendee from taking
4  does not ban the possession of firearms or ammunition on the premises of the
5  Fairgrounds, requiring that they instead go to a *different* location property and state
6  law already governs sales at gun shows *at* least 10 days later to take possession of
7  any firearm purchasedas strictly as it governs sales at the gun show. Before a gun
8  show attendee would take possession of ammunition purchased on the premises, the
9  attendee would have to rely on a vendor to retrieve the ammunition from stock, pass
10  a background check conducted electronically by the California Department of
11  Justice, pay a fee, and wait for the vendor to upload the purchaser's personal
12  information and details of the specific ammunition being transferred. What's more,
13  no person other than security personnel or law enforcement may possess both a
14  firearm and ammunition for that firearm at the same time, with the exception of
15  vendors who are selling both"brick-and-mortar" stores.

16      211.236.    But even if Defendants had a "legitimate and substantial" interest

17  in limiting a key aspect of gun show events, and thus barring Plaintiffs from freely

18  assembling and associating at the Fairgrounds, they have imposed an

19  unconstitutional and overly broad restriction on Plaintiffs' rights to assembly by

20  prohibiting the sale of firearms and ammunition at the Fairgrounds.

21      237.   As a direct and proximate result of Defendants' conduct, all Plaintiffs

22  have suffered irreparable harm, including the violation of their constitutional right to

23  free association and assembly, entitling them to declaratory and injunctive relief.

24  Without intervention by this Court, through declaratory and injunctive relief,

25  Plaintiffs will continue to suffer this irreparable harm.

26                      **SIXTH CAUSE OFOF ACTION**
27  **Violation of the Right to Equal ProtectionKeep & Bear Arms Under U.S.**
                      **Const., amend. XIVII**
                      **42 U.S.C. § 1983**
28   (By All Plaintiffs Bardack, Diaz, Dupree, Irick, Solis, Walsh, LAX Ammo, CRPA,

South Bay, and SAF Against ~~All~~ Defendants Bonta, Stephan, and District)

~~212.~~238.     Plaintiffs incorporate by reference paragraphs 1 through ~~212~~237 of this Complaint as if fully set forth herein in their entirety.

~~213.1. The Fourteenth Amendment to the United States Constitution, enforceable under 42 U.S.C. § 1983, provides that no state shall deny to any person within its jurisdiction the equal protection of the laws.~~

~~214.   Generally, equal protection is based upon protected classes of person who are similarly situated; however, individuals who suffer irrational and intentional discrimination or animus can bring claims of equal protection where the government is subjecting only the Plaintiffs to differing and unique treatment compared to others who are similarly situated, *Engquist*, 553 U.S. 591, even if not based on group characteristics, *Village of Willowbrook*, 528 U.S. 562.~~

239.   ~~Disparate treatment~~Plaintiffs Bardack, Diaz, Dupree, Irick, Solis, Walsh, LAX Ammo, and members and supporters of Plaintiffs CRPA, South Bay, and SAF, have sold or bought firearms or ammunition at gun show events at the Fairgrounds in the past and, but for the adoption and enforcement of AB 893, they would do so again.

240.   Plaintiffs have a right, under the Second Amendment, to buy and sell firearms and the ammunition necessary for the effective operation of those firearms.

241.   Defendants Bonta and Stephan, acting under ~~the~~ color of state law, ~~when one is engaged in activities that are fundamental rights, is actionable~~are the government actors responsible for enforcing and prosecuting violations of AB 893, which deprives Plaintiffs of their right to access firearms and ammunition secured by the Second Amendment of the United States Constitution in violation of 42 U.S.C. § 1983.

242.   Defendant District interprets, implements, and enforces state laws and policies in regard to the Fairgrounds, including AB 893, which deprives Plaintiffs of their right to access firearms and ammunition secured by the Second Amendment of

the United States Constitution in violation of 42 U.S.C. § 1983.

243.   Defendants' enforcement of AB 893, which prohibits the sale of firearms and ammunition at the Fairgrounds with the purpose and intention (or at least the effect) of banning gun show events at the Fairgrounds, violates Plaintiffs' Second Amendment right to buy and sell firearms and the ammunition necessary to the effective operation of those firearms.

244.   Defendants cannot satisfy their burden to justify their ban on the sale of firearms and ammunition at the Fairgrounds under the history- and tradition-based test applied in *Heller* and recently confirmed in *Bruen*.

245.   As a direct and proximate result of Defendants' conduct, all Plaintiffs have suffered irreparable harm, including the violation of their constitutional right to buy and sell firearms and ammunition, entitling them to declaratory and injunctive relief. Without intervention by this Court, through declaratory and injunctive relief, Plaintiffs will continue to suffer this irreparable harm.

### SEVENTH CAUSE OF ACTION
**Violation of the Right to Equal Protection ~~Clause of~~ Under U.S. Const., amend. XIV**
**42 U.S.C. § 1983**
(By All Plaintiffs Against Defendants Bonta, Stephan, and District)

246.   Plaintiffs incorporate by reference paragraphs 1 through 245 of this Complaint as if fully set forth herein in their entirety.

247.   Defendants, acting under color of state law, are enforcing AB 893, which deprives Plaintiffs of right to equal protection under the law secured by the Fourteenth Amendment of the United States Constitution in violation of 42 U.S.C. § 1983.

~~215.~~248.   On its face and as applied, AB 893 is an unconstitutional abridgement of Plaintiffs' right to equal protection under the law guaranteed by the Fourteenth Amendment. ~~*Mosley*, 408 U.S. 92; *Carey*, 447 U.S. 455.~~ because it is a viewpoint-discriminatory and animus-based restriction on Plaintiffs' protected

speech that serves no compelling governmental interest

216.249.    Although Plaintiff Crossroads operates a legal and legitimate business and the Fairgrounds is suitable for the purposes of hosting a gun show at its public facility, as demonstratedshown by over 30 years of uninfringed use of the Fairgrounds, AB 893 prevents Plaintiffs from equally participating in the use of the publicly owned venue by unconstitutionally eliminating Plaintiffs' ability to freely conduct otherwise lawful business transactions and freely express their beliefs with like-minded people.

217.250.    Defendants' refusal to permit Plaintiffs equal access to the Fairgrounds forto host its promotion of gun showsshow events and engage in the speech, assembly, and association that takes place at such events, does not further any compelling (or even legitimate) governmental interest.

218.251.    Defendants' refusal to allow Plaintiffs equal use of the public facility while continuing to allow contracts for the use of the facility with other similarly situated legal and legitimate businesses is a violation ofviolates Plaintiffs' right to equal protection under the law because it is based on a "bare desire to harm a politically unpopular group." *U.S. Dep't of Agric. v. Moreno*, 413 U.S. at528, 534. (1973)

219.252.    As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered irreparable harm, including the violation of their constitutional right to equal protection under the law, entitling them to declaratory and injunctive relief and nominal damages. Without intervention by this Court, through declaratory and injunctive relief, Plaintiffs will continue to suffer this irreparable harm.

///

///

///

## EIGHTH CAUSE OF ACTION
~~SEVENTH CAUSE OF ACTION~~

### Intentional Interference with Prospective Economic Advantage
(By Plaintiffs Crossroads, Walsh, LAX Ammo, CRPA, and SAF Against
Defendants Newsom, Bonta, Ross, and District)

~~220.~~253.    Plaintiffs incorporate by reference paragraphs 1 through ~~220~~252 of this Complaint as if fully set forth herein in their entirety.

~~221.~~254.    For more than 30 years, Plaintiff Crossroads has maintained contracts with Defendant District, under which Plaintiff Crossroads annually hosts about five gun-show events at the Fairgrounds. An economic relationship has been in effect between Plaintiff Crossroads and Defendant District to operate gun shows on the state fairground property for over 30 years.

~~222.~~255.    In turn, Plaintiff Crossroads maintains countless economic relationships with for-profit and nonprofit vendors, including but not limited to, Plaintiffs Walsh, LAX Ammo, CRPA, and SAF. These vendors pay for space at Plaintiff Crossroads' Del Mar gun shows ~~in order~~ to sell merchandise (including firearms and ammunition) and organization memberships, among other things.

~~223.~~256.    Defendants Newsom, Bonta, Ross, and District had actual knowledge of the existence of these relationships.

~~224.~~257.    By adopting and enforcing AB 893, which bans the sale of firearms and ammunition at the Fairgrounds and effectively bans gun shows at the Fairgrounds, Defendants Newsom, Bonta, Ross, and District engaged in an intentional act designed to disrupt these economic relationships.

~~225.~~258.    The adoption and enforcement of AB 893 by Defendants Newsom, Bonta, Ross, and District did, in fact, disrupt the known economic relationships between Plaintiff Crossroads and Defendant ~~2nd DAA~~District and between Plaintiff Crossroads and its vendors, including Plaintiffs Walsh, LAX Ammo, CRPA, and SAF.

~~226.~~259.    Plaintiffs Crossroads, Walsh, LAX Ammo, CRPA, and SAF have suffered actual damages as a result of the conduct of Defendants Newsom,

Bonta, Ross, and District complained of herein.

227.260.    Plaintiffs Crossroads, Walsh, LAX Ammo, CRPA, and SAF notified Defendants Newsom, Bonta, Ross, and District of this claim by filing a Government Tort Claim pursuant tounder California's Tort Claims Act. Ex. 7.

228.261.    Defendants Newsom, Bonta, Ross, and District neither accepted nor rejected Plaintiffs' Government Tort Claim in writing within 45 days, so the claim was rejected by operation of law.

/ / /

/ / /

### NINTH CAUSE OF ACTION

### EIGHTH CAUSE OF ACTION
**Negligent Interference with Prospective Economic Advantage**
(By Plaintiffs Crossroads, Walsh, LAX Ammo, CRPA, and SAF Against
Defendants Newsom, Bonta, Ross, and District)

229.262.    Plaintiffs incorporate by reference paragraphs 1 through 229261 of this Complaint as if fully set forth herein in their entirety.

230.263.    For more than 30 years, Plaintiff Crossroads has maintained contracts with Defendant District, under which Plaintiff Crossroads annually hosts about five gun-show events at the Fairgrounds. An economic relationship has been in effect between Plaintiff Crossroads and Defendant District to operate gun shows on the state fairground property for over 30 years.

231.264.    In turn, Plaintiff Crossroads maintains countless economic relationships with for-profit and nonprofit vendors, including, but not limited to, Plaintiffs Walsh, LAX Ammo, CRPA, and SAF. These vendors pay for space at Plaintiff Crossroads' Del Mar gun shows in order to sell merchandise (including firearms and ammunition) and organization memberships, among other things.

232.265.    Defendants Newsom, Bonta, Ross, and District had actual

1   knowledge of the existence of these relationships.

2       233.266.      Defendants Newsom, Bonta, Ross, and District knew that, by

3   adopting and enforcing AB 893, which bans the sale of firearms and ammunition at

4   the Fairgrounds and effectively bans gun shows at the Fairgrounds, these economic

5   relationships would be disrupted if they did not act with reasonable care.

6       234.267.      Defendants Newsom, Bonta, Ross, and District knew that, by

7   adopting and enforcing AB 893, which bans the sale of firearms and ammunition at

8   the Fairgrounds and effectively bans gun shows at the Fairgrounds, in fact failed to

9   act with reasonable care.

10      235.268.      The adoption and enforcement of AB 893 by Defendants

11  Newsom, Bonta, Ross, and District did, in fact, disrupt the known economic

12  relationships between Plaintiff Crossroads and Defendant 2nd DAA and between

13  Plaintiff Crossroads and its vendors, including Plaintiffs Walsh, LAX Ammo,

14  CRPA, and SAF.

15      236.269.      Plaintiffs Crossroads, Walsh, LAX Ammo, CRPA, and SAF

16  have suffered actual damages as a result of the conduct of Defendants Newsom,

17  Bonta, Ross, and District complained of herein.

18      237.270.      Plaintiffs Crossroads, Walsh, LAX Ammo, CRPA, and SAF

19  notified Defendants Newsom, Bonta, Ross, and District of this claim by filing a

20  Government Tort Claim pursuant tounder California's Tort Claims Act. Ex. 7.

21      238.271.      Defendants Newsom, Bonta, Ross, and District neither accepted

22  nor rejected Plaintiffs' Government Tort Claim in writing within 45 days, so the

23  claim was rejected by operation of law.

24              **NINTHTENTH CAUSE OF ACTION**
              **Intentional Interference with Contract**

25  (By Plaintiff Crossroads Against Defendants Newsom, Bonta, Ross, and District)

26      239.272.      Plaintiffs incorporate by reference paragraphs 1 through 239271

27  of this Complaint as if fully set forth herein in their entirety.

28      240.273.      For more than 30 years, Plaintiff Crossroads has maintained

---

1   contracts with Defendant District, under which Plaintiff Crossroads annually hosts

2   about five gun-show events at the Fairgrounds. Thus, an economic relationship has

3   been in effect between Plaintiff Crossroads and the District to operate gun shows on

4   state fairground property for over 30 years.

5         241.274.   For decades, Defendant District has given Plaintiff Crossroads an

6   effective right of first refusal to secure event dates for the coming year as a returning

7   contractor at the Fairgrounds under the District's longstanding "hold" system.

8         242.275.   Defendants Newsom, Bonta, Ross, and District had actual

9   knowledge of the existence of these relationships.

10         243.276.   By adopting and enforcing AB 893, which bans the sale of

11   firearms and ammunition at the Fairgrounds and effectively bans gun shows at the

12   Fairgrounds, Defendants Newsom, Bonta, Ross, and District engaged in an

13   intentional act designed to disrupt these economic relationships.

14         244.277.   The adoption and enforcement of AB 893 by Defendants

15   Newsom, Bonta, Ross, and District did, in fact, disrupt the known economic

16   relationships between Plaintiff Crossroads and Defendant 2nd DAA and between

17   Plaintiff Crossroads and its vendors, including Plaintiffs Walsh, LAX Ammo,

18   CRPA, and SAF.

19         245.278.   Plaintiffs Crossroads has suffered actual damages as a result of

20   the conduct of Defendants Newsom, Bonta, Ross, and District complained of herein.

21         246.279.   Plaintiff Crossroads notified Defendants Newsom, Bonta, Ross,

22   and District of this claim by filing a Government Tort Claim pursuant tounder

23   California's Tort Claims Act. Ex. 7,

24         247.280.   Defendants Newsom, Bonta, Ross, and District neither accepted

25   nor rejected Plaintiffs' Government Tort Claim in writing within 45 days, so the

26   claim was rejected by operation of law.

27                       **PRAYER FOR RELIEF**

28

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for:

1.     A declaration that AB 893, codified at California Food & Agricultural Code section 4158, violates the free speech rights of Plaintiffs CRPA, South Bay, SAF, and Individual Plaintiffs Bardack, Diaz, Dupree, Irick, Solis, and Walsh under the First Amendment to the United States Constitution;

2.     A declaration that AB 893 violates the free speech rights of Plaintiff Crossroads under the First Amendment to the United States Constitution;

3.     A declaration that AB 893, codified at California Food & Agricultural Code section 4158, violates the free speech rights of Plaintiffs Solis, Walsh, Captain Jon's, and LAX Ammo under the First Amendment to the United States Constitution;

4.     A declaration that AB 893, codified at California Food & Agricultural Code section 4158, violates the free speech rights of all Plaintiffs under the First Amendment to the United States Constitution because it imposes a prior restraint on their speech;

5.     A declaration that AB 893, codified at California Food & Agricultural Code section 4158, violates the rights of assembly and association of all Plaintiffs under the First Amendment to the United States Constitution;

6.     A declaration that AB 893, codified at California Food & Agricultural Code section 4158, violates the rights of all Plaintiffs to keep and bear arms under the Second Amendment to the United States Constitution;

6.7.   A declaration that AB 893, codified at California Food & Agricultural Code section 4158, violates the rights of all Plaintiffs to equal protection under the law per the Fourteenth Amendment to the United States Constitution;

7.8.   AnA preliminary and permanent injunction prohibiting all Defendants or any ofBonta, Stephan, and District, their employees, agents, and successors in office, from enforcing AB 893, codified at California Food & Agricultural Code

1    section 4158;

2         8.9.   An order for damages, including punitive and nominal damages,

3    according to proof;

4         9.10.   An award of costs and expenses, including attorney's fees, pursuant

5    tounder 42 U.S.C. § 1988 or other appropriate state or federal law; and

6

7    ///

8    ///

9    ///

10        10.11.Any such other relief the Court deems just and equitable.

11

12   Dated:  October 4, 2021August       MICHEL & ASSOCIATES, P.C.
13   31, 2022

14                                        s/ Anna M. Barvir
                                          Anna M. Barvir
15
                                          Counsel for Plaintiffs B&L Productions, Inc.,
16                                        Barry Bardack, Ronald J. Diaz, Sr., John
                                          Dupree, Christopher Irick, Robert Solis,
17                                        Lawrence Michael Walsh, Captain Jon's
                                          Lockers, LLC, L.A.X. Firing Range, Inc.,
18                                        California Rifle & Pistol Association,
                                          Incorporated,Inc., South Bay Rod and Gun
19                                        Club, Inc.

20

21   Dated:  October 4, 2021August       LAW OFFICES OF DON KILMER
22   31, 2022

23                                        s/ Don Kilmer
                                          Don Kilmer
24                                        Counsel for Plaintiff Second Amendment
                                          Foundation
25

26

27

28

**CERTIFICATE OF SERVICE**
IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

Case Name: *B & L Productions, Inc., et al. v. Newsom, et al.*
Case No.: 21-cv-01718-AJB-KSC

IT IS HEREBY CERTIFIED THAT:

I, the undersigned, am a citizen of the United States and am at least eighteen years of age. My business address is 180 East Ocean Boulevard, Suite 200, Long Beach, California 90802.

I am not a party to the above-entitled action. I have caused service of:

**NOTICE OF ERRATA RE: FIRST AMENDED COMPLAINT**

on the following party by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them.

Charles J. Sarosy, Deputy Attorney General
charles.sarosy@doj.ca.gov
300 South Spring Street, Suite 1702
Los Angeles, CA 90013-1230
  *Attorneys for Defendants Governor Gavin Newsom,*
  *Attorney General Rob Bonta, Secretary Karen Ross, and*
  *22nd District Agricultural Association*

Timothy M. White, Senior Deputy
timothy.white@sdcounty.ca.gov
Office of County Counsel, County of San Diego
1600 Pacific Highway, Room 355
San Diego, CA 92101-2469
  *Attorneys for Defendants Summer Stephan, Attorney of*
  *San Diego County and Lonnie Eldridge, County Counsel*
  *of San Diego County*

I declare under penalty of perjury that the foregoing is true and correct.

Executed September 8, 2022.

Laura Palmerin

CERTIFICATE OF SERVICE